# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 49-cv-2782-EWN-CBS**

(Consolidated Cases:  Civil Nos. 2782, 5016 and 5017)

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Civil No. 2782** |

Plaintiff,

v.

NORTHERN COLORADO WATER
CONSERVANCY DISTRICT, *et al.,*

Defendants.

| | |
|---|---|
| In the Matter of the Adjudication of Priorities of Water Rights in Water District No. 36 for Purposes of Irrigation: | **Civil No. 5016** |

**Petitioners:**
THE COLORADO RIVER WATER CONSERVATION DISTRICT
THE GRAND VALLEY WATER USERS ASSOCIATION
ORCHARD MESA IRRIGATION DISTRICT
PALISADE IRRIGATION DISTRICT
GRAND VALLEY IRRIGATION COMPANY, AND
MIDDLE PARK WATER CONSERVANCY DISTRICT

| | |
|---|---|
| In the Matter of the Adjudication of Priorities of Water Rights in Water District No. 36 for Purposes Other Than Irrigation: | **Civil No. 5017** |

**Petitioners:**
THE COLORADO RIVER WATER CONSERVATION DISTRICT
THE GRAND VALLEY WATER USERS ASSOCIATION
ORCHARD MESA IRRIGATION DISTRICT
PALISADE IRRIGATION DISTRICT
GRAND VALLEY IRRIGATION COMPANY, AND
MIDDLE PARK WATER CONSERVANCY DISTRICT

## CLIMAX MOLYBDENUM COMPANY'S PETITION ON INTERVENTION FOR DECLARATORY RELIEF

**INTRODUCTION**

Intervenor Climax Molybdenum Company ("Climax") plans to resume operations at the Climax Mine in 2009, at which time Climax will need to exercise its water rights in-priority. It is anticipated that Climax will invest up to $250 Million in new capital infrastructure at the mine. The dispute described below surrounding the proper administration of Climax's CA 1710 Water Rights with respect to the Green Mountain Hydroelectric Right and Denver's "Power Interference Agreement" casts a shadow over Climax's plans to resume operations at the Climax Mine by raising uncertainty about the mine's ability to operate at full capacity. Climax's CA 1710 Water Rights are essential to the viability of resumed operations at the Climax Mine at its historic levels of production.

Therefore, Climax, by and through its undersigned counsel, hereby petitions this Court as follows:

1)    Seniority of Climax's CA 1710 Water Rights. Climax requests the Court to interpret the judgments and decrees that collectively constitute the Blue River Decree, together with the decrees entered by the Summit County District Court in Civil Actions 1710 and 1806, and enter a declaratory judgment that the Climax Mine's water rights that were adjudicated by the Summit County District Court in Civil Action 1710 ("Climax's CA 1710 Water Rights") are senior in priority to the 1,726 cubic feet per second direct flow hydroelectric right decreed by this Court for Green Mountain Reservoir (the "Green Mountain Hydroelectric Right"); or, alternatively,

2)     Denver's Diversion and Storage of Water under the "Power Interference

Agreement."  If the Court denies Climax's foregoing request and determines that

Climax's CA 1710 Water Rights are junior in priority to the Green Mountain

Hydroelectric Right, Climax requests the Court to address the diversion and storage of

water by the Denver Water Board's ("Denver") Blue River Diversion Project by

interpreting the Blue River Decree, together with Senate Document 80, the April 16,

1964 Decree, and the February 9, 1978 Supplemental Judgment and Decree.  The Blue

River Diversion Project's diversion and storage of water pursuant to the "Power

Interference Agreement" (that Denver entered into with the Bureau of Reclamation

("Bureau") within the 1955 stipulation executed contemporaneously with the Blue River

Decree) may only occur to the extent that Denver's 1946 water rights for the Blue River

Diversion Project ("Blue River Diversion Project's 1946 Water Rights") are in-priority as

against Western Slope water rights other than the Green Mountain Hydroelectric Right.

Denver's Blue River Diversion Project may not divert or store water under the Power

Interference Agreement in contravention of Western Slope water rights that are junior to

the Green Mountain Hydroelectric Right and senior to the Blue River Diversion Project's

1946 Water Rights.  Consequently, under its alternative claim for relief, Climax asks the

Court to enter a declaratory judgment that:  a) Denver's diversion or storage of water

diverted under the Power Interference Agreement is pursuant to the Blue River Diversion

Project's 1946 Water Rights, b) diversions or storage by Denver under the Power

Interference Agreement are junior and subordinate to Climax's CA 1710 Water Rights

(with 1935 and 1936 priority dates), and c) Denver may not divert or store water under

the Power Interference Agreement unless and until Climax's CA 1710 Water Rights are fully satisfied.

Climax's Exhibit Nos. 1 through 19 for this petition are being conventionally filed herewith.

In support of this petition, Climax states the following:

## PARTIES, JURISDICTION, AND VENUE

1.       Climax is a corporation incorporated under the laws of the State of Delaware. Climax owns and operates the Climax Mine, which is located in Summit, Lake, and Eagle Counties in the State of Colorado.  (Area Location Map, Ex. 1)  The Climax Mine owns water rights that divert from Tenmile Creek, a tributary of the Blue River, that were decreed by the District Court for Summit County, Colorado.

2.       The United States of America ("United States") was the applicant for, and is the holder/trustee of, water rights decreed to the Colorado-Big Thompson Project.  The Colorado-Big Thompson Project includes the Green Mountain Reservoir Hydroelectric Plant.  The Green Mountain Reservoir Hydroelectric Plant diverts water from the Blue River under the Green Mountain Hydroelectric Right, and is located in Summit County, Colorado.  (Id.)

