IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

Civil Action No. 49-cv-02782-EWN-CBS

Consolidated Civil Case Nos. 2782, 5016 and 5017 and

DISTRICT COURT, WATER DIVISION NO. 5, STATE OF COLORADO
Case No. 06CW255

---

CONCERNING THE APPLICATION FOR WATER RIGHTS OF THE CITY AND COUNTY OF DENVER, ACTING BY AND THROUGH ITS BOARD OF WATER COMMISSIONERS, IN SUMMIT COUNTY

---

CLIMAX MOLYBDENUM COMPANY'S STATUS REPORT

---

COMES NOW Climax Molybdenum Company ("Climax"), by and through its undersigned counsel, and hereby submits this status report for the magistrate's consideration at the Rule 26(f) conference to be held on April 17, 2008.

**I.    STATEMENT OF THE CASE**

This case involves an application by the City and County of Denver, acting by and through its Board of Water Commissioners ("Denver") for a finding of reasonable diligence and for a finding that a portion of the water right has been made absolute. Denver filed its application with both this Court and the Water Court for Water Division No. 5 on December 26, 2006, as required by the Order of the United States District Court dated December 14, 2000, in Consolidated Case Nos. 2782, 5016, and 5017, and Division 5 Water Court Case No. 99CW44, and pursuant to the United States District Court's Order dated August 4, 1977. Application at 1.

The conditional and partially absolute water rights that are the subject of the application in this matter were originally decreed in Case Nos. 1805 and 1806 in the Summit County District

963751.1
4/15/08

Court on March 10, 1952. Thereafter these cases were removed to the United States District Court for the District of Colorado and given Civil Action Nos. 5016 and 5017 to correspond to Summit County District Court Nos. 1805 and 1806. In Federal Court, they were consolidated with Case No. 2782. On October 12, 1955, the Summit County District Court Decree of March 10, 1952 was incorporated in and confirmed by a judgment and decree entered by the Federal Court in these consolidated cases.

On August 4, 1977, pursuant to Denver's motion, the United States District Court for the District of Colorado entered an "Order Regarding Further Proceedings Consonant with the Colorado Water Right Determination and Administration Act" in consolidated Case Nos. 2782, 5016, and 5017 ("the "1977 Order"). The 1977 Order provides the procedure under which diligence applications are to proceed in these consolidated cases. The 1977 Order provides that "[t]his [Federal] Court will act as the Water Judge provided for by the 1969 Act for Water Division No. 5 insofar as proceedings in connection with cases numbered 5016 and 5017 are concerned." 1977 Order ¶ 1. The clerk of the Division 5 Water Court is further instructed to perform the duties that would be required of the clerk if the proceedings remained before the Division 5 Water Judge.

II.  **LEGAL STANDARDS**

The narrow focus of this case, and the determination that this court must make, is whether Denver has exercised reasonable diligence with respect to its conditional Blue River Diversion Project water right, and whether Denver has actually diverted and placed to beneficial use a portion of that right during the subject diligence period, to make that portion of the water

2

right "absolute." A conditional decree confers "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based." C.R.S. § 37-92-103(6). Accordingly, "[a] conditional water right gives the holder the ability to perfect a water right in the future as long as the holder diligently develops the right to eventual maturity." *Municipal Subdist., Northern Colo. Water Conservancy Dist. v. OXY USA, Inc.*, 990 P.2d 701, 705-06 (Colo. 1999).

In order to prove that the conditional portion of the water right is being developed "diligently," every six years Denver must file an application with this court for a finding of reasonable diligence, or the conditional water right will be considered abandoned. C.R.S. § 37-92-301(4)(a)(I). The holder must then file a new application for a finding of diligence within six years after each successive diligence decree is entered, until such time as the water right is actually applied to beneficial use. At that time, Denver can apply to make the right "absolute," which means that it will become a vested right, and it will no longer be necessary to show diligence in the development of the right going forward. When the water right matures, the priority of the right will relate back to the date of the original conditional decree. *Municipal Subdist., Northern Colo. Water Conservancy Dist. v. OXY USA, Inc.*, 990 P.2d 701, 706 (Colo. 1999).

