**Proposed Addendum to Scheduling Order, 49-cv-02782**

**Protocol for the Discovery of Electronically Stored Information[1]**

This Protocol for the Discovery of Electronically Stored Information ("the Protocol") is intended to provide the parties with a comprehensive framework to address and resolve a variety of issues unique to electronically stored information ("ESI"). In developing this Protocol, the parties reviewed both the District of Kansas's "Guidelines for Discovery of Electronically Stored Information" and the District of Maryland's "Suggested Protocol for the Discovery of Electronic Information."

The Protocol is intended to facilitate the production of ESI and promote the resolution of discovery-related conflicts without Court intervention. It is not, however, inflexible; indeed, the parties intend to supplement it as additional information becomes available about the parties' respective information technology and sources of discoverable information. The Protocol specifically applies to the ESI provisions of Federal Rules of Civil Procedure 16, 26, 33, 34, and 37.[2] This protocol supplements the information contained in the Initial Disclosure Statements for Denver and Climax.

**I. Preservation of Electronically Stored Information**

All parties and their counsel are reminded of their duty to preserve evidence that may be relevant to this action. The date range for preservation for Denver is from December 26, 2006 to present. The date range for preservation for opposers is from the date of each opposer's respective filing of a statement of opposition to the present. The duty extends to documents,

---

[1] To the extent feasible, the same or a similar protocol will apply to discoverable electronically stored information of the opposers. This protocol will be affirmed or supplemented following a review of the opposers' systems.

[2] All references to "the Rules" or "Rule" shall be to the Federal Rules of Civil Procedure.

993762.1
6/30/08                                **Exhibit A**

data, and tangible things in the possession, custody and control of the parties to this action, and any employees, agents, contractors, carriers who possess materials reasonably anticipated to be subject to discovery in this action. "Documents, data, and tangible things" shall be interpreted broadly to include writings, records, files, correspondence, reports, memoranda, calendars, diaries, minutes, electronic messages, voice mail, e-mail, telephone message records or logs, computer and network activity logs, hard drives, backup data, removable computer storage media such as tapes, discs and cards, printouts, document image files, web pages, databases, spreadsheets, software, books, ledgers, journals, orders, invoices, bills, vouchers, check statements, worksheets, summaries, compilations, computations, charts, diagrams, graphic presentations, drawings, films, charts, digital or chemical process photographs, video, phonographic, tape or digital recordings or transcripts thereof, drafts, jottings and notes, studies or drafts of studies or other similar such material. Information that serves to identify, locate, or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition.

Until the parties reach an agreement on a preservation plan or the Court orders otherwise, each party shall take reasonable steps to preserve all documents, data, and tangible things containing information potentially relevant to the subject matter of this litigation. In addition, counsel shall exercise all reasonable efforts to identify and notify parties and non-parties of their duties, including employees of governmental, corporate or institutional parties, to the extent required by the Federal Rules of Civil Procedure. All parties understand that failure to preserve documents may result in sanctions.

## II. Facilitation of ESI Discovery

### 1. **IT Architecture**

#### i. **Denver's IT Architecture**

Denver has identified a variety of sources of potentially relevant ESI and will produce relevant ESI from all available sources.

Denver maintains that the bulk of discoverable ESI is housed in the following four electronic repositories:

1. Email Server

At all times relevant hereto, Denver has maintained electronic mail on a Microsoft Exchange Server ("MES"). Each individual user has a unique user name and password. The user name and password is associated with a unique email inbox.

Each Denver Water email user is solely responsible for the management of emails they send and receive, including the saving and deletion of emails. Emails that are deleted by the user are maintained on the MES for thirty days before system-wide deletion. Denver backs up the MES for disaster recovery purposes only.

The MES gets daily differential incremental backups (which just backs up what was modified since the last backup), as well as a weekly full backups (the entire server gets backed up regardless of whether the information is static or dynamic). Differential backups are retained for 2 weeks and are kept onsite at all times. Full backups are retained for 4 weeks, with the exception of the first weekend of the month being retained for 26 weeks (6 months). The server also gets daily CONFIG backups, which is the system registry. The MES database is backed up

daily and retained for 2 weeks. The database also gets a weekly full backup that is retained 4 weeks.

