IN UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO

Civil Action No.: 49-cv-02782-EWN-CBS
Consolidated Civil Case Nos. 2782, 5016 and 5017 and

DISTRICT COURT, WATER DIVISION NO. 5 STATE OF COLORADO
Case No. 2006CW255

**AMENDED APPLICATION FOR FINDING OF REASONABLE DILIGENCE AND TO
MAKE ABSOLUTE A CONDITIONAL WATER RIGHT INCLUDING APPLICANT'S
INITIAL STATEMENT OF AFFIRMATIVE DEFENSES**

CONCERNING THE APPLICATION FOR WATER RIGHTS OF THE CITY AND COUNTY
OF DENVER, ACTING BY AND THROUGH ITS BOARD OF WATER COMMISSIONERS,
IN SUMMIT COUNTY

THIS AMENDED APPLICATION is filed pursuant to C.R.S. § 37-92-301(4); by Order

of the United States District Court dated December 14, 2000; pursuant to the United States

District Court's Order dated August 4, 1977 (Attached as Exhibit A); and pursuant to Magistrate

Judge Shaffer's December 11, 2008 Minute Order setting January 26, 2009 as the deadline for

amending pleadings.

**I.      AMENDED APPLICATION FOR FINDING OF REASONABLE DILIGENCE**

**AND TO MAKE ABSOLUTE A CONDITIONAL WATER RIGHT.**

1.      Name, address and telephone number of Applicant:

City and County of Denver, acting by and through its Board of Water Commissioners

("the Board"), 1600 W. 12th Avenue, Denver, Colorado 80204, telephone (303) 628-6460.

2.      Name of Structure: Blue River Diversion Project

3.      Describe the conditional water right, giving the following from the Referee's

Ruling and Judgment and Decree.

A.    Date of original decree:

March 10, 1952 and incorporated and confirmed by Findings of Fact, Conclusions

of Law, Judgment and Decree in Consolidated Cases Civil Nos. 2782, 5016 and 5017 in

the United States District Court in and for the District of Colorado dated October 12,

1955.

Civil Action Nos. 1805 and 1806 in the District Court of the County of Summit,

State of Colorado, and Civil Case Nos. 5016 and 5017, which are Federal District Court

Numbers, corresponding to Summit County District Court Nos. 1805 and 1806.

Court: District Court for the County of Summit, State of Colorado, and the United

States District Court in and for the District of Colorado.

B.    Location:

The Blue River Diversion Project diverts water from Dillon Reservoir though the

Montezuma Tunnel (now called the Harold D. Roberts Tunnel), the west portal of which

is located at a point whence the East quarter corner of Section 18, Township 5 South,

Range 77 West of the 6th P.M. bears South 81°07' East 941.6 feet.

C.    Source:

The sources of water for the Blue River Diversion Project are the Blue River, the

Snake River, and Ten Mile Creek, all of which are tributaries of the Colorado River; and

the waters which would naturally become part of said streams.

D.    Appropriation Date: June 24, 1946

E.    Amount:       268 cfs conditional
                    520 cfs absolute
                    788 cfs total

Application for Finding of Diligence
And to Make Absolute
Blue River Diversion Project

F.      Use:

Municipal use, domestic use, mechanical use, manufacturing use, fire protection, street sprinkling, watering of parks, lawns and grounds, and irrigation.

4.      The Blue River Diversion Project is an integral part of the Denver Municipal Water Works System. The following is a list of activities and work that have been completed or are in the process of being completed since December of 2000, pertaining to the collection, development, storage, treatment and distribution of water which is the subject of this application. The list is not meant to be all inclusive.

A.      Completed annual dam safety inspection and prepared report for Dillon Dam and Reservoir. Reviewed the Federal Energy Regulatory Commission's report for Dillon Dam, Dillon Reservoir and Roberts Tunnel.

B.      Contracted $54,489 for inspection and repair of the hydroelectric turbine at the Roberts Tunnel.

C.      Engineered and received proposals for a new pre-cast concrete bridge deck on the access road to the vent shaft of the Roberts Tunnel.

Prepared a study for the installation of a new standby generator for the Roberts Tunnel hydroelectric facility.

D.      Performed annual drill of the Emergency Preparedness Plan (EPP).

E.      Engineered upgrades to the elevator at the West Portal of the Roberts Tunnel to address safety and reliability concerns.

