**FILED**
United States Court of Appeals
Tenth Circuit

<u>PUBLISH</u>

**November 25, 2009**

UNITED STATES COURT OF APPEALS

**Elisabeth A. Shumaker**
**Clerk of Court**

**TENTH CIRCUIT**

---

CITY OF COLORADO SPRINGS;
CITY AND COUNTY OF DENVER,
acting by and through its Board of
Water Commissioners,

     Petitioners - Appellees,

and

NORTHERN COLORADO WATER
CONSERVANCY DISTRICT,

     Defendant - Appellee,

v.

CLIMAX MOLYBDENUM
COMPANY,

     Petitioner - Appellant.

No. 08-1154

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:49-cv-02782-EWN-CBS)**

---

Brian Nazarenus (Olivia D. Lucas with him on the briefs), Ryley Carlock &
Applewhite, Denver, Colorado, for Appellant.

Bennett Raley (Mary M. Hammond and William A. Paddock, Carlson, Hammond
& Paddock, LLC, Denver, Colorado; Patricia L. Wells, Michael L. Walker, Casey
S. Funk, and Jeffrey F. Davis, City and County of Denver, acting by and through
its Board of Water Commissioners; Robert V. Trout and Peggy E. Montaño,
Trout, Raley, Montaño, Witwer & Freeman, P.C., Denver, Colorado, with him on

the brief), Trout, Raley, Montaño, Witwer & Freeman, P.C., Denver, Colorado, for Appellees.

---

Before **KELLY, EBEL,** and **LUCERO**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

In this water law litigation, Climax Molybdenum Company ("Climax") appeals the district court's denial of its motion to intervene in a set of consolidated cases over which the district court retained jurisdiction after first deciding them more than fifty years ago. The appeal presents an issue of first impression in this circuit: whether a proposed intervenor may establish standing, and thus federal court jurisdiction over its motion to intervene, by "piggybacking" on the standing of an existing party to a lawsuit over which the district court has retained jurisdiction but within which there is no current, active dispute among the parties.

Exercising appellate jurisdiction under 28 U.S.C. § 1291, we conclude that within litigation over which a district court has retained jurisdiction after entering a final decree, a proposed intervenor may not establish piggyback standing where the existing parties in the suit are not seeking judicial resolution of an active dispute among them. Because Climax is unable to establish either piggyback or independent standing in the cases at issue, we VACATE the district court's order

2

and REMAND with instructions to dismiss Climax's motion for lack of
jurisdiction.

## I.    BACKGROUND

The multifaceted litigation behind this appeal turns on the adjudication and
administration of water rights on Colorado's Blue River, a tributary of the
Colorado River on the state's Western Slope.  The Blue River rises in Summit
County and flows north through Breckenridge, Dillon, and Silverthorne, joining
the Colorado River just south of Kremmling.

### A.    *CA 1710 in Summit County District Court*

Climax owns the Climax Mine (the "Mine"), a molybdenum mine and mill
in Colorado's Summit, Lake, and Eagle Counties.  In 1937, as part of a
supplemental stream adjudication in Summit County District Court, Water District
36,[1] and pursuant to its "mining, milling, manufacturing and domestic purposes"
(Aplt. App. at 86, 89, 92, 94, 96), Climax was decreed five conditional rights to
divert water from Tenmile Creek, which is a tributary to the Blue River  This
adjudication was denominated Civil Action 1710 ("CA 1710").

The Summit County court assigned two of Climax's conditional rights, for
Supply Canal No. 1 and Supply Canal No. 2, priority dates of August 15, 1935; it
assigned the remaining three rights, for Tenmile Diversion Ditch No. 1, Tenmile

---

[1]Colorado's current system of water courts was not adopted until passage of
the Water Right Determination and Administration Act of 1969, Colo. Rev. Stat.
Ann. § 37-92-101 through -602.

Diversion Ditch No. 2, and Chalk Mountain Ditch, a priority date of June 4, 1936.

The court further assigned these rights priority numbers 99-C, 100-C, 103-C,

104-C, and 105-C, respectively.  Climax later perfected its conditional CA 1710

rights, and the Mine was operated continuously from 1937 through 1984.

