IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Acton No.: 49-cv-02782-MSK-CBS

Consolidated Civil Case Nos. 2782, 5016 and 5017 and

DISTRICT COURT, WATER DIVISION NO. 5 STATE OF COLORADO
Case No. 06CW255

—————————————————————————————————————

CONCERNING THE APPLICATION FOR WATER RIGHTS OF THE CITY AND COUNTY
OF DENVER, ACTING BY AND THROUGH ITS BOARD OF WATER COMMISSIONERS,
IN SUMMIT COUNTY

—————————————————————————————————————

### OPPOSER CLIMAX MOLYBDENUM COMPANY'S AMENDED STATEMENT OF OPPOSITION STATING COUNTERCLAIMS AND CROSSCLAIMS

—————————————————————————————————————

Comes now Opposer, Climax Molybdenum Company ("Climax") and, pursuant to Fed.
R. Civ. P. 13 and 15, presents the Court with its Amended Statement of Opposition Stating
Counterclaims and Crossclaims in response to the Amended Application for Finding of
Reasonable Diligence and to Make Absolute Conditional Water Rights and Applicant's Initial
Statement of Affirmative Defenses (the "Amended Application") filed by Applicant the City and
County of Denver Acting by and Through its Board of Water Commissioners ("Denver" or
"Applicant"), accepted for filing on May 29, 2009.

1.      Name, mailing address and telephone number of Opposer:

        Climax Molybdenum Company ("Climax")
        Highway 91, Fremont Pass
        Climax, Colorado 80429
        Telephone: (719) 486-2150

2.     State facts as to why the Amended Application should not be granted or why it should be granted only in part or on certain conditions:

A.     Climax owns water rights on the Colorado River and its tributaries that may be materially injured if the Amended Application is granted without appropriate protective terms and conditions.

B.     The Amended Application must meet the requirements of C.R.S. § 37-92-305(9). The Applicant must establish that waters can and will be diverted, stored or otherwise captured, possessed and controlled and will be beneficially used, and that the project will be completed with diligence and within a reasonable time.  The Applicant must also show that the claimed beneficial use is not based upon speculative purposes and that any claimed beneficial use was in accordance with the terms of the Blue River Decree and Colorado water law.

C.     The Applicant must prove that it expended the steady application of effort to complete the appropriation in a reasonably efficient and expedient manner.

D.     The Applicant must meet its burden of proof with respect to each element of its claims, including ownership of or right to use each water right and structure described in the Amended Application.

E.     The Amended Application contains insufficient information to enable Climax to determine whether other grounds for objection exist. Climax therefore reserves the right to state further grounds for objection when more information is available.

F.     Climax's Amended Statement of Opposition is continuing in nature and shall apply equally to any further Amended Application that may be filed herein, so that the filing of a separate Statement of Opposition to any such further Amended Application shall not be required.

## <u>COUNTERCLAIMS AND CROSSCLAIMS</u>

Climax asserts the following counterclaims and crossclaims in response to the new affirmative defenses raised by Denver in its Amended Application.  This Amended Statement of Opposition is timely pursuant to Fed. R. Civ. P. 15(a)(3) because it is filed within fourteen (14) days of May 29, 2009, the date the Amended Application was accepted for filing, not including the period of time between June 6, 2009 and December 30, 2009 during which this matter was stayed.  (5/29/09 Minute Order, Doc. # 282; 5/29/09 Notice of Amended Application, Doc. # 283; 6/5/09 Minute Entry, Doc. # 285)

### INTRODUCTORY ALLEGATIONS

1.      Climax's counterclaims and crossclaims concern the following water rights and agreement:

(a)  *Climax's CA 1710 Water Rights*.  The Climax Mine is located at the headwaters of the Blue River.  Climax's Blue River water rights were decreed on or about October 26, 1937 in Colorado Water District No. 36 by the Summit County, Colorado, District Court (the "Summit County Court") in Civil Action 1710, with an August 15, 1935 appropriation date ( the "CA 1710 Water Rights").[1]

(b)  *Denver's Blue River Diversion Project Water Rights*.  On or about October 12, 1955, this Court decreed conditional rights for Denver's Blue River Diversion Project in the Blue River Decree, recognizing a 1946 appropriation date (the "Blue River Diversion Project

_____

[1] The term "appropriation date" refers to the nominal priority of a water right based on the date of initiation of its appropriation.  Water rights in Colorado are administered according to their date of *adjudication*.  However, courts and state water administrators look to a water right's appropriation date to determine the order of priority of administration of different water rights adjudicated in the same year.  *See* C.R.S. § 37-92-206; <u>United States v. Bell</u>, 724 P.2d 631, 641-42 (Colo. 1986) (*See also infra* ¶¶ 20-22.)  The term "priority date" is often used in older decrees such as the Blue River Decree with the same meaning.

Water Rights").  Denver's Blue River Diversion Project Water Rights are the subject of these diligence proceedings.  Denver's Blue River Diversion Project primarily consists of the Harold D. Roberts Tunnel (formerly the Montezuma Tunnel, now know as the "Roberts Tunnel") and Dillon Reservoir, an approximately 252,000 acre-feet reservoir located on the Blue River in Summit County, Colorado.  Dillon Reservoir and the Roberts Tunnel are located between the Climax Mine and Green Mountain Reservoir on the Blue River, approximately eighteen miles downstream from the Climax Mine and approximately twenty-eight miles upstream from Green Mountain Reservoir.  Together, the Roberts Tunnel and Dillon Reservoir allow Denver to divert water from the Blue River on the West Slope of the Continental Divide for use in Denver's service area on the East Slope of the Continental Divide.

(c) *The United States of America's GMR Hydro Right and GMR Storage Right.* The United States of America ("United States") was the applicant for, and is the holder/trustee of, water rights decreed by this Court in the Blue River Decree to the Colorado-Big Thompson Project, a federal water project delivering water from the Colorado River on the West Slope to recipients in Northern Colorado on the East Slope (the "C-BT Project").  The C-BT Project includes Green Mountain Reservoir and the Green Mountain Reservoir Hydroelectric Plant.  As explained in more detail below, the October 12, 1955 Blue River Decree decrees to the United States a 1,726 cubic feet per second (c.f.s.) non-consumptive direct flow right for power generation at the Green Mountain Reservoir Hydropower Plant with an August 1, 1935 appropriation date (the "GMR Hydro Right").  The Blue River Decree also decrees to the United States a 154,645 acre-feet storage right in Green Mountain Reservoir with the same August 1, 1935 appropriation date (the "GMR Storage Right").  Currently, the GMR Hydro Right and

GMR Storage Right are being administered according to their August 1, 1935 appropriation dates, without postponement (*see infra* ¶¶ 20-22).

(d)     *The Power Interference Agreement.*  The Power Interference Agreement is not a decreed water right.  Instead, it is an agreement between Denver and the United States contained, along with other stipulated terms, in the "Stipulation of October 5, 1955, filed with this Court on that date, and the Amendment to that Stipulation, dated October 10, 1955" (the "Blue River Decree Stipulation") which is contained in the Findings of Fact and Conclusions of Law entered in Case Nos. 5016 and 5017 and 2782 as part of the Blue River Decree. Under the Power Interference Agreement, Denver may divert water attributable to the GMR Hydro Right in exchange for providing to the United States the associated amount of power that the direct flow water diverted by Denver otherwise would have produced at the Green Mountain Reservoir Hydropower Plant.  There are several conditions associated with Denver's ability to divert pursuant to this Agreement, as described in more detail below.

2.     Denver has asserted in these diligence proceedings that it may divert water for its Blue River Diversion Project Water Rights pursuant to the Power Interference Agreement before the GMR Storage Right has been fully satisfied.  Denver has also asserted in these diligence proceedings that it may divert water pursuant to the Power Interference Agreement using the GMR Hydro Right's priority, instead of using the Blue River Diversion Project Water Rights' priority which is junior to the GMR Hydro Right.

3.     These assertions by Denver threaten the priority of Climax's CA 1710 Water Rights.  To protect its CA 1710 Water Rights, Climax raises two counterclaims and two crossclaims, summarized here and explained in more detail below.

