IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 49-cv-02782-MSK-CBS

Consolidated Case Nos. 2782, 5016 and 5017; and

DISTRICT COURT, WATER DIVISION NO. 5 STATE OF COLORADO

Case No. 2006CW255

---

CONCERNING THE APPLICATION FOR WATER RIGHTS OF THE CITY AND
COUNTY OF DENVER, ACTING BY AND THROUGH ITS BOARD OF WATER
COMMISSIONERS

---

**APPLICANT'S RESPONSES TO CLIMAX MOLYBDENUM COMPANY'S FIRST
DISCOVERY REQUEST TO APPLICANT**

---

Applicant, the City and County of Denver, acting by and through its Board of Water

Commissioners ("Applicant"), by its attorneys, hereby submits its Objections and Responses to

Objector Climax Molybdenum Company's ("Climax") First Discovery Request:

## GENERAL OBJECTIONS

1.      Applicant objects to each and every interrogatory, and request for production of

documents to the extent it seeks information subject to the attorney-client privilege and/or work

product doctrine.

2.      Applicant objects to the definitions and instructions to the discovery requests to

the extent that they are vague, ambiguous, overbroad and capable of being construed to impose

obligations on Applicant beyond those imposed by the Federal Rules of Civil Procedure.

3.      Applicant objects to each and every interrogatory, and request for production of

documents to the extent that it seeks information or documentation in the possession, custody or

control of third parties who are not parties to this litigation.



EXHIBIT
2

4.     Applicant objects to each and every interrogatory, and request for production of documents to the extent that it seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence.

5.     Applicant objects to each and every interrogatory, and request for production of documents to the extent that it is vague, ambiguous, overbroad, and/or unduly burdensome.

6.     Magistrate Judge Shaffer's December 11, 2008 Minute Order set January 26, 2009 as the deadline for amending pleadings and Applicant will file its statement of Affirmative Defenses on January 26, 2009. Applicant objects to each and every interrogatory, and request for production of documents as premature to the extent it seeks responses regarding Applicant's Affirmative Defenses not yet pleaded. The responses contained herein relate to the affirmative defenses identified in Applicant's prior disclosures, expert disclosures, expert deposition testimony and discovery responses. Applicant reserves the right to supplement this response when such claims are specifically identified by a pleading filed with the court.

7.     These general objections are incorporated into Applicant's responses to each interrogatory and request for production of documents.

II.     **DEFINITIONS:**

The following definitions shall apply for the purpose of Denver's responses to these discovery requests.

1.     YOU, YOUR, or Climax means Climax Molybdenum Company and its agents, employees, consultants, contractors, and anyone else acting on its behalf.

2.     Applicant, Denver or Denver Water means the City and County of Denver, acting by and through its Board of Water Commissioners.

3.     Blue River Decree means the Findings of Fact and Conclusions of Law, Final Decree and Final Judgment dated October 12, 1955, entered in the Consolidated Cases, Case

Nos. 2782, 5016 and 5017; as amended on October 29, 1957 and all subsequent Orders, Judgments and Decrees entered by the United States District Court in Civil Nos. 2782, 5016 and 5017 including judgments and decrees in actions for finding of reasonable diligence and to make absolute.

4.      "Opposers" means Colorado River Water Conservation District ("River District"); Grand Valley Water Users Association ("GVWUA"), Ute Water Conservancy District, acting by and through the Ute Water Activity Enterprise ("Ute"); Orchard Mesa Irrigation District ("Orchard Mesa"); Palisade Irrigation District ("Palisade"); Middle Park Water Conservancy District ("Middle Park"); Grand Valley Irrigation Company ("Grand Valley"); and YOU.

5.      "Exhibit O" means the "Exhibit O" attached and incorporated by reference to the River District's First Set of Interrogatories, Requests for Production of Documents and Requests for Admission to Applicant dated October 9, 2008.

6.      "Stipulation" means the Stipulation of October 5, 1955, between the parties to Consolidated Case Nos. 2782, 5016 and 5017.

7.      "Metropolitan Area" means the area reasonably integrated with the development of Denver.  It is not limited to the City of Denver's lands or to the boundaries shown on Exhibit O, but is to be defined flexibly and functionally over time.

### III.    INTERROGATORIES

**INTERROGATORY NO. 1:**

1.      For your claimed affirmative defense of collateral estoppel, please:
    a.      Set forth the complete factual basis for the claimed defense;
    b.      Fully describe all evidence you intend to use to support the claimed defense; and
    c.      Identify all persons who have knowledge of facts supporting the claimed defense.

**RESPONSE:**

   1.a. Set forth the complete factual basis for the claimed defense;

**1.**  **To the extent the OPPOSERS claim the Applicant's service area is limited to the area described in Exhibit O, the Applicant asserts the following defenses:**

  All Opposers, including YOU, are estopped under the doctrines of res judicata and collateral estoppel and law of the case from challenging Denver's service of water to geographic areas inside or outside of "Exhibit O" by the decree entered in C.A. 1805 and 1806; the Blue River Decree and Stipulation; the 1962, 1964, 1966, 1968, 1972, 1978, 1982, 1986, and 1990 diligence proceedings; the 1963 dispute which resulted in the April 16, 1964 stipulation and consent decree; Case No. 87CW376 WD5; Case No. 88CW382; and Case No 91CW252.

  a. **The Opposers are estopped by the decrees entered in C.A. 1805 and 1806.**

  All Opposers to this action are estopped by the doctrines of res judicata and collateral estoppel and the doctrine of law of the case from challenging Denver's service of water to geographic areas inside or outside of the area depicted in "Exhibit O" by the decree entered in C.A. 1805 and 1806 dated March 10, 1952 which ordered, adjudged and decreed to the Applicant a priority of June 24, 1946 for the diversion of water "for the benefit of the persons lawfully entitled thereto in Denver and areas adjacent to Denver served by the Denver Municipal Water System" for purposes other than irrigation. The decree does not restrict the place of use to an area depicted on Exhibit O.

  In 1942, Applicant sought, and eventually obtained in C.A. 1805 and 1806 and confirmed in the Blue River Decree, water to serve the future needs of the dynamically expanding Denver metropolitan area, adjacent areas and areas in its vicinity in order to allow it to reach its greatest potential. Applicant intended to serve the lands then in the City and County of Denver, lands that would thereafter become a part of the City and County of Denver, areas adjacent to Denver

to be served by the Denver Municipal Water System, and also such other lands in the vicinity of the City and County of Denver as may from time to time be covered by temporary rental contracts negotiated by Applicant with the owners of said lands. Applicant's 1942 Statements of Claim in C.A. 1805 and 1806 at Part III state: "The Denver Municipal Water System consists of a number of reservoirs, ditches, pipe lines, and other structures forming an interrelated water works system whose parts are located in various water districts of the State of Colorado on both sides of the Continental Divide for supplying the City and County of Denver, its inhabitants, and others with water, for domestic use and other beneficial purposes." The Statements of Claim in C.A. 1805 and 1806 also state at Part IX: "The lands lying under and proposed to be irrigated by water from the Blue River Diversion Project consist of the lands in the City and County of Denver, being approximately 33,000 acres at the present time, together with such other lands as may hereafter become a part of the City and County of Denver, and also such other lands in the vicinity of the City and County of Denver as may from time to time be covered by temporary rental contracts negotiated by Claimant with the owners of said lands pursuant to the provisions of the charter of Claimant." The March 10, 1952 Decree in Civil Action No. 1806 decreed Applicant's priority for the diversion of water "for the benefit of the persons lawfully entitled thereto in Denver and areas adjacent to Denver served by the Denver Municipal Water System."