3.       The Bureau of Reclamation ("the Bureau") is a department or agency within the United States' Department of the Interior.  The Bureau is responsible for day-to-day administration of water projects constructed pursuant to the Reclamation Act of 1902, 32 Stat. 388, as amended.  Under this authority, the Bureau administers the Colorado-Big Thompson Project and its features, including Green Mountain Reservoir and the Green Mountain Hydroelectric Plant.

4.      Denver owns and operates the Blue River Diversion Project.  The Blue River Diversion Project primarily consists of the Harold D. Roberts Tunnel ("Roberts Tunnel" – a.k.a. "Montezuma Tunnel") and Dillon Reservoir.  Dillon Reservoir is an approximately 252,000 acre feet reservoir located on the Blue River in Summit County, Colorado.  Dillon Reservoir and the Roberts Tunnel are located between the Climax Mine and Green Mountain Reservoir, approximately eighteen miles downstream from the Climax Mine and approximately twenty-eight miles upstream from Green Mountain Reservoir.  (Id.)

5.      Jurisdiction is proper based on the continuing jurisdiction retained by the Court in the above-captioned cases.  Further, the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action arises under the decree of the United States District Court for the District of Colorado in Civil Case Nos. 2782, 5016 and 5017, which was incorporated into statute by federal law on April 11, 1956 at 70 Stat. 110.  Finally, Climax brings this petition according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

6.      Venue is proper in this court as a continuing matter under the retained jurisdiction of this Court, and pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims herein occurred in this district, and a substantial part of the property that is the subject of this action is situated in this district.

**SUPPORTING ALLEGATIONS**

7.      On June 9, 1934, a supplemental water rights adjudication for purposes other than irrigation was initiated for the Blue River in Colorado Water District No. 36, in the District Court for Summit County, State of Colorado (the "Summit County Court"), Civil Action No. 1710 ("CA 1710").  Climax moved to intervene and filed its petition in CA 1710 to obtain a decree for several water rights on the Blue River, including Supply Canal No. 1 and Supply Canal No. 2.

Climax also filed a petition and ditch claim statements for the Ten Mile Diversion Ditch No. 1, the Ten Mile Diversion Ditch No. 2, and the Chalk Mountain Ditch.

8.    On or about October 26, 1937, the Summit County Court entered its decree in CA 1710, granting priority numbers to ditches and canals ranging from Priority Number 69 to Priority Number 105-C.  (CA 1710 Findings and Decree, Ex. 2)  Climax's CA 1710 Water Rights received the following priority numbers and priority dates:  Supply Canal No.1, Priority Number 99-C, Aug. 15, 1935; Supply Canal No. 2, Priority Number 100-C, Aug. 15, 1935; Ten Mile Diversion Ditch No. 1, Priority Number 103-C, June 4, 1936; Ten Mile Diversion Ditch No. 2, 104-C, June 4, 1936; and Chalk Mountain Ditch, Priority Number 105-C, June 4, 1936.[1] (Id. at 10, 12)

9.    In 1942, Denver brought Civil Action 1806 ("CA 1806") in the Summit County Court as a supplemental adjudication of water rights in the Blue River, Water District No. 36, for purposes other than irrigation.  Denver sought to adjudicate the water rights of its Blue River Diversion Project.

10.    Notice of CA 1806 was published on or about August 20, 1942, and included the following language:  "Provided, any decree entered in this proceeding shall be subject to all valid decrees, original or supplemental, heretofore entered in Water District No. 36, and no such prior decree shall be in any manner changed or modified in this proceeding."  (CA 1806 Notice, Ex. 3)

11.    On or about January 19, 1944, the United States and the Northern Colorado Water Conservancy District ("Northern") filed a joint Petition and Statement of Claim in CA 1806 for

---

[1]    The letter "C" in these priority numbers denoted the fact that those water rights were decreed as conditional water rights.  Climax's conditional water rights that were adjudicated in CA 1710 were made absolute in subsequent years.

Green Mountain Reservoir, the Elliott Creek Feeder Canal, and the Green Mountain Hydroelectric Plant.[2]  (United States/Northern Statement of Claim, CA 1806, Ex. 4)

12.    On or about June 8, 1949, the United States filed its complaint with this Court in Case No. 2782 ("Case No. 2782") against Northern, the Colorado River Water Conservation District (the "River District"), the Palisade Irrigation District, Denver, the Moffat Tunnel Water & Development Company, the City of Colorado Springs, Public Service Company of Colorado, and the South Platte Water Users Association.  (United States Complaint, Case No. 2782, Ex. 5) By this complaint, among other relief, the United States sought a declaration of the respective rights of Northern, the River District, and the interests they represent in the operation of the Colorado-Big Thompson Project under Senate Document 80.[3]  (Id. at 18-19)  The United States also sought an adjudication of all water rights associated with the Colorado-Big Thompson Project, including the water rights for Green Mountain Reservoir and the Green Mountain Hydroelectric Plant.  (Id.)

13.    In Case No. 2782 the United States also sought to quiet title to water rights against certain named appropriators from the eastern slope of Colorado, including Denver, the Moffat Tunnel Water & Development Company, and the City of Colorado Springs.  (Id.)

14.    The United States did not name Climax as a Defendant in Case No. 2782.  (Id.)

_____

[2]    The water right for the Elliot Creek Feeder Canal, a component of the Colorado-Big Thompson Project, was also part of the statement of claim.  This water right is located on Elliot Creek and is not directly downstream from Climax's water rights.  Accordingly, Climax's petition for declaratory relief does not include the water rights for the Elliot Creek Feeder Canal. Climax respectfully reserves the right to seek to amend its petition if discovery reveals that Climax's CA 1710 Water Rights could be subject to a call from the water rights for the Elliot Creek Feeder Canal.