In this case, Denver will have the burden of proof to establish that it has been reasonably diligent in the development of its conditional water right for the Blue River Diversion Project. *See Municipal Subdist., Northern Colo. Water Conservancy Dist. v. Chevron Oil Shale Co.*, 986 P.2d 918, 921 (Colo. 1999) (stating that "[t]o demonstrate reasonable diligence, the applicant must show 'the steady application of effort to complete the appropriation in a reasonably

3

expedient and efficient manner under all the facts and circumstances'"); C.R.S. § 37-92-301(4)(b). Under Colorado law, a non-exhaustive list of relevant factors to consider includes the size and complexity of the project, the extent of the construction season, the availability of material, labor, and equipment, the economic ability of the claimant, and the intervention of outside delaying factors when analyzing whether the reasonable diligence standard has been met. *Chevron Oil Shale Co.*, 986 P.2d at 921. The activities taken to develop the water right must be project-specific. However, "work on one feature of the project or system shall be considered in finding that reasonable diligence has been shown in the development of water rights for all features of the entire project or system." C.R.S. § 37-92-301(4)(b).

Denver must further show that the water "can be and will be" diverted and beneficially used, and that the project can and will be completed with diligence and within a reasonable time. *Id.* § 37-92-305(9)(b). The "can and will" test requires the applicant to demonstrate a substantial probability that the intended appropriation can and will reach fruition. A non-exhaustive list of factors courts are to consider under this requirement in diligence proceedings includes: "1) economic feasibility; 2) status of requisite permit applications and other required governmental approvals; 3) expenditures made to develop the appropriation; 4) ongoing conduct of engineering and environmental studies; 5) design and construction of facilities; and 6) nature and extent of land holdings and contracts demonstrating the water demand and beneficial uses which the conditional right is to serve when perfected." *Pagosa Area Water & Sanitation Dist. v. Trout Unlimited*, 170 P.3d 307, 316 (Colo. 2007).

Denver must also demonstrate that the conditional water right does not violate the "anti-speculation doctrine." Under this doctrine;

4

> [A] governmental water supply agency has the burden of demonstrating three elements in regard to its intent to make a non-speculative conditional appropriation of unappropriated water: (1) what is a reasonable water supply planning period; (2) what are the substantiated population projections based on a normal rate of growth for that period; and (3) what amount of available unappropriated water is reasonably necessary to serve the reasonably anticipated needs of the governmental agency for the planning period, above its current water supply.

*Id.* at 313. Denver must substantiate a non-speculative intent to appropriate unappropriated water, and it must have a specific plan and intent to divert, store, or otherwise capture, possess, and control a specific quantity of water for specific beneficial uses. *Id.* at 315, C.R.S. § 37-92-103(3)(a)(II). Estimates of future need should be adjusted in subsequent diligence proceedings. *Pagosa Area Water & Sanitation District*, 170 P.3d at 316. This court "should closely scrutinize a governmental agency's claim for a planning period that exceeds fifty years." *Id.* at 317.

With respect to Denver's claim to make a portion of the water right absolute, Denver must show that it has captured, possessed, and controlled the water, and applied it to a beneficial use. *City of Lafayette v. New Anderson Ditch Co.*, 962 P.2d 955, 961 (1998); C.R.S. § 37-92-305(9)(a). If a portion of the conditional water right has in fact been diverted and applied to beneficial use, then it will mature into an absolute right. *City of Lafayette*, 962 P.2d at 962.

### III.  SPECIFIC FED.R.CIV.P. RULE 26 ISSUES

Rule 26(f) requires that parties discuss the issue of preservation of potentially relevant documents. *See* FRCP Rule 26(f)(2). To ensure the expansive discovery permitted by Rule 26(b)(1), all litigants have a duty to preserve documents, including electronically stored

5

information (ESI), that may be relevant to pending or anticipated litigation. *See Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 627-628 (D. Colo. 2007).

In anticipation of the Rule 26(f) conference, Climax Molybdenum Company ("Climax") reminded the City and County of Denver Board of Water Commissioners ("Denver") of its obligation to preserve documents, particularly ESI, that are potentially relevant to Denver's December 26, 2006 *Application for a Finding of Reasonable Diligence and to Make Absolute a Conditional Water Right* ("the Application"). While both Climax and Denver agree that both parties have an obligation to preserve relevant evidence, the parties disagree on the operative date or "trigger" for the duty to preserve and the scope of preservation. Denver has also taken the position that much ESI is not relevant to its claims. It is our hope that all parties can resolve these matters informally and reach an agreement as to the trigger date, the scope of the preservation undertaken and the preservation and production of ESI.