The backup tapes are automatically recycled at the end of their retention period. In order to save an email, the user has three options: (1) Do nothing -- the email(s) will remain in the user's inbox on the MES; (2) print out the email(s) and store as a paper document; or (3) move the email(s) to a personal folder (.pst file), typically stored on the user's PC hard drive.

Denver shall collect all relevant ESI from the MES as well as any targeted personal email folders (.pst files) using a manual search process for each of the identified Key Persons associated with the proceeding. Denver may then search the captured data for relevant information using the agreed upon search terms.

### 2. Records and Document Administration (RDA) repositories

Denver maintains various electronic document management systems (collectively referred to as "RDA") used to track and store ESI and scanned – and sometimes – coded images of paper or microfilmed documents. The RDA repositories are made up of a various FileNet, SQL-Server databases, Oracle databases, and network file shares, all hosted on a storage area network ("SAN"). There is an RDA intranet application front-end enabled for searching the RDA repositories. The RDA repositories that house scanned document images also contain indexed key-words about document images that can be queried in order to assist in document retrieval. Native files stored on an RDA network file share can be manually identified and searched using keywords. Duncan McCollum is the person with administrative oversight of the RDA.

The portion of metadata and files contained within back-end databases, like SQL Server, can be produced in its entirety via backup or data extraction, or certain tables, views, or data elements that store file metadata can be culled from the larger set using queries based off of the agreed upon search terms. The extracted metadata can then be used to produce the associated files.

### 3. Network Shared Drives

Denver has many shared drives for its working files. Working files on these shared drives may never have been included in email correspondence or uploaded into an RDA repository. These files can be identified by key persons and information custodians. The files stored on these drives are in native format and can be manually identified, and searched using keywords. However, some of the documents may also be scanned images and will be more difficult to identify and search.

### 4. Data Warehouse

Denver has a data warehouse and a set of business intelligence (BI) tools that are used by key persons within this litigation. The BI tools enable decision makers to query various datamarts and the underlying data warehouse to produce research, planning and other analytic reports. The information contained in the data warehouse and datamarts may be useful in determining whether published reports were accurately developed based on the data points within the warehouse. Data within the warehouse persists and can be extracted or queried to check the validity of published reports using the BI tools.

### ii. Opposers' IT Architecture

### 1. Climax Molybdenum Company

#### i. Corporate History

Climax Molybdenum Company is a fifth-tier subsidiary of Freeport-McMoRan Copper & Gold, Inc. Specifically, the ownership is as follows:

1. Climax Molybdenum Company is a wholly-owned subsidiary of the Cyprus Climax Metals Company;

2. Cyprus Climax Metals Company is a wholly-owned subsidiary of the Cyprus Metals Company;

3. Cyprus Climax Metals Company is a wholly-owned subsidiary of Cyprus Amex Minerals Company;

4. Cyprus Amex Minerals Company is a wholly-owned subsidiary of Freeport-McMoRan Corporation (FKA Phelps Dodge Corporation); and

5. Freeport-McMoRan Corporation is a wholly-owned subsidiary of Freeport-McMoRan Copper & Gold Inc.

#### ii. Climax' IT Architecture

Climax maintains a local area network on a Microsoft exchange server. Climax has a number of shared drives for its department working files. Working files on these drives may never have been included in email correspondence. These files can be identified by key persons and information custodians. The files stored on these drives are in native format. There is a nightly backup on the system registry (CONFIG).

Information pertaining to water rights accounting or operations are maintained solely on the shared G drive. Access to this information requires a unique user name and password. The

data relating to water rights is maintained in two databases, one Excel and one Access. Only four (4) individuals and one team account can access information pertaining to water rights from the G drive. The team account access is to permit approximately ten (10) water technicians to upload data, e.g. reservoir elevations, flow rates, and pump run time, to the restricted databases on the G drive.

The individuals who have access to the water rights databases on the G drive are identified under key persons and information custodians, infra. They are: Tavis Rogers, Peter Werner, Gary Slifka, and Gordon Stinnett.

For much of the relevant time, there has been a duplicate of the Excel and Access databases maintained on the G drive. These duplicates are updated periodically and extend back to approximately 2006.