F.      Replaced the roof on the Roberts Tunnel Access Shaft House and Dillon Dam Control House

3

G.      Installed steel lining in the Morning Glory spillway shaft to prevent erosion of the concrete at Dillon Dam at a cost to the Board of over $1.9 million.

H.      Conducted surveying activities on the North Fork of the South Platte River, Dillon Reservoir and Dam including control of section and property corners using Global Positioning System (GPS) at Dillon Reservoir.

I.      Engaged in real estate transactions relating to Dillon Reservoir, Roberts Tunnel or the North Fork of the South Platte River.

J.      Reviewed parcel maps of the Board's property for potential purchase, trade, and/or to retain around Dillon Reservoir.

K.      The Board continued its maintenance and rehabilitation program for facilities necessary to utilize the conditionally decreed water rights of the various units of the Denver Municipal water system, including:

        1.      Completed annual safety inspections and prepared reports for Strontia Springs Dam, High-line Dam and Intake and Marston Dam.

        2.      Replaced Dillon Reservoir's outlet works hydraulic system piping.

        3.      Replaced river gauge on the Blue River at Dillon Reservoir.

        4.      Completed replacement of the standby generator at Strontia Springs Dam and Reservoir.

L.      Awarded contract to JCOR Mechanical, Inc. in the amount of $166,400 for flocculation/sedimentation storm runoff drainage improvement project at Foothills

Treatment Plant. The project includes installation of drain piping to reroute storm water drainage out of and away from flocculation and sedimentation basin.

M.     Filed Annual Reports of Beneficial Use with the Department of Agriculture, U.S. Forest Service. These reports show the Board's activities related to the Right-of-Way No. D-027915, Williams Fork Diversion Project and Right-of-Way No. 032121, Two Forks Reservoir Project, where the waters that are the subject of this application can be stored.

N.     Continued monitoring in conjunction with the Summit Water Quality Committee concerning water quality at Dillon Reservoir.

O.     Prepared and submitted the Annual Colorado River Return Flow Report as required by the Blue River Decree, demonstrating the uses of that water and steps taken to make successive uses thereof, including water that is the subject of this application.

P.     In the fall of 1992, the Board's staff initiated development of a long-range planning process using Integrated Resource Planning (IRP) techniques. IRP is a comprehensive form of utility resource planning which considers a wide range of potential supply-side and demand management resource options, features extensive public involvement, deals explicitly with future uncertainties, and lists tradeoffs among carefully-defined policy objectives. The product of IRP is a small number of well-documented resource strategies that have been evaluated against measurable evaluation criteria, which are tied to policy objectives agreed upon by stakeholders.

Q.     Since the inception of the IRP effort, multiple configurations and options have been evaluated to supply build-out demand of Denver's contract service area,

including reuse, demand management and supply projects which involve both system refinements and cooperative projects with other water supply entities. The efforts culminated in the issuance of the October 15, 1996, Board Resource Statement, which addressed issues concerning current supply and delivery obligations, future strategies for water supply for the near-term and long-term, and involvement with other metropolitan water supply purveyors. The initial IRP effort also resulted in the issuance of a report in 1997. The updated and re-issuance of the 1997 report was completed in February of 2002, reflecting changes resulting from numerous initiatives set out in the initial 1997 report. The Board's staff has begun updating the IRP for anticipated publication in 2007. The implementation of the IRP is an on-going effort and the Board continues instituting recommendations resulting from the 2002 IRP report. In December 2006, the Board adopted the 2007 Supplement to the Board Resource Statement dated October 15, 1996. The Supplement augments and elaborates on the 1996 Statement, and describes some of the issues that will influence the Board's direction in coming years.

R.    These resource strategies will help the Board pursue its effort toward the continued development of water available from the Blue River Diversion Project. Since 2000, the Board has expended approximately $298,000 on the IRP update efforts, which costs exclude any design and construction costs of projects identified by the IRP.

S.    The Board has undertaken the Lawn Irrigation Return Flow Project (LIRF). Portions of water delivered to the Board's customers for lawn irrigation reaches the South Platte River as return flow. LIRFs include both surface water and groundwater returns. Under Colorado water law, the Board is entitled to take credit for that portion of

return flow attributable to its imported and fully consumable water supplies, including water diverted under the subject water rights. The Board's LIRF project is designed to quantify reusable return flows with sufficient detail and accuracy to obtain Water Court approval. In 1999, staff completed the Phase I scoping study of the effort needed to quantify LIRFs. In 2000, the Board approved a $2 million Phase II analysis. In 2004, an application was filed with the Water Court seeking approval of the analysis and a proposed decree allowing the use of LIRFs in the Board's system. A final report is expected in 2009.