     B.     *CA 1805 and CA 1806 in Summit County District Court*

     The same year that Climax secured its conditional rights to divert from

Tenmile Creek, "Congress authorized a reclamation project known as the

Colorado-Big Thompson Project ('CBT')."  <u>City of Grand Junction v. City &</u>

<u>County of Denver</u>, 960 P.2d 675, 679 (Colo. 1998).  The CBT's purposes, along

with Congress's directives for implementing the project, were laid out in Senate

Document No. 80, 75th Congress, 1st Session (1937).  Those purposes included

diverting water from Colorado's Western Slope to provide "for the irrigation of

approximately 615,000 acres of irrigated land" on the state's Eastern Slope.

(Aplt. App. at 247).  The CBT "was also intended, however, to generate

hydroelectric power and supply additional water for agricultural and industrial

uses on the Western Slope."  <u>In re Application of City & County of Denver</u>, 935

F.2d 1143, 1146 (10th Cir. 1991).  In accordance with Senate Document No. 80,

the United States built the Green Mountain Reservoir and Power Plant on the Blue

River, roughly sixteen miles southeast of Kremmling, Colorado.  The Green

Mountain facility is downstream of Climax's Tenmile Creek diversion points.

In 1942, after construction on the Green Mountain Reservoir and Power Plant had been completed, a number of appropriators of Blue River water–including the City and County of Denver ("Denver") and the City of Colorado Springs ("Colorado Springs")–initiated in Summit County District Court two adjudications for claims to "water from the Blue River and its tributaries in Water District No. 36." (Aplt. App. at 222.) These two proceedings, civil actions 1805 ("CA 1805") and 1806 ("CA 1806"), were intended to determine, respectively, relative priorities to Blue River water for purposes of irrigation and for purposes other than irrigation. The cases were consolidated for trial in the Summit County court.

At issue for Denver in CA 1805 and CA 1806 were water rights for its Blue River Diversion Project, which diverted "the waters of the Blue River, the Snake River and Tenmile Creek at or near their confluence, together with the waters naturally tributary thereto," to the Denver metropolitan area for use in "the water works system owned by Denver." (Aplt. App. at 233.) The Blue River Diversion Project impounded water in the Dillon Reservoir and transmitted it to the North Fork of the South Platte River via the Montezuma Tunnel, later renamed the Roberts Tunnel. The Dillon Reservoir and Roberts Tunnel are situated downstream of Climax's Tenmile Creek diversion points and upstream of the Green Mountain Reservoir and Power Plant.

The United States entered CA 1805 and CA 1806 in 1944, claiming water rights for the Green Mountain Reservoir and Power Plant under the CBT.  In 1949, while the Summit County cases were pending, the United States withdrew its claim in those proceedings and brought a declaratory judgment action in federal court, asking the court to declare its "rights and obligations in connection with the operation of the" CBT under Senate Document No. 80, to "determine its rights to the use of water from the Colorado River, the Blue River, and other tributaries of the Colorado River," and to quiet title to those water rights as against a group of defendants including Denver and Colorado Springs (collectively, "the Cities").  (Id. at 111-12, 128-29.)  This federal case was denominated Civil Action 2782 ("CA 2782").

The Summit County District Court decided CA 1805 and 1806 in March of 1952.  The United States having withdrawn from the proceedings, the Colorado River Water Conservation District ("CRWCD") instead  appeared as the claimant for water rights for the Green Mountain Reservoir and Power Plant.[2]  In its

---

[2]When it "filed its statement of claim for adjudication of right to the Green Mountain Reservoir," the CRWCD

> recit[ed] that [it] was a beneficiary under Senate Document 80, . . . and that the Green Mountain Reservoir and power plant was constructed for the benefit of said claimant and other claimants and users from the Colorado River and its tributaries in Western Colorado, and the claim was made for the use and benefit of all such persons.

(continued...)

6

Judgment and Decree, the county court adjudicated Denver's Blue River

Diversion Project claims by awarding conditional rights with a priority date of

June 24, 1946; it further adjudicated conditional rights for Colorado Springs, with

a priority date of May 13, 1948.  The court denied the "claim of the Colorado

River Water Conservation District for a decree for the Green Mountain

Reservoir," finding that the evidence submitted for that claim "was insufficient to

justify the Court in entering any decree" of water rights for the Green Mountain

facility.  (Id. at 225.)  See City & County of Denver, 276 P.2d at 1011.

    CA 1805 and CA 1806 reached the Colorado Supreme Court in 1954.