4.      In its first counterclaim against Denver, the "Power Interference Claim," Climax asserts that Denver may only divert pursuant to the Power Interference Agreement when the GMR Storage Right is satisfied and Denver's Blue River Diversion Project Water Rights are in priority.  Senate Document 80 (the Congressional document authorizing the C-BT Project and Green Mountain Reservoir) clarifies that Green Mountain Reservoir was constructed to protect water rights decreed to water users on the West Slope of Colorado from the impacts of the C-BT Project.  Together, the Blue River Decree and Senate Document 80 preclude Denver from using Green Mountain Reservoir rights (via the Power Interference Agreement) to divert water ahead of West Slope water rights that are senior to Denver's Blue River Diversion Project Water Rights, including Climax's CA 1710 Water Rights.

5.      Furthermore, under the terms of the Blue River Decree and the February 9, 1978 Supplemental Judgment and Decree entered in Case Nos. 5016, 5017 and 2782 interpreting that Decree, Denver cannot divert under the Power Interference Agreement until: (1) Green Mountain Reservoir has filled; (2) the Secretary of Interior has given permission; and (3) "such diversions by Denver would otherwise be in priority."

6.      In its second counterclaim against Applicant Denver, the "GMR Hydro Right Priority Claim," Climax asserts that its CA 1710 Water Rights, adjudicated in 1937 with an August 15, 1935 appropriation date, are senior to the GMR Hydro Right, adjudicated in 1955 with an August 1, 1935 appropriation date, and that Climax's CA 1710 Water Rights should therefore be administered as senior to the GMR Hydro Right.  The impact of this counterclaim on these diligence proceedings is that if Denver has been diverting under the Power Interference Agreement using the appropriation date of the GMR Hydro Right, and the GMR Hydro Right is

junior to Climax, then Denver has been diverting out of priority and improperly relying on water attributable to Climax's CA 1710 Water Rights to show diligence for its Blue River Diversion Project Water Rights.

7.     Climax's crossclaims against co-party the United States stem from its GMR Hydro Right Priority Claim against Applicant Denver.  For its crossclaims, Climax asserts that its CA 1710 Water Rights, adjudicated in 1937 with an August 15, 1935 appropriation date, are senior to (a) the GMR Hydro Right, adjudicated in 1955 with an August 1, 1935 appropriation date, and (b) the GMR Storage Right, also adjudicated in 1955 with the same August 1, 1935 appropriation date.  Climax's CA 1710 Water Rights should therefore be administered as senior to the GMR Hydro Right and GMR Storage Right.

A.     **Procedural history of these diligence proceedings.**

8.     These diligence proceedings are before the United States District Court, District of Colorado (the "Court") sitting as a Colorado water court, to determine whether Denver has diligently pursued the application to beneficial use of its Blue River Diversion Project Water Rights and whether some of those rights should be deemed absolute.

9.     Denver's Blue River Diversion Project Water Rights were originally decreed as conditional rights by the Summit County Court in Civil Actions 1805 and 1806 ("CA 1805 and 1806").  These two cases were removed to this Court by the United States after the parties to CA 1805 and 1806 joined the United States to those state court water cases to pursue the adjudication of the United States' water rights associated with the Bureau of Reclamation's C-BT Project.

10.     Upon removal to federal court, CA 1805 and 1806 were re-numbered as Case Nos. 5016 and 5017 and were consolidated with federal court Case No. 2782, a water right quiet

title action brought by the United States against certain entities on the East Slope of the Continental Divide in Colorado, including Denver and the City of Colorado Springs.  Together, Case Nos. 5016, 5017 and 2782 are known as the "Consolidated Cases" and the collection of findings of fact and conclusions of law (which incorporate the Blue River Decree Stipulation) and final decrees entered in these cases on October 12, 1955 is known as the "Blue River Decree."

11.    Denver filed its Application for a Finding of Reasonable Diligence and to Make Absolute a Conditional Water Right (the "Application") on December 26, 2006 concurrently in the Colorado state court, Water Division 5, Case No. 06CW255, and in this federal Court in the Consolidated Cases, seeking a determination of diligence for its Blue River Diversion Project Water Rights and to make a portion of those rights absolute.  (12/26/06 Notice of Application, Doc. # 146)

12.    On February 28, 2007, Climax filed a timely Statement of Opposition to Denver's Application in order to protect its CA 1710 Water Rights and to ensure Denver meets the required burden of proof to show diligence for its Blue River Diversion Project Water Rights. (2/28/07 Statement of Opposition, Doc. #156)

13.    Denver's instant diligence action is raised in the Consolidated Cases pursuant to the Final Judgment entered in Case Nos. 5016 and 5017 on October 12, 1955, which decreed that Denver was required to prove due diligence on its conditional Blue River Diversion Project Water Rights.

14.    These diligence proceedings initially were held in Colorado state court in Case No. 06CW255.  The Colorado Division Engineer's summary of consultation was served on the

parties on June 11, 2007 and a status conference was held before the state court water referee on

September 25, 2007.

   15.  In February 2008, the parties agreed that activity in these diligence proceedings

should be handled exclusively by this Court based on the August 4, 1977 Order in the

Consolidated Cases.  The Order states that

> [a]ll proceedings arising under cases numbered 5016 and 5017
> pursuant to the initiation of action by any party shall be before the
> Judge of said United States District Court without reference to any
> referee and any matter which the [Colorado Water Right
> Determination and Administration] Act of 1969 automatically
> refers to a referee is hereby ordered re-referred to the judge of this
> court to which said cases are assigned. . . . The proceedings
> referred to herein shall be limited to those matters relating to the
> filing of applications for quadrennial showing of due diligence and
> applications for making absolute conditional decrees or portions
> thereof.

(Case No. 06CW255, 2/4/08 Motion for an Order Vacating the February 19, 2008 Status
Conference, Doc. # 18439532; Case No. 06CW255, 2/6/08 Response to Motion for an Order
Vacating Status Conference, Doc. # 18473479.)

   16.  Since February 2008, these diligence proceedings have been before this Court in

the Consolidated Cases.

**B.  Climax's actions to protect its CA 1710 Water Rights.**

   17.  Climax was not a party to the original adjudication of Denver's conditional rights

in CA 1805 and 1806 because Climax's senior CA 1710 Water Rights had been decreed prior to

August 20, 1942, when the general adjudication of Water Rights on the Blue River that gave rise

to CA 1805 and 1806 was noticed.

18. Because Climax was not a party to the state court actions, Climax was not made a party when the state court actions were removed to the federal Court and ultimately became the Consolidated Cases.

19. Historically, Climax's lack of party status in the Consolidated Cases had not caused injury to Climax because the water rights decreed in the Consolidated Cases were junior to Climax's upstream CA 1710 Water Rights and had been administered as such by state water administration officials pursuant to the postponement doctrine.

20. The postponement doctrine is a corollary to the prior appropriation doctrine which mandates that water rights in Colorado be enforced according to relative priority. The prior appropriation doctrine, also known as the "first in time, first in right" doctrine, requires that senior water rights receive all of their water before junior rights may be fulfilled. See, Coffin v. Left Hand Ditch Co., 6 Colo. 443, 447 (1882).

21. The prior appropriation doctrine is modified by the "postponement doctrine." Under the postponement doctrine, "[p]riority of appropriation determines the relative priority among water rights or conditional water rights awarded in one calendar year, but, regardless of the date of appropriation, water rights or conditional water rights decreed in one year are necessarily junior to all priorities awarded in decrees in prior years." See United States v. Bell, 724 P.2d 631, 641-42 (Colo. 1986).

22. The postponement doctrine is currently codified at C.R.S. § 37-92-306 and was in effect in 1955 when the Blue River Decree was entered. See Adjudication Act of 1943, § 148-9-13(3), 7 C.R.S. (1963) (repealed and replaced in 1969 by the Water Right Determination and Administration Act. Ch. 373, sec. 20(1), 1969 Colo.Sess.Laws 1200, 1223)); see also City and

County of Denver v. Colorado River Water Conservation Dist., 696 P.2d 730, 739 & n.8 (Colo. 1985).