    **b.**    **The Opposers are estopped by the Blue River Decree.**

All Opposers to this action are estopped by the doctrines of res judicata and collateral estoppel and the doctrine of law of the case from challenging Denver's service of water to geographic areas inside or outside of the area depicted in "Exhibit O" by the Stipulation dated October 5, 1955 upon which the United States District Court based its Findings of Fact and Conclusion of Law and Final Decree entered herein on October 12, 1955, and as amended

October 29, 1957. These affirmative defenses bar all Opposers' objections to the geographic area to which Applicant now provides water and has provided water since 1955. Paragraph 19 of the Blue River Decree incorporates the Decrees in Case Nos. 1805 and 1806 by reference. The Blue River Decree defined the area which Denver may serve water to as the area "reasonably integrated *with the development* of Denver." *Blue River Decree*, p. 35 ¶4(g) (emphasis added). The parties to the Blue River Decree and the Court further found "that the City and County of Denver . . . [is] in need of adequate supplies of water for municipal purpose both present *and future*." *Blue River Decree*, p. 30 ¶ 3 (emphasis added). Opposers also "recognized" and the District Court also found "that the Blue River constitutes a source of supply to which each must look in the future if the respective municipalities *are to reach their greatest potential*." *Blue River Decree*, p. 30 ¶ 3 (emphasis added).

      c.      **Opposers are estopped by Prior Diligence Proceedings.**

With regard to prior diligence proceedings, all Opposers, including YOU, are estopped by the doctrines of res judicata and collateral estoppel and law of the case from challenging Denver's service of water inside or outside of the geographic area depicted in Exhibit O to the extent that Denver's ability to serve a geographic area greater than Exhibit O was either litigated, stipulated to, or upheld in the April 16, 1964, January 9, 1973, March 16, 1973, March 5, 1976, September 15, 1978, October 3, 1985, February 6, 1996, June 2, 1987, November 10, 1992, and March 11, 1993 diligence proceedings and determinations.

For example, and not by way of limitation, in the 1962 diligence proceeding, Denver put on direct testimony by Hudson Moore, a member of the Board of Water Commissioners since 1951, that Denver had entered into contracts to serve water to North Table Mountain Water and Sanitation District and the City of Arvada, a geographic area estimated to be 5,360 acres, and

that Denver anticipated that it would be entering into contracts to serve an additional 16,000 acres of land in the coming years. *Testimony of Hudson Moore*, Jr. p. 41-42 (Jan. 12, 1962). Following this proceeding, which was contested by the United States Government, a decree finding reasonable diligence was entered by the District Court.

Similarly, during the 1964 diligence proceeding, Mr. P.K. Bryant, a Denver Water civil engineer, testified that Denver had two major raw water contracts with the City of Arvada and North Table Mountain Water and Sanitation District. *Testimony of Bryant*, p. 39 (Apr. 6, 1964). When asked what other contracts Denver had within the metropolitan area, Mr. Bryant testified that Denver had a contract for water service with the Martin Plant south of Littleton and the Atomic Energy Commission on the Rocky Flats. *Id.* Mr. Bryant further testified, based on "Exhibit C" which depicted a map of Denver's service area, that if Denver had enough water it had a demand to serve an area consisting of 277,955 acres, or a population of 2,194,204 people. *Testimony of Bryant*, p. 53-55 (Apr. 6, 1964).

Again in a contested 1972 diligence proceeding, Mr. Robert Fischer, the Director of Water Resource Development, testified on cross examination that Denver served water to Littleton and Lakewood; that Denver was preparing to serve water to Broomfield; and that Denver was considering serving water to Northglenn. *Testimony of Robert Fischer*, pp. 55-59 (Oct. 20, 1972). In addition, Carl E.C. Carlson, Denver's Chief of Plant, testified while being cross-examined by the United States that the "Metropolitan Area" primarily includes the City and County of Denver, areas outside the city limits, as well as non-contiguous areas. *Testimony of Carl E.C. Carlson*, p. 29 l. 3-19 (Oct. 20, 1972). Following this proceeding, a final judgment was entered in which the Court made 158 cfs of the Roberts Tunnel direct flow fight absolute. *Order*, Civil Action Nos. 2782, 5016 and 5017 (Mar. 16, 1973). The District Court further held

that Denver has broad powers to dispose of or exchange the return flow of transmountain waters as it sees fit. In addition, the Court found that it makes no difference whether Denver uses Blue River water to directly replace evaporation losses or uses more Blue river water for municipal purposes even though another source is used to replace evaporation because the same end is achieved even though the method of accounting for the water may be different.

Similarly, all Opposers, including YOU, are estopped by the contested 1974 diligence proceeding and its resultant March 5, 1976 decree. There, the Applicant applied for diligence and to make absolute 252,678 acre feet of the conditional water rights associated with Dillon Reservoir and 163 cfs the Blue River Diversion Project. The application was duly noticed. The River District contested Denver's application.    By stipulation dated August 11, 1975, the Applicant deferred its request to make absolute 252,678 acre feet absolute and the River District agreed that 163 cfs was diverted pursuant to the priorities awarded to the Blue River Diversion Project and placed to beneficial use in accordance with the decree entered in C.A. Nos. 1805 and 1806.

The contested 1978 diligence proceedings, including the May 25, 1978 diligence hearing and resultant order, similarly preclude the Opposers' objections. At issue was whether Denver entitled to a decree making absolute the full capacity of Dillon Reservoir and 324 cfs of the Blue River Diversion Project; how the water was applied to beneficial use in the areas allowed by the decree; and whether Denver has been in compliance with the decree for purposes of diligence. Denver put on evidence to support a finding of diligence and a claim to make absolute a portion of its Roberts Tunnel direct flow right and the full amount of the Dillon storage right. The River District's attorney, Kenneth Balcomb, stated that one of the issues of concern to "West Slope" interests was whether the water taken through the Roberts Tunnel was applied to "the area

allowed by the court decree, that is the reasonably integrated area of the Denver metropolitan area." *Tr. Kenneth Balcomb,* 12, ll. 8-17 (May 25, 1978). One of Denver's witnesses, Robert Fischer, the Director of Water Resource Development, testified on cross examination that Denver believed the "Metropolitan Area" could increase in size even if it resulted in an increased draft on the Blue River. *Testimony of Robert Fischer*, p. 93 ll. 5-9 (May 25, 1978). When asked by the River District's attorney whether the "Metropolitan Area" has changed from 1955 to1977, Mr. Fischer further answered that "it is obvious that the metropolitan area has changed since 1955, and so I guess you would have to say that the Board of Water Commissioners' view of what the metropolitan area may have been in 1955 is obviously changed in 1978.   The metropolitan area has changed." *Testimony Robert Fischer*, p. 92 ll. 10-18 (May 25, 1978). The Court subsequently awarded a decree finding that Denver had made 324 cfs of the Roberts Tunnel direct flow right, and 252,678 acre feet of Dillon Reservoir storage right absolute. *Decree and Determination*, Case Nos. 2782, 5016 and 5017 (W-741-77) p. 3-4 ¶7-8 (D. Colo. Sep. 1, 1978) without any limitation or restriction to an area as depicted in Exhibit O. In that same proceeding, the attorney for the River District, Mr. Balcomb, stated that "Quite frankly, if Denver has complied with the decree, and I think they have to some extent, Your Honor should award them diligence. We are only concerned about how much of it should be absolute." *Transcript of Kenneth Balcomb*, p. 15, l. 22-25; p. 16, l. 1-2. (May 25, 1978).