[3]    A copy of Senate Document 80 was attached to the United States' Complaint.  (United States Complaint, Case No. 2782, Ex. 5)

15.     On or about July 11, 1949, and after the filing of Case No. 2782, the United States filed its notice of withdrawal of claims in CA 1806.

16.     On or about July 11, 1949, the River District filed a statement of claim in CA 1806 for water rights to Green Mountain Reservoir and its associated structures, alleging that it was a beneficiary of Senate Document 80 and that Green Mountain Reservoir was constructed for its benefit.

17.     The Summit County Court entered its decree in CA 1806 on or about March 10, 1952, denying the River District's statement of claim for water rights for Green Mountain Reservoir and associated structures.  (CA 1806 Judgment and Decree, Ex. 6 at 5)  No water rights were decreed in CA 1806 by the Summit County Court for Green Mountain Reservoir or the Green Mountain Hydroelectric Plant.  (Id.)

18.     In the CA 1806 decree, the Summit County Court granted water rights to Denver's Blue River Diversion Project.  Dillon Reservoir was decreed a 252,678 acre feet storage right with a June 24, 1946 priority date.  (Id. at 12)  In addition, the Roberts Tunnel was decreed a 788 cubic feet per second ("c.f.s.") water right with a June 24, 1946 priority date.  (Id. at 61-62)

19.     The last priority number decreed in CA 1710 to ditches or canals was Priority Number 105(C).  (CA 1710 Findings and Decree, Ex. 2 at 12)  The priority numbers that were decreed by the Summit County Court in CA 1806 for ditches and canals were subsequent, ranging from Priority Number 106, with a December 31, 1892 appropriation date, to Priority Number 150(C), with a May 13, 1948 appropriation date.  (CA 1806 Decree, Ex. 6 at 8-10)

20.     The decree in CA 1806 stated:  "[N]othing herein contained shall be held, deemed or construed to change the date of appropriation or volume or quantity of water appropriated or

the time of appropriation or the manner of use, or to in any other way change or modify or adversely affect decrees of this Court heretofore entered." (Id. at ¶ 4)

21.     Denver appealed the 1946 priority dates that the Summit County Court adjudicated for Blue River Diversion Project to the Supreme Court for the State of Colorado, and the River District cross-appealed the Summit County Court's denial of water rights for Green Mountain Reservoir and Green Mountain Hydroelectric Plant.  The supreme court upheld the Summit County Court's judgment regarding the Blue River Diversion Project's 1946 priority dates.  However, the supreme court reversed the Summit County Court with respect to the water rights for Green Mountain Reservoir and the Green Mountain Hydroelectric Plant, and remanded CA 1806 and CA 1805 (which adjudicated rights on the Blue River for purposes of irrigation) to the Summit County Court for entry of a decree regarding only water rights on the Blue River for Green Mountain Reservoir and the Green Mountain Hydroelectric Plant.  See City and County of Denver v. Northern Colo. Water Conservancy Dist., 130 Colo. 375, 276 P.2d 992 (1955).

22.     Upon remand to the Summit County Court, the United States was served notice pursuant to the McCarran Amendment, 43 U.S.C. § 666, and entered its appearance in CA 1805 and 1806.  On May 5, 1955, the United States petitioned to remove the cases to the federal District Court.  Removal was effectuated, and the cases were renumbered in federal court as Case Nos. 5016 and 5017 (the "Removed Summit County Cases").  Case Nos. 5016 and 5017 were subsequently consolidated for purposes of trial with Case No. 2782 (collectively, the "Consolidated Cases").

23.     The "Blue River Decree" as it was entered by the Court on October 12, 1955, actually consists of two separate sets of documents – one set for the Consolidated Cases, and one set for the Removed Summit County Cases.  As described in greater detail below, during the

morning of October 12, 1955, the Court was prepared to enter a "Findings of Fact and

Conclusions of Law and Final Decree" in Case Nos. 5017, 5016 and 2782 (i.e., the Consolidated

Cases); this set of documents consisted of a "Findings of Fact and Conclusions of Law" for all

three cases, and a "Final Decree" for all three cases.  (Findings of Fact and Conclusions of Law,

and Final Decree, Case Nos. 5017, 5016 and 2782, Ex. 7)  However, in the context of the Court's

consideration of this set of documents, counsel for the River District insisted on a separate set of

documents for Case Nos. 5016 and 5017 (i.e., the Removed Summit County Cases ).  The reason

the River District insisted on a separate set of documents for Case Nos. 5016 and 5017 was to

insure that the water rights adjudicated by the federal District Court would be administered in

accordance with water rights priorities that had been previously awarded in earlier adjudications

by the Summit County Court.

     24.    In response to the River District's concerns, the Court entered two sets of

documents on the afternoon of October 12, 1955.  The first set of documents was the "Findings

of Fact and Conclusions of Law, and Final Judgment" for Case Nos. 5016 and 5017 (i.e., the

Removed Summit County Cases), but not Case No. 2782 (the federal quiet title action).

(Findings of Fact and Conclusions of Law, and Final Judgment, Case Nos. 5016 and 5017, Ex. 8)

This first set of documents consisted of a "Findings of Fact and Conclusions of Law" and a

"Final Judgment," but did not include a "Final Decree."

     25.    The second set of documents was the "Findings of Fact and Conclusions of Law,

and Final Decree" for Case Nos. 5016, 5017 and 2782 (i.e., the Consolidated Cases).  (Findings

of Fact and Conclusions of Law, and Final Decree, Case Nos. 5017, 5016 and 2782, Ex. 7)  This

second set of documents consisted of a "Findings of Fact and Conclusions of Law" and a "Final

Decree," but did not include a "Final Judgment."