### A. Preservation Trigger

As noted above, a litigation hold is generally triggered when a party has notice that evidence is relevant to litigation or when a party should have known that evidence may be relevant to future litigation. The future litigation must be "probable" which courts have held to mean "more than a possibility." *See Hynix Semiconductor Inc. v. Rambus, Inc.*, 2006 WL 565893, *21 (N.D. Cal. 2006). Yet, the determination whether litigation can be reasonably anticipated should be based on good faith and reasonable evaluation of the facts and circumstances known at the time. *See* The Sedona Conference® Principles for Electronic Document Production, Principle 5, 2nd Ed. (2007).

It is Climax's position that Denver should preserve and produce potentially relevant information from December 14, 2000 to the present.

Equally, important, Denver should disclose when it commenced preservation of the relevant evidence at issue in this litigation and specifically what is being preserved as well as the location and source of this information. In many instances, Denver may have a statutory obligation to preserve information or may preserve such information as part of its routine document retention policy. It is our hope to develop and further understand Denver's policies and practices through the Rule 26(f) meet and confer.

**B.     Scope of Preservation and Production of ESI**

Although we agree with Denver that the duty does not require a party to keep every scrap of paper in its file, we strongly believe that Climax is entitled to the preservation and discovery of potentially relevant evidence in Denver's care, custody and control. See *Danis v. USN Communications, Inc.,* 2000 WL 1694325, *32 (N.D. Ill. 2000). Discoverable information will necessarily include emails and other electronically stored information that relate to the Application and Denver's claim that is has undertaken numerous diligence activities in connection with the conditional water rights.

An applicant must show that its intent to appropriate is not based upon the speculative sale or transfer of the appropriative rights, and that there is a substantial probability that the applicant "can and will" complete the appropriation with diligence. "Can and will" is a completely separate showing in a diligence case. It is essentially a forward-looking demonstration of intent to complete a water right. A diligence determination requires a historical

examination of an applicant's activities. It is this look back into history that is relevant to Denver's Application.

In support of its Application, Denver cites a list of some thirty-three activities and work pertaining to the collection, development, storage, treatment, and distribution of water that Denver has either completed or is in the process of completion. Climax fully intends to take discovery related to these activities and will seek the production of ESI. While not an exhaustive list of activities concerning which Climax will seek discovery, the following illustrates the need for Denver to preserve and prepare to produce all potentially relevant evidence:

> **Application, ¶ 4.M. Annual Reports of Beneficial Use Filed with Department of Agriculture and United States Forest Service.**

Denver states that these reports show its activities related to Right-of-Way No. D-027915 (Williams Fork Diversion Project) and Right-of-Way No. D-027915 (Two Forks Reservoir Project) where the waters that are the subject of this application are to be stored. These reports relate directly to Denver's Application. All communications between Denver, the Department of Agriculture and the United States Forest Service related to Denver's plan to possess and control water for a specific beneficial use would be highly relevant to its claim of diligence. Potentially relevant documents would include emails and written communications regarding these alleged activities.

> **Application, ¶ 4.O Prepared and Submitted Annual Colorado River Return Flow Report As Required by The Blue River Decree.**

According to Denver, its submission of the Annual Colorado River Return Flow Report demonstrates the uses of that water and the specific steps taken to make successive uses,

including water that is subject to its Application. Climax is entitled to documents relevant to Denver's efforts to prepare and submit the report, including internal communications and emails generated to compile and circulate the report.

**Application, ¶ 4.P.   Development of Long-Range Planning Process using Integrated Resource Planning Techniques**

An Integrated Resource Plan (IRP) is a water supply planning process which, among other things, develops computations of safe or firm yield and then plots these values against demand projections to indicate the timing and the magnitude for the next increment of supply. As acknowledged by Denver, the IRP considers "a wide range of potential supply-side and demand resource options, features extensive public involvement, deals explicitly with future uncertainties and lists tradeoffs among carefully-defined policy objections."

The IRP is intended to consider the practical implementation of a water conservation plan as opposed to the purely theoretical considerations. The former requires input from a variety of sources, both internal and external to both evaluate and validate the IRP. Climax is entitled to discovery related the establishment of performance standards for conservation that would include Denver's internal communications and emails related to the IRP as well as external communications including public comments and any information regarding expenditures, and evidence of intended or actual progress.

**Application, ¶ 4.R.   Discussions with Town of Frisco, Colorado.**

As part of its diligence efforts, Denver lists discussions with the Town of Frisco related to the expansion and improvements of the marina and purchase of surplus parcels of land. Climax is entitled to all communications, including emails, regarding these discussions.