The information in the two databases is utilized to prepare annual reports to the state engineer accounting for water rights usage.

Freeport-McMoRan Copper & Gold Inc. also maintains a wide area network. That network utilizes Microsoft exchange servers in Phoenix, Arizona. The wide area network backs up email onto LT02 tapes on a rotating basis. There is a two year retention period for emails, corporation wide. Decisions to save emails (beyond the backup to the wide area network) are made by the user. If the user does nothing, the emails will remain in the users inbox on the system. Alternatively, the user can either print out the emails and store them as a paper document or move the email to a personal folder (.pst file), typically stored on the users pc hard drive.

Climax will capture the data maintained with respect to water rights accountability and operations during the relevant period. In addition, the hard drives of the desk tops used by the four individuals with access to that information will be searched for relevant files.

Three people, Fred Menzer, Tim Gibson and Lee Wilkening, located at corporate headquarters in Phoenix, may have been privy to information relating to Climax's water rights. The hard drives of the computers for each of these individuals will also be searched for relevant ESI.

Remote access to the wide area network or the local area network is restricted to access by company laptops and requires a unique user ID and password.

Finally, Climax will seek to ascertain the identities of any persons receiving data in connection with the drafting and publication of those portions of the annual report of Freeport-McMoRan Copper & Gold Inc. that relate to the Climax Molybdenum Company water rights and the projected availability for operations of the Climax Molybdenum Mine. If identified, appropriate measures will be taken to determine whether relevant information, either hard copy or in electronically stored form, exists.

### 2. Key Persons and Information Custodians

#### i. Denver

Denver has provided a list of eight (8) individuals ("Key Persons") who have particular knowledge of the facts and circumstances underlying this litigation in addition to information potentially relevant to this action. Those individuals have been identified as follows:

1. Bill Bates, Manager of Water Rights Protection
2. Marc Waage, Manger of Water Resource Planning
3. Tom Malmberg, Sales Administrator

    4. John Bambei, Chief of Engineering

    5. Steve Schmitzer, Manager of Water Resource Analysis

    6. Greg Fisher, Manager of Demand Planning

    7. Roger Steger, Water Resource Engineer IV

    8. Bob Peters, Water Resource Engineer IV

Yet unidentified Key Persons include any applicable clerical or support personnel who directly prepare, store, or modify ESI for the individuals listed above, but not limited to, the network administrator, custodian of records or records management personnel, and any administrative assistants or personal secretaries.

### ii. Opposers

In addition to those persons identified in Climax's Initial Disclosure Statement, the following persons who may have particular knowledge of those aspects of this action which relate to the Climax water rights are:

    1. Diana Arnold, Information Technology, Climax Molybdenum Company;

    2. Tavis Rogers, Water Rights Accounting, Climax Molybdenum Company;

    3. Peter Werner, responsible for water operations, Climax Molybdenum Company;

    4. Gary Slifka, Climax Molybdenum Company;

    5. Gordon Stinnett, Climax Molybdenum Company;

    6. Fred Menzer, Land and Water, Freeport-McMoRan Copper & Gold Inc.;

       7.    Tom Gibson, Freeport-McMoRan Copper & Gold Inc.; and

       8.    Lee Wilkening, Freeport-McMoRan Copper & Gold Inc.

Unidentified key persons may include clerical or support personnel who directly prepare, store or modify ESI for the individual s listed above or on Climax's Initial Disclosure Statement . They may also include the network administrator, custodian or records or records management personnel, and any administrative assistant or personal secretaries.

### 3. "Not Reasonably Accessible" ESI

The parties do not anticipate that discovery will impact information that it deems as not reasonably in accessible due to undue cost of burden but reserve the right to object under Rule 26(b)(2)(B), if necessary and appropriate.

### III. Efforts to Limit Associated Discovery Costs and Delay

The parties understand and agree that the discovery of ESI should be done expeditiously and without delay. In an effort to manage the cost of producing ESI, the parties have agreed to a two-tier or staged discovery of ESI. However, both parties reserve the right to request or to oppose additional more comprehensive production in a latter stage of discovery. Accordingly, discovery shall proceed in the following sequence: (1) after receiving requests for production of ESI, the parties should search their ESI, other than that identified as not reasonably accessible without undue burden or cost, and produce responsive ESI within the parameters of Rule 26(b)(2)(C); (2) searches of or for ESI identified as not reasonably accessible should not be conducted until the prior step has been completed; and (3) requests for information expected to be found in or among ESI that was identified as not reasonably accessible should be narrowly focused, with a particular factual basis supporting each request.