      T.      Discussed with the Town of Dillon the requirements necessary for construction of an additional caretaker's house. Continued discussions with the Town of Frisco regarding the expansion and improvements of the marina and purchase of surplus parcels of land.

      U.      The Board, in cooperation with the South Adams County Water and Sanitation District (South Adams), is developing storage on the South Platte River downstream of Denver to enhance the yield of its municipal water system.  This storage will recapture and regulate the Board's reusable return flow presently unusable due to the lack of timely upstream exchange potential or demand, including return flows resulting from the use of water that is the subject of this application. The stored returns will be released to the river when upstream exchange potential exists. Additionally, downstream storage will be used to augment the delivery of water to the Recycling Plant when there is legally insufficient reusable return flow available to the plant. Prior to 2006, the projected capacity of these downstream storage sites, which are principally gravel pits already

mined or in the process of being mined, was approximately 20,000 acre-feet. These reclaimed gravel pits are clustered in two complexes; the North Complex, to be supplied water through an enlarged Fulton Ditch, and the South Complex, to be supplied water through the Burlington Ditch. The Board subsequently determined that a total of 30,000 acre feet of downstream reservoir storage is required to optimize the Board's reusable return flows for replacement purposes. In order to optimize the use of these reusable return flows for replacement purposes, the Board acquired the $27 million Lupton Lakes site in 2006, which is situated on the east side of the South Platte River approximately 25 miles downstream from Denver. The 353 acre property is currently being mined for its sand and gravel deposits. Mining is anticipated to be complete by 2020, and upon reclamation and conversion to a water storage facility, will have a predicted capacity of 11,400 acre feet. In consideration for the Board's agreement to use its facilities to regulate and deliver to South Adams the Board's existing obligation to provide 5,000 acre feet supply of its reusable supplies (5K Water), South Adams and the Farmers Reservoir and Irrigation Company paid approximately $14 million of the $27 million acquisition costs, with the balance paid by the Board. As part of the arrangement, South Adams also agreed to convey to the Board all of its interests in the North and South Complexes, bringing the total amount of anticipated downstream storage ultimately owned and controlled by Denver to over 30,000 acre feet.  Between 2001 and 2006, a total of approximately $30.3 million has been spent on development of the downstream storage system.

    V.  In January of 1999, the United States Fish and Wildlife Service (FWS) issued the Programmatic Biological Opinion (PBO) for the 15-Mile Reach of the

Colorado River. The PBO streamlines Endangered Species Act (ESA) consultation for the Board and other water users by providing compliance for all current depletions (averaging about one million acre-feet per year) in the Colorado River above the confluence of the Colorado and Gunnison Rivers near Grand Junction, Colorado. It also provides ESA compliance for up to 120,000 acre-feet per year of new depletions. The continued and successful implementation of the PBO facilitates diversion of water through the Blue River Diversion Project, including water diverted under the subject water rights. It further addresses fish recovery actions that affect the Colorado River, including the 15-Mile Reach from Palisade, Colorado, to the confluence with the Gunnison River. The Board worked as part of a group comprised of other water users, the FWS, the U.S. Bureau of Reclamation, environmental groups and the State of Colorado to develop mechanisms for improving habitat in the Colorado River. These mechanisms are included in the PBO and are as follows:

- Continuation of the Coordinated Reservoir Operations Study, a voluntary program to enhance peak flow conditions in the 15-Mile Reach. The study has been ongoing since 1995. Its goal is to enhance habitat in the 15-Mile Reach through re-operation of upstream storage reservoirs, including Williams Fork and Dillon reservoirs, to achieve higher peak flow conditions. The Board has provided water releases to the fish under this Coordinated Reservoir Operations program. In 2006 alone, the Board's operations contributed over 10,000 acre feet to this effort.