Sitting en banc, the court affirmed the Summit County court's adjudication of

Blue River rights and priority dates for Denver and Colorado Springs.  Id. at

995-1005, 1006-09.  The court reversed the "denial of any decree to the Green

Mountain Reservoir and power plant," remanding to the Summit County Court

with instructions to adjudicate rights for the Green Mountain facility.  City &

County of Denver, 276 P.2d at 1015.  "Water rights cannot in fact be adjudicated

as to part of the claimants only," the court reasoned; "[t]hey are relative both as

to time and amount," so that "[n]one is certain unless all are determined."  Id. at

1011.

---

[2](...continued)
City & County of Denver v. N. Colo. Water Conservancy Dist., 276 P.2d 992,
1009 (Colo. 1954) (en banc).

C.    *The Consolidated Cases in federal court*

On remand of CA 1805 and CA 1806, in April of 1955, the United States

was served with notice and a summons pursuant to the McCarran Amendment, 43

U.S.C. § 666, which Congress had passed in 1952.  The United States promptly

removed CA 1805 and CA 1806 to federal court.  Denying the Cities' motion to

remand the cases to state court, the district court "specifically limited the issues

in those removed cases to be in accordance with the mandate of the Supreme

Court of the State of Colorado."  (Aplt. App. at 246.)  Removed cases CA 1805

and CA 1806 were re-numbered Civil Action 5016 ("CA 5016") and Civil Action

5017 ("CA 5017"), and they were consolidated for trial with the United States'

declaratory judgment action, CA 2782.  CA 2782, CA 5016, and CA 5017 became

known as the "Consolidated Cases" in the United States Court for the District of

Colorado.[3]

The district court issued its Findings of Fact and Conclusions of Law and

Final Decree in the Consolidated Cases–the "Blue River Decree"–in October of

1955.  The Blue River Decree, which incorporated the parties' settlement

agreement and stipulation, adjudicated the United States' right to divert Blue

River water for the Green Mountain Reservoir and Power Plant, with a priority

_____

[3]The parties to the Consolidated Cases are the United States, the Northern
Colorado Water Conservancy District, the Colorado River Water Conservation
District, the Cities, the Grand Valley Water Users Association, the Orchard Mesa
Irrigation District, the Palisade Irrigation District, the Grand Valley Irrigation
Company, and the Middle Park Water Conservancy District.  (Aplt. App. at 27.)

date of August 1, 1935.  The Decree incorporated by reference the Summit
County District Court's decrees in CA 1805 and CA 1806, insofar as those
decrees adjudicated the Cities' water rights.  The Decree also included a
stipulation between the United States and the Cities permitting the Cities, under
certain circumstances, to divert Blue River water out-of-priority as against the
Green Mountain Power Plant right.  Climax refers to this stipulation as the
"Power Interference Agreement."  (Aplt. br. at 9.)

The Power Interference Agreement provided that the Cities' out-of-priority
diversions of Blue River water were "subject to the rights of the United States of
America to fill each year the Green Mountain Reservoir to a capacity of 154,645
acre feet for utilization by the United States of America in accordance with . . .
Senate Document No. 80."  (Aplt. App. at 272.)  These out-of-priority diversions
thus were "subject to the decision of the Secretary of the Interior that [they] will
not adversely affect the ability of Green Mountain Reservoir to fulfill its function
. . . except only as to the production of power."  (Id.)

The Power Interference Agreement further provided that the Cities could
divert out-of-priority water as against the Green Mountain Power Plant right
"solely [for] municipal purposes," and only if the Cities delivered to the United
States "electrical energy . . . in substantially the same amounts, at approximately
the same hours and at substantially the same rates of delivery" that the Green
Mountain Power Plant would have generated in the absence of the out-of-priority

9

diversions.  (Id. at 272, 273.)  In addition, the Agreement dictated that the Cities

"will at all times bypass water in quantities sufficient to meet all legal calls of

downstream water rights on the Blue River, and within Colorado below the

confluence of that stream with the main stream of the Colorado River."  (Id. at

273.)

The district court "retain[ed] continuing jurisdiction for the purpose of

effectuating the objectives of" the Blue River Decree, which was "approved by

the United States Congress in P.L. 485, 84th Congress, April 11, 1956."  (Id. at

306, 451.)  Invoking that continuing jurisdiction, the parties to the Consolidated

Cases have returned to the district court to settle a number of disputes since the

Decree was issued in 1955.  Climax has never successfully intervened in those

disputes.