23.    In 2005, Climax learned that the Colorado State Engineer (the "State Engineer") was planning to administer the GMR Hydro Right and GMR Storage Right according to their August 1, 1935 appropriation dates, without postponement to their October 12, 1955 adjudication date, and therefore as senior to Climax's CA 1710 Water Rights.  The State Engineer also asserted that Denver's Blue River Diversion Project Water Rights, which have a 1946 appropriation date and the same October 12, 1955 adjudication date, would be administered as senior to Climax's CA 1710 Water Rights, which have August 15, 1935 and June 4, 1936 appropriation dates and a 1937 adjudication date, by virtue of the Power Interference Agreement.

24.    Climax filed a Statement of Opposition in these diligence proceedings in February 2007 and thereby became a party to the Consolidated Cases for the purposes of litigating Denver's Application for diligence for its Blue River Diversion Project Water Rights.

25.    In its Statement of Opposition, Climax opposed Denver's diligence application on several grounds, including that Denver "must . . . show that the claimed beneficial use is not based upon speculative purposes and that any claimed beneficial use was in accordance with the terms of the Blue River Decree and Colorado water law."   (2/28/07 Climax Statement of Opposition, Doc. # 156 at ¶ B)

26.    At that time, discovery had not commenced in these diligence proceedings. Therefore, Climax was unaware of Denver's position that – contrary to the Blue River Decree – Denver was able to divert water to satisfy its Blue River Diversion Project Water Rights before

Green Mountain Reservoir had filled, and thereby divert senior to Climax's CA 1710 Water Rights.

27.    Based on the 2005 State Engineer determination regarding administration of Climax's CA 1710 Water Rights, Climax concluded that it needed to intervene as a full party to the Consolidated Cases to seek judicial determination of the relative priority of Climax's CA 1710 Water Rights vis-à-vis those rights decreed by the Blue River Decree, and to seek judicial determination of the proper administration of the Power Interference Agreement.

28.    On April 5, 2007, Climax moved to intervene as a party to the Consolidated Cases.  (4/5/07 Motion to Intervene, Doc. # 159)

29.    In its Petition on Intervention, filed simultaneously with its Motion to Intervene, Climax requested that the Court declare Climax's CA 1710 Water Rights senior in priority to the GMR Hydro Right held by the United States. (4/5/07 Motion to Intervene, Doc. # 159)

30.    In the alternative, Climax requested a declaration that: (a) Denver's diversions or storage of water under the Power Interference Agreement are pursuant to the 1946 priority of the Blue River Diversion Project Water Rights; (b) diversions or storage by Denver under the Power Interference Agreement are junior to Climax's CA 1710 Water Rights; and (c) Denver may not divert or store water under the Power Interference Agreement unless and until Climax's CA 1710 Water Rights are fully satisfied.

31.    The claims Climax raised in its Petition on Intervention were substantially similar to the Power Interference Claim and the GMR Hydro Right Priority Claim Climax now asserts as counterclaims in these diligence proceedings. (*See supra* ¶¶ 4-6)

32.    On March 25, 2008, the Court denied Climax's Motion to Intervene, thereby refusing to accept Climax's Petition on Intervention for filing.  (4/25/08 Order, Doc. # 187)

33.    On April 28, 2008, Climax filed its Notice of Appeal to the Tenth Circuit, appealing the Court's denial of its Motion to Intervene as a full party to the Consolidated Cases. (4/24/08 Notice of Appeal, Doc. # 196)  Briefing in Climax's appeal of its Motion to Intervene began on June 16, 2008 and was closed on August 4, 2008.

**C.    <u>Issues raised through discovery in these diligence proceedings.</u>**

34.    While Climax pursued its Motion to Intervene as a full party into the Consolidated Cases, these diligence proceedings progressed in Colorado state court, Case No. 06CW255, and later in this Court exclusively.  (*See supra* ¶¶ 11-16)

35.    The Initial Scheduling Order before this Court was entered on May 19, 2008, after Climax had filed its Notice of Appeal to the Tenth Circuit of the denial of its intervention petition. (5/19/08 Scheduling Order, Doc. # 209)

36.    Pursuant to the May 19, 2008 scheduling order, initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) were served in these diligence proceedings on or about June 16, 2008, after Climax had filed its Notice of Appeal regarding its Motion to Intervene.  The parties made initial expert disclosures in October 2008.

37.    During discovery in these diligence proceedings, Climax submitted expert reports pursuant to Fed. R. Civ. P. 26(a)(2) that detailed the potential injury to Climax's CA 1710 Water Rights should Denver's Blue River Diversion Project Water Rights be continued, and that described the injury to Climax's CA 1710 Water Rights should the requested amount of Denver's Blue River Diversion Project Water Rights be deemed absolute.  In these reports,

Climax questioned whether Denver properly diverted water pursuant to the Blue River Decree Stipulation.

38.     In its October 15, 2008 expert report, Climax based its injury analysis on two claims: (1) Denver's diversions pursuant to the Power Interference Agreement were exercised unlawfully out-of-priority as against Climax's CA 1710 Water Rights; and (2) Denver improperly relied on its ability to divert under the terms of the Power Interference Agreement (as improperly interpreted by Denver) for water to supply its Blue River Diversion Project Water Rights.

39.     The initial expert report of James E. Slattery, P.E., disclosed by Denver pursuant to Fed. R. Civ. P. 26(a)(2), asserted among other things that: (1) the water available for diversion under the Roberts Tunnel direct flow water right averaged 94,300 acre-feet a year ("Opinion 1") and (2) water is available for diversion under the 788 c.f.s. Roberts Tunnel direct flow right in most years ("Opinion 2").

40.     During Mr. Slattery's November 19, 2008 deposition, Climax learned that Mr. Slattery assumed, as a basis for Opinion 1 and Opinion 2, that Denver had the right to divert water for its Blue River Diversion Project Water Rights before Green Mountain Reservoir had achieved a "paper fill;" that is, Denver could divert without regard for the legal effect of the senior priority of the GMR Storage Right.

41.     Mr. Slattery's opinions were therefore based on an improper interpretation of the Blue River Decree, that is, that Denver could divert water (either directly or via the Power Interference Agreement) with the same priority as that of the United States' GMR Storage Right and GMR Hydro Right.

42.     In his December 8, 2008 rebuttal expert report, Mr. Gary Thompson, P.E., Climax's expert, asserted that Mr. Slattery's opinions regarding the available water supply for Denver's Blue River Diversion Project Water Rights were incorrect because Mr. Slattery's opinions rely on the improper assumption that Denver may divert water for the Blue River Diversion Project before the GMR Storage Right is satisfied.

43.     Mr. Thompson also opined that Mr. Slattery's opinion regarding the availability of 788 c.f.s. for Denver's Roberts Tunnel direct flow right was incorrect because Mr. Slattery based his opinion on the assumption that Denver could divert this water under the Power Interference Agreement even when the GMR Hydro Right and GMR Storage Right were unsatisfied (that is, Denver could divert water under the Power Interference Agreement "using" the United States' priority date for the GMR Hydro Right rather than Denver's junior priority date for its Blue River Diversion Project Water Rights).

44.     In order to address issues raised in discovery, Denver moved the Court to amend its Application on January 26, 2009.  (1/26/09 Motion for Leave to File Amended Application, Doc. # 268)

45.     Climax did not object to this motion, but reserved its right to file a response or subsequent objection.  (1/26/09 Motion for Leave, Doc. # 268)

46.     This Court accepted Denver's Amended Application for filing on May 29, 2009. (5/29/09 Minute Order, Doc. #282; 5/29/09 Notice of Amended Application, Doc. # 283)

**D.    Denver's Amended Application puts matters raised in discovery at issue in these diligence proceedings, and Climax's counterclaims and crossclaims are now ripe for adjudication.**

47.    In its Amended Application, accepted for filing on May 29, 2009, Denver for the first time asserted affirmative defenses.  (5/29/09 Notice of Amended Application, Doc. # 283 at 23.)

48.    In its General Statement of Affirmative Defenses in its Amended Application, Denver contends that "[t]he Opposers' discovery responses and Rule 26 disclosures served to date reflect contentions that are barred as a matter of law, including but not limited to preclusion pursuant to the following Affirmative Defenses: . . . 9.   The Opposers' objections to the Application are contrary to and barred by the Blue River Decree Stipulation."  (Doc. #283 at 16, 17)

49.    This affirmative defense directly addresses Climax's contentions that: (1) Denver's claimed beneficial use of water for its Blue River Diversion Project Water Rights is not in accordance with the Blue River Decree because it is based on Denver's improper diversions of Blue River water under the Power Interference Agreement before the GMR Storage Right is satisfied; and (2) such diversions injure Climax's CA 1710 Water Rights.