In 1982, Denver filed an application for quadrennial finding of reasonable diligence, which was duly noticed.  The River District and Middle Park opposed.  Without claiming the Exhibit O was a limitation upon the Applicant's service area, these Opposers withdrew from the action and did not contest the motion for summary judgment that there were no contested issues of fact or law.  A decree was entered continuing the conditional water right on October 3, 1985

In 1986, Denver filed another application for quadrennial finding of reasonable diligence and to make absolute 473 cfs of the Roberts Tunnel direct flow right. *Application*, Civil Action Nos. 2782, 5016 and 5017 (86CW132 WD5) (May 27, 1986).  Middle Park and the River District filed statements of opposition to this application contending that Denver must show it was in compliance with the Blue River Decree. Both parties withdrew their opposition. Copper Mountain served interrogatories on Denver, in which Copper Mountain inquired as to the area where the water Denver was seeking to make absolute was used.  Denver responded that "[t]he water referred to in paragraph 5 of the Application was used for municipal purposes as defined in paragraph 4 of the Stipulation in the Blue River Decree.  Geographically the water was utilized in the metropolitan area of the City and County of Denver as defined in subparagraph 4(g) of the Stipulation incorporated in the Blue River Decree." *Response of the City and County of Denver, acting by and through its Board of Water Commissioners to the Second Set of Interrogatories Submitted by Copper Mountain, Inc.*, Case No. 2782, 5016 and 5017 (86CW132 WD5) Response to Interrogatory No. 7 p. 3 (Nov. 6, 1986). Denver further stated that with regard to sources other than the Blue River, Denver "delivers all waters to the City and County of Denver and to portions of the Denver Metropolitan area pursuant to contract for purposes permitted by the particular decree." *Id.* at Response to Interrogatory No. 8 p. 3. In 1987, the Court made additional portions of the Roberts Tunnel direct flow right absolute and found that Denver had placed the water to its decreed beneficial use. Specifically, the Court found and concluded that Denver had diverted 468 cfs of the direct flow right on July 20, 21, 23 and 26, 1982 and placed the water "to its decreed beneficial use in the Denver Municipal Water Works System" without any limitation or restriction to an area depicted on Exhibit O. *Findings of Fact, Conclusions of*

*Law, Decree and Order*, Case Nos. 2782, 5016, 5017 (86CW132 WD5) p. 6 ¶9(a) (D. Colo. June

2, 1987).

In 1990, Denver filed an application for finding for reasonable diligence and to make

absolute a 520 cfs of the Roberts Tunnel direct flow right. *Application*, Civil Action Nos. 2782,

5016 and 5017 (90CW112WD5) (May 31, 1990). The River District, Middle Park and others

contested this application. In 1993, the Court awarded another diligence decree and further

decreed an amount absolute under Denver's Roberts Tunnel direct flow right. *Findings of Fact,*

*Conclusions of Law, Decree and Order*, Case Nos. 2782, 5016, 5017 (90CW112 WD5) (D.

Colo. Mar. 11 1993). Specifically, the Court found and concluded that "[o]n June 8, 1989, the

Board diverted 520 cfs through the Roberts Tunnel and placed this water to its decreed beneficial

use in the Denver Municipal Waterworks System." *Id.* at p. 10 ¶9, p. 11 ¶3. Both Middle Park

and the River District withdrew their statements of opposition to Denver's application.

**d.    Preclusive Effect of 1963 Dispute.**

Opposers are estopped by the 1963 dispute which resulted in the stipulation of April 16,

1964 regarding the interpretation of certain provisions contained in the Blue River Decree. In

that dispute, the River District's attorney, Frank Delaney, deposed Robert S. Millar, the

Secretary-Manager of Denver's Board of Water Commissioners, regarding Exhibit O. *Dep. of*

*Robert S. Millar*, Civil Action Nos. 2782, 5016 and 5017 p. 51 l. 1-2 (Nov. 26, 1963). Mr.

Delaney asked "[w]hat are the boundaries of the metropolitan area of Denver that the Water

Board is planning to supply water to?" and Secretary-Manager Millar responded that"[t]he

metropolitan area of Denver that I believe anyone now or in the future would plan to supply

water would be those areas which require this water service, which the Denver Water Board

could offer," and that Westminster, Golden, Littleton, Aurora, in Commissioner Millar's mind,

"definitely fall within the metropolitan area." *Dep. of Robert S. Millar*, Civil Action Nos. 2782,

5016 and 5017 p. 51, l. 16-25, p. 52, l. 2-8 (Nov. 26, 1963). In addition, Secretary-Manager

Millar testified that the Federal Center, Fort Logan, Rocky Mountain Arsenal, Fitzsimons, Lowry

field are also included in the metropolitan area. *Id.* at p. 52, l. 9-23. Mr. Delaney then asked if

"the planning of the Denver Water Board contemplate the use of water impounded or taken in

the Dillon Reservoir or taken from the Blue River through the Roberts Tunnel in any area outside

of the area marked in blue, in red, on Defendant's Exhibit O in the appendix attached to –

Denver's appendix in Case No. 16881, which I will exhibit to you," p. 57, l. 14-19, to which

Secretary-Manager Millar responded that:

> I can see the map that you have placed before me, there are large sections with
> straight lines, and this is – I have no idea what part of this printed matter this may
> be, all that I know is that this is a map with areas in blue and an orange-colored
> red which I can not [sic] relate to anything we are doing today, or plan doing,
> because I'm not acquainted with this map nor the book of which this appears to be
> a part.

*Dep. of Robert S. Millar*, Civil Action Nos. 2782, 5016 and 5017 p. 57, l. 25, p. 58 l. 1-6 (Nov.

26, 1963). Mr. Delaney asked whether Denver has "a similar map indicating the boundaries of

the area to be served by waters form the Dillon Reservoir and from the Blue River." Secretary-

Manager Millar responded that "to my knowledge, no. This does not say that someone at some

time has not for some purpose drawn some type of map, but to my knowledge, no, the Denver

Water Board has none." *Dep. of Robert S. Millar,* Civil Action Nos. 2782, 5016 and 5017p. 58, l.

7-12 (Nov. 26, 1963). Following up on this, Mr. Delaney asked if there are "any limits as

indicated upon a map or otherwise defined in terms of the Water Board's extension of service

outside the metropolitan area?" *Dep. of Robert S. Millar*, Civil Action Nos. 2782, 5016 and 5017

p. 58 l. 13-15 (Nov. 26, 1963). Secretary-Manager Millar answered that:

[t]o my knowledge, no, because I have never heard anyone limit physically by boundaries, metes and bounds, or anything as physical as that, what is the metropolitan area of Denver. And I don't mean to talk as an abstraction or something like that, but when something is not real and it's in the future, it's difficult for me to understand just what you are – what you want from me, and from this type of map, I can not [sic] answer those questions, because the metropolitan area is the metropolitan area now, roughly defined, and at some future date another metropolitan area, so far as acres or square miles are concerned. And I'm not capable of delineating or marking this area, both as an individual and as Secretary Manger of the Denver Water Board, and I certainly can't speak for the members of the board on that subject.

*Dep. of Robert S. Millar*, Civil Action Nos. 2782, 5016 and 5017 p. 58, l. 16-25, p. 59 l. 1-4 (Nov. 26, 1963). .

    **e.**    **Preclusive Effect of Case No. 87CW376 WD5.**

Opposers are also estopped by the doctrines of res judicata and collateral estoppel from challenging Denver's ability to serve inside or outside of the geographic area depicted in Exhibit O by Case No. 87CW376 WD5 which involved Denver's application for a refill right at Dillon Reservoir for use within the Denver Metropolitan Area as defined by Exhibits 58, 59 and the Affidavit of John Loughry. There, the Opposers stipulated to a decree granting Denver Water a refill right to Dillon Reservoir for use within the metropolitan area as defined by Exhibit 58. Exhibit 58 depicts a geographic area significantly larger than the geographic area depicted in Exhibit O. In Case No. 87CW376, Denver also submitted an affidavit attesting to additional areas annexed for Denver International Airport by Denver during the pendency of the case, and Denver's intent to provide water to these recently annexed areas. Specifically, the Affidavit of John Loughry detailed the changes in the metropolitan area that had occurred since 1987:

    5.    The area which received a water supply from the Board of Water Commissioners at the time the application was filed herein is shown on Exhibit 58. The area which presently receives its water supply from the Board of Water Commissioners is shown on Exhibit 58. The area served by the Board has increased from 1987. A list of distributor contracts denominated Exhibit 57 lists

the contracts with metropolitan water providers who contracted with the Board for
their water supply.