26.     The "Final Judgment" entered in Case Nos. 5016 and 5017 (Ex. 8 at folio pp. 248-60) was the reason that two sets of documents were entered for the different proceedings.  It was the document selected by the parties and the Court to insure that the water rights adjudicated by the federal District Court would be administered in accordance with water rights priorities that had been previously awarded in earlier adjudications by the Summit County Court.

27.     The history of the events that led to the entry of these documents is as follows.  On the eve of trial on October 5, 1955, a "general theory of the stipulation" was announced by the parties in Court.  (October 5, 1955 Transcript, Ex. 9 at 3)  The signed stipulation was provided to the Court the evening of October 5, 1955.  (October 6, 1955 Transcript, Ex. 10 at 19)

28.     In the days following the submittal of the stipulation to the Court, the parties negotiated and drafted the language and terms of the documents that now constitute the Blue River Decree.  In addition, hearings were conducted in which the United States presented its prima facie case.

29.     On October 11, 1955, while the documents that now constitute the Blue River Decree were being drafted, counsel for the River District, Mssrs. Frank Delaney and John Barnard, tendered to the Court identical motions in Case Nos. 5016 and 5017 entitled "Motion and Request for the Entry of Separate Findings of Fact, Conclusions of Law, and Judgment." (Motion and Request for Entry of Separate Findings of Fact, Conclusions of Law, and Judgment, Case No. 5017, Ex. 11.  See also, October 11, 1955 Transcript, Ex. 12 at 190-91)  While conferring about the reason for the River District's motion, the Court and Mssrs. Delaney and Barnard had the following discussion:

> MR. BARNARD:     May I say one word I hope will clarify the situation?  5016 and 5017 are two cases which came to this Court on removal from the District Court of Summit County.  They came to the District Court of Summit County upon a remand by

the [Colorado] Supreme Court with certain specific directives, which were that there should be awarded on the claim statement of someone to the Green Mountain Reservoir and Power Plant, the priorities of right to the use of water to which the evidence should disclose they were entitled.

Now, as I say, that function – or let me say first, the decrees heretofore entered by the Summit County District Court are not complete until they are supplemented by the decree which Judge Luby under the remand would have entered but which now must be entered by Your Honor, having been removed to this Court. *The Findings of Fact, Conclusions of Law, Final Decree and Final Judgment, for example, on which we have been working, while they fix a priority date, are completely barren of the assignment of any priority numbers which are necessary to be assigned in order that hereafter the water officials may administer those decrees,* and, as I see it, one of the functions to be performed by the Findings of Fact, Conclusions of Law and Judgment to be tendered by Mr. Delaney is to provide a thing which may be sent by this Court to the District Court of Summit County to be integrated with that as yet incomplete decree in Summit County District Court.

THE COURT:        Well, I don't quite understand your position on that.  I can understand it down to the point about being sent to the District Court of Summit County, I agree that it probably should be recorded, just as a decree of that court would.  But I don't think that on any removal case the judgment of this Court goes back to the State Court.  I mean, we enter the judgment here.

MR. BARNARD:        That is correct.  But there are in the decree, for example –

THE COURT:        *You are saying, in effect, that you think the decree here in 5016 and 5017 should be in the form that would be entered in the State Court, is that right?*

MR. BARNARD:        *Something to that effect, but it should assign priority numbers.*

THE COURT:        Well, that is a matter, I expect, that can be established from the file you have here or something.  *Where would you get the numbers?*

MR. BARNARD:        *You would have to take them from the decree of the District Court of Summit County and Mr. Delaney in his prepared form has assigned priority numbers which fit in with the priority numbers in that decree, isn't that right, Mr. Delaney?*

MR. DELANEY:        *That's right.*

(Id. at 196-98 (emphasis added)).

30.      After hearing the position of the United States on the issue, and after hearing from

counsel for the River District and the United States on the mechanics and proof by which such

priority numbers would be determined (id. at 198-203), the Court stated the following:

> THE COURT:          I wish you gentlemen would talk about that.  I am willing
> to concede that from a practical standpoint if there could be numbers included in here to
> correspond to the State Decrees and it was absolutely certain that the numbers would be
> accurate enough that they wouldn't get confused with any other state numbers or change
> anybody's position by reason of a number rather than a priority date, that there might be
> some virtue to getting the numbers in.  I am thinking just from a practical angle because
> everyone on the stream usually knows the numbers of the other's priority, not the date of
> the priority but the number, and if there is any way of giving them numbers that are
> accurate, I don't quite see how there could be any objection to that.  On the other hand,
> unless you are absolutely sure of that and there is some basis for doing it, I would rather
> proceed on the priority date because that could be ascertained by the state authorities in
> the administration of water on that basis.  It may not have a number, that would be
> established, but it would be different than the ordinary practice.  I think the standard
> practice in all the state adjudications is to have a decree  number.  Whether you can find
> that out from the record here I don't know.

(Id. at pp. 203-04)  After further discussion about the appropriate procedure to follow, the Court

stated:

> THE COURT:          I am expressing no view on the thing because it is
> something new as to what can be done, but I can see immediately the advantage of
> having number decrees on the thing to correspond with the state numbers on the other
> decrees, on the subsequent and prior decrees, because if there is another adjudication or
> something else that isn't removed to this Court they will start numbering off of the other
> list, probably, and there might have to be some clarification on these decrees.  Everyone
> should be interested in that because you are all claiming some benefit under these
> decrees.  I think you better talk that matter over and see what you can come up with and
> we will try to expedite it as much as we can.

(Id. at 205-06)  The October 11, 1955 hearing subsequently adjourned after further discussion

about tangential procedural issues.

31.      The Court reconvened the Consolidated Cases the following day, October 12,

1955, at 9:30 a.m.