**Application, ¶ 4.S.  Storage Development on the South Platte River**

Denver, in cooperation with the South Adams County Water and Sanitation District (South Adams) is developing storage on the South Platte River downstream of Denver to allegedly enhance the yield of its municipal water system. Denver claims this downstream storage will be used to augment the delivery of water to a recycling plant where there is legally insufficient reusable return flow available.

According to Denver, prior to 2006, the projected capacity of these downstream storage sites was approximately 20,000 acre-feet. Denver subsequently determined that a total of 30,000 acre-feet of downstream reservoir storage was necessary. In addition to electronic communications between Denver and South Adams related to the recapture and regulation of Denver's reusable return flow, Climax is entitled to any electronically versions of maps, plats, engineering reports related to the capacity of the particular storage sights and genesis of water that runs through the planned development.

**Application, ¶ 4.T.  Implementation of the Programmatic Biological Opinion**

In January 1999, the United States Fish and Wildlife Service (FWS) issued the Programmatic Biological Opinion (PBO) for the 15-mile Reach of the Colorado River. The PBO provides compliance for all current depletions in the Colorado River above the confluence of the Colorado and Gunnison Rivers. PBO implementation is a continuing and ongoing process that facilitates diversion of water through the Blue River Diversion Project, including water diverted under the subject water rights.

Denver alleged that it works as part of a group comprised of other water users, the FWS, the U.S. Bureau of Reclamation, environmental groups and the State of Colorado to develop

mechanisms for improving habitats in the Colorado River. These mechanisms include: (1) Continuation of the Coordinated Reservoir Operations Study; (2) A commitment by water users to provide a permanent supply of water to the Recovery Program; (3) a Coordinated Facilities Operations Study; (4) Long term funding legislation; and (5) Proposed Sulpher Gulch Reservoir project.

Climax is entitled to communications, including emails, and all correspondence between Denver, water users, FWS, U.S. Bureau of Reclamation, environmental groups and the State of Colorado related to the mechanisms included in the PBO. In addition, communications documenting Denver's "substantial efforts" to assure funding of the Colorado River Program, including electronic copies, including drafts, of multiple letters sent to legislators and congresspersons in Washington D.C.

**Application, ¶ 4.U.   Denver's Resolution of Intent to Appropriate Water.**

In December 1999, Denver adopted a resolution of its intent to appropriate water and filed a joint water application for storage rights from the Colorado River. Climax contends that the resolution and joint application are insufficient evidence of Denver's diligence because neither relates to the Blue River Diversion Project. Rather, the proposed Sulpher Gulch Reservoir project is a joint undertaking with the Northern Colorado Conservancy District and its Municipal Subdistrict. Water stored in the reservoir is released back to the Colorado River to fulfill obligations under the Colorado River Recovery Act. Denver alleges that these activities, in turn, facilitate the diversion of water to be used under the water rights that are the subject of the Application.

Climax is entitled to the discovery of relevant electronic information related to the understanding and interpretation of Denver's obligations under the Colorado River Recovery Program and how it relates to the Blue River Diversion Project, including emails and other correspondence between Denver and the Northern Colorado Conservancy District. In addition, several studies have been conducted relative to a joint water right application, including a feasibility level geotechnical study, a report on environmental resource and permitting issues, and a proposed decree in support of water rights. The U.S. Geological Survey also published a report in cooperation with Denver and the Northern Colorado Conservancy District. Not only are these reports and studies relevant to these proceedings, but internal and external emails and other communications related to these discussions may prove invaluable to Climax's challenge to Denver's Application.

**Application, ¶ 4.V.   Design of Non-Potable Water Recycling Plant and Distribution Facilities.**

The Denver non-potable water recycling plant and associated distribution facilities capture effluent water from the Metro Wastewater Plant before discharging it to the South Platte River. The water delivered to the recycling project may include water diverted under the water rights that are subject to Denver's Application. In 2005, Denver began designing several additions to expand its distribution system for the recycled water. Climax seeks communications, including emails and other correspondence regarding the recycling project and its anticipated completion date, if any.

**Application, ¶ 4.W.   Completion of Clear Water Storage Reservoirs**

Denver alleges that it has undertaken efforts to plan, design, construct and complete clear water storage reservoirs to store treated water to maintain peak hour demands. Climax is entitled to discovery regarding these reservoirs and Denver's maintenance of peak hour demands, including emails and other correspondence related to Denver's plans, design, and construction are relevant and the subject matter of appropriate discovery.