1. **Search Methodology**

The parties agree that the use of search terms is an appropriate mechanism in this case to limit the burdens of electronic discovery. The parties shall consider the various search methodologies for retrieving or reviewing ESI, including the identification of the systems to be searched; identification of systems that will not be searched; restrictions or limitations on the search; factors that limit the ability to search; and the use of key word searches, with an agreement on the words or terms to be searched. If the parties are unable to agree on search terms, they will seek the Court's guidance and input. All preservation and keyword searching shall be done in a generally accepted forensically sound manner that, if reasonably possible, preserves the metadata.

2. **Cost Shifting**

Unless otherwise instructed by the Court, each party shall be responsible for the costs associated with production of its own ESI.

**IV. Efforts to Avoid Discovery Disputes**

In an effort to avoid discovery disputes, the parties have agreed to a format for the production of electronically stored information as well as a procedure for the handling of inadvertently produced ESI. In the event that the parties cannot resolve a dispute regarding ESI between themselves, the parties will meet and confer in good faith prior to seeking Court intervention.

1. **Form of Production**

Consistent with Rule 34 and the committee notes, the parties have tentatively agreed that potentially relevant ESI, excluding emails, should be produced as a Bates-stamped static-image

format along with reasonably accessible metadata that will enable the receiving party to have the same ability to access, search, and display the information as the producing party. When ESI is produced in its native format, the parties shall collect and produce the files in a manner that preserves the integrity of the files, including, but not limited to, the contents of the file, all available metadata (including system, substantive and embedded metadata).

Where available, emails shall be produced in a .PST file format without any degradation of the native file format. Should static images of ESI be insufficient to understand and use the documents, or if the electronic data cannot be read, manipulated (e.g., database and spreadsheets), or searched, the party shall produce the requested files in their native file format in lieu of static images. The parties acknowledge and agree that they may be required to re-produce such information in its native format, if necessary.

Prior to production, the parties shall further discuss and agree on the method and manner of redacting information from ESI and the procedures to set forth a claim of privilege, including an agreed-upon format for a privilege log.

### 2. Attorney-Client Privilege or Work Product

The parties are aware of the potential for inadvertent production of privileged and otherwise protected materials (including metadata) and agree to the following procedures in the event of such production:

(i) upon notification or discovery of an inadvertently produced document or communication, counsel for the opposing party shall be notified immediately in writing (including by email);

(ii) if the party producing the inadvertently-produced document or communication so demands within five business days after receiving such notification, then all copies of the

inadvertently produced document shall be returned to the producing party or destroyed, at the discretion of the inadvertently producing party. All copies of the inadvertently produced document or communication submitted to third parties, submitted into the discovery record, or submitted to the Court shall be retrieved through the use of all reasonable means by the party making the submission and, again, returned to the producing party or destroyed. All costs and fees incurred by the party making or attempting such retrieval shall be borne by the inadvertent producing party;

(iii) if documents or other communications are inadvertently produced and the producing party demands their return or destruction as set forth above, the receiving party may challenge that demand in writing (including by email) within five business days of receiving it. The failure to challenge that demand timely shall constitute a waiver of the right to challenge it at all. In the event that the receiving party does timely challenge the demand for return or destruction, outside counsel for the receiving party may retain one copy of the inadvertently produced materials until the parties meet and confer as set forth above. If the parties fail to achieve a resolution of that dispute, the issue shall be presented to the court. In that event, the burden of seeking a judicial resolution shall be borne by the party who inadvertently produced the materials, which party must initiate such a resolution under this Magistate's discovery dispute resolution procedures within ten business days after the parties have met and conferred as set forth above. During such time as the parties' dispute over the return of the inadvertently produced materials remains unresolved, those materials shall neither be disclosed to the parties nor used for any purpose other than challenging the assertion of the privilege or work-product doctrine. Applying the applicable case law, the Court shall determine whether a waiver occurred.