- Water users made a commitment to provide a permanent supply of up to 10,825 acre-feet of water to the Recovery Program. In this regard, the Board has expended significant effort to develop the Sulphur Gulch Project as described below. In the interim, the Board entered into a memorandum of agreement in April of 2000 with the Colorado Water Conservation Board (CWCB) and FWS to provide on a temporary basis up to 5,412.5 acre-feet per year of deliveries from West slope reservoirs to enhance 15-Mile Reach flows in late summer and fall low flow periods. The Board has released water as directed by the FWS to enhance flows for endangered fish. Between 2001 and 2006, the Board released a total of approximately 25,000 acre feet of water from its west slope storage facilities for these flow enhancement purposes.

- Coordinated Facilities Operations Study. The state has sponsored a study to evaluate options to obtain an additional 20,000 acre-feet for peak flow enhancement. The study will evaluate many alternatives, including re-operation of existing facilities and use of conditional water rights to obtain an additional 20,000 acre-feet of water for peak flow deliveries in average water years.

- Non-flow related participation includes support of long term funding legislation. Long term funding legislation was signed into law on October 30, 2000. However, substantial efforts have been required in

the last several legislative budget cycles to assure funding for the

Colorado River Program. In 2005, the Board sent multiple letters to

legislators and congressmen in Washington D.C. supporting efforts to

continue funding for the Colorado River Program. Water users also

support successful completion and implementation of non-flow related

habitat improvements such as acquisition of flooded bottomlands, non-

native species control, and construction of fish ladders.

W.     In December of 1999, the Board adopted a resolution of its intent to

appropriate water and filed a joint water right application for storage rights from the

Colorado River in Mesa County, Colorado. The proposed Sulphur Gulch Reservoir

project is to be a joint effort with the Northern Colorado Conservancy District and its

Municipal Subdistrict. The project includes a reservoir on Sulphur Gulch; a tributary of

the Colorado River in Mesa County located 4 miles west of DeBeque, Colorado, and a

pumping plant for diverting water from the Colorado River. Water stored in the reservoir

will then be released back to the Colorado River and thereby help fulfill obligations

under the Colorado River Recovery Program for threatened and endangered fish species.

This, in turn, will facilitate the diversion of water to be used under the water rights that

are the subject of this application. A feasibility level geotechnical study was performed

in late 2000 by GET Consultants for the Sulphur Gulch site at a cost of approximately

$70,000. In 2001, a physical availability study, a report on environmental resource and

permitting issues, and a proposed decree was prepared in support of water right applied

for in Case No. 99CW279. In 2004, the USGS finished and published a report prepared

in cooperation with Denver Water and Northern Colorado Water Conservancy District. The report summarizes the results of a study of the probable effects of the proposed Sulphur Gulch Reservoir on the water quality and quantity in Colorado River near Grand Junction, Colorado. In 2005, interested parties began discussions to resolve issues related to the project. Other east slope municipalities and water users agreed to enter into a MOU to support and assist in the completion of Sulphur Gulch Reservoir or another project.

X.      Denver Water commissioned the design of its non-potable water recycling plant and associated distribution facilities in 1997. The system captures effluent water from the Metro Wastewater Plant before it is discharged to the South Platte River for subsequent reuse. The water delivered to the Recycling Project includes water diverted under the water rights that are the subject of this application. The recycled water will be used by outdoor irrigation and industrial customers located primarily in the north and central sections of Denver. Construction of the project's first phase of a 30 million gallon per day treatment plant including distribution lines, storage reservoirs, and pumping plants was started in 2001 and was completed in February 2004 at a cost of $110.9 million. Service of recycled water to customers began in the spring of 2004. In 2005, the Board began designing several key additions to expand its distribution system for delivery of the recycled water. When complete, these additions will include a new 6 million gallon basin at Capitol Hill in central Denver and a new pump station at 11th & Quebec in east Denver. The basin and pump station will feed new conduits serving the redeveloped areas around the former Stapleton Airport and Lowry Air Force Base.

Construction of these additions began in 2006 with a completion target of 2007 at an estimated direct cost $14.6 million.

     Y.     Denver Water remitted Power Interference Payments to the Secretary of Interior under 4(b) of the Blue River Decree Stipulation.

     Z.     Denver Water inspected and prepared Engineering Inspection Reports of the North Fork of the South Platte River from the Roberts Tunnel to Glen Isle.

     AA.     Planning, design, construction and completion of clear water storage reservoirs necessary for the storage of treated water for the purpose of maintaining peak hour demands placed upon the components of the Board's water system.