Climax first moved to intervene in the Consolidated Cases in 1962, when

Denver and the CRWCD argued in Summit County District Court CA 1710 that

"all matters involving water rights in Water District No. 36 had been removed to

[the federal court] as a result of the removal of Civil Actions Nos. 1805 and

1806."  (Aplt. App. at 480.)  In a June 1963 order denying the motion to

intervene, the district court held that CA 1710 had not been removed to federal

court, and that there was no federal court jurisdiction over that action.  The

district court explained,

> Under the laws of the State of Colorado this Court can take no
> action in the removed Civil Action No. 1806 [federal CA 5017]
> affecting the vested property rights of American Metal Climax, Inc.,[4]
> which it has obtained in Civil Action No. 1710 . . . .
>
> American Metal Climax, Inc., is not and will not be bound by the
> judgment of this Court in these consolidated actions entered October
> 12, 1955, or by any future judgment, order or decree of this Court
> entered in Civil Action No. 5017.

(Id. at 485-86.)  Climax again moved to intervene in the Consolidated Cases

during a 1992 dispute among the parties, but voluntarily withdrew that motion

before it was decided.

D.    *Climax's instant motion to intervene*

Following its almost fifty years of continuous operation from 1937 through

1984, the Mine generally has been dormant since 1984.  Climax plans to return

the Mine to full operation this year, and it "will need to exercise all of its water

rights in-priority to operate the mine at full capacity."  (Aplt. br. at 5.)  Climax's

CA 1710 rights account for between thirty-five and thirty-nine percent of the

Mine's water supply.

According to Climax, at a February 18, 2005, meeting of Colorado River

water users, the Colorado State Engineer–the state's primary administrator of

water rights–indicated that he planned to administer Climax's CA 1710 rights as

junior to both the federal Green Mountain Power Plant right and Denver's Blue

River Project Diversion right under the Power Interference Agreement.  Climax

---

[4]American Metal Climax, Inc., was Climax's predecessor in interest.

11

believes that its CA 1710 rights are senior to both the Green Mountain Power

Plant right and Denver's right to divert Blue River water under the Power

Interference Agreement, and thus disputes the State Engineer's planned method of

administration.

After "attempting, unsuccessfully, to resolve the dispute short of litigation"

(Aplt. App. at 569), Climax filed its Motion to Intervene in the Consolidated

Cases, along with a Petition on Intervention for Declaratory Relief.  Climax

ultimately sought "a declaratory judgment announcing the relative priority of its

water rights on the Blue River *vis-à-vis* those rights decreed by [the district] court

to other parties in the Blue River Decree."  (Dist. ct. order at 2.)  The Northern

Colorado Water Conservancy District ("NCWCD") and the Cities opposed the

motion to intervene; the CRWCD, Grand Valley Water Users Association,

Orchard Mesa Irrigation District, Palisade Irrigation District, Grand Valley

Irrigation Company, and Middle Park Water Conservancy District responded to

the motion but did not oppose it; and the United States did not respond to the

motion.

The district court denied Climax's motion as to both intervention of right

and permissive intervention under Fed. R. Civ. P. 24.  The court held that Climax

could not meet the impairment-of-interest requirement for intervention as of right

under Rule 24(a)(2), because the rule "requires that a would-be intervenor be 'so

situated that underlying of the action may as a practical matter impair or impede

12

[its] ability to protect its interest.'" (Dist. ct. order at 15 (quoting Fed. R. Civ. P. 24(a)(2)) (emphasis and alteration added by district court).)  The court explained that "[a]s a matter of plain meaning, . . . this phrase requires some <u>pending</u> action or judgment of the court that–absent the intervenor's actions–might practically impair its interest."  (<u>Id.</u> (emphasis added by district court).)  Here, there is no "currently pending motion or proceeding before [the] court" in the Consolidated Cases, and the district court reasoned that granting the motion "could raise grave concerns as to a would-be intervenor's ability to skirt standing requirements." (<u>Id.</u> at 15, 16.)