50.    On June 5, 2009, this Court entered a stay in these diligence proceedings until December 31, 2009.  (6/5/09 Minute Entry, Doc. # 285)  Although discovery had commenced prior to the stay, it is anticipated that discovery will continue in these diligence proceedings after the stay is lifted.

51.    On November 25, 2009, during the stay of these diligence proceedings, the Tenth Circuit Court of Appeals issued its decision on Climax's Motion to Intervene as a party to the

Consolidated Cases, vacating the Court's opinion and remanding to the Court to dismiss Climax's Motion to Intervene on the basis that Climax lacked standing.  (11/25/09 USCA Opinion and Judgment, Doc. # 289)

52.     The Tenth Circuit concluded that, although Climax "demonstrate[d] an injury in fact that is concrete and particularized as well [as] imminent," it did not have independent Article III standing to assert its claims in the Consolidated Cases.  (Doc. #289 at 17)  In its Article III standing analysis, the Tenth Circuit found that, despite Climax's demonstrable injury in fact, it nonetheless lacked standing to intervene because its allegations of injury were "not fairly traceable to a challenged action of any existing party to the Consolidated Cases."  (Doc. #289 at 17-18)  The Tenth Circuit explained:

> Climax did not allege that any of the existing parties in the Consolidated Cases has performed or proposed any act that threatens Climax's water rights or their relative priorities.  Instead, Climax has alleged that acts or proposed acts of the Colorado State Engineer threaten its water rights. The State Engineer is not a party to the Consolidated Cases and is 'not before the court.'

(Doc. #289 at 17) (internal citations omitted).

53.     The Tenth Circuit also concluded that Climax did not have "piggyback standing" to assert independent claims in the Consolidated Cases because "there is no active adversarial dispute to which the existing parties to the Consolidated Cases are seeking judicial resolution" and therefore no Case or Controversy before the court. (Doc. #289 at 22)

54.     By the fall of 2008 when Climax's Power Interference Claim and GMR Hydro Right Priority Claim had ripened through discovery in these diligence proceedings, Climax had already filed its Notice of Appeal with the Tenth Circuit and briefing had closed.

55.     Climax has standing to assert claims of injury against Denver in these diligence proceedings.  Discovery in these diligence proceedings has revealed that Climax's CA 1710 Water Rights have been directly threatened by Denver's assertions that it has diverted, and is legally entitled to divert, Blue River water to make absolute its Blue River Diversion Project Water Rights, even when those diversions were made prior to Green Mountain Reservoir filling and were thereby out-of-priority relative to Climax's senior CA 1710 Water Rights.

56.     Denver's Affirmative Defenses assert that the Opposers' claims (including Climax's) against it are "contrary to the Blue River Decree."  (5/29/09 Notice of Amended Application, Doc. # 283 at 17)

57.     Climax's position is that Denver cannot demonstrate the feasibility of its Blue River Diversion Project because Denver relies on water that it is illegally diverting out-of-priority as against Green Mountain Reservoir and Climax's CA 1710 Water Rights.

58.     Denver's stated entitlement to this water is the type of "proposed. . . act that threatens Climax's water rights" that the Tenth Circuit found necessary for standing. (11/25/09 USCA Opinion and Judgment, Doc. #289 at 17, citations omitted)

59.     Climax's counterclaims arise out of the same transaction and occurrence that is the subject matter of Denver's Amended Application.  The information revealed in discovery and the affirmative defenses raised in Denver's Amended Application have placed at issue the proper interpretation of the Power Interference Agreement and the correct priority of the GMR Hydro Right in relation to Climax's CA 1710 Water Rights and thus support counterclaims by Climax against Denver's asserted interpretation of the Blue River Decree.

60.     Climax's crossclaims arise out of the same transaction or occurrence that is the subject matter of Denver's Amended Application, and relate to property that is the subject matter of Denver's Amended Application.  The GMR Storage Right and the GMR Hydro Right, which share the same appropriation and adjudication dates, should be administered in the same manner.

### PARTIES, JURISDICTION AND VENUE

61.     Climax is a corporation incorporated under the laws of the State of Delaware.  It is a wholly-owned subsidiary of Freeport-McMoRan Copper and Gold Inc.  Climax owns and operates the Climax Mine, which is located in Summit, Lake, and Eagle Counties in the State of Colorado.  Climax owns the CA 1710 Water Rights that divert from Tenmile Creek, a tributary of the Blue River, and that were decreed by the Summit County Court in Civil Action 1710. Climax is a party to these diligence proceedings.  (2/28/07 Statement of Opposition, Doc. # 156)

62.     The United States owns the GMR Hydro Right and GMR Storage Right as a trustee for the C-BT Project.  The United States is a named party in the Consolidated Cases and has admitted that it is a party to these diligence proceedings.  (12/21/09 Transcript of Rule 16 Hearing, Doc. # 290 at p. 30:1-9)

63.     The Bureau of Reclamation ("the Bureau") is a department or agency within the United States Department of the Interior.  The Bureau is responsible for the day-to-day administration of water projects constructed pursuant to the Reclamation Act of 1902, 32 Stat. 388, as amended.  Under this authority, the Bureau administers the C-BT Project and its features, including Green Mountain Reservoir and the Green Mountain Hydroelectric Plant.

64.     Denver owns and operates the Blue River Diversion Project and is the holder of the Blue River Diversion Project Water Rights.  Denver is a named party to the Consolidated Cases and the Applicant in these diligence proceedings.

65.     Jurisdiction is proper based on the continuing jurisdiction retained by the Court in the Consolidated Cases, based on the August 4, 1977 Order in the Consolidated Cases, and based on the McCarran Amendment, 42 U.S.C. § 666.

66.     Further, the Court has subject matter jurisdiction over these counterclaims and crossclaims pursuant to 28 U.S.C. § 1331, because this action arises under the Blue River Decree, which was incorporated into statute by federal law on April 11, 1956.  Pub. L. No. 84-485, 70 Stat. 105, 110 (1956), *codified at* 43 U.S.C. 620j (1982).  Finally, Climax brings these counterclaims and crossclaims according to the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

67.     Venue is proper in this Court as a continuing matter under the Court's retained jurisdiction, and pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the counterclaims and crossclaims herein occurred in this district, and a substantial part of the property that is the subject of this action is situated in this district.

### GENERAL ALLEGATIONS

68.     Denver asserts in these diligence proceedings that it can divert water to satisfy and make absolute its Blue River Diversion Project Water Rights before the GMR Storage Right is satisfied, thereby diverting senior to Climax's CA 1710 Rights.  The history of the Blue River Decree does not support Denver's assertion.

69.     On June 9, 1934, a supplemental water rights adjudication for purposes other than irrigation was initiated for the Blue River in the Summit County Court in CA 1710.

70.     On or about October 26, 1937, the Summit County Court entered its decree in CA 1710 granting priority numbers to ditches and canals ranging from Priority Number 69 to Priority Number 105-C.  In that adjudication, Climax's CA 1710 Water Rights received the following priority numbers and appropriation dates:  Supply Canal No. 1, Priority Number 99-C, Aug. 15, 1935; Supply Canal No. 2, Priority Number 100-C, Aug. 15, 1935; Ten Mile Diversion Ditch No. 1, Priority Number 103-C, June 4, 1936; Ten Mile Diversion Ditch No. 2, 104-C, June 4, 1936; and Chalk Mountain Ditch, Priority Number 105-C, June 4, 1936.  The letter "C" in these priority numbers denotes the fact that those water rights were decreed as conditional water rights. Climax's conditional water rights that were adjudicated in CA 1710 were made absolute in subsequent years.

71.     In 1942, Denver brought CA 1806 in the Summit County Court as a supplemental adjudication of water rights in the Blue River, Water District No. 36, for purposes other than irrigation, to adjudicate the water rights of its Blue River Diversion Project.

72.     Notice of CA 1806 was published on or about August 20, 1942, and included the following language:  "Provided, any decree entered in this proceeding shall be subject to all valid decrees, original or supplemental, heretofore entered in Water District No. 36, and no such prior decree shall be in any manner changed or modified in this proceeding."