6.    Since 1987, there have been several significant service area changes,
including the annexation of more than 43 square miles of area for the Denver
International Airport, the expansion of the Ken-Caryl service area, the extension
of the Willows Water District contract, and the Board's agreement in 1995 to
provide service to the City of Glendale . . . .

*Affidavit of John Loughry* ¶ 5, 6 (Jan. 14, 1997). Despite the expansion in the geographic area

served by Denver in Case No. 87CW376, the Water Court entered a decree, to which the

Opposers, Middle Park, Orchard Mesa, the River District, GVWUA, Ute, Palisade, and Grand

Valley stipulated to, thereby approving a refill right for Dillon Reservoir for use in Denver's

1992 service area without any limitations or restrictions to an area depicted in Exhibit O.

    f.    **Preclusive Effect of Case No. 88CW382 WD5**

    Opposers are further estopped by the doctrines of res judicata and collateral estoppel

from challenging Denver's ability to serve outside of the geographic area depicted in Exhibit O

by Case No. 88CW382 WD5, which involved an application of the United States of America for

a 1935 priority for the exchange of water from Green Mountain Reservoir ahead of Denver's

Williams Fork Reservoir priority.    Denver's actions in that case were based upon the

understanding that it could serve an area reasonably integrated with the development of Denver

without any restrictions or limitations to an area depicted in Exhibit O. Had Denver known that

the River District considered the metropolitan area to be that area defined in Exhibit O then its

actions may have been different.

    g.    **Preclusive Effect of Case No. 91CW252WD5**

    Opposers are further estopped by the doctrines of res judicata and collateral estoppel

from challenging Denver's ability to serve inside or outside of the geographic area depicted in

Exhibit O by Case No. 91CW252 WD5, which involved a joint application of the River District and the Applicant to use waters held in Wolford Mountain Reservoir for substitution pursuant to the terms of the 1991 MOA. Without claiming the Exhibit O was a limitation upon the Applicant's use of water retained in Dillon, the Opposers stipulated to the entry of a decree that provided that water retained in Dillon Reservoir would be use for all purposes for which such reservoir has been decreed and such uses are subject to the limitations as are set forth in the October 12, 1955 Decree in these Consolidated Cases. Further, this decree adjudicated an exchange from Wolford Mountain Reservoir for storage in Dillon Reservoir or diversion through the Roberts Tunnel and that such water would be used either directly or stored and subsequently used through the various units of the Denver Municipal Water Works System without any restriction or limitation to an area as depicted in Exhibit O.

2.    **The Opposers' discovery responses and expert disclosures contend that terms and conditions must be imposed as necessary to prevent any violations of decreed conditions associated with the exercise of the claimed water rights.**

The Opposers have not specifically alleged in any pleading what decreed conditions have been violated and the Applicant reserves the right to supplement this response based if and when such specific claims are alleged in a pleading. Without waiving this objection, the Applicant asserts that the Opposers are estopped by previous decrees making the following claims made in expert disclosures.

a.    **Location and Configuration of the Blue River Diversion Project**

Opposers are estopped by the doctrines of res judicata and collateral estoppel and law of the case from challenging the configuration of the Blue River Diversion Project and the location of the points of diversion as the Court has decreed the current configuration of the project

throughout previous diligence proceedings during which Denver has made portions of the Blue River Diversion Project absolute.

Denver's 1942 statement of claim, in the description of the diversion structures, contains the following provision: "Upon construction of the Dillon Reservoir, hereinafter mentioned, all of the above mentioned means of diversion will be eliminated, and diversion from all of the three mentioned streams and tributary drainage will be accomplished by raising the water of said stream to elevation 8,860 feet above sea level, or more, so as to cause the waters of said streams to flow by gravity into the tunnel hereinabove mentioned which is an alternate tunnel substituted on a new line from the tunnel whose west portal was described in subparaparaph (a) above, the alternate tunnel being adopted by reason of better geological conditions, and having a west portal at a point whence the East Quarter corner of Section 18, Township 5 South, Range 77 West of the 6[th] P.M. bears South 81° 07' East, 941.6 feet."

In the January 12, 1962 diligence hearing concerning the Blue River Diversion Project, Denver also presented testimony regarding the configuration of the Project and the location of the points of diversion. There, E.L. Moseley, Denver's Project Engineer of Denver's new transmountain diversion system, testified that the Dillon Dam will control the waters of the Blue, Snake and Ten Mile Rivers and that it would raise the waters so as to submerge and control those waters at the points of diversion originally planned for as part of the Blue River Diversion Project. *Testimony of E.L. Mosley*, p. 21-22 (Jan. 12, 1962). Mr. Mosley further testified that "earlier plans as they developed over the years from 1914 down, at one time involved a shorter tunnel at a higher elevation with a series of collection ditches." According to Mr. Mosley, the water was originally to have been brought to that Tunnel by diversion ditches and then, of course, the reservoir will cover these like a "blanket" so that diversion will occur of exactly the

same waters as were referred to in the filing maps which are already on file in this case. *Id.* At

the conclusion of the hearing, the Court made a finding of diligence:

> The Court: Well, the Court finds from the evidence that the City and County of
> Denver have offered in connection with these conditional decrees a showing of
> due diligence has been made and the conditional decrees will remain in force.

*Transcript*, p. 75 (Jan. 12, 1962).

In the 1964 diligence proceeding, Denver put on testimony of the configuration of the

Blue River Diversion Project without objection from the River District. Specifically, in the April

6, 1964 diligence proceeding, Denver presented testimony that the West Portal had been

extended from the original portal down into the reservoir area due to the instability of the rock

face above. *Testimony of Mark E. Barber*, p. 10 (April 6, 1964).

In September 1978, the Court issued a decree finding that Denver had been diligent with

regard to the Blue River Diversion Project. The Court also awarded a decree to Denver making

absolute the full amount for Denver's Dillon storage right and 324 cfs of Denver's Roberts

Tunnel direct flow right. In awarding this decree, the Court found that "the physical works

necessary for diversion of the Blue River Project direct flow rights have been completed and the

evidence herein having shown that facilities necessary to bring about the application of the water

appropriated to beneficial use are in the course of a continuous pattern of development and

construction, the court finds no necessity for setting a specific date for further showing of

diligence with respect to the appropriations herein referred to." *Decree and Determination*, Case

Nos. 2782, 5016, and 5017 ¶ 9 (September 1, 1978).

In 1982, Denver filed an application for finding of reasonable diligence and to make

absolute a portion of the Roberts Tunnel direct flow right. *Application for Quadrennial Finding

of Reasonable Diligence*, Case Nos. 2782, 5016 and 5017 (82CW129 WD5) (May 27, 1982).

Denver's application stated that: "[t]he Roberts Tunnel Diversion Project diverts water from Dillon Reservoir through the Montezuma Tunnel (now called the Harold D. Roberts Tunnel), the west portal of which is located at a point whence the East quarter corner of Section 18, Township 5 South, Range 77 West of the 6th P.M. bears South 81° 07' East 941.6 feet." *Id.* at p. 1-2 ¶ 3b." The District Court entered a decree finding that with regard to the location: "The Blue River Diversion Project diverts water from the Blue River and its tributaries hereinafter described through the Montezuma Tunnel (now called the Harold D. Roberts Tunnel), the west portal of which is located at a point whence the east quarter (E ¼) corner of Section 18, Township 5 South, Range 77 West of the 6th Principal Meridian, bears South 81°07' East, 941.6 feet." *Findings of Fact, Conclusions of Law, Judgment and Decree*, Civil Action Nos. 2782, 5016 and 5017 (82CW192 WD5) p. 2 ¶6(b) (D. Colo. Oct. 3, 1985). Middle Park and the River District filed statements of opposition to this application and Denver's application was duly noticed.