THE COURT:        Mr. Veeder [counsel for the United States] handed me this morning what I assume are the new Findings of Fact and Conclusions of Law and Final Judgment, so entitled, and another called Findings of Fact and Conclusions of Law and Final Decree.  I haven't had time to examine them in detail.  I wondered, Mr. Delaney, have you looked at these?

MR. DELANEY:        I am a little confused on terminology.  I think, so far as the Final Decree is concerned, it determines the issues in [Case No.] 2782.  The other one [i.e., the United States' proposed Findings of Fact and Conclusions of Law and Final Judgment for Case Nos. 5016 and 5017], as I see it, doesn't conform to the administrative system established by state law and that would leave the officers of the State of Colorado who have to administer water rights in hopeless confusion, wholly unworkable in my judgment.

THE COURT:        Have you tendered to the conference [of attorneys drafting the judgments and decrees] or anyone the changes that you think should be made or the things that you think should be included?

MR. DELANEY:        I have proposed a form I am ready to submit Your Honor.  Maybe an examination of the form would disclose the difference in the ideas more clearly than any oral statement to the Court could possibly do.

THE COURT:        Well, have you submitted that form to the conference [of attorneys drafting the judgments and decrees]?

MR. DELANEY:        I have submitted that form, Your Honor.  I found it necessary to rewrite two pages.

(October 12, 1955 Transcript, Ex. 13 at 222-23)

32.    The document that Mr. Delaney "found necessary to rewrite" by submitting his "two page form" to the Court, and to the conference of attorneys drafting the judgments and decrees, was the "Final Judgment" for Case Nos. 5016 and 5017.

33.    After confirming that none of the parties had any objections to the proposed "Findings of Fact and Conclusions of Law, and Final Decree" for Case Nos. 5016, 5017 and 2782 (Ex. 7), the Court instructed counsel for the United States (Mr. Veeder) as follows:

THE COURT:        What occurs to me is that you might retire and look at Mr. Delaney's suggested two-page change in the Final Judgment [for Case Nos. 5016 and 5017] here and see if that can be incorporated in the matter the way you have prepared it.

He has changed two pages, apparently.  Now, as I indicated last night, if you can with certainty and sureness put in the decree numbers, I think there would be some virtue to that from an administrative standpoint.  I think the statute, which I have looked at since we met yesterday, as I read it, provides that that may or may not be done, that numbers may or may not be given to the various decrees in the Court's discretion.  However, I may be a little bit sensitive to the advantage of having numbers in from an experience I recall a great many years ago, where in one water district there had been one adjudication, I think out of a number, in which numbers had not been included in the decree, simply the date of the priority, whereas in the other adjudication numbers had been given.  I know that that caused them confusion in the examination of titles and also in the administration of the water rights because it was necessary for the water officials or for anyone checking the title, not only to check the decrees on the subsequent and prior adjudications which were designated by number, as to the number, but also as to the date of the appropriation.  In other words, the numbers meant nothing without checking the date of the appropriation just because of this one adjudication that didn't give numbers.

I would think here it is just purely a mechanical proposition of looking at Mr. Delaney's suggestions and seeing if that can be incorporated in the Final Judgment.  He said it is just a two-page change.

MR. VEEDER:        We will certainly be pleased to do that, Your Honor.

(October 12, 1955 Transcript, Ex. 13 at 223-25).

34.        After hearing the final testimony in the United States' prima facie case, the Court

and counsel for the parties discussed the final mechanics for assembling and drafting the

judgment and decree for the proceedings.  During the course of these discussions, the Court

twice emphasized the importance of addressing the priority issue that had been raised by the

River District:

THE COURT:        Well, I think the thing to do now is for you gentlemen to consider these suggestions of Mr. Delaney and see if they can be incorporated in the order you have already drawn, or the Final Judgment, without affecting it.  I gather from what Mr. Delaney says, I haven't seen the form he has prepared, that he thinks this is deficient in not having additional recitals and, of course, as I indicated yesterday I think everybody is entitled, who desires, to have the matter in such form that there can be no question about the effect of the decree, etc.  So [Mr. Veeder] you might briefly look into that matter and see whether you can reach any agreement about the inclusion of these matters he is talking about in the Final Judgment.

*        *        *        *        *

THE COURT:        All right.  I think that takes care of all the loose ends that I
reserved rulings on.  So if you gentlemen will look over this matter that Mr. Delaney has,
with the idea of possibly including it in the Final Judgment, in the form prepared, you
may report back to the Court whenever you are ready.

(Id. at 229, and 232-33)

35.        The Court then adjourned the proceeding while the Final Judgment in 5016 and

5017 was modified to address the River District's concerns.  The Court reconvened at 3 p.m. that

afternoon and entered the documents that collectively constitute what is referred to as the "Blue

River Decree" -- the "Findings of Fact and Conclusions of Law, and Final Judgment" for Case

Nos. 5016 and 5017 (Ex. 8), and the "Findings of Fact and Conclusions of Law, and Final

Decree" for Case Nos. 5016, 5017 and 2782 (Ex. 7).  (October 12, 1955 Transcript, Ex. 13 at

239-240)

36.        The Green Mountain Hydroelectric Right is Junior to Climax's CA 1710 Water

Rights.  To reiterate, the Final Judgment entered in Case Nos. 5016 and 5017 (Ex. 8 at folio pp.

248-60) was the reason that two sets of documents were entered for the different proceedings.