**Application, ¶ 4.Y.   Eventual Completion of the Denver Municipal Water System**

In this overly broad category, Denver alleges, as part of its list of activities in support of its Application, that it has or will plan, design, construct and litigate issues related to the eventual completion of various components of the Denver Municipal Water Systems, including the Blue River Diversion Project. Discovery of documents, including email and other communications, is relevant to the determination of whether Denver can and will complete the project with diligence. In addition, documents related to litigation involving the Blue River Diversion Project are equally relevant to Climax's defense of the Application.

**Application, ¶ 5.A.   Water Applied To Beneficial Use**

According to the Application, on June 23, 2006, Denver diverted 654 cfs through the Roberts Tunnel and allegedly placed the water to beneficial use. Climax believes that Denver cannot prove that is properly diverted 654 cfs of water through the Roberts Tunnel and subsequently placed the water to beneficial use. To further establish and bolster this challenge, Climax seeks communications, including emails and other correspondence, related to the claimed diversion and beneficial use. The information is undoubtedly relevant and should be preserved pending its production.

These and other issues are appropriate for consideration at the Rule 26(f) Scheduling Conference.

Respectfully submitted this 15th day of April, 2008.

RYLEY CARLOCK & APPLEWHITE

_____/s/__Robert J. Pohlman_____
Brian M. Nazarenus, #16984
Robert J. Pohlman, # 6262
Olivia D. Lucas, #36114
1999 Broadway, Suite 1800
Denver, Colorado  80202
Telephone:  (303) 863-7500
Facsimile:   (303) 595-3159
E-mail:bnazarenus@rcalaw.com
         rpohlman@rcalaw.com
         olucas@rcalaw.com

ATTORNEYS FOR OPPOSER CLIMAX MOLYBDENUM COMPANY

## CERTIFICATE OF SERVICE

I certify that on April 15, 2008, a true and correct copy of the foregoing was served on the following through Lexis/Nexis and through ECF for the United States District Court as stated below:

| Party | Party Type | Attorney | Firm |
|---|---|---|---|
| CITY AND COUNTY OF DENVER ACTING BY AND | Applicant | Funk, Casey S | Denver Water Board Legal Division |
| COLORADO RIVER WATER CONSERVATION DIST. | Opposer | Fleming, Peter C | Colorado River Water Conservation District |
| COLORADO RIVER WATER CONSERVATION DIST. | Opposer | Hawes, Taylor E C | Colorado River Water Conservation District |
| DIVISION 5 ENGINEER | Division Engineer | Division 5 Water Engineer | Division 5 Engineer |
| FRISCO, TOWN OF | Opposer | Montgomery, James R | Moses Wittemyer Harrison & Woodruff PC |
| GRAND VALLEY IRRIGATION | Opposer | Aldrich, Frederick G | Aldrich, Frederick G LLC |
| GRAND VALLEY WATER USERS ASSOCIATION | Opposer | Kurath, Kirsten Marie | Williams Turner & Holmes PC |
| GRAND VALLEY WATER USERS ASSOCIATION | Opposer | Hermundstad, Mark Allen | Williams Turner & Holmes PC |
| MIDDLE PARK CONSERVANCY DISTRICT | Opposer | Cazier, Stanley W | Cazier McGowan & Walker |
| MIDDLE PARK CONSERVANCY DISTRICT | Opposer | Walker, John D | Cazier McGowan & Walker |
| ORCHARD MESA IRRIGATION DISTRICT | Opposer | Kurath, Kirsten Marie | Williams Turner & Holmes PC |
| ORCHARD MESA IRRIGATION DISTRICT | Opposer | Hermundstad, Mark Allen | Williams Turner & Holmes PC |
| STATE ENGINEER | State Engineer | State Water Engineer, Colorado | Colorado Division of Water Resources |
| UTE WATER CONSERVANCY DISTRICT | Opposer | Kurath, Kirsten Marie | Williams Turner & Holmes PC |
| UTE WATER CONSERVANCY DISTRICT | Opposer | Hermundstad, Mark Allen | Williams Turner & Holmes PC |
| WATER DIVISION 5, WATER CLERK KATHY HALL | | | |

s/ Patricia A. Quinn

*This document was filed and served via Lexis/Nexis File and Serve pursuant to C.R.C.P. Rule 121. A duly signed original of this document is on file at the law firm of Ryley Carlock & Applewhite.*