     BB.     Planning, design, construction and completion of conduits, pumping plants and distribution systems necessary for carrying treated water to and from the Board's water system.

     CC.     Planning, design, construction and litigation necessary for the eventual completion of various components of the Denver Municipal Water System, including the Foothills Treatment Plant, and the Blue River Diversion Project.

     DD.     During the subject diligence period over $689 million has been spent on the planning, design, construction and litigation necessary to meet for the eventual completion of various components of the Denver Municipal Water System.

     EE.     The Applicant participated in the state engineer's changes to the administration of Green Mountain Reservoir 2004-present.

     FF.     The Applicant routinely inspects and maintains the Roberts Tunnel and the hydroelectric facility.

GG.    The Applicant continually exercises the Blue River Diversion Project water rights.

HH.    The Applicant participates in the USGS cooperative stream gauging program.

5.    Water applied to beneficial use:

A.    Date water applied to beneficial use: On or about June 23, 2006, the Applicant diverted 654 cfs through the Roberts Tunnel and subsequently placed the water to beneficial use.

B.    Use:   Its decreed beneficial uses.

C.    Description of place of use where water is applied to beneficial use: The water was placed to beneficial use in the area served by the Denver Municipal Waterworks System.

6.    Names(s) and address(es) of owner(s), or reputed owners of the land upon which any new diversion or storage structure, or modification to any existing diversion or storage structure, is or will be constructed, or upon which water is or will be stored, including any modification to the existing storage pool: Not applicable. The Blue River Diversion Project is an existing diversion structure that has not been modified.

WHEREFORE, it is requested that in view of the magnitude of the project and in view of the planning, design and construction of the integral parts of the Board's water system and the expenditures associated with the costs of the completion of the facilities of the Board's water system, of which the Blue River Diversion Project is an integral part, that the Court enter a

Finding and Decree of Reasonable Diligence for the Blue River Diversion Project and continuing the remaining conditional decree in full force and effect.

The Board further requests this Court to make absolute 654 cfs which was diverted and placed to beneficial use in the area served by the Denver Municipal Waterworks System.

## II.    APPLICANT'S STATEMENT OF CLAIMS

A.    Applicant has been reasonably diligent in placing the subject conditional water rights to beneficial use pursuant to the requirements of C.R.S. 37-92-301(4).

B.    Applicant has demonstrated a steady effort to complete the appropriation in a reasonably expedient and efficient manner under all the facts and circumstances.

C.    The Applicant operates an integrated water supply system and work on one feature of the system must be considered in finding that reasonable diligence has been shown in the development of the subject water rights.

D.    The activities described in its application further or contribute to the development of the amount remaining conditionally decreed.

E.    Applicant has satisfied the requirement that "No claim for a conditional water right may be recognized or a decree therefore granted except to the extent that it is established that the waters can be and will be diverted, stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time." C.R.S. § 37-92-305(9)(b).

F.    Applicant has satisfied the requirements under C.R.S. § 37-92-103(3).

G.    Applicant is a governmental agency that is entitled to the anti-speculation exception in C.R.S. § 37-92-103(3).

H.      Applicant's substantiated population projections and other needs and requirements support a continuation of the remaining amounts conditionally decreed.

I.      Applicant's reasonably anticipated needs include amounts to meet risks associated with municipal planning such as drought, global warming, environmental regulatory obligations, economic uncertainties and other contingencies.

J.      For its claim to make absolute, Applicant has captured, possessed, and controlled; and applied the water to a beneficial use in accordance with the terms of the decree. C.R.S. §37-92-305(9)(a), City of Lafayette v. New Anderson Ditch Co., 962 P.2d 955, 961 (Colo. 1998).

K.      Applicant's claim to make absolute is in accordance with the decree.

## III.     APPLICANT'S INITIAL STATEMENT OF AFFIRMATIVE DEFENSES

### A.     General Statement of Affirmative Defenses.

The Opposers' discovery responses and Rule 26 disclosures served to date reflect contentions that are barred as a matter of law, including but not limited to preclusion pursuant to the following Affirmative Defenses:

1.      The Opposers' objections to the Application are barred by the doctrine of waiver;

2.      The Opposers' objections to the Application are barred by the doctrines of promissory estoppel and equitable estoppel;