The court went on to deny permissive intervention under Rule 24(b) on the ground that, based on Climax's dispute with the State Engineer, the State Engineer likely would become a necessary party to the Consolidated Cases, thus causing undue delay for, or prejudice to, the existing parties.  The court also concluded that "state water court appears to present the most natural forum for assessing the relative priority of Climax's [CA 1710] rights . . . *vis-à-vis* those rights" adjudicated in the Blue River Decree.  (<u>Id.</u> at 26.)

Climax timely appealed.

13

## II.    DISCUSSION

A.    *Standard of review*

If we reach the merits of Climax's appeal, our review of the district court's denial of the motion to intervene as of right will be de novo, while our review of the denial of the motion for permissive intervention will be for abuse of discretion.  DeJulius v. New Eng. Health Care Employees Pension Fund, 429 F.3d 935, 942 (10th Cir. 2005).

However, "[b]efore turning to the merits, we must address the threshold question" of whether Climax has standing to intervene in the Consolidated Cases. Wyoming ex rel Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008). "Any party, whether original or intervening, that seeks relief from a federal court must have standing to pursue its claims."  Dillard v. Chilton County Comm'n, 495 F.3d 1324, 1330 (11th Cir. 2007) (per curiam), cert. denied, Green v. Chilton County Comm'n, 128 S. Ct. 2961 (2008).  Furthermore, although the district court did not rule on whether Climax had standing to intervene, and "[a]lthough neither side raises the issue here,[5] we are required to address the issue."  FW/PBS, Inc. v.

---

[5]The Cities and NCWCD did argue before the district court that Climax's motion was not ripe, but the district court dismissed that argument because the parties failed to provide any legal support for the theory that there is a "ripeness requirement within the timeliness requirement of a motion to intervene."  (Dist. ct. order at 10 n.2.)  The Cities and NCWCD also point out in their Answer Brief that there is no current dispute among the parties to the Consolidated Cases, and that Climax does not allege that it has a dispute with any of those parties.  (Aple. br. at 2-3.)

14

City of Dallas, 493 U.S. 215, 230-31 (1990), overruled on other grounds, City of

Littleton v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774 (2004). "The federal courts are

under an independent obligation to examine their own jurisdiction, and standing

'is perhaps the most important of the jurisdictional doctrines.'" Id. at 231

(quoting Allen v. Wright, 468 U.S. 737, 750 (1984) (alteration omitted)); see also

New Eng. Health Care Employees Pension v. Woodruff, 512 F.3d 1283, 1288

(10th Cir. 2008). We review questions of standing de novo. Crank, 539 F.3d at

1241.

      B.    *Does Climax have standing to intervene in the Consolidated Cases?*

          1.    <u>What Climax must establish</u>

"'[O]n many occasions the Supreme Court has noted that an intervenor may

not have standing, but has not specifically resolved that issue, so long as another

party to the litigation has sufficient standing to assert the claim at issue.'" San

Juan County, Utah v. United States, 503 F.3d 1163, 1171-72 (10th Cir. 2007) (en

banc) (quoting panel decision in San Juan County, Utah v. United States, 420

F.3d 1197, 1205 (10th Cir. 2005) (citing McConnell v. Fed. Election Comm'n,

540 U.S. 93, 233 (2003); Arizonans for Official English v. Arizona, 520 U.S. 43,

66 (1997); and Diamond v. Charles, 476 U.S. 54, 64 (1986))). Where a proposed

intervenor has been permitted to intervene on the basis of an existing party's

standing to assert the claim at issue, the Court has described the situation as

"piggyback" standing. Diamond, 476 U.S. at 64.

We have held that "parties seeking to intervene under Rule 24(a) or (b) need not establish [independent] Article III standing <u>so long as another party with constitutional standing on the same side as the intervenor remains in the case.</u>" <u>San Juan County</u>, 503 F.3d at 1172 (quotation omitted; emphasis added).  We reasoned that such piggyback standing is permissible because "[i]n that circumstance the federal court has a Case or Controversy before it regardless of the standing of the intervenor."  <u>Id.</u>  Under <u>San Juan County</u>, Climax thus must establish that "the federal court has a Case or Controversy before it," either because Climax has independent Article III standing or because "another party with constitutional standing on the same side" as Climax remains in the case.  <u>Id.</u>

2.    <u>Whether Climax may establish independent standing</u>

In order to satisfy Article III requirements independently, Climax bears the burden of proving

> (1) [that] it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

<u>New Eng. Health Care</u>, 512 F.3d at 1288.  This showing establishes "a justiciable case or controversy," and thus enables federal court jurisdiction.  <u>Utah Animal Rights Coal. v. Salt Lake County</u>, 566 F.3d 1236, 1240 (10th Cir. 2009).