73.     On or about January 19, 1944, the United States and the Northern Colorado Water Conservancy District ("Northern") filed a joint Petition and Statement of Claim in CA 1806 for

Green Mountain Reservoir, the Elliott Creek Feeder Canal, and the Green Mountain Hydroelectric Plant.

74.     On or about June 8, 1949, the United States filed its complaint with this Court in Case No. 2782 to quiet title to water rights associated with the C-BT Project against Denver, Northern, the Colorado River Water Conservation District (the "River District"), the Palisade Irrigation District, the Moffat Tunnel Water & Development Company, the City of Colorado Springs, Public Service Company of Colorado, and the South Platte Water Users Association. By this complaint and among other relief, the United States sought a declaration of the respective rights of Northern, the River District, and the interests they represent in the operation of the C-BT Project under Senate Document 80.   The United States also sought an adjudication of all water rights associated with the C-BT Project, including the water rights for Green Mountain Reservoir and the Green Mountain Hydroelectric Plant.

75.     The United States did not name Climax as a defendant in Case No. 2782.

76.     On or about July 11, 1949, and after the filing of Case No. 2782, the United States filed its notice of withdrawal of claims in CA 1806.

77.     On or about July 11, 1949, the River District filed a statement of claim in CA 1806 for water rights to Green Mountain Reservoir and its associated structures, alleging that the River District was a beneficiary of Senate Document 80 and that Green Mountain Reservoir was constructed for the District's benefit.

78.     The Summit County Court entered its decree in CA 1806 on or about March 10, 1952, denying the River District's statement of claim for water rights for Green Mountain

Reservoir and associated structures. No water rights were decreed in CA 1806 by the Summit County Court for Green Mountain Reservoir or the Green Mountain Hydroelectric Plant.

79.    In the CA 1806 decree, the Summit County Court granted water rights to Denver's Blue River Diversion Project. Dillon Reservoir was decreed a 252,678 acre-feet storage right with a June 24, 1946 appropriation date. In addition, the Roberts Tunnel was decreed a 788 c.f.s. direct flow water right with a June 24, 1946 appropriation date.

80.    The last priority number decreed in CA 1710 to ditches or canals was Priority Number 105(C). The priority numbers that were decreed by the Summit County Court in CA 1806 for ditches and canals were subsequent to the last priority number decreed in CA 1710 (Priority Number 105(C)), ranging from Priority Number 106, with a December 31, 1892 appropriation date, to Priority Number 150(C), with a May 13, 1948 appropriation date.

81.    The decree in CA 1806 stated: "[N]othing herein contained shall be held, deemed or construed to change the date of appropriation or volume or quantity of water appropriated or the time of appropriation or the manner of use, or to in any other way change or modify or adversely affect decrees of this Court heretofore entered."

82.    Denver appealed the 1946 appropriation dates that the Summit County Court adjudicated for the Blue River Diversion Project Water Rights to the Supreme Court for the State of Colorado. The River District cross-appealed the Summit County Court's denial of water rights for Green Mountain Reservoir and Green Mountain Hydroelectric Plant. The Colorado Supreme Court upheld the Summit County Court's judgment regarding the Blue River Diversion Project Water Rights' 1946 appropriation dates. However, the Colorado Supreme Court reversed the Summit County Court with respect to the water rights for Green Mountain Reservoir and the

Green Mountain Hydroelectric Plant, and remanded CA 1806 and CA 1805 (which adjudicated rights on the Blue River for purposes of irrigation) to the Summit County Court for entry of a decree regarding water rights on the Blue River for Green Mountain Reservoir and the Green Mountain Hydroelectric Plant.  See City and County of Denver v. Northern Colo. Water Conservancy Dist., 130 Colo. 375, 276 P.2d 992 (1955).

83.    Upon the Colorado Supreme Court's remand to the Summit County Court, the United States was served notice pursuant to the McCarran Amendment, 43 U.S.C. § 666, and entered its appearance in CA 1805 and 1806.  On May 5, 1955, the United States petitioned to remove the cases to the federal Court.  Removal of CA 1805 and 1806 in their entirety to federal Court was effectuated, and the cases were renumbered in federal Court as Case Nos. 5016 and 5017 (the "Removed Summit County Cases").  Case Nos. 5016 and 5017 were subsequently consolidated for purposes of trial with Case No. 2782 (the "Consolidated Cases").

84.    The "Blue River Decree" was entered by the Court on October 12, 1955 and consists of two separate sets of documents – one set for the Consolidated Cases, and one set for the Removed Summit County Cases.  Findings of Fact and Conclusions of Law were entered in the Removed Summit County Cases as well as in the Consolidated Cases, and incorporated the Blue River Decree Stipulation.

85.    The Blue River Decree Stipulation recites the parties' agreement to the Findings of Fact, Conclusions of Law, and Final Decree and Final Judgment in the Removed Summit County Cases and the Consolidated Cases, and then addresses how the East Slope cities of Denver, Colorado Springs, and Englewood may use certain water diverted from the West Slope.

The Power Interference Agreement is contained in paragraph 4 of the Blue River Decree Stipulation, as one of many stipulated terms.

**A.**     **General allegations regarding Denver's diversion and storage of water under the Power Interference Agreement.**

86.     Paragraph 4(b) of the Blue River Decree Stipulation contains the Power Interference Agreement between Denver and the United States, which states:

> 4(b)     The City and County of Denver and the City of Colorado Springs in consideration of the agreement by the United States of America to permit the use of rights to the use of water by those municipalities as provided in this Stipulation will

> (1)     Deliver or cause to be delivered to the United States of America electrical energy at Green Mountain Substation or such other place or places to be designated by the Secretary of the Interior within a radius of eighty-five miles airline from Denver and all costs of delivery to be borne by the aforesaid municipalities.

> (2)     The electrical energy herein provided for will be delivered to the United States in substantially the same amounts, at approximately the same hours and at substantially the same rates of delivery that would have been generated by the Green Mountain Powerplant had it not been for the diversions of the waters by the municipalities in question.

> Should the City and County of Denver and the City of Colorado Springs or either of them decide to let any other person, corporation or entity use the power drop from such water at any time, such agreement for such use shall be subject to the regulation and approval of the Secretary of the Interior of the United States.

87.     The Power Interference Agreement allows Denver to divert water attributed to the United States' 1,726 c.f.s. direct flow GMR Hydro Right if and only if: (1) Denver has consent to do so from the Secretary of the Interior; (2) Denver's 1946 Blue River Diversion Project Water Rights are in priority; and (3) Denver delivers the quantity of electric power to the United States that would have otherwise been produced by the direct flow of water through the Green Mountain Hydroelectric Plant had the United States diverted the water pursuant to its senior GMR Hydro Right.

88.     The Power Interference Agreement is contained in the Blue River Decree Stipulation between the parties that was incorporated into the Blue River Decree's Findings of Fact and Conclusions of Law.  Nowhere in the Final Judgment for Case Nos. 5016 and 5017 or the Final Decree for Case Nos. 5016, 5017 and 2782 is any water right decreed to Denver pursuant to the Power Interference Agreement.  Nor was the priority for the GMR Hydro Right transferred or changed to the Blue River Diversion Project.

89.     Instead, the Blue River Diversion Project's diversion or storage of water under the Power Interference Agreement is pursuant to Denver's junior priority for the Blue River Diversion Project Water Rights only; Denver cannot show due diligence using any other priority date to divert this water.

90.     As such, if Denver diverts pursuant to the Power Interference Agreement using the GMR Hydro Right's senior priority, and then uses the diverted water for the purposes claimed in its diligence application, Denver cannot establish its lawful ownership or right to use such water because it diverted under a priority other than the junior priority date assigned to the Blue River Diversion Project Water Rights.

91.     The Blue River Decree's Findings of Fact and Conclusions of Law also qualify Denver's right to divert Blue River water because Green Mountain Reservoir must achieve a fill to its capacity of 154,645 acre-feet before Denver may divert under its Blue River Diversion Project Water Rights and the Power Interference Agreement.