In 1986, Denver filed another application for quadrennial finding of reasonable diligence and to make absolute 473 cfs of the Roberts Tunnel direct flow right. In the 1986 application, Denver sought a finding that "[t]he Roberts Tunnel Diversion Project diverts water from Dillon Reservoir through the Montezuma Tunnel (now called the Harold D. Roberts Tunnel), the west portal of which is located at a point whence the East quarter corner of Section 18, Township 5 South, Range 77 West of the 6th P.M. bears South 81° 007' East 941.6 feet." *Id.* at p. 1-2 ¶ 3B. *Application*, Civil Action Nos. 2782, 5016 and 5017 (86CW132 WD5) (May 27, 1986). Subsequently, in 1987 the District Court entered a decree finding that with regard to the location: "The Blue River Diversion Project diverts water from the blue River and its tributaries hereinafter described through the Montezuma Tunnel (now called the Harold D. Roberts Tunnel), the west portal of which is located at a point whence the east quarter (E ¼) corner of

Section 18, Township 5 South, Range 77 West of the 6th Principal Meridian, bears South 81°07'
East, 941.6 feet." *Findings of Fact, Conclusions of Law, Judgment and Decree*, Civil Action
Nos. 2782, 5016 and 5017 (86CW132 WD5) p. 2 ¶6(b) (D. Colo. June 2, 1987). Middle Park and
the River District filed statements of opposition to this application and Denver's application was
duly noticed.

In 1990, Denver filed an application for finding for reasonable diligence and to make
absolute a 520 cfs of the Roberts Tunnel direct flow right. *Application*, Civil Action Nos. 2782,
5016 and 5017 (90CW112WD5) (May 31, 1990). Denver's application stated that "[t]he Blue
River Diversion Project diverts water from Dillon Reservoir through the Montezuma Tunnel
(now called the Harold D. Roberts Tunnel), the west portal of which is located at a point whence
the East quarter corner of Section 18, Township 5 South, Range 77 West of the 6[th] P.M. bears
South 81° 07' East 941.6 feet." *Id.* at p. 1 ¶ 3B. In 1993, the District Court awarded another
diligence decree and decreed 520 cfs of Denver's Roberts Tunnel direct flow right absolute. In
finding and awarding the 1993 diligence decree, the District Court made the same finding as to
the location of the Blue River Diversion Project as it did in 1985 and 1987. *Findings of Fact,
Conclusions of Law, Judgment and Decree*, Civil Action Nos. 2782, 5016 and 5017 (90CW112
WD5) p. 2 ¶ 5(b) (D. Colo. Mar. 11 1993). Middle Park and the River District filed statements
of opposition to this application and Denver's application was duly noticed.

**b.    Storage in South Platte Reservoirs**

Opposers are also estopped by the doctrines of collateral estoppel and res judicata and
law of the case from challenging Denver's ability to store Blue River Water in Cheesman and
Eleven Mile Reservoirs directly and by exchange as Denver based its previous claims to make
absolute portions of 158 cfs of its Blue River direct flow and storage right on these operations.

Specifically, in the 1972 diligence proceeding Denver Water's witness, Robert Fischer, Director

of Water Resource Development, testified on cross examination that Denver stores Blue River

Water by exchange in Cheesman and Eleven Mile Reservoirs. *Testimony of Robert Fischer*, p.

54 l. 3-24; p. 61 l. 19-25; p. 62 l.1-14; p. 63 l.14-25; p. 64 l. 1-13 (Oct. 20, 1972).    Kenneth

Balcomb participated in this same proceeding on behalf of the River District, Grand Valley

Water Users Association, Orchard Mesa Irrigation District and Grand Valley Irrigation

Company. *Transcript*, p. 1 (Oct. 20, 1972).

Further by decree, entered in C.A. 3635 and Case No. W-8387-77, the Applicant claimed

and was adjudicated a right to exchange or transfer waters from the Colorado River to structures

located in former Water District No. 8 including Cheesman and Chatfield Reservoirs. By decree

entered in C.A. 3286, Colorado River waters can also be stored in Antero, Eleven Mile Canon

and Cheesman Reservoirs by exchange.

**2.      The Opposers contend that Applicant must prove that the Blue River Diversion Project is part of an "integrated system." The Opposers are estopped from making this claim by previous decrees.**

In 1982, Denver filed an application for finding of reasonable diligence and to make

absolute a portion of the Roberts Tunnel direct flow right. *Application for Quadrennial Finding*

*of Reasonable Diligence,* Case Nos. 2782, 5016 and 5017 (82CW129 WD5) (May 27, 1982).

Denver's application stated that:

> Work done towards completion of the Blue River Diversion Project and the
> application of water therefrom to the beneficial uses for which the Board has
> appropriated said water includes design, construction and integration of structures
> for the storage, purification, and distribution of the waters which are the subject of
> this proceeding, continuously and without interruption and with reasonable
> dispatch. The structures involved include facilities for the succession of uses of
> the waters involved. The entire project in itself and as related to other parts of the
> Denver Municipal Water System of which the Roberts Tunnel is an integral part,
> are large, intricate, require extensive scientific research and development, and
> necessarily take many years to complete, in a sequence established and executed

by the Board and its employees to bring about the complete utilization of all the
waters involved expeditiously and with reasonable diligence.

Id. ¶ 4c. Subsequently, the District Court entered a decree, in 1985 finding that "The Blue River
Diversion Project is an integral part of the Denver Municipal Water Works System." *Findings of
Fact, Conclusions of Law, Judgment and Decree*, Civil Action Nos. 2782, 5016 and 5017
(82CW192 WD5) ¶8 (D. Colo. Oct. 3, 1985). Middle Park and the River District filed statements
of opposition to this application and Denver's application was duly noticed.

In 1986, Denver filed another application for quadrennial finding of reasonable diligence
and to make absolute 473 cfs of the Roberts Tunnel direct flow right. In the 1986 application,
Denver sought a finding that "in view of the magnitude of the project and in view of the
planning, design and construction of the integral parts of the Board's water system and the
expenditures associated with the costs of the completion of the facilities of the Board's water
system, of which the Blue River Diversion Project is an integral part, that the Court enter a
Finding and Decree of Reasonable Diligence of the Blue River Diversion Project and continuing
the remaining conditional decree in full force and effect." *Application*, Civil Action Nos. 2782,
5016 and 5017 (86CW132 WD5) (May 27, 1986). Subsequently, in 1987 the District Court
entered a decree finding that "The Blue River diversion project is an integral part of the Denver
Municipal Waterworks System." *Findings of Fact, Conclusions of Law, Judgment and Decree*,
Civil Action Nos. 2782, 5016 and 5017 (86CW132 WD5) p. 3 ¶ 8 (D. Colo. June 2, 1987).
Middle Park and the River District filed statements of opposition to this application and Denver's
application was duly noticed.

In 1990, Denver filed an application for finding for reasonable diligence and to make
absolute a 520 cfs of the Roberts Tunnel direct flow right. Application, Civil Action Nos. 2782,
5016 and 5017 (90CW112WD5) (May 31, 1990). In Denver's 1990 diligence application,

Denver sought a finding that "in view of the magnitude of the project and in view of the planning, design and construction of the integral parts of the Board's water system and the expenditures associated with the costs of the completion of the facilities of the Board's water system, of which the Blue River Diversion Project is an integral part, that the Court enter a Finding and Decree of Reasonable Diligence of the Blue River Diversion Project and continuing the remaining conditional decree in full force and effect." Subsequently, in 1993 the District Court entered a decree finding that "The Blue River diversion project is an integral part of the Denver Municipal Waterworks System." *Findings of Fact, Conclusions of Law, Judgment and Decree*, Civil Action Nos. 2782, 5016 and 5017 (90CW112 WD5) p. 4 ¶ 8 (D. Colo. Mar. 11 1993). Middle Park and the River District filed statements of opposition to this application and Denver's application was duly noticed.