The Final Judgment determined that the priority date of the Green Mountain Hydroelectric Right

was August 1, 1935, and awarded the Green Mountain Hydroelectric Right priority number

122B.  (Findings of Fact and Conclusions of Law, and Final Judgment, Case Nos. 5016 and

5017, Ex. 8 at folio p. 259)  This priority number is subsequent to the priority numbers

previously assigned by the Summit County Court to Climax's CA 1710 Water Rights, which

were:  Supply Canal No. 1, Priority Number 99; Supply Canal Number 2, Priority Number 100;

Ten Mile Diversion Ditch Number 1, Priority Number 103; Ten Mile Diversion Ditch Number 2,

Priority Number 104; and Chalk Mountain Ditch, Priority Number 105.  (CA 1710 Findings and

Decree, Ex. 2 at 12)  A review of the CA 1806 decree entered by the Summit County Court

before the case was removed to federal District Court shows that the 1806 decree contains the

intervening priority numbers between Climax's Chalk Mountain Diversion Ditch (Priority

Number 105) and the Colorado-Big Thompson Project's Elliott Creek Feeder Canal and Green

Mountain Reservoir Hydroelectric Plant priorities (Priority Numbers 122A and 122B,

respectively), starting with Priority Number 106 for the "Tenderfoot Ditch" through Priority

Number 122 for the "Smith Pipeline."  (CA 1806 Judgment and Decree, Ex. 6 at 8-10)

37.     The ordering of the priority number for the Green Mountain Hydroelectric Right,

relative to the ordering of the priority numbers of the water rights decreed in CA 1710 and CA

1806, clearly establishes that this Court intended for the Green Mountain Hydroelectric Right to

be administered by state water officials as junior to the rights previously decreed by the Summit

County Court in CA 1710, including Climax's CA 1710 Water Rights.  This is further confirmed

by the transcripts cited above of the 1955 proceedings that led to the entry of the Blue River

Decree.

38.     The Findings of Fact and Conclusions of Law entered in the Blue River Decree

also contain at paragraph 4(b) of the stipulation the so-called "Power Interference Agreement"

between Denver and the United States, which states:

> 4(b)     The City and County of Denver and the City of Colorado Springs in
> consideration of the agreement by the United States of America to permit the use of
> rights to the use of water by those municipalities as provided in this Stipulation will
>
> (1)     Deliver or cause to be delivered to the United States of America electrical
> energy at Green Mountain Substation or such other place or places to be designated by
> the Secretary of the Interior within a radius of eighty-five miles airline from Denver and
> all costs of delivery to be borne by the aforesaid municipalities.
>
> (2)     The electrical energy herein provided for will be delivered to the United
> States in substantially the same amounts, at approximately the same hours and at
> substantially the same rates of delivery that would have been generated by the Green

Mountain Powerplant had it not been for the diversions of the waters by the municipalities in question.

Should the City and County of Denver and the City of Colorado Springs or either of them decide to let any other person, corporation or entity use the power drop from such water at any time, such agreement for such use shall be subject to the regulation and approval of the Secretary of the Interior of the United States.

(Findings of Fact and Conclusions of Law, and Final Decree, Case Nos. 5017, 5016 and 2782, Ex. 7 at Bates 33[4]; and Findings of Fact and Conclusions of Law, and Final Judgment, Case Nos. 5016 and 5017, Ex. 8 at folio p. 231)

39.     The Power Interference Agreement is contained in the stipulation between the parties that was incorporated into the Blue River Decree's Findings of Fact and Conclusions of Law.  Denver contends that when the Blue River Diversion Project diverts or stores water out-of-priority against the Green Mountain Hydroelectric Right under the Power Interference Agreement, such diversion or storage of water occurs under the Green Mountain Hydroelectric Right's August 1, 1935 priority date.  However, nowhere in the Final Judgment for Case Nos. 5016 and 5017 (Ex. 8 at folio pp. 248-60) or the Final Decree for Case Nos. 5016, 5017 and 2782 (Ex. 7 at Bates 50-66), is any water right decreed for Denver pursuant to the Power Interference Agreement.  Nor was the priority for the Green Mountain Reservoir Hydropower Right transferred or changed to the Blue River Diversion Project.  Instead, the Blue River Diversion Project's diversion or storage of water pursuant to the Power Interference Agreement is under the Blue River Diversion Project's 1946 Water Rights only.

40.     In 1964, a dispute arose between the parties to the Blue River Decree about Denver's right to store Green Mountain Reservoir water in Dillon Reservoir in anticipation of a

---

[4]     The Bates numbers on this exhibit were not on the original.  Bates numbers were affixed by Climax to the exhibit copy for ease of reference.

Green Mountain Reservoir fill. This dispute ultimately led to the April 16, 1964 Decree, which

clarified the rules by which Dillon Reservoir could store in anticipation of a Green Mountain

Reservoir fill. (April 16, 1964 Decree, Ex. 14)

41.    In 1977, a dispute arose between the parties to the Blue River Decree about the

nature of Denver's rights with respect to Green Mountain Reservoir pursuant to the stipulations

and decrees entered in 1955 and 1964. Unlike many decrees entered in the history of this

proceeding, the 1977 dispute did not result in a stipulation between the parties. Rather,

following a Memorandum Opinion and Order entered by the Court on November 2, 1977

(Memorandum Opinion and Order, Nov. 2, 1977, Ex. 15), the Court entered a Supplemental

Judgment and Decree on February 9, 1978 which determined "Denver's rights as to the operation

of Green Mountain Reservoir" under the "Judgments and Decrees of this Court of October 12,

1955, and April 16, 1964." (Supplemental Judgment and Decree, February 9, 1978, Ex. 16) At

paragraph 4(b) of the February 9, 1978 Supplemental Judgment and Decree, the Court

determined Denver's rights under the "Power Interference Agreement" as follows:

> 4(b)    *Following completion of the annual filling of Green Mountain Reservoir*
> under the senior right of the United States, subject to the approval of the Secretary of the
> Interior, Denver has a right to divert flows in the Blue River at Dillon Reservoir in
> contravention of the senior power generation right of the United States (which is in the
> amount of 1726 c.f.s.) *if such diversions by Denver would otherwise be in priority*;
> provided, however, that acceptable arrangements for power replacement are tendered to
> the United States by Denver as stipulated in the 1955 and 1964 Judgments and Decrees.