3.      The Opposers' objections to the Application are barred by the doctrine of laches;

4.      Opposers' objections to the Application are barred by lack of injury;

5.      Opposers' objections to the Application are barred by clerical error;

6.      The Opposers' objections to the Application are barred by the doctrine of law of the case;

7.      The Opposers' objections to the Application are barred by the doctrines of collateral estoppel and res judicata;

8.      The Opposers' are barred from raising any equitable defenses by the doctrine of unclean hands.

9.      The Opposers' objections to the Application are contrary to and barred by the Blue River Decree Stipulation;

10.      The Opposers' objections are barred by the doctrine of failure of consideration;

11.      The Opposers' objections are barred by the various statutes of limitations;

12.      The Opposers lack standing to assert objections or claims to Applicant's compliance with Paragraphs 4(e) and 4(f) of the Blue River Decree Stipulation.

13.      With regard to Opposer Climax specifically, Climax waived its right to challenge the adequacy of Applicant's reuse of Blue River water insofar as Climax did not participate in Civil Action Nos. 2782, 5016 and 5017, and the Blue River Decree Stipulation only provides that the United States may apply for injunctive or other remedial orders, suspending or proportionately reducing diversion or imposing conditions upon the taking of Blue River water by the Applicant.

14.      The Opposers' objections under Paragraph 4(g) of the Blue River Decree to the geographic area to which Applicant provides water are barred by the last sentence of Paragraph 4(g), which states: "...the limitations in this subparagraph shall not apply in the

case where electrical energy is produced by such water as an incident to its use for municipal purposes."

15.     Applicant reserves the right to supplement these Affirmative Defenses if and when the Opposers assert through pleadings, disclosures or discovery responses, additional contentions that are barred as a matter of law.

**B.     Factual Support For Application of Affirmative Defenses.**

1.     Starting with their execution of the Blue River Decree Stipulation on October 5, 1955, the Opposers have taken legal positions and executed stipulations in this proceeding and in other proceedings that are directly contrary to the Opposers' contentions and posturing herein.  Further, since 1955, the Court has entered final orders and decrees containing preclusive findings and holdings directly contrary to the Opposers' posture herein.  In addition, since 1955 the Opposers have engaged in conduct, including the execution of agreements with Applicant, reflecting legal and factual positions directly contrary to their contentions herein.  Objector's agreements with Applicant acknowledge and are based upon Applicant's compliance with the Blue River Decree Stipulation.   Since 1955, Applicant has relied on Opposers' stipulations, agreements, and promises by entering into agreements to provide water to various distributors and by developing a water works system capable of serving an area reasonably integrated with the development of Denver.

2.     The preclusive stipulations, orders and decrees entered in this civil action include the Blue River Decree Stipulation executed by the Opposers on October 5, 1955, and the Court's orders and decrees entered on October 12, 1955, April 16, 1964, January 9, 1973, March 16, 1973,  March 5, 1976, September 15, 1978, October 3, 1985,  February 6, 1996,

June 2, 1987, November 10, 1992, March 11, 1993, September 23, 1999 and December 14,

2000.  In Civil Action No. 3286, the Applicant secured a decree to exchange water from the

Colorado River to Cheesman, Eleven-mile and Antero Reservoirs.  In 1972, in C.A. 3635 and

Case No. W-8783-77, the Applicant secured decrees to exchange and transfer waters from the

Colorado River to structures located in former Water District 8 on the South Platte including

Cheesman, Strontia and Chatfield Reservoirs.  Further, in 1978, this Court decreed and

determined diligence for the diversion of the Blue River direct rights and made absolute

252,678 acre feet for Dillon Reservoir and 324 cfs for the Applicant's Blue River direct

rights.  In 1991, the Applicant and Opposers filed an application herein under in Civil Nos.

2782, 5016, 5017 for a determination and declaration that the Applicant may use Wolford

Mountain Reservoir in fulfilling Applicant's obligation under paragraph 4(c) of the Blue

River Decree Stipulation.  Further, in 1993, this Court confirmed and approved that on June 8,

1989, the Applicant diverted 520 cfs of the subject water rights to its decreed beneficial use in

the Denver Municipal Waterworks System.  In 1999, this Court determined that the Dillon

Reservoir refill decree did not adversely affect the objectives of the final decree entered by

this court in Consolidated Case Nos. 2782, 5016 and 5017.