Climax alleges that the State Engineer has announced an intention to administer Climax's CA 1710 water rights as junior to the Green Mountain Power

16

Plant right and Denver's Blue River Diversion Project right under the Power

Interference Agreement.  According to Climax, the Mine would lose thirty-five to

thirty-nine percent of its required water supply if its CA 1710 rights are thus

subordinated to the United States' and Denver's rights under the Blue River

Decree.  The Mine would then be disabled from operating at its planned level of

production after its 2009 restart.  These allegations demonstrate an injury in fact

that is concrete and particularized as well imminent.

Climax's independent standing founders, however, on the rock of fair

traceability.  A plaintiff's injury is fairly traceable to the challenged action of a

defendant where there is a "causal connection between the injury and the conduct

complained of"–that is, where the injury is the result of "the challenged action of

the defendant and not the result of the independent action of some third party not

before the court."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)

(emphasis added; quotation, alteration omitted).  Here, "Climax did not allege

that any of the existing parties in the Consolidated Cases has performed or

proposed any act that threatens Climax's water rights or their relative priorities."

(Aple. br. at 3.)  "Instead, Climax has alleged that acts or proposed acts of the

Colorado State Engineer threaten its water rights."  (Id.)  The State Engineer is

not a party to the Consolidated Cases and is "not before the court," Lujan, 504

U.S. at 560.  Any injury in fact to its CA 1710 rights that Climax may suffer,

therefore, is not fairly traceable to a challenged action of any existing party to the

17

Consolidated Cases.  Climax is unable to establish independent standing to intervene.

### 3.  Whether Climax may establish piggyback standing

To establish piggyback standing, Climax must demonstrate that there remains in the Consolidated Cases, on the same side as Climax, another party with Article III standing.  In other words, there must be "another party to the litigation [that has] sufficient standing to assert the claim at issue." San Juan County, 503 F.3d at 1171 (quotation omitted).

The critical issue we must decide in this appeal is whether there remains a constitutional Case or Controversy before the federal court–and thus standing for the existing parties–where that court has retained jurisdiction over a case in which it has already issued a final decree, but where there is no current, active dispute among those existing parties that they have asked the court to resolve.  For the reasons that follow, we conclude that despite its "retained jurisdiction,"[6] a federal court in such a situation does not have before it a Case or Controversy, and that the existing parties consequently do not have constitutional standing upon which a prospective intervenor may piggyback.

---

[6]The term "retained jurisdiction" is something of a misnomer in this context, as a federal court may not create, by fiat, a perpetual Case or Controversy before it.  See infra, pp. 20-21.

18

> a.   The Case or Controversy requirement in cases of
> retained jurisdiction

Because this is a question of first impression in this circuit, we look to our

sister circuits for guidance.  In <u>Dillard v. Chilton County Commission</u>, the

Eleventh Circuit decided a case with facts analogous to those before us here.  In

<u>Dillard</u>, the district court had entered, in 1988, a consent decree in a Voting

Rights Act case; the court had then retained jurisdiction over the case to enforce

that decree.  <u>Id.</u> at 1327, 1337.  Some fifteen years later, two proposed intervenors

sought to intervene in the "long-pending case" in order to vacate the consent

decree, which they alleged exceeded the district court's authority and violated

federal law.  <u>Id.</u> at 1327, 1329.  The Chilton County Commission, the existing

party upon whose side the intervenors proposed to make their complaint-in-

intervention, "did not join in the Intervenors' request for relief, nor did it pray

independently for relief from continued application of the consent decree."  <u>Id.</u> at

1329.  Indeed, the Commission "took no action on its own behalf to invalidate the

consent decree," and it filed no claims against Dillard (the existing party

adversarial to the Commission) that "would have revived the prior adversarial

conflict between the original parties."  <u>Id.</u>

Like this court, the Eleventh Circuit holds that a prospective intervenor

may piggyback upon the standing of an existing party to a case, provided that

there is "a justiciable case or controversy at the point at which intervention is

sought." Id. at 1330; see San Juan County, 503 F.3d at 1172.  The Dillard court
explained that "[t]his rule is not without limits:  Intervenors must show
independent standing to continue a suit if the original parties on whose behalf
intervention was sought settle or otherwise do not remain adverse parties in the
litigation." Dillard, 495 F.3d at 1330.  Furthermore, because there must be a
justiciable case or controversy when intervention is sought, "[n]either the mere
existence of a consent decree nor the continuation of the district court's
jurisdiction for enforcement purposes is enough to support piggyback standing
absent an existing dispute between the original parties for which they seek a
judicial resolution." Id. at 1336 (emphasis added).