92.     In 1964, a dispute arose between the parties to the Blue River Decree about Denver's right to store Green Mountain Reservoir water in Dillon Reservoir in anticipation of a Green Mountain Reservoir fill.  This dispute ultimately led to the April 16, 1964 Consent Decree

entered in the Consolidated Cases, which clarified the rules by which Denver can store water in Dillon Reservoir in anticipation of a Green Mountain Reservoir fill, and also reiterated the fact that Denver has no right, title or interest in the Green Mountain Reservoir.

93.    During the hearing on the 1964 Consent Decree, Glenn Saunders, then counsel for Denver, articulated Denver's position with respect to its priority on the Blue River:  "Simply stated, it is [Denver's] position that we do not divert on rights of the United States but on our own rights when the United States is not exerting or exercising its rights, and the court's statement could be read in the light that we were going to divert the Government's rights, and we are not."

94.    In 1977, a dispute arose between the parties to the Blue River Decree about the nature of Denver's rights with respect to Green Mountain Reservoir pursuant to the stipulations and decrees entered in 1955 and 1964.  Unlike many decrees entered in the history of this proceeding, the 1977 dispute did not result in a stipulation between the parties.  Rather, following a Memorandum Opinion and Order entered by the Court on November 2, 1977, the Court entered a Supplemental Judgment and Decree on February 9, 1978 which determined Denver's rights "as to the operation of Green Mountain Reservoir" under the "Judgments and Decrees of October 12, 1955, and April 16, 1964."  At paragraph 4(b) of the February 9, 1978 Supplemental Judgment and Decree, the Court determined Denver's rights under the Power Interference Agreement as follows:

> 4(b)    *Following completion of the annual filling of Green Mountain Reservoir* under the senior right of the United States, subject to the approval of the Secretary of the Interior, Denver has a right to divert flows in the Blue River at Dillon Reservoir in contravention of the senior power generation right of the United States (which is in the amount of 1726 c.f.s.) *if such diversions by Denver would otherwise be in priority*;

provided, however, that acceptable arrangements for power replacement are tendered to the United States by Denver as stipulated in the 1955 and 1964 Judgments and Decrees.

(Emphasis added.)

95.    The condition of paragraph 4(b) of the February 9, 1978 Supplemental Judgment and Decree that diversions by Denver under its Power Interference Agreement may only occur when "such diversions by Denver would otherwise be in priority" prohibits Denver from diverting and storing under the Power Interference Agreement in contravention of Western Slope water rights that are senior to the Blue River Diversion Project Water Rights.

96.    This condition is necessary in order to prevent Denver from improperly benefiting from the C-BT Project by using the GMR Hydro Right's senior priority to enable the Blue River Diversion Project to divert or store water to the detriment of Western Slope water users like Climax.

97.    Without diverting under the GMR Hydro Right's senior priority, Denver will not have enough water to show that it can and will divert, store or otherwise capture, possess and control sufficient waters to satisfy its diligence obligations under C.R.S. § 37-92-305(9).

98.    The historic beneficial use of Climax's CA 1710 Water Rights has occurred entirely within the Western Slope of Colorado.  The Climax Mine was in full operation from the adjudication of the CA 1710 Water Rights in 1937 until 1984, and was never administered as junior to the GMR Hydro Right, the GMR Storage Right or the Blue River Diversion Project Water Rights.

99.    During the severe drought year of 1977, the Blue River Diversion Project Water Rights were required to stop diverting and storing water, but Climax's CA 1710 Water Rights

were not curtailed. Indeed, total water consumption at the Climax Mine in 1977 was approximately 6,352 acre-feet – the third highest water-use year in the mine's history.

100. Due to a collapse of the molybdenum market in the early 1980's, the Climax Mine generally has not operated since 1984. Even though Climax has not exercised its water rights in recent years, it retains its priority senior to the GMR Hydro Right, the GMR Storage Right and the Blue River Diversion Project Water Rights under Colorado water law because it has not abandoned its rights and intends to begin diverting again after 2010. See C.R.S. § 37-92-103(2).

101. Denver cannot rely on diversions made pursuant to the GMR Hydro Right's priority, and before the GMR Storage Right has been satisfied, to show diligence for its junior Blue River Diversion Project Water Rights. Denver's assertions that it can make such diversions are contrary to the senior priority of Climax's CA 1710 Water Rights, contrary to Senate Document 80, and contrary to the terms of the Power Interference Agreement.

**B.    General Allegations Regarding the GMR Hydro Right and GMR Storage Right.**

102. Under the postponement doctrine, Climax's CA 1710 Water Rights, adjudicated pursuant to an action initiated in 1934 and finalized in 1937, are senior to the rights decreed in the Blue River Decree, initiated in 1942 in CA 1805 and 1806 and finalized in 1955 in the Consolidated Cases, regardless of the appropriation date of the water rights (also referred to in the Blue River Decree as the "priority date") of the water rights. (*See also supra* ¶¶ 1(a) and n.1)

103. The Court's specific intent to apply the postponement doctrine to rights decreed in the Blue River Decree, including the GMR Storage Right and the GMR Hydro Right, in relation

to water rights decreed in CA 1710 is clear from the Court's transcripts and the priority numbers assigned to the GMR Hydro Right and GMR Storage Right.

104.    For example, in the context of the Court's consideration of the set of documents comprising the Blue River Decree, counsel for the River District insisted on a separate set of documents for Case Nos. 5016 and 5017 (the Removed Summit County Cases ).  The reason for this insistence was to ensure that the water rights adjudicated by the federal Court would be administered in accordance with water rights priorities that had been previously awarded in earlier adjudications by the Summit County Court, like those awarded to Climax in CA 1710.

105.    In response to the River District's concerns, the Court entered two sets of documents on October 12, 1955.  The first set of documents was the "Findings of Fact and Conclusions of Law, and Final Judgment" for the Removed Summit County Cases, but not Case No. 2782 (the federal quiet title action).  These documents consisted of a "Findings of Fact and Conclusions of Law" (including the Blue River Decree Stipulation) and a "Final Judgment," but did not include a "Final Decree."

106.    The second set of documents made up the "Findings of Fact and Conclusions of Law, and Final Decree" the Consolidated Cases.  These documents consisted of  "Findings of Fact and Conclusions of Law" (including the Blue River Decree Stipulation) and a "Final Decree," but did not include a "Final Judgment."

107.    The "Final Judgment" entered in the Removed Summit County Cases was the reason that two different sets of documents were entered for the two proceedings.  It was the document selected by the parties and the Court to ensure that the water rights adjudicated by the federal Court would be administered in accordance with water rights priorities that had been

previously awarded in earlier adjudications by the Summit County Court, i.e. the Final Judgment indicated the Court's intent that the postponement doctrine would apply to the rights adjudicated by the Blue River Decree.

108.    The history of the documents constituting the Blue River Decree reflects the deliberate inclusion of priority numbers, in addition to priority dates, in adjudicating the water rights.  Priority numbers assist Colorado water courts in the administration of water rights by employing a simple numerical system rather having courts rely on calendar dates.   For example, if two rights were appropriated on the same day, the water court would assign priority numbers to those rights to organize them in a single file line for administration, rather than organizing them in clumps around certain dates.

109.    On the eve of trial on October 5, 1955, the parties announced a "general theory of the stipulation" and provided the Court with their signed stipulation.

110.    In the days following the submittal of the stipulation to the Court, the parties negotiated and drafted the language and terms of the documents that now constitute the Blue River Decree.  In addition, hearings were conducted in which the United States presented its prima facie case.

111.    On October 11, 1955, while the documents that now constitute the Blue River Decree were being drafted, counsel for the River District, Mssrs. Frank Delaney and John Barnard, tendered to the Court identical motions in Case Nos. 5016 and 5017 entitled "Motion and Request for the Entry of Separate Findings of Fact, Conclusions of Law, and Judgment." While conferring about the reason for the River District's motion, the Court and Mssrs. Delaney

and Barnard discussed the option of incorporating priority numbers for adjudicated water rights into the Final Judgment in the Removed Summit County Cases.

112.    After hearing the position of the United States on the issue, and after hearing from counsel for the River District and the United States on the mechanics and proof by which such priority numbers would be determined, the Court stated the following on the record:

> I am willing to concede that from a practical standpoint if there could be numbers included in here to correspond to the State Decrees and it was absolutely certain that the numbers would be accurate enough that they wouldn't get confused with any other state numbers or change anybody's position by reason of a number rather than a priority date, that there might be some virtue to getting the numbers in.  I am thinking just from a practical angle because everyone on the stream usually knows the numbers of the other's priority, not the date of the priority but the number, and if there is any way of giving them numbers that are accurate, I don't quite see how there could be any objection to that.