> 1.b.    Fully describe all evidence you intend to use to support the claimed defense; and

- Transcript of Testimony, Case No. 2782, 5016 and 5017 (Jan. 12, 1962).
- Transcript of Testimony, Case No. 2782, 5016 and 5017 (Apr. 6, 1964).
- Transcript of Testimony, Case No. 2782, 5016 and 5017 (Oct. 20, 1972).
- Transcript of Testimony, Case No. 2782, 5016 and 5017 (May 25, 1978).
- Findings of Fact, Conclusions of Law, Decree and Order, Case Nos. 2782, 5016, 5017 (90CW112 WD5) (D. Colo. Mar. 11, 1993).
- Findings of Fact, Conclusions of Law, Decree and Order, Case Nos. 2782, 5016, 5017 (86CW132 WD5) (D. Colo. June 2, 1987).
- Decision, Judgment and Decree, Case No. W-741, (March 5, 1976).
- Findings of Fact, Conclusions of Law, Decree and Order, Case Nos. 2782, 5016, 5017 (82CW129 WD5) (D. Colo. Oct. 3, 1985).
- Statement of Claim of the City and County of Denver for the Blue River Diversion Project, Being a Portion of the Denver Municipal Water System, Case No. 1806 (Nov. 16, 1942).
- Judgment and Decree, Case Nos. 1805 and 1806 (Mar. 10, 1952).
- Decree, Case No. 87CW376 WD5.
- Distributor Contracts.
- Blue River Decree and Stipulation.
- Application and Decree for Quadrennial Finding of Reasonable Diligence, Case Nos. 2782, 5016 and 5017 (82CW129 WD5) (May 27, 1982).

- Application and Decree for Quadrennial Finding of Reasonable Diligence and to Make Absolute a Conditional Water Right, Case Nos. 2782, 5016 and 5017 (86CW132 WD5) (May 27, 1986).
- Application and Decree for a Finding of Reasonable Diligence and to make Absolute a Conditional Water Right, Case Nos. 2782, 5016 and 5017 (90CW112 WD5) (May 31, 1990).
- Amended Findings of Fact Conclusions of Law, Decree and Order, Case Nos. 2782, 5016 and 5017 (90CW112 WD5) (D. Colo. Mar. 16, 1993).
- Motion for Summary Judgment, Case Nos. 2782, 5016 and 5017 (90CW112 WD5) (Mar. 19, 1993).
- Affidavit of William G. Bates, Case Nos. 2782, 5016 and 5017 (90CW112 WD5) (Nov. 21, 1991).
- Response of the City and County of Denver, acting by and through its Board of Water Commissioners to the Second Set of Interrogatories Submitted by Copper Mountain, Inc., Case No. 2782, 5016 and 5017 (86CW132 WD5) Response to Interrogatory No. 7 p. 3 (Nov. 6, 1986).
- Dep. of Robert S. Millar, Civil Action Nos. 2782, 5016 and 5017 p. 58, l. 16-25, p. 59 l. 1-4 (Nov. 26, 1963).
- Decree and stipulations, Case No. 91CW252, WD #5.
- Contracts and service area in 1962, 1964, 1966, 1968, 1970, 1974, 1978, 1982, 1986, 1990 and 1996.
- Decree C.A. 3635 and decision in Denver v. Englewood, 826 P.2d 1266.
- Decree C.A. 3286.

       1.c.    Identify all persons who have knowledge of facts supporting the claimed defense.

- Glen Saunders, deceased.
- Robert Fischer, deceased.
- Hudson Moore, deceased.
- P.K. Bryant, deceased.
- E.L. Moseley, deceased.
- Mark E. Barber, deceased
- E.C. Carlson, deceased
- William G. Bates
- Ken Mitchell
- Eric Kuhn

## INTERROGATORY NO. 2:

    2.    For your claimed affirmative defense of promissory estoppel, please:

       a.    Set forth the complete factual basis for the claimed defense;

       b.    Fully describe all evidence you intend to use to support the claimed defense; and

      c.     Identify all persons who have knowledge of facts supporting the claimed
defense.

**RESPONSE:**

      a.     Set forth the complete factual basis for the claimed defense;

Denver Water incorporates herein its responses to Interrogatory No. 1 above.

The doctrine of promissory estoppel applies to bar certain Opposers from litigating the issues which Opposers settled and resolved with Denver in 1955. More specifically, Opposers executed the Stipulation dated October 5, 1955 upon which the United States District Court based its Findings of Fact and Conclusion of Law and Final Decree entered herein on October 12, 1955, and as amended October 29, 1957. In addition, in Case No. 87CW376 WD5, where Denver applied for and was awarded a decree to refill Dillon Reservoir, certain Opposers stipulated to Denver's service of water inside and outside of the geographic area depicted in Exhibit O.

With regard to the River District specifically, the River District, has been a party to a series of Agreements with Denver that acknowledge and are based upon Denver's compliance with the Blue River Decree, including each of the Agreements listed on Attachment 1 to Denver's November 10, 2008 discovery responses. Also, the River District has repeatedly engaged in conduct contrary to its current discovery posturing. For example: in 1987, the River District entered into the Rock Creek Lease Agreement without any restrictions on Applicant's service area; in 1992 the River District agreed to accept Denver's payment of $43,000,000 to finance the construction and use of Wolford Mountain Reservoir to be used by your client for west slope purposes and by Denver for substitution in these Civil Action Nos. 2782, 5016 and 5017 without any restrictions on Denver's service area; and in 1992 the River District agreed to convey to Denver a permanent interest in forty percent of the capacity of Wolford Mountain

Reservoir and forty percent of the water right used by the Denver for substitution under paragraph 4.(c) of the 1955 Stipulation without any restrictions on Denver's service area.

Since 1955, Denver has relied on the stipulations, agreements, and promises in 1986, 1987, 1992, 1995 made by certain Opposers and entered into contracts and developed a water works system capable of serving the Denver Metropolitan Area, as opposed to the limited geographic area depicted in Exhibit O. Under their present posture, Opposers have reneged on their stipulations, agreements, and promises, and now claim that Denver may only serve the geographic area depicted in Exhibit O, and may thereby cause Denver to rely on Opposers stipulations, agreements and promises to Denver's detriment.

Furthermore, because of the amount of time that has passed and the numerous occasions when Denver placed Opposers on notice of Denver's interpretation of the meaning and effect of the term Metropolitan Area, Opposer have acted in bad faith to the extent that they knew of "Exhibit O" and yet entered into various stipulations and contractual arrangements with Denver involving significant sums of money.

        b.     Fully describe all evidence you intend to use to support the claimed defense; and

- All items identified in Denver's response to interrogatory no. 1b.
- 1986 MOA
- 1987 Rock Creek Reservoir Lease Agreement
- 1991 MOA
- 1992 Amendment to Rock Creek Reservoir Agreement
- 1995 Supplemental Agreement,
- 1992 Clinton Fraser Agreement.
- Stipulation in Case No. 88CW382.
- Stipulation in Case No. 86CW376.
- Stipulation in Case No. 91CW252.

        c.     Identify all persons who have knowledge of facts supporting the claimed defense.

- David Little
- Ed Pokorney
- William G. Bates
- Eric Kuhn
- Ken Mitchell
- Hubert Farbes
- Roland Fischer

**INTERROGATORY No. 3:**

3.      For your claimed affirmative defense of equitable estoppel, please:
   a.      Set forth the complete factual basis for the claimed defense;
   b.      Fully describe all evidence you intend to use to support the claimed defense; and
   c.      Identify all persons who have knowledge of facts supporting the claimed defense.

**RESPONSE:**

Denver Water incorporates herein its responses to Interrogatory Nos. 1 and 2 above.

**INTERROGATORY No. 4:**

4.      For your claimed affirmative defense of waiver, please:
   a.      Set forth the complete factual basis for the claimed defense;
   b.      Fully describe all evidence you intend to use to support the claimed defense; and
   c.      Identify all persons who have knowledge of facts supporting the claimed defense.