(Id. at 2-3 (emphasis added))

42.    Denver May Not Benefit from the Green Mountain Hydroelectric Right to the

Detriment of Western Slope water users, such as Climax. The limitation of paragraph 4(b) of the

February 9, 1978 Supplemental Judgment and Decree that diversions by Denver under its

"Power Interference Agreement" may only occur when "such diversions by Denver would

otherwise be in priority" prohibits Denver from diverting and storing under the Power

Interference Agreement in contravention of Western Slope water rights that are junior to Green

Mountain Reservoir's Hydroelectric Right but are senior to the Blue River Diversion Project's

1946 Water Rights.  This limitation is necessary in order to prevent Denver from improperly

benefiting from the Colorado-Big Thompson Project by using the Green Mountain Hydroelectric

Right's 1936 priority to enable the Blue River Diversion Project to divert or store water to the

detriment of Western Slope water users.

43.     The historic beneficial use of Climax's CA 1710 Water Rights occurred entirely

within the Western Slope of Colorado.  The Climax Mine was in full operation from the

adjudication of the CA 1710 Water Rights in 1937 until 1984, and was <u>never</u> administered as

junior to the Green Mountain Hydroelectric Right or the Blue River Diversion Project's 1946

Water Rights.  During the severe drought year of 1977, the Blue River Diversion Project was

required to stop diverting and storing water, but Climax's water rights were not curtailed.

Indeed, total water consumption at the Climax Mine in 1977 was approximately 6,352 acre feet –

the third highest year in the mine's history.  However, due to a collapse of the molybdenum

market in the early 1980's, the Climax Mine generally did not operate from 1984 through the

present.

44.     On August 28, 1962, Climax moved to intervene in Case No. 5017.  Climax

moved to intervene because Denver had asserted in a Summit County Court diligence proceeding

involving one of Climax's CA 1710 Water Rights that the removal of Civil Action 1806 to the

federal District Court had divested the Summit County Court of jurisdiction over Climax's CA

1710 Water Rights.  (Motion of American Metal Climax, Inc. to Intervene, Case No. 5017, Ex.

17)[5]  Climax's motion to intervene in Case No. 5017 was denied by the Court on June 21, 1963.

(Order Denying Motion of American Metal Climax, Inc. to Intervene, June 21, 1963, Ex. 18)

Although the Court specifically determined that "[t]he representation of the interests of [Climax],

by existing parties to Civil Actions Nos. 2782, 5016 and 5017 is inadequate," it further

concluded that "[Climax] is not and will not be bound by the judgment of this Court in these

consolidated actions entered October 12, 1955, or by any future judgment, order or decree of this

Court entered in the Consolidated Cases."  (Id. at ¶ 12)  The Court concluded that "[u]nder the

laws of the State of Colorado this Court can take no action in the removed Civil Action No. 1806

affecting the vested property rights of [Climax], which it has obtained in Civil Action No. 1710."

(Id. at ¶ 11)

          45.     In 1992 Climax filed a large change of water rights application with the Water

Court for Division No. 5, Case Nos. 92CW233 and 92CW336, to quantify the historic

consumptive use of its water rights and make the decreed points of diversion of the water rights

consistent with the actual locations of the rights (which had been altered over the years due to

mining activities).  Nineteen parties filed statements of opposition to the application, including

Denver.  A sixty-six page final decree was entered by the Division No. 5 Water Court in this

matter on January 8, 2001.  (Findings of Fact, Conclusions of Law, Judgment and Decree, Case

Nos. 92CW233 and 92CW336, Ex. 19)  The decree confirmed the historic consumptive use of

Climax's water rights at 8,125 acre feet in a peak production year, and 5,333 acre feet over a five

---

[5]       Climax Molybdenum Company is a successor in interest to American Metal Climax, Inc.

year average, and authorized the continued use of the water rights at the Climax Mine.[6]  (Id. at

¶ 6.4)

46.    During the late 1990's the Colorado State Engineer's tabulation of water rights for

Water Division 5 listed Climax's CA 1710 Water Rights as subordinate to the Green Mountain

Hydroelectric Right, but not to the Blue River Diversion Project's 1946 Water Rights.  However,

the State Engineer's tabulation is not authoritative, see C.R.S. § 37-92-401(11) ("the relative

listing of water rights in a tabulation shall not create any presumption of seniority") and

Consolidated Home Supply v. Town of Berthoud, 896 P.2d 260, 264-65 (Colo. 1995).

Additionally, the issue of the relative priorities between Climax's CA 1710 Water Rights versus

the Green Mountain Hydroelectric Right and the Blue River Diversion Project's 1946 Water

Rights was not ripe because the Climax Mine was not operating and, thus, Climax had no need to

use its CA 1710 Water Rights.

47.    During a February 18, 2005 meeting of Colorado River water users, Climax's

representatives were informed by the Colorado State Engineer that the State Engineer's office

would administer the Green Mountain Hydroelectric Right as senior to Climax's CA 1710 Water

Rights.  The Colorado State Engineer also stated that the Blue River Diversion Project's 1946

Water Rights would be administered as senior to Climax's CA 1710 Water Rights when Denver

diverts or stores water under the Power Interference Agreement.