    3.    The Opposers have entered into dozens of  agreements that reflect legal and

factual positions and achieved results for Opposers' purposes directly contrary to the

Opposers' contentions herein, including most notably, but not limited to: Opposers'

agreement in the 1955 Blue River Decree Stipulation itself; Opposers' more recent 1987 Rock

Creek Lease Agreement; the Opposers' agreement in 1992 to accept Applicant's payment of

$43,000,000 to finance the construction and use of Wolford Mountain Reservoir to be used by

Application for Finding of Diligence
And to Make Absolute
Blue River Diversion Project

Opposers for west slope purposes and by the Applicant for substitution in these Civil Action

Nos. 2782, 5016 and 5017; and the Opposers' 1992 agreement to convey to Applicant a

permanent interest in forty percent of the capacity of Wolford Mountain Reservoir and forty

percent of the water right used by the Applicant for substitution under paragraph 4(c) of the

Blue River Decree.

4.     The Affirmative Defenses set forth above bar the Opposers' objections to the

geographic area to which Applicant provides water.  In 1942, Applicant sought, and

eventually obtained in 1955 through the Blue River Decree Stipulation, water to serve the

future needs of the dynamically expanding Denver metropolitan area, adjacent areas and areas

in its vicinity in order to allow it to reach its greatest potential.  More particularly, in 1942

Applicant intended to serve the lands then in the City and County of Denver, lands that would

thereafter become a part of the City and County of Denver, areas adjacent to Denver to be

served by the Denver Municipal Water System, and also such other lands in the vicinity of the

City and County of Denver as may from time to time be covered by temporary rental

contracts negotiated by Applicant with the owners of said lands.  Applicant's 1942 Statements

of Claim in Civil Action Nos. 1805 and 1806 at Part III state: "The Denver Municipal Water

System consists of a number of reservoirs, ditches, pipe lines, and other structures forming an

interrelated water works system whose parts are located in various water districts of the State

of Colorado on both sides of the Continental Divide for supplying the City and County of

Denver, its inhabitants, and others with water, for domestic use and other beneficial

purposes."  The Statements of Claim in Civil Action Nos. 1805 and 1806 also state at Part

IX: "The lands lying under and proposed to be irrigated by water from the Blue River

Diversion Project consist of the lands in the City and County of Denver, being approximately

33,000 acres at the present time, together with such other lands as may hereafter become a

part of the City and County of Denver, and also such other lands in the vicinity of the City

and County of Denver as may from time to time be covered by temporary rental contracts

negotiated by Claimant with the owners of said lands pursuant to the provisions of the charter

of Claimant."  The March 10, 1952 Decree in Civil Action No. 1806 decreed Applicant's

priority for the diversion of water "for the benefit of the persons lawfully entitled thereto in

Denver and areas adjacent to Denver served by the Denver Municipal Water System."

Paragraph 19 of the Blue River Decree Stipulation incorporates the Decrees in Case Nos.

1805 and 1806 by reference.  The Blue River Decree Stipulation states at Paragraph 3: "It is

further stipulated and agreed by and between the parties to this cause that the City and County

of Denver and the City of Colorado Springs are in need of adequate supplies of water for

municipal purposes both present and future.  Likewise recognized by the parties is that the

Blue River constitutes a source of supply to which each must look in the future if the

respective municipalities are to reach their greatest potential."  Paragraph 4(g) of the Blue

River Decree states: "The City and County of Denver and the City of Colorado Springs will

utilize Blue River water for municipal purposes and no other within their metropolitan areas.

Such metropolitan area shall be limited to such an area as is reasonably integrated with the

development of Denver or Colorado Springs as the case may be. … Provided that the

limitations in this subparagraph shall not apply in the case where electrical energy is produced

by such water as an incident to its use for municipal purposes."

5.      The Affirmative Defenses set forth above bar the Opposers' contentions challenging the configuration of the Blue River Diversion Project and the location of the points of diversion.  Specifically, the Applicant's 1942 statement of claim described that the collection system from Ten Mile, Blue and the Snake Rivers would be "eliminated" after the construction of Dillon Reservoir and diversions would be accomplished at the west portal of the Roberts Tunnel.  Numerous claims for diligence and to make absolute were granted based upon diversions at the west portal.

6.      The Affirmative Defenses set forth above bar Opposers' from objecting to the established fact that the Blue River Diversion Project is an integral part of the Denver Municipal Water Works System.