The Seventh Circuit has explained in compelling terms why mere retained
jurisdiction over a case does not create a perpetual case or controversy, even for
the original parties to the case.  In United States v. Accra Pac, Inc., 173 F.3d 630,
633 (7th Cir. 1999), the Government argued that a "court's authority to
superintend the implementation of a consent decree dissolves all obstacles to
judicial review."  The Seventh Circuit rejected that argument, explaining that
even for the original parties to a decree over which the district court has retained
jurisdiction, initiating an action in the case requires an active adversarial dispute:

> [D]istrict judges can't suspend the application of Article III or grant
> themselves the power to issue advisory opinions one case at a time,
> and litigants can't stipulate to the enlargement of federal jurisdiction.
> A case or controversy must be present at every moment of the
> litigation. . . .

20

> Like many another decree, this one reserved to the court the
> power of enforcement. But general language about continuing
> jurisdiction must be limited to enforcement of the decree when the
> parties are at loggerheads about some concrete subject, lest it
> condone a violation of Article III.

Id. We agree with the reasoning of Dillard and Accra Pac and now hold that within litigation over which a district court has retained jurisdiction after entering a final decree, a proposed intervenor may not establish piggyback standing where the existing parties are not seeking judicial resolution of an active dispute among themselves. Applying that holding, we turn to an analysis of whether the existing parties to the Consolidated Cases have standing upon which Climax may piggyback in its motion to intervene.

> b.    Whether there is a current, active dispute among the
>       existing parties to the Consolidated Cases

In order to determine whether the existing parties have standing upon which Climax may piggyback, we must determine "whether there is an ongoing litigation claim or controversy between" those parties. Dillard, 495 F.3d at 1338. The test for that determination is "whether one party or the other to the decree is seeking 'judicial resolution of the dispute.'" Id. (quoting Diamond, 476 U.S. at 62; alteration omitted). "'The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art[icle] III's requirements' of a case or controversy unless one party is actually seeking judicial relief against another." Id. (quoting Diamond, 476 U.S. at 62).

As Climax conceded at oral argument, there is no active adversarial dispute to which the existing parties to the Consolidated Cases are seeking judicial resolution.  Because there is thus no constitutional Case or Controversy within the Consolidated Cases, even the original parties to the lawsuit do not have standing to pursue an action based merely on the district court's retained jurisdiction. Consequently, no other party "with constitutional standing" and on the same side as Climax is currently involved in the Consolidated Cases, so that the district court did <u>not</u> have a "Case or Controversy before it regardless of the standing of the intervenor." <u>San Juan County</u>, 503 F.3d at 1172.  Climax is unable to establish piggyback standing to intervene.

## III.   CONCLUSION

"[N]either forms of action nor modes of procedure operate to confer jurisdiction not otherwise extant."  <u>United States v. Martin</u>, 267 F.2d 764, 769 (10th Cir. 1959).  Because Climax is unable to demonstrate either independent or piggyback standing to intervene in the Consolidated Cases, we VACATE the district court's order and REMAND with instructions to dismiss Climax's motion for lack of jurisdiction.[7]

---

[7]Because of our ruling on jurisdiction, we do not reach the merits of the district court's rulings on intervention.

22

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

November 25, 2009

Douglas E. Cressler
Chief Deputy Clerk

To all counsel of record:

**RE:    08-1154, CO River Wtr Conservation Dist, et al v. N. CO Wtr Conservancy
Dist, et al**
Dist/Ag docket: 1:49-CV-02782-EWN-CBS, 1:55-CV-05016-EWN, 1:55-CV-05017-EWN

Dear Counsel:

Enclosed is a copy of the opinion of the court in the captioned case. Judgment was
entered today.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

EAS/klp