After further discussion about the appropriate procedure to follow, the Court stated:

> I am expressing no view on the thing because it is something new as to what can be done, but I can see immediately the advantage of having number decrees on the thing to correspond with the state numbers on the other decrees, on the subsequent and prior decrees, because if there is another adjudication or something else that isn't removed to this Court they will start numbering off of the other list, probably, and there might have to be some clarification on these decrees.

113.    The Court and counsel for the parties discussed the final mechanics for assembling and drafting the judgment and decree.  During the course of these discussions, the Court twice emphasized the importance of addressing the priority issue that had been raised by the River District.

114.    The Court then adjourned the proceeding while the Final Judgment in the Removed Summit County Cases was modified to address the River District's concerns.  The Court reconvened and entered the documents that collectively constitute what is referred to as the "Blue River Decree"—the "Findings of Fact and Conclusions of Law, and Final Judgment" for

the Removed Summit County Cases and the "Findings of Fact and Conclusions of Law, and Final Decree" for the Consolidated Cases.

115.    The Final Judgment in the Removed Summit County Cases determined that the appropriation date of the GMR Hydro Right was August 1, 1935, and awarded the GMR Hydro Right priority number 122B.

116.    The GMR Hydro Right priority number is subsequent to the priority numbers previously assigned by the Summit County Court to Climax's CA 1710 Water Rights, namely: Supply Canal No. 1, Priority Number 99; Supply Canal Number 2, Priority Number 100; Ten Mile Diversion Ditch Number 1, Priority Number 103; Ten Mile Diversion Ditch Number 2, Priority Number 104; and Chalk Mountain Ditch, Priority Number 105.

117.    A review of the CA 1806 decree entered by the Summit County Court before the case was removed to federal District Court shows that the CA 1806 decree contains the intervening priority numbers between Climax's Chalk Mountain Diversion Ditch (Priority Number 105) and the C-BT Project's Elliott Creek Feeder Canal and Green Mountain Reservoir Hydroelectric Plant priorities (Priority Numbers 122A and 122B, respectively), starting with Priority Number 106 for the "Tenderfoot Ditch" through Priority Number 122 for the "Smith Pipeline."

118.    The ordering of the priority number for the GMR Hydro Right, relative to the ordering of the priority numbers of the water rights decreed in CA 1710 and CA 1806, establishes that this Court intended for the GMR Hydro Right to be administered by state water officials as junior to the rights previously decreed by the Summit County Court in CA 1710, including Climax's CA 1710 Water Rights.

119.    The Final Judgment in the Removed Summit County Cases determined that the appropriation date of the GMR Storage Right was August 1, 1935, the same date as decreed to the GMR Hydro Right, and awarded the GMR Storage Right Reservoir Priority Number 74A for 154,645 acre-feet of water.

120.    The GMR Storage Right and the GMR Hydro Right are decreed with the same appropriation date.

121.    The specific intent of the Court in the Final Judgment in the Removed Summit County Cases, as evidenced by the priority numbering, was that rights associated with the C-BT Project, including the GMR Hydro Right and the GMR Storage Right, would be administered pursuant to Colorado's postponement doctrine with respect to decrees previously entered by the Colorado state water court in CA 1710, including Climax's CA 1710 Water Rights.

122.    On November 10, 1992, this Court entered a stipulation between the parties to the Consolidated Cases to resolve a claim by the United States regarding rights to exchange water from Green Mountain Reservoir.   The stipulation also resolved questions regarding the appropriate dates to be used to administer these exchanges (the "1992 Stipulated Decree"). Other language in the 1992 Stipulated Decree was intended to resolve a conflict that had arisen between the C-BT Project and water rights owned by Denver that were not specifically described in the list of priority numbers that was contained in the Final Judgment entered by this Court in the Removed Summit County Cases.

123.    As part of the 1992 Stipulated Decree, the Court ordered that "This Court's Decree of October 12, 1955, evidences the priority date of the direct flow, storage and exchange water rights for the operation of the C-BT Project as August 1, 1935, and those rights shall be

administered with said priority date as though adjudicated in the first available adjudication following that date."

124.    The 1992 Stipulated Decree also provided that "This Decree . . . is intended to implement and shall not modify or change the stipulations, judgments, orders and decrees in these Consolidated Cases."

125.    The holdings in the 1992 Stipulated Decree, to be consistent, cannot be read to modify or change the Final Judgment in the Blue River Decree that the GMR Hydro Right and GMR Storage Rights be administered as junior to the water rights decreed in CA 1710, including Climax's CA 1710 Water Rights.

### First Counterclaim (against Applicant Denver) – Power Interference Claim

**Declaratory Judgment Regarding the Storage or Diversion of Water by the Blue River Diversion Project Under the Power Interference Agreement**

126.    Climax incorporates and re-alleges the allegations in paragraphs 1-125.

127.    The facilities contained within Denver's Blue River Diversion Project are not structures included in the C-BT Project, and the Power Interference Agreement is not a decreed water right.

128.    Denver is barred by Senate Document 80, as well as by the various judgments and decrees entered by this Court, from benefiting from the C-BT Project.

129.    Climax's CA 1710 Water Rights are senior to the Blue River Diversion Project Water Rights, under which Denver diverts and stores water pursuant to the Power Interference Agreement.

130.    Denver may not divert or store water under the Power Interference Agreement in contravention of Western Slope water rights that are senior to the Blue River Diversion Project Water Rights.

131.    WHEREFORE, Climax requests a declaration that:  (a) Denver's diversion or storage of water under the Power Interference Agreement is pursuant to the Blue River Diversion Project Water Rights' junior priority date; (b) diversions or storage by Denver under the Power Interference Agreement are junior to Climax's CA 1710 Water Rights; and (c) Denver may not divert or store water under the Power Interference Agreement unless and until Climax's CA 1710 Water Rights are fully satisfied.

**Second Counterclaim (against Applicant Denver) – GMR Hydro Right Priority Claim**

**Declaratory Judgment that Climax's CA 1710 Water Rights Are Senior to the Green Mountain Hydroelectric Right**

132.    Climax incorporates and re-alleges the allegations in paragraphs 1 – 131.

133.    Climax holds the following water rights decreed by the Summit County Court in CA 1710: Supply Canal No. 1, Priority Number 99, Aug. 15, 1935; Supply Canal No. 2, Priority Number 100, Aug. 15, 1935; Ten Mile Diversion Ditch No. 1, Priority Number 103, June 4, 1936; Ten Mile Diversion Ditch No. 2, Priority Number 104, June 4, 1936; and Chalk Mountain Ditch, Priority Number 105, June 4, 1936.

134.    After entry of the decree by the Summit County Court in CA 1710, the federal Court decreed water rights in Case No. 5017 for the GMR Hydro Right.  The direct flow GMR Hydro Right was decreed with Priority Number 122B.

135.    The priority number decreed to the GMR Hydro Right is junior and subordinate to the priority numbers decreed to Climax in CA 1710.

136.   Any diversions by Denver pursuant to the Power Interference Agreement made under the GMR Hydro Right priority are also junior to Climax's CA 1710 Water Rights.

137.   WHEREFORE, Climax requests a declaration that its CA 1710 Water Rights are senior in priority to the GMR Hydro Right and therefore that any diversions by Denver made under the GMR Hydro Right priority are also junior to Climax's CA 1710 Water Rights.

### First Crossclaim (against co-party the United States of America)

### Declaratory Judgment that Climax's CA 1710 Water Rights Are Senior to the Green Mountain Reservoir Hydroelectric Right

138.   Climax incorporates and re-alleges the allegations in paragraphs 1 – 137.

139.   Climax's CA 1710 rights were decreed by the Summit County Court on October 26, 1937, pursuant to an adjudication initiated in 1934.

140.   After entry of the decree in CA 1710 by the Summit County Court, the federal Court decreed water rights for the GMR Storage Right and the GMR Hydro Right in Case No. 5017, initiated in 1942 and adjudicated in 1955.