**RESPONSE:**

   a.      Set forth the complete factual basis for the claimed defense;

Denver Water incorporates herein its responses to Interrogatory Nos. 1, 2 and 3 above.

1.      **Metropolitan Area**

Opposers waived the right to challenge Denver's service to customers outside of the geographic area depicted in "Exhibit O" and have assented to Denver's current service area as a result of the 1955 stipulation and decree entered in this case; Denver's prior diligence cases; the

1963 dispute which resulted in the April 16, 1964 stipulation; 87CW376 WD5 and by agreements and stipulations described below .

### a.    Opposers waived their claims and defenses under the Blue River Decree.

Opposers have waived the right to challenge Denver's service to its customers located inside and out outside of "Exhibit O" under the October 5, 1955 Stipulation, and the Decree entered by the District Court for the District of Colorado on October 12, 1955. Specifically, the Opposers entered into a stipulation providing that Denver may use "Blue River water for municipal purposes and no other within their metropolitan areas. Such metropolitan area shall be limited to such an area as is reasonably integrated with the development of Denver . . . ." Opposers further "stipulated and agreed . . . . that the City and County of Denver . . . [is] in need of adequate supplies of water for municipal purposes both present and future," and that it is "recognized by the parties . . . that the Blue River constitutes a source of supply to which each must look in the future if the respective municipalities are to reach their greatest potential." *Stipulation*, Civil Action Nos. 2782, 5016 and 5017 p. 2, ¶ 3 (D. Colo. Oct. 5, 1955). With regard to Climax specifically, Climax waived its right to challenge Denver's service of water to the metropolitan area" when Climax chose not to participate in Civil Action Nos. 2782, 5016 and 5017 and subsequent Blue River diligence proceedings and Case No. 87CW376.

### b.    Opposers waived their claims and defenses in prior diligence proceedings.

In the Blue River Diligence Proceedings, Denver put on evidence either through direct testimony or cross examination of the area it considered to be the Metropolitan Area and the Opposers assented to this area and thereby waived their argument that Denver is precluded from serving either inside or outside the geographic area depicted in "Exhibit O." The complete factual basis for this defense is set forth in Denver Water's response to interrogatory no. 1a.

c.    **Opposers waived their claims and defenses in the 1963 dispute.**

Opposers waived their claims and defenses regarding Exhibit O when they deposed Commissioner Millar in the 1963 dispute which resulted in the April 16, 1964 stipulation. When Commissioner Millar stated that his interpretation of the term Metropolitan Area differed with the geographic area depicted in Exhibit O, Opposers took no action to challenge Denver's interpretation and thereby assented to Denver's understanding of the term Metropolitan Area. The specific factual basis for this defense is set forth more fully in Denver's response to interrogatory no. 1a.

d.    **Opposers waived their claims and defenses in Case No. 87CW376 WD5.**

Opposers further waived their right to object to the geographic area served by Denver when they assented by stipulation to Denver's decree appropriating a refill right from Dillon Reservoir in Case No. 87CW376 WD5. There, Denver Water was appropriating a water right for use within a "service area" depicted by Exhibit 58 and 59. Further, Denver filed an affidavit by John Loughry in Case No. 87CW376 detailing the changes in the area to be served by Denver between 1987 and 1992:

> 5.    The area which received a water supply from the Board of Water Commissioners at the time the application was filed herein is shown on Exhibit 58. The area which presently receives its water supply from the Board of Water Commissioners is shown on Exhibit 58.  The area served by the Board has increased from 1987. A list of distributor contracts denominated Exhibit 57 lists the contracts with metropolitan water providers who contracted with the Board for their water supply.
>
> 6.    Since 1987, there have been several significant service area changes, including the annexation of more than 43 square miles of area for the Denver International Airport, the expansion of the Ken-Caryl service area, the extension of the Willows Water District contract, and the Board's agreement in 1995 to provide service to the City of Glendale . . . .

*Affidavit of John Loughry* ¶ 5, 6 (Jan. 14, 1997)

e.    **Opposer the River District waived its claims and defenses when it entered
into the Rock Creek Reservoir Lease Agreement.**

Opposer, the Colorado River Water Conservation District, also waived the right to

challenge the geographic area served by Denver when it entered into the Rock Creek Reservoir

Lease Agreement dated March 3, 1987; the Memorandum of Agreement among the City and

County of Denver, U.S. Bureau of Reclamation, Northern Colorado Water Conservancy District

and the Colorado River Water Conservation District dated December 30, 1991; and the July 21,

1992 Agreement Amending the Lease Agreement between Colorado River Water Conservation

District and the City and County of Denver.  As a consequence of these agreements, the River

District agreed to lease water to Denver from Muddy Creek or Rock Creek Reservoir for

purposes of replacement and substitution for Dillon Reservoir knowing full well that at the time

water stored in Dillon Reservoir was being used in a geographic area inside and outside "Exhibit

O."

## 2.  Configuration of the Blue River Diversion Project

Opposers have repeatedly waived and assented to the current configuration of the Blue

River Diversion Project in Denver's prior Blue River Diligence cases. The specific factual basis

for this defense is addressed in response to interrogatory no. 1a.

## 3.  Reuse Obligation

Opposers have waived the right to challenge Denver's reuse of Blue River Water

pursuant to the stipulation and decree entered by the United States District Court for the District

of Colorado. Paragraph 4(f) of the Stipulation and Decree provides that:

> The United States of America reserves the right, at any time after use of Blue
> River water commences hereunder, to apply to this Court for injunctive or other
> remedial orders, suspending or proportionately reducing diversions or imposing
> conditions upon the taking of Blue River water by the particular city, if the United

States shall establish as a fact that the particular city has failed to exercise due diligence in taking, with respect to return flow of water of the Colorado River System, all steps which, in view of legal limitations and economic feasibility, might reasonably be required of such city in establishing, enforcing, utilizing or operating a plan designed to accomplish said reduction by such city of its Blue River water use.

*Findings of Fact and Conclusions of Law and Final Decree*, Civil Action Nos. 2782, 5016 and

5017 p. 35 ¶4(f) (D. Colo. Oct. 12, 1955); *Stipulation*, Civil Action Nos. 2782, 5016 and 5017 p.

7 ¶4(f) (D. Colo. Oct. 5, 1955). Only the United States Government reserved the right to apply to

the Court for injunctive relief or other remedial orders with regard to Denver's reuse of Blue

River water. Neither the Colorado River Water Conservation District, the Grand Valley Water

Users Association, Orchard Mesa irrigation District, Palisade Irrigation District, nor the Grand

Valley irrigation Company reserved the right to seek such similar relief. Thus, these entities have

waived the right to challenge the extent of Denver's reuse of its Colorado River water.

With regard to Climax specifically, Climax waived its right to challenge the adequacy of

Denver's reuse of Blue River water insofar as Climax did not participate in Civil Action Nos.

2782, 5016 and 5017, and the Blue River Decree only provides that the United States may

challenge Denver's reuse of Colorado River water.

        b.       Fully describe all evidence you intend to use to support the claimed defense; and

- See Denver's Response to Interrogatory 1b.
- Findings of Fact and Conclusions of Law and Final Decree, Civil Action Nos. 2782, 5016 and 5017 p. 35 ¶4(f) (D. Colo. Oct. 12, 1955).
- Stipulation, Civil Action Nos. 2782, 5016 and 5017 p. 7 ¶4(f) (D. Colo. Oct. 5, 1955).
- Memorandum of Agreement among the City and County of Denver, U.S. Bureau of Reclamation, Northern Colorado Water Conservancy District and the Colorado River Water Conservation District dated December 30, 1991.
- Rock Creek Reservoir Lease Agreement dated March 7, 1987.
- Stipulation, Civil Action Nos. 2782, 5016 and 5017 p. 2,¶ 3 (D. Colo. Oct. 5, 1955).
- Agreement Amending the Lease Agreement between Colorado River Water Conservation District and the City and County of Denver dated July 21, 1992.