48.    Climax plans to resume operations at the Climax Mine in 2009, at which time

Climax will need to exercise its full rights in-priority.  It is anticipated that Climax will invest up

---

[6]    Including Climax's Arkansas Well water right, which is tributary to the Arkansas Basin
and was not included in 92CW233 and 92CW336, Climax's historic consumptive use in a peak
production year is 8,911 acre feet, and 6,119 acre feet over a long-term average.

to $250 Million in new capital infrastructure at the mine. The current uncertainty surrounding the proper administration of Climax's CA 1710 Water Rights with respect to the Green Mountain Hydroelectric Right and Denver's Power Interference Agreement casts a shadow over Climax's plans to resume operations at the Climax Mine by raising uncertainty about the mine's ability to operate at full capacity. The CA 1710 Water Rights represent approximately thirty-five to thirty-nine percent of the yield of the Climax Mine's portfolio of water rights, and are essential to the operational viability of resumed operations at the Climax Mine at its historic levels of production.

49.    Statements by state water administration officials that the Green Mountain Hydroelectric Right will be administered as senior to Climax's CA 1710 Water Rights causes uncertainty and insecurity about the availability of water to the Climax Mine, which in turn creates uncertainty and insecurity about the operational capacity of the Climax Mine and Climax's planned investments therein.

50.    Statements by state water administration officials that the Blue River Diversion Project will be administered as senior to Climax's CA 1710 Water Rights when Denver diverts or stores water under the Power Interference Agreement causes uncertainty and insecurity about the availability of water to the Climax Mine, causing uncertainty and insecurity about the operational capacity of the Climax Mine and Climax's planned investments therein.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Declaratory Judgment that Climax's CA 1710 Water Rights Are Senior to the Green Mountain Hydroelectric Right

51.    Climax incorporates the forgoing paragraphs herein by reference as though fully set forth herein.

52. Climax holds the following water rights decreed in CA 1710: Supply Canal No.1, Priority Number 99, Aug. 15, 1935; Supply Canal No.2, Priority Number 100, Aug. 15, 1935; Ten Mile Diversion Ditch No. 1, Priority Number 103, June 4, 1936; Ten Mile Diversion Ditch No. 2, Priority Number 104, June 4, 1936; and Chalk Mountain Ditch, Priority Number 105, June 4, 1936.

53. After entry of the decree in CA 1710, water rights were decreed in Case No. 5017 for the Green Mountain Hydroelectric Right. The Green Mountain Hydroelectric Right was decreed with Priority Number 122B. The priority number decreed to the Green Mountain Hydroelectric Right is junior and subordinate to the priority numbers decreed to Climax in CA 1710.

54. Climax requests a declaration that its CA 1710 Water Rights are senior in priority to the Green Mountain Hydroelectric Right.

<u>Second, Alternative, Claim for Relief</u>
**Declaratory Judgment Regarding the Storage or Diversion of Water by the Blue River Diversion Project Under the Power Interference Agreement**

55. Alternatively, if the Court denies Climax's first claim for relief and determines that Climax's CA 1710 Water Rights are junior in priority to the Green Mountain Hydroelectric Right, Climax requests the Court to grant Climax's second claim for relief below.

56. Climax incorporates the forgoing paragraphs herein, except for paragraphs 51-54, by reference as though fully set forth herein.

57. The facilities contained within Denver's Blue River Diversion Project are not structures included in the Colorado-Big Thompson Project, and the Power Interference Agreement has not been decreed as a water right with a priority date.

58.     Denver is barred by Senate Document 80, as well as by the various judgments and decrees entered by this Court, from benefiting from the Colorado-Big Thompson Project.

59.     Climax's CA 1710 Water Rights are senior to the Blue River Diversion Project's 1946 Water Rights, under which rights Denver diverts and stores water under the Power Interference Agreement.

60.     The Blue River Diversion Project's diversion or storage of water pursuant to the Power Interference Agreement may only occur to the extent that the Blue River Diversion Project's 1946 Water Rights are in-priority as against Western Slope water rights other than the Green Mountain Hydroelectric Right.  The Blue River Diversion Project may not divert or store water under the Power Interference Agreement in contravention of Western Slope water rights that are junior to the Green Mountain Hydroelectric Right and senior to the Blue River Diversion Project's 1946 Water Rights.

61.     Climax requests a declaration that:  a) Denver's diversion or storage of water under the Power Interference Agreement is pursuant to the Blue River Diversion Project's 1946 Water Rights, b) diversions or storage by Denver under the Power Interference Agreement are junior to Climax's CA 1710 Water Rights, and c) Denver may not divert or store water under the Power Interference Agreement unless and until Climax's CA 1710 Water Rights are fully satisfied.

WHEREFORE, Climax requests the Court to declare:

That Climax's CA 1710 Water Rights are senior in priority to the Green Mountain Hydroelectric Right.

Alternatively, Climax requests the Court to declare:

      1)     That Denver's diversion or storage of water under the Power Interference

Agreement is pursuant to the Blue River Diversion Project's 1946 Water Rights;

      2)     That diversions or storage by Denver under the Power Interference

Agreement are junior and subordinate to Climax's CA 1710 Water Rights; and

      3)     That Denver may not divert or store water under the Power Interference

Agreement unless and until Climax's CA 1710 Water Rights are fully satisfied.

Respectfully submitted this 5th day of April, 2007.

RYLEY CARLOCK & APPLEWHITE

s/ Brian M. Nazarenus
1999 Broadway, Suite 1800
Denver, Colorado 80202
Telephone: (303) 863-7500
Facsimile: (303) 595-3159

ATTORNEYS FOR PLAINTIFF-INTERVENOR
CLIMAX MOLYBDENUM COMPANY

Plaintiff-Intervenor's Address:

1746 County Road 202
P.O. Box 68
Empire, CO  80438