7.      The Affirmative Defenses set forth above bar Opposers' contentions challenging Applicant's ability to store Blue River water in Strontia, Chatfield, Cheesman, Eleven Mile Reservoirs and Antero either directly or by exchange.

8.      The Affirmative Defenses set forth above bar the Opposers' contention that the Applicant is not complying with its reuse obligations under Paragraphs 4(e) and 4(f) of the Blue River Decree.

9.      The Opposers waived any right and lack standing to contend that the Applicant is not complying with its reuse obligations under Paragraphs 4(e) and 4(f) of the Blue River Decree.  Pursuant to the Blue River Decree, only the Secretary of Interior has standing to assert such a contention.

10.    The Affirmative Defenses set forth above bar the Opposers' contention that Applicant is not complying with Paragraph 4(g) of the Blue River Decree by allowing use of Blue River waters outside the boundaries of the City and County of Denver.

11.   The Affirmative Defenses set forth above bar the Opposers' contention that Applicant is not complying with Paragraph 4(g) of the Blue River Decree by selling Blue River waters for use by other entities outside the boundaries of the City and County of Denver.

12.    The Affirmative Defenses set forth above bar the Opposers' contention that Applicant is not complying with Paragraph 4(g) of the Blue River Decree by selling effluent and return flows derived from Blue River waters to other entities for augmentation and industrial uses.

13.    The Affirmative Defenses set forth above bar the Opposers' contention that Applicant is not complying with Paragraph 4(g) of the Blue River Decree by using Blue River waters for other than municipal purposes.

**[SIGNATURE PAGE FOLLOWS ON THE NEXT PAGE]**

Respectfully submitted this 26th day of January, 2009.

**DENVER WATER**
Casey S. Funk
Daniel J. Arnold
1600 W 12th Avenue
Denver, CO 80204-3412

*Counsel for Applicant City & County of Denver,
acting by and through its Board of Water
Commissioners*

**KAMLET SHEPHERD & REICHERT, LLP**

*/s/ Stephen D. Gurr*
Stephen D. Gurr
Barry A. Schwartz
1515 Arapahoe Street, Tower 1, Suite 1600
Denver, CO 80202

*Counsel for Applicant City & County of Denver,
acting by and through its Board of Water
Commissioners*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of January, 2009, a true and correct copy of the foregoing **AMENDED APPLICATION FOR FINDING OF REASONABLE DILIGENCE AND TO MAKE ABSOLUTE A CONDITIONAL WATER RIGHT INCLUDING APPLICANT'S INITIAL STATEMENT OF AFFIRMATIVE DEFENSES** was served upon the following counsel:

*Via ECF and LexisNexis Case No 06CW255:*

Brian M. Nazarenus, Esq.
Robert J. Pohlman, Esq.
Roger T. Williams, Esq.
RYLEY CARLOCK & APPLEWHITE
1999 Broadway, Suite 1800
Denver, CO   80202
*Counsel for Climax Molybdenum Company*

Anne Jamieson Castle, Esq.
Douglas L. Abbott, Esq.
Christopher L. Thorne, Esq.
Holland & Hart, LLP-Denver
P.O. Box 8749
555 17th Street
#3200
Denver, CO 80201-8749
*Counsel for Colorado River Water Conservation District*

Mark A. Hermundstad, Esq.
Kirsten M. Kurath, Esq.
Williams Turner & Holmes, P.C.
200 North 6th Street
PO Box 338
Grand Junction, CO 81502
*Counsel for Grand Valley Water Users Association*
*Counsel for Orchard Mesa Irrigation District*
*Counsel for Ute Water Conservancy District*

Peter C. Fleming, Esq.
Jason V. Turner, Esq.
PO Box 1120
Glenwood Springs, CO 81602
*Counsel for Colorado River Water Conservation District*

Frederick G. Aldrich, Esq.
Aldrich Frederick, LLC
601A 28 ¼ Road
Grand Junction, CO 81506
**_Counsel for Grand Valley Irrigation Company_**

Stanley W. Cazier, Esq.
John D. Walker, Esq.
Cazier McGowan & Walker
PO Box 500
Granby, CO 80446
**_Counsel for Middle Park Water Conservancy District_**

Nathan A. Keever, Esq.
Dufford Waldeck Milburn & Krohn, LLP
744 Horizon Court, Suite 300
Grand Junction, CO 81506
**_Counsel for Palisade Irrigation District_**

_/s/ Diana L. Brechtel_