141.   The priority number decreed by this Court to the GMR Hydro Right is junior and subordinate to the priority numbers decreed to Climax in CA 1710.

142.   WHEREFORE Climax requests a declaration that its CA 1710 Water Rights are senior in priority to the GMR Hydro Right.

### Second Crossclaim (against co-party the United States of America)

### Declaratory Judgment that Climax's CA 1710 Water Rights Are Senior to the Green Mountain Reservoir Storage Right

143.   Climax incorporates and re-alleges the allegations in paragraphs 1 – 142.

144.    Climax's CA 1710 rights were decreed by the Summit County Court on October 26, 1937, pursuant to an adjudication initiated in 1934.

145.    After entry of the decree in CA 1710 by the Summit County Court, the federal Court decreed water rights for the GMR Storage Right and the GMR Hydro Right in Case No. 5017, initiated in 1942 and adjudicated in 1955.

146.    The priority number decreed by this Court to the GMR Hydro Right is junior and subordinate to the priority numbers decreed to Climax in CA 1710.

147.    The GMR Hydro Right and the GMR Storage Right are decreed with the same priority date.

148.    The GMR Storage Right should be treated in the same manner as the GMR Hydro Right and declared junior to Climax's CA 1710 Water Rights.

149.    WHEREFORE Climax requests a declaration that its CA 1710 Water Rights are senior in priority to the GMR Storage Right.

WHEREFORE, Climax requests the Court to declare:

(1)    As against Denver, that Denver's diversion or storage of water under the Power Interference Agreement is pursuant to the Blue River Diversion Project Water Rights' decreed junior priority date; that diversions or storage by Denver under the Power Interference Agreement are junior and subordinate to Climax's CA 1710 Water Rights; and that Denver may not divert or store water under the Power Interference Agreement unless and until Climax's CA 1710 Water Rights are fully satisfied; or, in the alternative,

(2)     As against Denver, that, because Climax's CA 1710 Water Rights are senior to the GMR Hydro Right, any diversions by Denver made pursuant to the Power Interference Agreement are junior to Climax's CA1710 Water Rights; and

(3)  As against the United States, that Climax's CA 1710 Water Rights are senior in priority to the GMR Hydro Right; and

(4) As against the United States, that Climax's CA 1710 Water Rights are senior in priority to the GMR Storage Right.

Climax further requests the Court order any other relief the Court deems just and proper.

Respectfully submitted this 6th day of January, 2010.

RYLEY CARLOCK & APPLEWHITE


     s/ Brian M. Nazarenus
Brian M. Nazarenus, Esq.
1999 Broadway, Suite 1800
Denver, Colorado 80202
Telephone:  (303) 863-7500
Facsimile:  (303) 595-3159

ATTORNEYS     FOR     OPPOSER     CLIMAX MOLYBDENUM COMPANY

## **VERIFICATION**

STATE OF COLORADO      )
                                  ) ss.

COUNTY OF ARAPAHOE      )

I, Gary B. Thompson, P.E., as Engineer for Climax Molybdenum Company, state under oath that I have read the foregoing Opposer Climax Molybdenum Company's Amended Statement of Opposition Stating Counterclaims and Crossclaims and verify its content.

By:      s/ Gary B. Thompson             
            Gary B. Thompson

Subscribed and sworn to before me this 6 day of January, 2010 by Gary B. Thompson

Witness my hand and official seal.

[Seal]

            s/ Cindy Brown               
            Notary Public

My commission expires:      2/13/2013          

**CERTIFICATE OF SERVICE**
**(Case No. 49-cv-02782—MSK-CBS)**

I hereby certify that on this 6th day of January, 2010, I electronically filed the foregoing
**OPPOSER CLIMAX MOLYBDENUM COMPANY'S AMENDED STATEMENT OF
OPPOSITION STATING COUNTERCLAIMS AND CROSSCLAIMS** with the Clerk of the Court
using the CM/ECF system, which will send notice of such filing to the following:

Stephen D. Gurr, Esq.
Barry A. Schwartz, Esq.
Kamlet Shepherd & Reichert, LLP
1515 Arapahoe Street, Tower 1, Suite 1600
Denver, CO 80202
*[Attorneys for City and County of Denver, acting
by and through its Board of Water Commissioners]*
sgurr@ksrlaw.com
bschwartz@ksrlaw.com

Casey S. Funk, Esq.
Daniel J. Arnold, Esq.
Jeffrey F. Davis, Esq.
Gail Rosenschein, Esq.
Denver Water Department
1600 West 12th Avenue
Denver, CO 80204
*[Attorneys for City and County of Denver, acting
by and through its Board of Water Commissioners]*
Casey.funk@denverwater.org
Daniel.arnold@denverwater.org
Jeff.davis@denverwater.org
Gail.rosenschein@denverwater.org

Peter C. Fleming, Esq.
Jason V. Turner, Esq.
Colorado River Water Conservation District
P.O. Box 1120
Glenwood Springs, CO 81602
*[Attorneys for Colorado River Water Conservation
District]*
pfleming@crwcd.org
jturner@crwcd.org

Douglas L. Abbott, Esq.
Christopher L. Thorne, Esq.
Megan N. Winokur, Esq.
Leah K. Martinsson, Esq.
Holland & Hart, LLP-Denver
P.O. Box 8749
555 17th Street, #3200
Denver, CO 80201-8749
*[Attorneys for Colorado River Water Conservation
District]*
dabbott@hollandhart.com
cthrone@hollandhart.com
mwinokur@hollandhart.com

James J. DuBois, Esq.
U.S. Department of Justice-CO-Environment
1961 Stout Street, 8th Floor
Denver, CO 80294
*[Attorneys for the United States of America]*
james.dubois@usdoj.gov

Chad Matthew Wallace, Esq.
Colorado Attorney General's Office
1525 Sherman Street, 5th Floor
Denver, CO 80203
*[Attorneys for State of Colorado]*
chad.wallace@satate.co.us

Mark A. Hermundstad, Esq.
Kirsten M. Kurath, Esq.
Williams Turner & Holmes, PC
200 North 6th Street
P.O. Box 338
Grand Junction, CO 81502
*[Attorneys for Grand Valley Water Users
Association; Orchard Mesa Irrigation District; Ute
Water Conservancy District]*
mherm@wth-law.com

Frederick G. Aldrich, Esq.
Aldrich, Frederick, LLC
601A 281/4 Road
Grand Junction, CO 81506
*[Attorneys for Grand Valley Irrigation]*
faldrich@aldrich-law.com

Stanley W. Cazier, Esq.
John D. Walker, Esq.
Cazier McGowan & Walker
P.O. Box 500
Granby, CO 80446
*[Attorneys  for Middle Park Conservancy District]*
cazier_mcgowan@hotmail.com

Nathan A. Keever, Esq.
Dufford Waldeck Milburn & Krohn, LLP
744 Horizon Court, Suite 300
Grand Junction, CO 81506
*[Attorneys for Palisade Irrigation District]*
keever@dwmk.com

Mary Mead Hammond, Esq.
Karl D. Ohlsen, Esq.
William A. Paddock. Esq.
Carlson, Hammond & Paddock, LLC
1700 Lincoln Street, Suite 3900
Denver, CO  80203
*[Attorneys for City of Colorado Springs]*
mhammond@chp-law.com
hoglsen@chp-law.com
bpaddock@chp-law.com

Bennett W. Raley, Esq.
Robert V. Trout, Esq.
Trout, Raley, Montano, Witwer & Freeman, PC
1120 Lincoln Street, Suite #1600
Denver, CO 80203
*[Attorneys for Northern Colorado Water
Conservancy District]*
braley@troutlaw.com
rtrout@troutlaw.com

David G. Hill, Esq.
Ann M. Rhodes, Esq.
Berg Hill Greenleaf & Ruscitti, LLP
1712 Pearl Street
Boulder, CO 80302
*[Attorneys for City of Englewood]*
dgh@bhgrlaw.com
amr@bhgrlaw.com

Austin C. Hamre
Duncan, Ostrander & Dingess, P.C.
3600 South Yosemite Street, Suite 500
Denver, CO 80237-1829
*[Attorneys for City of Aurora]*
ahamre@dodpc.com\

  s/ Betty R. Stephens

.