- Memorandum of Agreement between the Colorado River Water Conservation District, and the City and County of Denver, acting by and through its Board of Water Commissioners, Northern Colorado Water Conservancy District, and the Municipal Subdistirct, Northern Colorado Water Conservancy District (Dec. 15, 1986).

> c. Identify all persons who have knowledge of facts supporting the claimed defense.

See Denver's responses to Interrogatory Nos. 1c, 2c and 3c above.

**INTERROGATORY NO. 5:**

> 5. For your claimed affirmative defense of laches, please:
> a. Set forth the complete factual basis for the claimed defense;
> b. Fully describe all evidence you intend to use to support the claimed defense; and
> c. Identify all persons who have knowledge of facts supporting the claimed defense.

**RESPONSE:**

Denver Water incorporates herein its responses to Interrogatory Nos. 1, 2, 3 and 4 above.

> a. Set forth the complete factual basis for the claimed defense;

Opposers have been aware of Exhibit O since the adjudication of Case No. 1805/1806. Further Opposers have been aware of Denver's service of water outside of the area depicted in Exhibit O since as early as Denver Water's Applications in C.A. 1805 and 1806 in 1942. In addition, Opposers have also been aware of Denver's interpretation of the term "metropolitan area." Yet, despite being aware of these facts for more than fifty years, Opposers have not taken the position in any of Denver's previous diligence cases where Denver sought to make water absolute, or any of Denver's previous appropriations of new water rights, that the water was unlawfully being used outside of the area depicted in Exhibit O and that this was inconsistent with the Blue River Decree and Stipulation. Furthermore, over the course of last fifty years, Denver has entered into agreements with various Opposers including the River District, under

which the River District leased replacement and substitution water to Denver to allow Denver to serve areas outside of Exhibit O, and having taken $43,000,000 from Denver, Opposers made no objection to Denver's service of water inside or outside of the geographic area depicted in Exhibit O. Denver's specific factual basis for this defense is more fully set forth above in Denver's response to interrogatory nos. 1a, 2a, 3a, and 4a.

With regard to Climax specifically, many years have gone by, and Climax has not sought to challenge the geographic area served by Denver. In addition, Climax has not challenged Denver's operations vis a vis Green Mountain Reservoir. Climax has not challenged the storage of Blue River water in Denver's South Platte reservoirs. Nor has Climax challenged the sufficiency of Denver's reuse efforts.

        b.      Fully describe all evidence you intend to use to support the claimed defense; and

Please see Denver's response to interrogatory nos. 1b, 2b, 3b, and 4b.

        c.      Identify all persons who have knowledge of facts supporting the claimed defense.

Please see Denver's response to interrogatory nos. 1c, 2c, 3c, and 4c. In addition, the following persons may have knowledge regarding the facts supporting Denver's laches defense.

- William Bates
- Eric Kuhn
- Glen Saunders (deceased)

**INTERROGATORY NO. 6.**

    6.     For your claimed affirmative defense of unclean hands, please:
        a.     Set forth the complete factual basis for the claimed defense;
        b.     Fully describe all evidence you intend to use to support the claimed defense; and
        c.     Identify all persons who have knowledge of facts supporting the claimed defense.

**RESPONSE:**

Denver Water incorporates herein its responses to Interrogatory Nos. 1, 2, 3, 4, and 5 above.

        a.      Set forth the complete factual basis for the claimed defense;

Opposer, the River District is barred by the doctrine of unclean hands from asserting that the doctrines of collateral estoppel and res judicata bars Denver from serving geographic areas insider or outside the areas depicted in Exhibit O, by their entry into the Wolford Mountain Lease Agreement, under which they agreed to take $43,000,000.00 to lease replacement for water to Denver, which was exchanged and substituted for water that they knew was going to be used outside the geographic area depicted in Exhibit O. Denver's specific factual bases for this response are set forth in its response to interrogatory nos. 2, 3, and 4.

Opposers are further barred by the doctrine of unclean hands because they consented either by stipulation or through their course of conduct to Denver's service of water inside or outside of the area depicted in Exhibit O since 1962, and only now, after more than fifty years, claim that Denver is limited to Exhibit O, and not the metropolitan area as defined by the Blue River Decree. Denver's specific factual bases are set forth in Denver's response to interrogatory nos. 1, 2, 3, 4, and 5.

        b.      Fully describe all evidence you intend to use to support the claimed defense; and

Please see Denver's response to interrogatory nos. 1b, 2b, 3b, 4b and 5b.

        c.      Identify all persons who have knowledge of facts supporting the claimed defense.

Please see Denver's response to interrogatory nos. 1c, 2c, 3c, 4c and 5c.

## IV.    REQUESTS FOR PRODUCTION OF DOCUMENTS

1.    Produce copies of each and every non-privileged document or evidence YOU have described, reviewed or prepared in response to Interrogatories Nos. 1 through 6.


**RESPONSE:**

Applicant has produced relevant, responsive and non-privileged documents through its Fed.R.Civ.P. 26(a)(1) and 26(a)(2) disclosures and the supplements thereto.  Applicant will produce additional relevant, responsive and non-privileged documents at the offices of undersigned counsel or by mutual agreement as to place and time.

As to form and objections:

**DENVER WATER**
Casey S. Funk
Daniel J. Arnold
1600 W 12th Avenue
Denver, CO 80204-3412

*Counsel for Applicant City & County of Denver,
acting by and through its Board of Water
Commissioners*

**KAMLET SHEPHERD & REICHERT, LLP**

/s/ Stephen D. Gurr
Stephen D. Gurr
Barry A. Schwartz
1515 Arapahoe Street, Tower 1, Suite 1600
Denver, CO 80202

*Counsel for Applicant City & County of Denver,
acting by and through its Board of Water
Commissioners*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of January, 2009, a true and correct copy of the foregoing **APPLICANT'S RESPONSES TO CLIMAX'S FIRST DISCOVERY REQUEST TO APPLICANT** was served upon the following counsel:

*Via Email and LexisNexis under Case No 06CW255 (serve only)*:

Brian M. Nazarenus, Esq.
Robert J. Pohlman, Esq.
Roger T. Williams, Esq.
RYLEY CARLOCK & APPLEWHITE
1999 Broadway, Suite 1800
Denver, CO   80202
***Counsel for Climax Molybdenum Company***


Anne Jamieson Castle, Esq.
Douglas L. Abbott, Esq.
Christopher L. Thorne, Esq.
Holland & Hart, LLP-Denver
P.O. Box 8749
555 17th Street
#3200
Denver, CO 80201-8749
***Counsel for Colorado River Water Conservation District***


Mark A. Hermundstad, Esq.
Kirsten M. Kurath, Esq.
Williams Turner & Holmes, P.C.
200 North 6th Street
PO Box 338
Grand Junction, CO 81502
***Counsel for Grand Valley Water Users Association***
***Counsel for Orchard Mesa Irrigation District***
***Counsel for Ute Water Conservancy District***

Peter C. Fleming, Esq.
Jason V. Turner, Esq.
PO Box 1120
Glenwood Springs, CO 81602
***Counsel for Colorado River Water Conservation District***

Frederick G. Aldrich, Esq.
Aldrich Frederick, LLC
601A 28 ¼ Road
Grand Junction, CO 81506
***Counsel for Grand Valley Irrigation Company***

Stanley W. Cazier, Esq.
John D. Walker, Esq.
Cazier McGowan & Walker
PO Box 500
Granby, CO 80446
***Counsel for Middle Park Water Conservancy District***

Nathan A. Keever, Esq.
Dufford Waldeck Milburn & Krohn, LLP
744 Horizon Court, Suite 300
Grand Junction, CO 81506
***Counsel for Palisade Irrigation District***

/s/ *Diana L. Brechtel*