# COLORADO RIVER COOPERATIVE AGREEMENT

This Agreement is entered into among the following listed Signatories, to become effective upon the first business day at least seven days after the last Signatory has signed this Agreement.  The Effective Date of this Agreement is the 26th day of September, 2013.  The Signatories acknowledge the mutual exchange of consideration in entering into this Agreement.

City and County of Denver, acting by and through its Board of Water Commissioners  (Denver Water)

Board of County Commissioners, County of Eagle

Board of County Commissioners, County of Grand

Board of County Commissioners, County of Summit

Colorado River Water Conservation District

Middle Park Water Conservancy District

Clinton Ditch and Reservoir Company

Eagle Park Reservoir Company

Eagle River Water and Sanitation District

Upper Eagle Regional Water Authority

Grand Valley Water Users Association

Orchard Mesa Irrigation District

Ute Water Conservancy District

Palisade Irrigation District

Mesa County Irrigation District

Grand Valley Irrigation Company

City of Glenwood Springs

City of Rifle

This Colorado River Cooperative Agreement consists of the 51-page agreement dated May 15, 2012 (pages 44, 45, 50, and 51 dated January 7, 2013); Attachments A through T, which have varying dates; and the CRCA Addendum dated April 5, 2012.

Exhibit B

# COLORADO RIVER COOPERATIVE AGREEMENT

## ARTICLE I
### Limitations on Denver Water's Water Supply Obligations

A.    <u>Geographic Limit on Service Area</u>.  All water available to Denver Water under its existing absolute and conditional water rights listed in Attachment A ("Attachment A Rights") shall be used within the City and County of Denver and Denver Water's current Service Area described in Attachment B ("Service Area"), except as provided in Article I.B.  The Service Area shall not be expanded beyond the boundaries depicted in Attachment B.

B.    <u>Limits on Use of Attachment A Water Rights Outside Service Area</u>.

    1.    <u>Fixed-Amount Contracts</u>. The Attachment A Rights may be used outside the current Service Area to provide up to 67,927 acre-feet of water under the existing contracts listed in Attachment C ("2010 Contracts").  In addition, Denver Water may enter into contracts to deliver an additional 4,000 acre-feet of water annually to be used in new permanent contractual arrangement not listed in Attachment C.

    Of the 67,927 acre-feet currently obligated under 2010 Contracts, Denver Water may transfer up to 45,000 acre-feet from a pre-existing water delivery obligation under a 2010 Contract to a different recipient under a new permanent contract ("Future Contract"), subject to the following limitations.

        a.    <u>Previously Delivered Water</u>.  The amount of water transferred to a Future Contract recipient must fall within the volume of water previously delivered to the 2010 Contract holder during a prior calendar year, and Denver Water's obligation to the 2010 Contract holder must be reduced by a like amount.  Some 2010 Contracts include an amount of water not previously delivered by Denver Water ("Unused 2010 Water")  A 2010 Contract holder may not substitute Unused 2010 Water for transferred water.  The 2010 Contract holder may access the volume of Unused 2010 Water only at a rate equivalent to growth in demand in the holder's service area after the date of the transfer.

        b.    <u>Future Contract Service Area</u>.  The service area of any Future Contract recipient must be located in Adams, Arapahoe, Broomfield, Douglas or Jefferson County.

1

c.      Drought Reductions.  All Future Contracts must provide for reductions
in deliveries during such times as Denver Water imposes mandatory
water use restrictions as part of a drought response program.

d.      Reuse Under Future Contracts.  If the 2010 Contract did not expressly
grant to the recipient of the water the right of reuse or successive use,
then the Future Contract may grant the right of reuse and successive
use of the transferred water only if such reuse is subject to the
provisions of Article I.B.2.e and Article II.  Nothing in this paragraph
shall prevent a recipient of a Future Contract from making an initial
fully consumptive use of the transferred water that will not generate
effluent or return flows.

e.      Recycle Water Contracts.  Any water transferred from one of the
Recycle Water contracts listed on Attachment C shall retain recycled
water as the source of water delivered under the Future Contract.

f.      Payment of West Slope Charge.  As a condition of receiving water
under a Future Contract, any Future Contract holder shall enter into a
West Slope Charge Agreement in substantially the form of Attachment
D, and shall pay a West Slope Charge of 12.5%.

g.      Prohibition on Seeking West Slope Supplies.  Any recipient of water
under a Future Contract must agree to comply with the Abstention
Provisions.

2.      Other Contractual Water Supply Obligations.  Some of Denver Water's supply
obligations to entities or areas outside the Service Area present unique
circumstances or opportunities and are not included within the volumetric
limit established in Article I.B.1.  Denver Water may use the Attachment A
Rights outside the Service Area to provide water under the following
circumstances:

a.      Obligations to Littleton under Littleton's Total Service Distributor
Contract dated March 9, 2011.

b.      Water to be provided to Public Service Company and to West Slope
entities in the event of a relaxation of the Shoshone Call under the
provisions of the 2007 Shoshone Agreement or the provisions of
Article VI of this Agreement.

c.      Use of Denver Water's water rights on the West Slope: (1) for
beneficial use by the West Slope entities; or (2) to meet regulatory
obligations required for Denver Water's operations or projects; or (3)
for other purposes specifically authorized under this Agreement.

d.    Water delivered from the potable water distribution system at Denver International Airport that would otherwise need to be discharged from the system to maintain the chlorine residual and avoid nitrification within the potable water system.

e.    Reusable return flows in excess of Denver Water's obligations under Article II or not committed to a 2010 Contract may be used in Joint Use Projects, subject to the following limitations in this subsection. The use of reusable return flows under this section does not in any way diminish Denver Water's obligations under Article II.  As a condition of such use, East Slope lessees or purchasers of Denver Water's reusable return flow for use outside the Service Area:

i.  Shall enter into a West Slope Charge Agreement in substantially the form of Attachment D, and shall pay a West Slope Charge of 12.5%.

ii.  Must comply with the Abstention Provisions.

iii. Will maximize using best efforts the reuse or successive use of reusable water available to them.

iv. Will adopt and implement a conservation plan that would achieve results similar or proportionately the same as Denver Water's.

3.    <u>Deliveries of Water on a Temporary Basis</u>.  Denver Water may use the Attachment A Rights to deliver water on a temporary basis outside the Service Area, as limited by the following provisions.

a.    For spot sales, subject to the following limitations:

i.    <u>Definition</u>.  The definition of a spot sale for purposes of this agreement is a lease of water available to Denver Water on a sporadic basis as a result of temporary hydrologic conditions or operational constraints, which is delivered to the recipient over a period no longer than 14 consecutive days.

ii.    <u>Holiday Restrictions</u>:  Spot sales of Blue River water will not be made for use during the Memorial Day, Fourth of July and Labor Day weekends.  For purposes of this paragraph 11, Memorial Day and Labor Day weekends means Friday, Saturday, Sunday and Monday of that holiday.  Fourth of July weekend means (1) if the holiday falls on a Thursday then the weekend is Thursday, Friday, Saturday, and Sunday; (2) if the holiday falls on either Friday, Saturday, Sunday, or Monday, then the weekend is Friday, Saturday, Sunday, and Monday; (3)

5/15/2012

if the holiday falls on a Tuesday then the weekend is Saturday, Sunday, Monday, and Tuesday; and (4) if the holiday falls on a Wednesday, then the weekend is only on Wednesday.

iii.  <u>Reservoir Level Restrictions</u>:  Spot sales of Blue River water will be made only when: (1) the Dillon Reservoir lake level is projected to be at or above the Frisco Marina elevation from June 18 to Labor Day weekend, and will not be reduced below that elevation as a result of the spot sales.  For purposes of this paragraph 11, the Frisco Marina elevation means the elevation at which the Frisco Marina can be fully operational.  At the time of execution of this agreement, the Signatories agree that the Frisco Marina elevation is 9012.  However, Summit County and Denver Water may later agree that a lower elevation has become suitable as the result of physical changes to the Marina or the Reservoir.

If Denver Water makes a spot sale of Blue River water during the runoff season prior to June 18 based on projections of reservoir level, and the reservoir level fails to reach the Frisco Marina elevation by June 18 or falls below that elevation prior to Labor Day, then Denver Water will forfeit the revenue received from the spot sale and deposit an equivalent amount into the West Slope Fund for water supply and water quality projects.

iv.  <u>Dillon Outflow Restrictions</u>.  Spot sales of Blue River water will not be made:

a)  From Memorial Day weekend to the end of July, if outflow from Dillon Reservoir is less than 300 cfs during any diversion and delivery of spot sale water; or

b)  At other times of the year, if outflow from Dillon Reservoir is less than 100 cfs during any diversion and delivery of spot sale water.

v.  <u>Limit on Temporary Water Deliveries</u>.  The total combined volume of all spot sales and temporary leases of water resulting from the Attachment A Rights will not exceed a three-year running average of 7,300 acre feet, with an annual maximum of 12,300 acre-feet in a given year.

vi.  <u>Payment by Recipients</u>.  Purchasers of spot sale water shall enter into a West Slope Charge Agreement in substantially the form of Attachment D, and shall pay a West Slope Charge of

15%.

vii.     Shoshone Call Restriction.  Spot sales will not be made when the senior Shoshone call is subject to relaxation under the provisions of the 2007 Shoshone Agreement or the provisions of Article VI.E of this Agreement.

b.     For temporary leases, subject to the following limitations:

i.     The definition of temporary leases for purposes of this agreement is a lease of water for a duration not to exceed five consecutive years.

ii.     Any lessee would be limited to no more than five years of water delivery in any ten year period under one or more temporary leases.

iii.     The total volume of spot sales and temporary leases of water from west slope sources will not exceed 3,300 acre-feet in any given year.

iv.     The total combined volume of all spot sales and temporary leases of water resulting from the Attachment A Rights will be limited as described in paragraph I(B)(3)(v).

v.     Lessees shall enter into a West Slope Charge Agreement in substantially the form of Attachment D, and shall pay a West Slope Charge of 15%.

vi.     All temporary leases must provide for reductions in deliveries during such times as Denver Water imposes mandatory water use restrictions as part of a drought response program.

4.     WISE Partnership Agreement.  The Attachment A Rights may be used to provide water under the WISE partnership agreement with the City of Aurora and the South Metro Water Authority, so long as the use of the rights is otherwise authorized under this Article I.B, and subject to the following limitations:

a.     The recipients of WISE water shall enter into a West Slope Charge Agreement in substantially the form of Attachment D, and shall pay a West Slope Charge of 12.5% on all water provided by Denver Water, regardless of which provision of Article I.B authorizes the use.

b.     The recipients of WISE water must comply with the Abstention Provisions.

5/15/2012

    c.       The recipients of WISE water must maximize using best efforts the reuse or successive use of reusable water available to them.

    d.       The recipients of WISE water must adopt and implement a conservation plan that would achieve results similar or proportionately the same as Denver Water's.

C.    <u>Other Water Rights</u>.

    1.    <u>Joint Use Projects</u>.  Denver Water may use its existing East Slope water rights listed in Attachment E in Joint Use Projects on the Front Range, so long as such use of the water rights does not result in a decrease in the supply of water available to Denver Water under the Attachment A Rights or in an increase in diversions of water by participants in the Joint Project, including Denver Water, from the West Slope to the East Slope.  Participants in these projects must agree to comply with the Abstention Provisions.

    2.    <u>New East Slope Water Rights</u>.  Denver Water may use outside the Service Area any water made available: (a) as a result of East Slope water rights appropriated or acquired after execution of this Agreement or (b) by means of contractual arrangements with East Slope entities entered into after execution of this Agreement involving East Slope water rights.  Such use of the water shall not result in a decrease in the supply of water available to Denver Water under the Attachment A Rights, or in an increase in diversions of water by participants in the project, including Denver Water, from the West Slope to the East Slope.

    3    <u>West Slope Water Rights</u>.  After the Effective Date of this Agreement, Denver Water will not seek to:  (a) develop any of its Division 5 water rights listed in Attachment E; or (b) create any new depletion, not caused by the exercise of the Division 5 water rights listed in Attachment A, from the Colorado River and its tributaries, for diversion to the East Slope; or (c) acquire any water right on the West Slope that would increase the yield Denver Water currently calculates based on the full use of the Division 5 water rights listed in Attachment A, without the prior approval of the River District and the County Commissioners for each county in which a new facility would be located or in which a new water right would be exercised.

    Denver Water will not seek to appropriate or acquire any other water right on the West Slope, without first consulting in good faith with potentially affected

5/15/2012

West Slope Signatories in order to identify and attempt to mitigate any potential adverse effect on West Slope interests, subject to the other provisions of this Agreement.  The West Slope Signatories reserve the right to oppose any such development, appropriation or acquisition of water rights in water court, permit proceedings, or other forums.

5/15/2012

## ARTICLE II
## Denver Water's Conservation and Reuse Commitments

A.    Reuse of Blue River Water.  Denver agrees to reuse its Blue River water and other lawfully available reusable water through exchanges into its South Platte diversion and storage facilities and through its recycled water treatment plant that provides water for nonpotable purposes.  For use within the Service Area and to provide up to 6,400 acre-feet of recycled water outside the Service Area under the Recycle Water contracts listed in Attachment C or Future Contracts resulting from the transfer of those contracts pursuant to Article I.B.1, Denver Water will fully construct its recycled water system with the capacity to provide 17,500 acre-feet annually and will maximize its exchanges within legal and water availability constraints.[1]  To achieve this level of reuse, Denver Water will complete construction of at least 30,000 acre-feet of gravel pit storage or other functionally equivalent storage.[2] The fully constructed recycled water plant is scheduled to be operational in 2020.  The 30,000 acre-feet of gravel pit storage is also anticipated to be completed in 2020.  However, the timing of development of gravel pit storage is directly related, in part, to the need for aggregate for construction purposes in the metro area, and is not within Denver Water's control.  Denver Water commits to construct sufficient infrastructure to achieve the volumes listed in this paragraph subject to the uncertainties of timing described in this paragraph.

B.    Conservation Plan.  Denver Water's 1996 IRP predicted that 29,000 acre-feet of water could be saved through active conservation efforts by 2045.  In 2006, the Denver Water Board mandated an accelerated conservation program to accomplish that level of savings by the end of 2016.  Denver Water agrees to continue to implement its existing conservation program described in Attachment F to achieve the savings of 29,000 acre-feet contemplated by the 1996 IRP, in addition to natural replacement, consistent with its goal of achieving the targeted savings by the end of 2016.  (It is often not possible to measure precisely the volume of water saved as a result of a specific action, e.g., requiring soil amendment, but Denver will implement the

---

[1] The volume of water that can be reused is determined by legal, regulatory and hydrologic conditions that vary significantly from year to year and over time, and may be fundamentally different in the future.  Over the past 20 years with an annual average demand of 285,000 acre-feet, Denver Water's reuse by exchange and replacement has averaged 16,300 acre-feet per year, with a maximum of 29,900 acre-feet and a minimum of 5,800 acre-feet.  With regard to future exchanges, Denver Water's computer simulation model predicts that, with an annual average demand of 345,000 acre-feet and completion of the storage described in this Article II.A, the annual average for exchanges and replacement will be 38,000 acre-feet.  These modeled predictions are based on historic hydrology, past administrative practices and numerous operational assumptions, and consequently may not be construed as any sort of mandated or targeted operational requirement.

[2] If Denver Water's water rights cannot be exercised as anticipated to operate exchanges, making a portion of the proposed 30,000 acre-feet of storage not useful in maximizing Denver Water's exchanges, then Denver Water will notify the West Slope Signatories and identify the functionally equivalent storage, other infrastructure, or other means that it proposes to utilize to maximize its exchanges and the parties shall discuss in good faith whether to modify the provisions of this Article II.A.

5/15/2012

conservation measures necessary to result in the volume of savings described in this paragraph.)  Denver Water will inform the West Slope Signatories in an annual progress report if it decides to substitute a different conservation measure than the ones listed in Attachment F.  Once Denver Water determines the conservation goal has been met, it will retain a reputable and qualified third party to confirm that the methodology used to quantify savings was reasonable.  If the third party determines the methodology was not reasonable, Denver Water will correct the identified defects in the methodology, and if necessary, undertake additional conservation measures to achieve the goal.

C.    <u>Commitment to Additional Efforts</u>.  In addition to taking actions necessary to achieve the results described in Articles II.A and II.B, Denver Water agrees to develop, for use within the Service Area and to satisfy the obligations listed in Article I.B, an additional 10,000 acre-feet on an average annual basis through reuse, including use of reusable sources of water for augmentation, and/or conservation measures not described in Articles II.A and II.B.  The development of the additional 10,000 acre-feet will commence no later than the completion of the efforts described in Articles II.A and II.B, and are anticipated to be completed by the end of calendar year 2030.  Once Denver Water determines the additional 10,000 acre-feet has been attained, it will retain a reputable and qualified third party to confirm that the methodology used to quantify the attainment was reasonable.  If the third party determines the methodology was not reasonable, Denver Water will correct the identified defects in the methodology, and if necessary, undertake additional reuse or conservation measures to achieve the goal.

5/15/2012

**ARTICLE III**
**Denver Water's Other Commitments**

A.      General

1.      Denver Water agrees to make a good faith effort to identify which of its West Slope conditional water rights might be needed and to abandon those conditional water rights that it deems are not needed.

2.      As used in this Article III, "Resolution of Blue River Decree Issues" means the entry of final judgments and decrees no longer subject to appeals which make absolute 654 cfs in 06CW255, Water Division 5, and in 49-cv-2782, U.S. District Court, and 141,712 acre-feet in 03CW039, Water Division 5, in accord with the Amended Application to Make Absolute, filed with the court on February 16, 2006.

3.      Use of Denver Water's Water Rights on West Slope.

   a.      Denver Water will be responsible for providing substitution water and power interference charges to Green Mountain Reservoir and replacement water to other senior downstream water rights as necessary to ensure that West Slope recipients of the water provided by Denver Water under this Article III may use the water as provided in this Agreement.

   b.      The signatories to this Agreement will cooperate to obtain such court decrees and approvals as are necessary to ensure that Denver Water's water that is made available to West Slope users under this Agreement, the 1985 Summit Agreement and the 1992 Clinton Agreement may be used on the West Slope for all uses, including but not limited to, fully consumptive uses, reuse and successive uses.

4.      Replacement Water.  Certain provisions of this Article III require recipients of water deliveries from Denver Water to make available to Denver Water "Replacement Water."  Replacement Water may be made available to Denver Water from Green Mountain Reservoir, Wolford Mountain Reservoir, West Slope supplies of Windy Gap Project water, water made available to the West Slope from relaxation of the Shoshone Call pursuant to the 2007 Shoshone Agreement or the provisions of Article VI.E, water stored in Old Dillon Reservoir, water made available to West Slope water users pursuant to the 2003 Colorado Springs Substitution Agreement including return flows of such water, decreed consumptive use credits and reusable return flows, water diverted from Straight Creek into Dillon Reservoir by Summit County users, or any other substitution source reasonably acceptable to the Bureau of Reclamation and the Signatories.  Where Replacement Water is required, Denver Water's delivery of water is contingent upon the Replacement Water

5/15/2012

10

being on hand and physically and legally available for Denver Water's use for substitution purposes and will be provided to Denver Water for each acre foot of water delivered.

5.　　Escalation. The amounts of money that Denver Water is committed to pay under this Article III will be subject to escalation beginning on the fourth anniversary of the Effective Date of this Agreement, based on changes in the Consumer Price Index for All Urban Consumers ("CPI-U") for the Denver-Boulder-Greeley Metropolitan Area.

B.　　**Summit County – Blue River**

1.　　Payment by Denver Water. $11 million will be paid by Denver Water, subject to the terms set forth below.

2.　　Waste Water Treatment Plant Fund. $1 million of the $11 million shall be deposited into an interest-bearing fund to be administered by Summit County to offset the impacts of lower Dillon Reservoir levels or reduced outflows from Dillon Dam on permitted wastewater dischargers in Summit County.

3.　　Environmental Enhancement Fund. $1 million of the $11 million shall be deposited into an interest-bearing fund to be used as 50% matching funds for Environmental Enhancement projects in Summit County. The Environmental Enhancement projects shall be selected by a committee composed of one representative from each of the five entities listed in Article III.B.4 below. If these entities cannot unanimously agree on a project or projects, then each entity will be entitled to use one-fifth of the funds for a 50% match for an Environmental Enhancement project selected by that entity.

4.　　Payments for Projects in Summit County. $9 million of the $11 million will be distributed in five equal shares to the following entities to offset the costs of the projects listed in Attachment G:

- Town of Dillon
- Town of Silverthorne
- Town of Frisco/Frisco Sanitation District
- Town of Breckenridge
- Summit County/other water districts listed in Attachment G

5.　　Reallocation of Funds. Denver Water will not object to the reallocation of the $9 million as may be agreed by these entities, and these entities will determine the allocation of these funds for the projects described in Attachment G without restrictions imposed by Denver Water. Funds can be used to reimburse the sponsoring entity for project costs incurred before the funding is to be provided by Denver Water under Article III.B.6 below.

5/15/2012

6.    <u>Timing of Payments</u>.  The schedule for payment of the $11 million is as follows:

    a.    $4.5 million of the $9 million described in Article III.B.4 above within one year of Resolution of Blue River Decree issues.

    b.    $4.5 million of the $9 million described in Article III.B.4 above within six months upon Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project.

    c.    The $1 million for Environmental Enhancements under Article III.B.3 will be deposited into the interest-bearing fund at the time of execution of the Agreement.  These funds would be immediately available as matching funds whenever an Environmental Enhancement project is selected pursuant to Article III.B.3.

    d.    The $1 million dedicated to assisting wastewater treatment plants under Article III.B.2 will be deposited into the interest-bearing fund at the time of execution of this Agreement.

7.    <u>250 Acre Feet of Dillon Storage Water</u>.  Upon Resolution of Blue River Decree Issues, Denver Water will provide an additional 250 feet per year of water from Dillon Reservoir with a yield as reliable as the yield available to Denver Water at Dillon Reservoir.  This water will be allocated as follows:

| | | |
|---|---|---|
| Town of Silverthorne | = | 60 acre feet |
| Summit County | = | 56 acre feet |
| Snake River Water District | = | 45 acre feet |
| Town of Dillon | = | 45 acre feet |
| Copper Mt. Metro District | = | 29 acre feet |
| Dillon Valley Metro District | = | 15 acre feet |

There shall be no Replacement Water or other compensation for this Dillon storage water.

8.    <u>Montezuma Shaft</u>.

    a.    Denver Water is willing to consider, on a case-by-case basis, use of the Montezuma Shaft by the Snake River Water District, East Dillon Water District and Summit County Government on a space available basis when the Roberts Tunnel is operating.  Any such future use will be subject to written acknowledgement by all water users that the supply is interruptible and will be subject to Denver Water's ability, in its sole discretion, to take the Roberts Tunnel out of service for maintenance, inspection and operational needs.

5/15/2012

b.  Any water resulting from use of the Montezuma Shaft as described in the preceding paragraph will come out of the users' allocations of water under the 1985 Summit Agreement, the 1992 Clinton Agreement or this Agreement.

9.  <u>Old Dillon Reservoir</u>.  Denver Water will not object to the construction and operation of Old Dillon Reservoir in accordance with permits issued by the U.S. Forest Service and U.S. Army Corps of Engineers.  Nothing herein shall be construed as a subordination to the operation of this project of any of Denver Water's decreed water rights and exchanges.  Upon execution of the agreement between Denver Water and Old Dillon Reservoir Water Authority, Denver Water will withdraw its statements of opposition to all pending Old Dillon Reservoir water court applications by Summit County and Towns of Dillon and Silverthorne.

10. <u>Dillon Reservoir Levels</u>.  Denver Water agrees to use its best efforts to maintain the water level of Dillon Reservoir for recreational and aesthetic purposes at or above 9012 feet in elevation, above mean sea level, from June 18 to Labor Day of each year.  This is a target elevation that may not be achieved, depending upon various factors, and is subject to Denver Water's water supply obligations.  Under the Blue River Decree, Denver Water's diversions are limited to municipal purposes only.  Denver Water will continue to comply with the Blue River Decree and to operate the Roberts Tunnel to meet its water supply obligations and not solely for recreational or hydropower purposes.

11. <u>Town of Frisco</u>.  Denver Water has  allowed the Town of Frisco to use its Future Dillon Water under the 1985 Summit Agreement as a source of augmentation supply for snowmaking at its winter sports area pursuant to the Future Dillon Water Agreement dated November 18, 2009 between Denver Water and Frisco. Denver Water and Frisco agree to participate in a joint study on the amount and timing of snowmaking return flows from the winter sports area and to cooperate in maximizing the amount of snowmaking return flows in any Water Court proceeding.

12. <u>Additional Exchanges</u>.  Denver Water will allow additional exchanges through Dillon Reservoir for the benefit of Summit County users, so long as Denver Water's firm yield is kept whole, such exchanges do not interfere with Denver Water's operations, and Denver Water is afforded an opportunity to protect its interests in any legal or administrative proceeding.

13. <u>Temporary Storage</u>.  At its sole discretion, Denver Water will allow Summit County entities to temporarily store additional water in Dillon Reservoir on a space available basis.

5/15/2012

14.    Additional 1493 Acre Feet.

a.    Upon resolution of Blue River Decree issues, Denver Water will
provide to the entities listed below 1493 acre feet per year from
Dillon Reservoir with a yield as reliable as the yield available to
Denver Water at Dillon Reservoir.  This water shall be made available
directly in Dillon Reservoir each year or, at the option of an
individual recipient, the portion of this water to which the recipient is
entitled shall be provided in Clinton Gulch Reservoir (the Clinton
Bookover Water") in lieu of an equal amount of water that would be
available to such recipient in Dillon Reservoir, by operating Denver
Water's Blue River Diversion Project water rights to allow storage of
the Clinton Bookover Water in Clinton Reservoir.  In the event
Denver Water does not have an account balance in Clinton Gulch
Reservoir pursuant to the terms of the 1992 Clinton Agreement, the
Clinton Bookover Water shall be booked over to the recipient from
water in storage in Clinton Gulch Reservoir, pursuant to separate
operating procedures to be agreed upon by Denver Water and the
Reservoir Company. In the event Denver Water has an account
balance in Clinton Reservoir pursuant to the terms of the 1992 Clinton
Agreement, the Clinton Bookover Water shall be booked over to that
recipient from Denver Water's account in Clinton Gulch Reservoir.
Any Clinton Bookover Water may not be carried over in Clinton
Gulch Reservoir from year to year.  Such water will be allocated as
follows:

-    Vail Summit Resorts (Keystone) = 302 acre feet (1)
-    Unallocated future supply pool = 175 acre feet (2)
-    Copper Mountain Resort = 142 acre feet (1)
-    Town of Silverthorne = 140 acre feet
-    Summit County = 134 acre feet
-    Vail Summit Resorts (Breckenridge) = 126 acre feet (1)
-    Town of Breckenridge = 108 acre feet (3)
-    Town of Dillon = 105 acre feet
-    Snake River Water District = 105 acre feet
-    Copper Mountain Metropolitan District = 69 acre feet
-    Arapahoe Basin Ski Area = 52 acre feet (1)
-    Dillon Valley Metro District = 35 acre feet

[1]This water may be used for snowmaking purposes and is entitled to
a snowmaking ratio of not more than 5 to 1  (or such other ratio based on the
amount of credited snowmaking return flows established by subsequent
decrees.) Denver Water and each ski area agree to participate in joint studies
on the amount and timing of snowmaking return flows from each ski resort
using the foregoing water, and to cooperate in maximizing the amount of
snowmaking return flows in any Water Court proceeding.  The combined

5/15/2012

14

volume of water for snowmaking amounts under this Article III, excluding snowmaking by the Town of Frisco under Article III.B.11, and the 1992 Clinton Agreement shall not exceed the 6000 acre feet limit on snowmaking water contained in the 1992 Clinton Agreement.

[2]The unallocated pool will be administered by a board consisting of one representative from the Towns of Breckenridge, Dillon, Frisco and Silverthorne and the Summit County Commissioners

[3]A portion of this water is entitled to the snowmaking ratio described in note 1 above. Denver Water and the ski area agree to participate in a joint study on the amount and timing of snowmaking return flows from the ski resort, and to cooperate in maximizing the amount of snowmaking return flows in any Water Court proceeding. The combined volume of water for snowmaking amounts under this Article III, excluding snowmaking by the Town of Frisco under Article III.B.11, and the 1992 Clinton Agreement shall not exceed the 6000 acre feet limit on snowmaking water contained in the 1992 Clinton Agreement.

b.      The recipients of this water shall provide to Denver Water Replacement Water for each acre foot of the yield water. The ratio shall be 1 acre foot of Replacement Water for each acre foot of water delivered above or into Dillon Reservoir and 1.4 acre feet of Replacement Water for each acre-foot made available below Dillon Reservoir.

c.      The Summit County users shall be responsible for accounting for the use of all water provided by Denver Water under this Agreement. This accounting will be coordinated by a single engineering firm with accounting under the 1985 Summit Agreement and the 1992 Clinton Agreement.

15.    Place of Use. The place of use of any of the water provided under this Article III.B will be a matter of internal agreement among Summit County water users and will not be limited by Denver Water, provided that any water booked over to Denver Water under the 1992 Clinton Agreement will be retained in Clinton Reservoir.

16.    Dillon Bypass Flows. Denver Water's release of water from Dillon Reservoir is subject to the terms of its 1966 right-of-way from the Department of Interior for Dillon Reservoir. Upon resolution of Blue River Decree issues, Denver Water agrees: (1) to waive its right to reduce releases under section 2 (C) of the 1966 right-of-way; and (2) to add the following new limitation upon its ability to reduce releases in addition to the conditions described in the right of way: Denver Water will not reduce releases below those required by section 2 (A) of the right of way unless an emergency

declaration banning residential lawn watering during the irrigation season is in force within its Service Area.  Nothing herein shall alter or amend Denver's ability to reduce bypasses under paragraph 2(A) of the right of way during an emergency or during temporary periods of time involving maintenance or repairs on the water facilities involved.  Nothing herein shall alter or amend any other obligation of Denver Water with respect to releases from Dillon Reservoir, including, without limitation, the terms of the Record of Decision for the Wolford Mountain (Muddy Creek) Reservoir; the Memorandum of Agreement among the U.S. Bureau of Reclamation, Northern Colorado Water Conservancy District, Colorado River Water Conservation District, and Denver Water dated December 30, 1991, regarding substitutions from Wolford Mountain Reservoir (MOA No. 2-AG-60-01550); the decree in Case No. 91CW252, Water Division No. 5 (also entered in Consolidated Case Nos. 2782, 5016, and 5017, U.S. District Court, District of Colorado); and the 1992 Clinton Agreement.

17.     Silverthorne's Dillon Storage Water.  Upon resolution of Blue River Decree issues, Denver Water and Summit County will amend the 1985 Summit Agreement to eliminate the current restrictions on the use of the 300 acre feet of Dillon Storage Water made available to the Town of Silverthorne.  A form of the revisions to the 1985 Summit Agreement to accomplish this result is attached as Attachment H.  The Silverthorne RICD will not be used to prevent or otherwise limit the exchange or substitution of any replacement or exchange water into Dillon Reservoir under this Agreement, the 1985 Summit Agreement or the 1992 Clinton Agreement.

18.     Colorado Springs Substitution Agreement.  Denver Water will agree to support extension of the Colorado Springs substitution agreement adjudicated in Case No. 03CW320, Water Division 5, as long as it is in substantially the same form as the present agreement.

## C.     Clinton Reservoir Agreements.

1.     Upon the execution of this Agreement, the 1992 Clinton Agreement shall be amended to add a new whereas clause after the second whereas clause to read as follows:

Whereas, by decree of the District Court in and for Water Division No. 5, State of Colorado, in Case No. 98CW57, Clinton Reservoir was granted a Use Enlargement and Second Filling in the amount of 4,250 acre feet for domestic, municipal, industrial, snowmaking, recreation, fish and wildlife propagation and augmentation purposes, both on the eastern and western slopes of Colorado, and an application is pending in Case No. 06CW252 for Clinton Gulch Reservoir 1st Enlargement and Refill Right for an additional

210 acre feet.  All references to Clinton Reservoir herein collectively refer to the storage rights decreed in Case Nos. W-2559, 98CW57 and 06CW252;

2.      Upon the execution of this Agreement, paragraph 1(b) of the 1992 Clinton Agreement shall be amended to read as follows:

(b)      Clinton Reservoir will retain for the uses set forth in paragraph 1(c) below any water stored in an accounting year if an allowable fill occurs.  An allowable fill occurs each year except:  (i) when Green Mountain Reservoir does not fill under its own right and the Water Board is required to provide substitution water to Green Mountain Reservoir in order to retain water diverted at Dillon Reservoir; or (ii) when the contents of Dillon Reservoir are less than 100,000 acre feet on August 1 for reasons other than the Water Board's maintenance or repair of its Dillon Reservoir facilities and the total combined contents of the Water Board's Dillon, Gross, Cheesman, Eleven Mile and Antero Reservoirs are less than 51% of their total usable capacity on August 1.  Subject to the provisions of Paragraph 9 below, if an allowable fill does not occur in a given accounting year, the water stored in Clinton Reservoir during that accounting year will be credited to the Water Board's account and retained in Clinton Reservoir until the contents of Dillon Reservoir as measured above the invert of the west portal of the Roberts Tunnel are 100,000 acre feet or less, in which event the water shall be released from Clinton Reservoir to Dillon Reservoir when requested by the Water Board, or until an allowable fill occurs, whereupon the Water Board's account balance of water stored in Clinton Reservoir will be reset to zero.  The release of the Water Board's water stored in Clinton Reservoir shall be scheduled in such a manner as to meet the Water Board's needs in a timely manner and also to avoid the erosion of the Clinton Canal.

3.      Clinton Flood Control Exchanges.  At its sole discretion, Denver Water will allow the Clinton Ditch & Reservoir Company to temporarily store Clinton Reservoir water released from storage for flood control purposes in Dillon Reservoir, limited to a space available basis, and to use the stored water as an exchange supply, pursuant to operating procedures to be agreed upon at the time of the proposed exchange.

4.      Clinton Reservoir Dead Storage Pool.  Upon execution of this Agreement, Denver Water and the Clinton Ditch & Reservoir Company will enter into the Interim Agreement regarding the Clinton Reservoir dead storage pool attached hereto as Attachment I.  Upon Resolution of Blue River Decree Issues, Denver Water and the Clinton Ditch & Reservoir Company will enter into the permanent Agreement regarding the Clinton Reservoir dead storage pool attached hereto as Attachment J.  The interim agreement will renew on a

year-to-year basis so long as the Signatories are still engaged in efforts to achieve Resolution of Blue River Decree Issues.

5. <u>Denver Water Opposition</u>.  Upon the execution of this Agreement, Denver Water will consent to the decree in Water Division No. 5 Case No. 06CW252 attached hereto as Attachment K for a total reservoir capacity of 4460 acre feet which includes a dead storage pool of 801 acre feet.

6. <u>Spillway Enlargement Water</u>.  Upon Resolution of Blue River Decree Issues, Denver Water and the Clinton Ditch & Reservoir Company will modify their existing 1992 Clinton Agreement to add the spillway enlargement water (up to a maximum of 500 acre feet).  The water from the total reservoir capacity, including the dead storage pool and spillway enlargement, will be allocated to existing shareholders of the Clinton Ditch & Reservoir Company on a pro rata basis as either fourth year supply, or one-third of that amount will be so allocated as an increase in the "Reservoir Yield" of Clinton Reservoir, as that term is defined in the1992 Clinton Agreement.

7. Upon the execution of this Agreement, paragraph 10(a) of the 1992 Clinton Agreement shall be amended to read as follows:

(a)  Whenever water cannot be diverted from the Snake River or its tributaries because of decreed instream flows, or the operation of the instream flow memorandum of agreement between Keystone Resorts Management, Inc. ("Keystone") and the Department of Natural Resources, or the water quality of the Snake River, Keystone may pump up to 1500 acre feet of water from September 1 of each year to March 31 of the following year from the Montezuma Shaft of the Roberts Tunnel, subject to the provisions of this paragraph.

D. **<u>Eagle County</u>**.

1. Any development and use of Wolcott Reservoir shall be in compliance with the terms of the settlement agreement between Denver Water and the Eagle River Water & Sanitation District and Upper Eagle Regional Water Authority and the subsequent decrees in Water Division No. 5 Case Nos. 02CW125 and 07CW126.

2. Denver Water will not seek any new appropriation of water in the Eagle River basin or pursue or participate in any acquisition of water rights or any project that would result in any new depletion from the Eagle River basin without the prior approval of the Eagle County Commissioners, the River District, the Eagle Park Reservoir Company, the Eagle River Water & Sanitation District, and the Upper Eagle Regional Water Authority.

5/15/2012

In addition, the Abstention Provisions applied in Article I of this Agreement provide that any entity receiving water from Denver Water under any Future Contract or any contract for Reusable Return Flows will not seek any new appropriation of water, or pursue or participate in any project that would result in any new depletion from the Eagle River basin.

3.  Denver Water will not oppose any future interconnect between Clinton and Eagle Park Reservoirs, provided that the water in Clinton Reservoir that has been booked over to Denver Water pursuant to the terms of the 1992 Clinton Agreement remains in Clinton Reservoir.

4.  Upon execution of this Agreement, Denver Water will withdraw its pending motion and statement of opposition in Water Division No. 5 Case No. 02CW403.

E.  **Grand County and Fraser, Williams Fork and Upper Colorado River Basins**

1.  <u>General Provisions for Article III.E.</u>

    a.  <u>Relationship to Moffat Project Permitting Process</u>.  Denver Water has applied for a permit for the Moffat Project from the Corps of Engineers ("COE") under Section 404 of the Clean Water Act.  The Moffat Project involves enlargement of Gross Reservoir located in Boulder County and the diversion of additional water from the Upper Colorado, Williams Fork and Fraser River watersheds in Grand County.  Grand County is a consulting agency in that permitting process and has submitted comments to COE that are a part of the regulatory record.  As part of the permitting process, the COE will approve a Mitigation Plan designed to avoid, minimize, or mitigate any new impacts to the stream environment that might be caused by the Moffat Project.

        i.  <u>Mitigation</u>.  The provisions of this Article III.E are not intended to define and do not substitute for the Mitigation Plan that will be required by COE.  Denver Water will comply with the Mitigation Plan approved by COE in addition to fulfilling the commitments contained in this Article III.E.  The funds committed by Denver Water in Articles III.E.2 and III.E.3 are subject to proportional reduction if the Mitigation Plan required in the permitting process mandates funds for the purposes described in those sections.

        ii.  <u>Improvements</u>.  Denver Water's commitments in sections E.5 through E.24 include several measures designed to improve current stream conditions ("Improvements") and do not represent mitigation for the Moffat Project.  The Signatories agree that they shall not represent

that the Improvements are designed or intended to avoid, minimize, or mitigate any impacts associated with the Moffat Project..

b.      Water Rights Issues.  The Signatories to this Agreement will cooperate to implement such legal mechanisms and to obtain such administrative and judicial approvals as Denver Water, Grand County, the River District, and Middle Park agree are necessary to ensure that the water provided under this Article III.E will be physically and legally available for the intended purposes of protecting and enhancing stream flows in the Fraser, Williams Fork, and Colorado Rivers and their tributaries.  Denver Water agrees not to divert any water through the Moffat Project for storage in an enlarged Gross Reservoir until such time that the water committed by Denver Water pursuant to this Article III.E is legally available for use by Grand County.

c.      Responsibility for Infrastructure.  Several provisions of this Article III.E require Denver Water to deliver or make water available for various uses within Grand County.  Except for the funding for water projects pursuant to Article III.E.14, Denver Water will not be responsible for the costs of any new infrastructure required to deliver or make the water available.

2.      $2 million to Address Water Quality  Upon Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project, Denver Water will provide $2 million to pay for measures to address water quality, including but not limited to improvements to the capacity of wastewater treatment plants.  If the Mitigation Plan required in the permitting process for the Moffat Project mandates funds for nutrient removal/water quality, then the direct funding to Grand County under this paragraph would be proportionately reduced.  For example, if the mitigation plan requires the expenditure of $500,000 for nutrient removal/water quality, then the direct funding to Grand County would be reduced to $1.5 million.  The water quality funds will be allocated and administered by a board consisting of one representative from each of the following entities: Grand County Commissioners, Town of Fraser, Grand County Water and Sanitation District No. 1, Winter Park Water and Sanitation District, Tabernash Meadows Water and Sanitation District, Granby Sanitation District, and Winter Park Ranch Water and Sanitation District.

3.      $1 Million for Aquatic Habitat.  Upon Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project, Denver Water will provide $1 million to be used in the Cooperative Effort process described in Article III.E.6  for the purpose of improving aquatic habitat in the Upper Colorado, Fraser and Williams Fork River basins. If the Mitigation Plan required in the permitting process for the Moffat Project mandates funds for this purpose, then the direct funding to Grand County under this paragraph would be proportionately reduced.

4.      Berthoud Pass Sedimentation Pond.   Denver Water has entered into an agreement with CDOT to construct a sediment catch basin above Denver's diversion structure on the Fraser River.  Denver Water has agreed to operate and maintain the project

and has also contributed $50,000 for this effort.  Grand County agrees that Denver Water may seek mitigation credit for sediment removal in the Fraser River from COE for its participation in the sediment project.

5.    Environmental Pool in Gross Enlargement.  Denver Water has entered into an agreement with the Cities of Boulder and Lafayette dated February 24, 2010, to create a 5,000 acre-foot Environmental Pool within the enlargement of Gross Reservoir as part of the Moffat Project.  Denver Water agrees not to store water, directly or by exchange, any of its West Slope water rights listed in Attachments A and E in the Environmental Pool in Gross Reservoir, unless the River District, Middle Park and Grand County have agreed in advance and in writing.

6.    Cooperative Effort for Aquatic Environment.  Denver Water, the River District, Middle Park, and Grand County agree to execute an intergovernmental agreement establishing the Learning by Doing Cooperative Effort ("Cooperative Effort") to protect, restore, and when possible enhance, the aquatic environment in the Upper Colorado, Fraser and Williams Fork River basins.  Denver Water and Grand County will jointly request that the COE acknowledge the Learning by Doing IGA in the Record of Decision for the Moffat Project.

7.    Additional $1 Million for Aquatic Habitat.  Upon Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project, Denver Water will provide $1 million to Grand County, in addition to the funds committed in Article III.E.3, to be used in the Cooperative Effort process for the purpose of improving aquatic habitat.

8.    $2 Million for Future Environmental Enhancements.  Denver Water will place $2 million in an interest bearing account acceptable to the Management Committee established as part of the Cooperative Effort within two years after the Moffat Project becomes operational to address potential future environmental enhancements in Grand County as part of the Cooperative Effort.

9.    Funds for Windy Gap Pumps to Provide Environmental Flows.  Beginning with the year the Moffat Project becomes operational, Denver Water will place $500,000 into an interest bearing fund (WG Pumping Fund) acceptable to and controlled exclusively by Grand County.  Two years after the fund is established, Denver Water will place a second $500,000 into the Fund.  The WG Pumping Fund shall be used by Grand County for the sole purpose of paying up to 50% of the annual costs for using the Windy Gap Pumps to pump water for environmental purposes.  The WG Pumping Fund may increase over time due to interest income and lower-than-expected use of the Fund, and will be capped at $2 million dollars.  Any amount in excess of $2 million at the end of a calendar year will be transferred to the Cooperative Effort established in Article III.E.6 above for environmental improvement projects identified in that process.  Grand County, in its sole discretion, can elect to transfer all or a portion of the WG Pumping Fund to the Cooperative

5/15/2012

Effort if Grand County determines that such a transfer would provide greater environmental value.

10. <u>Annual Bypasses on Fraser River Collection System</u>.  Each calendar year beginning with the year the Moffat Project becomes operational, Denver Water agrees to make available to Grand County 1,000 acre feet of water from its Fraser Collection System ("Fraser 1,000 af") for use for environmental purposes and any incidental recreational benefit.  The Fraser 1,000 af shall be in addition to bypasses of water by Denver Water required under the Amendatory Decision and existing contracts.

   a.    As referenced in Article III.E.1.b, Denver Water will cooperate with Grand County and the other Signatories to implement such legal mechanisms, including the possibility of augmenting instream flows and making deliveries to downstream demands, and to obtain such court decrees and approvals as are necessary to protect the Fraser 1,000 af in the Fraser and Colorado Rivers so that it reaches critical stream segments and is not diverted directly or by exchange by intervening structures within Grand County.

   b.    The Fraser 1,000 af shall be bypassed from Denver Water's existing facilities in coordination with the Cooperative Effort, at times, in locations and in the amounts requested by Grand County for environmental purposes.  As part of the Cooperative Effort and on a case-by-case basis, Denver Water agrees to consider making available more than 1000 acre feet in a calendar year.

   c.    The Fraser 1,000 af shall be measured at appropriate points of measurement for bypasses from the Fraser Collection System and shall be converted to acre feet with the standard factor, i.e.1 cfs for 24 hours = 1.983 af.

   d.    Upon Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project, Denver Water will undertake voluntary pilot projects using the Fraser 1,000 af for environmental purposes.

11. <u>Annual Releases from Williams Fork</u>.  Each calendar year beginning with the year the Moffat Project becomes operational, if a portion of the Fraser 1,000 af is made available during a call on the river or when a Shoshone Outage Protocol is in effect as described in Article VI, Denver Water agrees to make available for release a like amount of water, up to 1,000 acre feet of water per year, from Williams Fork Reservoir ("Williams Fork 1,000 af") to Grand County for environmental purposes and any incidental recreational benefit.  The Williams Fork 1,000 af shall be in addition to releases of water by Denver Water required under pre-existing contracts and other legal obligations.

   a.    As referenced in Article III.E.1.b, Denver Water agrees to cooperate with Grand County and the other Signatories to implement such legal mechanisms, including augmenting instream flows and deliveries to downstream demands, and to obtain such court decrees and approvals as are necessary to protect the

Williams Fork 1,000 af in the Williams Fork and Colorado Rivers so that it reaches critical stream segments and is not diverted directly or by exchange by intervening structures within Grand County.

b.      The Williams Fork 1,000 af releases shall be coordinated with the Cooperative Effort and shall be made available at times and in the amounts requested by Grand County for use in the stream.

c.      The Williams Fork 1,000 af shall be measured at the gage immediately below Williams Fork Reservoir and converted to acre feet with the standard factor, i.e.1 cfs for 24 hours = 1.983 af.

d.      All or part of the Williams Fork 1,000 af, up to 2500 acre-feet, may be carried over in Williams Fork Reservoir by Grand County into subsequent years, subject to space available, payment of pro rata evaporative loss, and so long as the carryover does not count against the Reservoir's fill or otherwise jeopardize Denver Water's decreed water rights.  The Williams Fork 1,000 af and any amount carried over shall be the first to spill from Williams Fork Reservoir.  Denver Water will notify Grand County as soon as it reasonably can that Williams Fork Reservoir is anticipated to spill, so that Grand County can determine whether to request a release prior to the anticipated spill.

e.      In addition to carrying over all or part of the Williams Fork 1,000 af, as described in Article III.E.11.d above, Grand County may also exchange or substitute into the 2,500 acre-feet of carryover capacity in Williams Fork Reservoir, water Grand County has introduced to the river upstream of the confluence of the Colorado and the Williams Fork Rivers.  The additional water stored in the carryover capacity will be subject to all the provisions of Article III.E.11.d.

f.      Upon Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project, Denver Water will undertake voluntary pilot projects using up to 1,000 acre-feet of releases from Williams Fork Reservoir, for environmental purposes.

12.     <u>Limits on Ability to Reduce USFS Bypass Flows</u>.  Denver Water is required by the United States Forest Service or the Bureau of Land Management to bypass the natural inflow at its points of diversion on the Fraser River, Vasquez Creek, St. Louis Creek and Ranch Creek under the stipulations 3(a), 3(b), 3(c), and 3(d) of the Amendatory Decision dated April 22, 1970, Serial No. 027914 (the "Amendatory Decision").  Beginning with the year the Moffat Project becomes operational, Denver Water agrees not to reduce bypasses of water as authorized by stipulations 3(e) and 5 of the Amendatory Decision, except when Denver Water has banned residential lawn watering during the irrigation season.  However, Denver Water will not reduce the bypass flow on a particular stream to an extent that would cause a municipal water provider in Grand County to impose mandatory restrictions on

indoor water use, unless Denver Water is also imposing mandatory restrictions on indoor water use within its Service Area.  Prior to the Moffat Project becoming operational, Denver Water agrees to undertake voluntary pilot projects limiting its ability to reduce bypass flows as described in this paragraph.

13. <u>Ditch Operational Changes</u>.  Denver has acquired several irrigation water rights in Grand County and agrees to make those water rights available to enhance environmental flows.

    a. <u>Big Lake Ditch</u>.  Upon execution of this Agreement, Denver Water will participate in a joint study of how to maintain the historic agricultural uses of the Big Lake Ditch so as to maximize the environmental benefits, while substantially preserving the yield for Denver Water that it has paid for and is counting on by retiring the Big Lake Ditch demand.  If the study finds the balance described in this paragraph, then Denver Water will implement the study beginning with the year the Moffat Project becomes operational.

    b. <u>Rich Ditch and Hammond No. 1 Ditch</u>.  Upon Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project Denver Water and Grand County agree to fund a study to determine how best to enhance stream flows with Denver Water's rights in the Rich Ditch and Hammond No.1 Ditch.  Any enhancements would be in addition to the Fraser 1,000 af and would begin with the year the Moffat Project becomes operational.

14. <u>Financial Contribution to Infrastructure Projects in Grand County</u>.  Denver Water agrees to pay the following amounts to offset the costs of the water supply projects listed in Attachment L.  The funds will be distributed by Grand County.

    a. Denver Water will place $1.95 million in the water supply project fund upon execution of an Article III Implementation Agreement in the form set forth in Attachment M by the recipients of those funds.

    b. Denver Water will place $2 million in the water supply project fund within six months after Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project or Resolution of the Blue River Decree issues, whichever occurs later.

15. <u>Year-Round Deliveries of Clinton Bypass Water</u>.  Upon the signing of an Article III Implementation Agreement by all recipients of Clinton Bypass Water, Denver Water will provide Clinton Bypass Water under the 1992 Clinton Agreement on a year round basis if the Grand County Water Users provide replacement water in accordance with the Replacement Water criterion of 4/3 to 1 in the summer, and if that water is in-hand and usable by Denver Water.  Grand County Water and Sanitation District No. 1, Winter Park Water and Sanitations District, Town of Granby and Town of Fraser have previously dedicated to Denver Water Replacement Water in Wolford Mountain Reservoir at a ratio of 2/3 to 1 for winter use.  If any of

5/15/2012

those entities opts to take their Clinton Bypass Water in the summer, that entity would be credited with the previously dedicated 2/3 acre-foot, and would only owe an additional 2/3 of an acre-foot of Replacement Water for summer releases. Denver Water agrees that the Grand County Operating Plan can be amended to add the Jim Creek diversion as a point of delivery for the Clinton Bypass Water.

16.     Twenty Percent Water.  Denver Water has had a policy whereby any party who purchases water rights for conveyance to the east slope through Denver Water's system will make 20% of that water available to in-basin users in the Fraser River Basin.  Denver Water agrees to make the temporary 20% contracts permanent after the snowmaking return flow recapture plan described in the Grand County Operating Plan is implemented, and provided that snowmaking is within the 6,000 acre-foot limit established by the 1992 Clinton Agreement.

17.     Municipal Use of Denver's Facilities.  On a case-by-case basis, Denver Water may allow water treatment plants on the Fraser River to use Denver Water's Fraser River Collection System to convey water as a temporary source of supply, if a back up supply is available and the necessary infrastructure has been installed.

18.     Use of Unused Capacity.  Denver Water is willing to explore, on a case-by-case basis, the possibilities for using its system to benefit Grand County if Denver Water's yield and operational needs are not impacted and its costs are not materially increased.

19.     Future West Slope Water Rights Development.  In addition to the limitations on Denver Water provided by Article I.C.3, Denver Water further agrees that it will not undertake any future water development projects or appropriations or acquisitions of water rights located in Grand County without the prior approval of the Grand County Commissioners and the River District.

20.     Grand County 375 Acre-Feet of Water.  Upon Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project, Denver Water agrees to make an additional 375 acre feet of water available to Grand County Water Users, to be managed in accordance with the 2012 Grand County Operating Plan with a Replacement Water ratio of 4/3 to 1 summer and 2/3 to 1 winter.

   a.     One hundred acre feet of the 375 acre feet will be allocated to the Winter Park Recreational Association for use in connection with the Winter Park Ski Area and Resort.  Any use of the 100 acre-feet for snowmaking will be governed by the provisions of footnote 1 in Article III.B.14; and snowmaking return flows must be above the Denver Water system.

   b.     The remaining 275 acre feet will be allocated in equal shares of 68.75 acre feet to the Town of Fraser, the Town of Granby, the Grand County Water and Sanitation District No. 1, and the Winter Park Water and Sanitation District.

5/15/2012

21.    <u>Water Supply for Grand County from Vail Ditch Shares</u>.  A group of governmental entities in Grand County has formed the Grand County Mutual Ditch and Reservoir Company (GCMD&RC), which has acquired shares in the Grand County Irrigated Land Company (Vail Ditch shares), and may acquire additional shares in the future. Upon execution of an Article III Implementation Agreement by GCMD&RC, Denver Water agrees to allow GCMD&RC's Vail Ditch shares to be traded for a like amount of water in Denver Water's Fraser Collection System and carried through that system for delivery and use in the headwaters of the Fraser River Basin, without any increase or decrease in yield to Denver Water's system, provided that GCMD&RC pays for any necessary new infrastructure and reimburses Denver Water for any additional operational costs.

Denver Water agrees not to oppose any changes of Vail Ditch shares or such other legal or administrative mechanisms that allow the GCMD&RC to use this water. Denver Water may file statements of opposition to such change applications for the limited purpose of ensuring compliance with the obligations of this agreement. Denver Water will cooperate in seeking Englewood's approval for use of its system to transport Vail Ditch shares.  If GCMD&RC is able to divert the Vail Ditch shares at other locations, Denver Water agrees not to object to such alternative diversions, provided that there is no adverse impact to Denver Water's supply or operations.

22.    <u>Denver Water Lands for Habitat or Access</u>.  Denver Water and Grand County will study which of Denver Water's lands in Grand County may have potential value for wildlife habitat and public fishing access without impacting present and future operational needs.  Within one year of Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project, Denver Water will decide which identified lands should be set aside for these purposes and what mechanism should be used.

23.    <u>Support for CWCB Filing</u>.  If information made available on the locations being considered, the impacts of the Wild and Scenic River issues, and the purpose and amounts of the filing demonstrates the lack of an impact on Denver Water's operations, Denver Water agrees not to oppose CWCB instream flow filings on those segments of the Colorado River below the confluence of the Blue River where currently there are no instream flow rights.

24.    <u>Support for RICD</u>.  If information made available on the locations being considered, the impacts to the Wild and Scenic River issues, and the purpose and amount of the filing demonstrate the lack of an impact on Denver Water's operations, Denver Water agrees not to oppose a Recreational In-Channel Diversion ("RICD") filing for the Colorado River below Gore Canyon in the Pumphouse reach above the Grand/Eagle County line.

**F.    <u>Grand Valley</u>.**

Denver Water shall pay $1.5 million into a fund (the "Grand Valley Fund") to be designated by and controlled by the Grand Valley Signatories to this Agreement (the "Grand Valley Entities"). The following provisions shall apply to the Grand Valley Fund:

1. The Grand Valley Fund and any accruals to the Grand Valley Fund shall be used for water supply, water quality and/or water infrastructure projects in or benefiting the Grand Valley. Subject to such limitation, the projects for which the money in the Grand Valley Fund will be used shall be determined in the sole discretion of the Grand Valley Entities.

2. Denver Water shall pay the $1.5 million into the Grand Valley Fund pursuant to the following schedule:

a. $1 million shall be paid within 2 years after resolution of Blue River Decree issues.

b. $500,000 shall be paid within 2 years after the Effective Date of this Agreement.

G. **Middle Colorado River**.

1. Within two years after the Effective Date of this Agreement , Denver Water shall place $500,000 in an interest-bearing account to offset additional operation and maintenance costs or the costs of upgrading diversion structures of water treatment plants in Garfield County, pursuant to the provisions of Article VI.E.3.

2. Within one year of issuance of an acceptable permit for the Moffat Project, Denver Water agrees to place $1 million in a fund for flow-related projects to protect Wild & Scenic Outstandingly Remarkable Values, and to propose this contribution as an element of the Mitigation Plan described in Article III.E.1.a.

## ARTICLE IV
### Agreements Regarding Denver Water's Water Rights

A.    Blue River Decree.  The West Slope Signatories shall support and cooperate in any legal or administrative proceedings necessary to implement the provisions of this Agreement related to the Blue River Decree.

    1.    Current Water Court Proceedings.  The West Slope Signatories shall not contest and the Signatories that are parties to the case will stipulate to the entry of the proposed decrees included in Attachment N in Case No. 2006CW255 (Roberts Tunnel) making 654 cfs absolute and finding diligence for the remaining conditional amount; and Case No. 2003 CW039 (Dillon Refill) making 141,712 acre-feet absolute in accord with the Amended Application to Make Absolute, filed with the court on February 16, 2006, and finding diligence for the remaining conditional amounts and uses.

    2.    Waiver of Claims Related to Blue River Decree.  The West Slope signatories agree that claim preclusion applies to all claims and objections to Denver Water's operations under the Blue River Decrees raised or which could have reasonably been raised in Case Nos. 06CW255 and 03CW039, or which could have reasonably been raised in previous diligence proceedings for these water rights.  The Signatories agree that the resolution of the current diligence proceeding constitutes an adjudication on the merits of their statements of opposition.

    3.    Claims Not Precluded.  The West Slope signatories may file statements of opposition in future proceedings under the Blue River Decree limited to: 1) Denver Water's compliance with this Agreement, and 2) claims that were not and could not reasonably have been raised in prior proceedings.

B.    East Slope Storage of Blue River Water.  " Imported Blue River Water" means any water transported through the Roberts Tunnel that was diverted under the Blue River Diversion Project direct flow or Dillon Reservoir storage priorities decreed in C.A. Nos. 1805 and 1806 and Civil Nos. 2782, 5016 and 5017, including water diverted under the decrees in Case Nos. 87CW376 and 91CW252 and water exchanged pursuant to paragraph IV.C.1 below.  Denver Water may store any Imported Blue River Water, whether released from Dillon Reservoir or diverted directly through the Roberts Tunnel at any existing or future storage facility on the East Slope; provided that the amount of Imported Blue River Water in storage on the East Slope does not exceed 400,000 acre feet at any point in time. This provision and limitation on the amount of Imported Blue River Water does not apply to the storage of return flows from the use or reuse of Imported Blue River Water either directly or by exchange to any existing or future storage facility.

C.    Denver Water's Exchanges.

    1.    Decreed Exchanges.  The West Slope Signatories agree that Denver Water may operate its exchanges from Williams Fork Reservoir to Dillon Reservoir decreed in the Blue River Decrees, Civil Action No. 657, and C.A. 1430, and Case No. 88CW382; and from Williams Fork Reservoir to Williams Fork Diversion Project (Jones Pass) and to the Fraser River Diversion Project decreed in Civil Action Nos. 657 and 1430).

    2.    Undecreed Exchanges from Dillon Reservoir.  The West Slope Signatories will not object to Denver Water's continued operation of and a decree for exchanges from Dillon Reservoir to Williams Fork Reservoir with an appropriation date of April 25, 1983, and to existing points of diversion for the Fraser River and Williams Fork Diversion Projects with an appropriation date of September 20, 1966, provided that the exchanges are exercised and operated and the decree contains terms and conditions that are at least as protective as the following;

        a.    An application for the exchanges was filed in Case No. 11CW21, the exchanges will be administered with a priority date of 2010, and the priority date or dates of the exchanges will not be antedated pursuant to C.R.S. § 37-92-305(10).  The West Slope Signatories may file a statement of opposition but shall limit their opposition to ensuring that the protective conditions in this paragraph are part of the decree.

        b.    The maximum amount of the exchange to the Williams Fork Reservoir is limited to a rate of 148 cfs (absolute) based on diversions on April 25, 1983 and an annual volume of 6,095 af (absolute) based on diversions in water year 1990.  The maximum amount of the exchange to the existing points of diversion on Fraser River and Williams Fork River Diversion Projects is limited to a rate of 56 cfs (absolute) based on diversions on September 9, 1985 and an annual volume of 8,747 af (absolute) based on diversions in water year 1967.

        c.    The exchanges from Dillon Reservoir to Williams Fork Reservoir or from Dillon Reservoir to the Fraser River and Williams Fork River Diversion Projects shall not be exercised or operated if the Division 5 Engineer advises Denver Water that curtailment of the exchanges is required to satisfy all senior instream flows existing in 2009, and located in the applicable stream reach affected by the diversion, including the following CWCB instream flow decrees:

          1)  Colorado River (80CW448, 80CW446, 80CW447)

          2) Williams Fork River  79CW185, 79CW183, 79CW181, 79CW180, 79CW175, 79CW173, 79CW172, 79CW170, 79CW169, 79CW168, 79CW165)

(a) Bobtail Creek (79CW164, 79CW163)

(b) Steelman Creek (79CW167, 79CW166).

3) Fraser River (90CW308B, 90CW308, 90CW315, 90CW307, 90CW302, 90CW289)

(a) St. Louis Creek (90CW316, 90CW317A, 90CW317, 90CW304)
(b) Vasquez Creek (90CW318)
(c)  Ranch Creek (90CW305, 90CW306A, 90CW306, 90CW314)
(d) Cabin Creek (90CW312)
(e) Hamilton Creek (90CW311)
(f) Meadow Creek (90CW310, 90CW309)

    d.    The provisions in this paragraph IV. C.2. shall apply irrespective of whether any of the CWCB instream flow decrees listed in Article IV.C.2.c above contain provisions that might otherwise protect Denver Water's existing exchanges through these reaches from impairment by CWCB instream flows in the reaches.

D.    <u>1978 Judgment and Decree</u>.  The Signatories agree that operations by which Denver Water diverts under its 1946 Roberts Tunnel direct flow right prior to the completion of the annual fill of Green Mountain Reservoir are consistent with the Blue River Decree, including the Supplemental Judgment and Decree entered in the Consolidated Cases on February 9, 1978, so long as such operations are in accordance with the Green Mountain Reservoir Administrative Protocol (Attachment R-1).  The Signatories will cooperate to obtain such administrative and judicial approvals as are necessary to ensure that the Protocol is made legally binding and enforceable and is implemented.

E.    <u>Substitution Agreements</u>.  The West Slope Signatories agree to support and execute, as appropriate, all future renewals of the Memorandum of Agreement among the U.S. Bureau of Reclamation, Northern Colorado Water Conservancy District, Colorado River Water Conservation District, and Denver Water dated December 30, 1991, regarding substitutions from Wolford Mountain Reservoir (MOA No. 2-AG-60-01550), provided that such renewals are consistent with this Agreement and are reasonably the same in form and substance as the existing MOA, as modified by the July 21, 1992 Agreement Amending Lease Agreement between Colorado River Water Conservation District and City and County of Denver.  The West Slope Signatories reserve the right to object to the addition of new substitution, exchange or replacement sources, or amounts other than those specified in Article III.A.4  not currently decreed for such use by Denver Water

F.  **Straight Creek Project.**  Summit County agrees to extend and not challenge the validity of the 1041 permit for Denver Water's Straight Creek project dated July 17, 1985, so that a new permit will not be required for Denver Water to proceed with the project as permitted in 1985 as described in Attachment O.  Consistent with its 1996 Resource Statement, Denver Water agrees that it will develop the Straight Creek project only with the prior approval of the Summit County Commissioners and the River District.

G.  **Wolford Mountain Reservoir.**

    1.  **Repayment Water.**  With regard to the 1000 acre feet of Repayment Water ("WMR 1KAF") referenced in paragraph 20(b) of the Agreement Amending Lease Agreement between the River District and Denver Water, dated July 12, 1992 ("Wolford Agreement"), the River District and Denver Water agree that the River District shall provide and account for the WMR 1KAF as follows:

        a.  The first 500 acre feet of the WMR 1KAF, along with the 613 acre feet of water available to Denver Water under paragraph 20(c) of the Wolford Agreement,  shall be made available every year and used by Denver Water for substitution purposes.

        b.  The remaining 500 acre-feet of the WMR1KAF shall be stored and used for substitution purposes in the same manner as the water storage attributable to Denver Water's 40% interest in the Wolford Mountain Reservoir water right and storage space (a volume of 24,000 acre-feet), on a pro rata basis (500 acre-feet = 0.83% of 60,000 acre-feet, so water would be stored at a rate of 40.83%).

    2.  **Second Enlargement of Wolford.**  Denver Water agrees to waive any right to participate in the second enlargement of Wolford Mountain Reservoir, in the same or **a** lesser amount as claimed in Case No. 03CW302, Water Division 5. The River District agrees that Denver Water is not obligated to pay any capital or OM&R costs associated with a second enlargement.

    3.  **1041 Permit for Wolford.**  The River District and Denver Water agree to work cooperatively as co-permittees to obtain any amendment to the Grand County 1041 permit for Wolford Mountain Reservoir that may be necessary (1) to address current operations of Wolford Mountain Reservoir under the Wolford Agreement; and (2) to effectuate the applicable provisions of this Agreement.  Upon application for such a permit amendment, Grand County agrees to cooperate to process an amendment as quickly as possible.

    4.  **Replacement Water.**  In addition to water in Wolford Mountain Reservoir that Denver Water is currently entitled to use for substitution and other purposes, this Agreement requires that Replacement Water be available to Denver Water as a condition of several water deliveries under Article III.

The estimated maximum volume of Replacement Water that might be required under this Agreement is 2,590 acre-feet in any single substitution year.  Under the 1992 Clinton Agreement and the 1985 Summit Agreement, West Slope entities have agreed to provide Replacement Water to Denver Water in an amount estimated to be 1,249 acre-feet annually, which could be supplied from Wolford.  The Signatories wish to ensure that Wolford Mountain Reservoir could be used to provide the full 3,839 acre feet of Replacement Water, even though it is anticipated that Replacement Water will be provided to Denver Water from other sources.  The Signatories agree to cooperate to implement acceptable amendments or approvals as might be necessary to ensure that the 1991 MOA between the Bureau of Reclamation, Denver Water, the Colorado River Water Conservation District and the Northern Colorado Water Conservancy District; the decree in Case No. 91CW252; and the 1041 permit for Wolford Mountain Reservoir allow the use of the full 3,839 acre feet of Replacement Water, in addition to the water in Wolford the Denver Water is currently entitled to use for substitution and other purposes**.**

The West Slope Signatories agree that Replacement Water provided by the West Slope to Denver Water from Wolford Mountain Reservoir as Replacement Water under the 1985 Summit Agreement, the 1992 Clinton Agreement and this Agreement is a permissible use of Wolford Mountain Reservoir by Denver Water.

H.    <u>Storage in Gross and Ralston Reservoirs</u>.  The West Slope Signatories shall not contest Denver Water's storage of Williams Fork and Cabin-Meadow Creek water as decreed in Case No. 657, in Gross and Ralston Reservoirs.  The agreement of the West Slope Signatories in this paragraph is premised on circumstances and consideration unique to this Agreement.

I.    <u>Deliveries of Water to the City of Golden</u>. The West Slope Signatories shall not contest whether Denver Water's delivery of water to the City of Golden under the contract dated May 10, 2007, is consistent with Denver's water rights decrees.

J.    <u>Moffat Project Permitting</u>.  With the exception of Grand County (which is a consulting agency in the NEPA process for the Moffat Project), the West Slope Signatories agree that the concerns raised in the comment letters they submitted on the October 2009 Draft EIS for the Moffat Project will be resolved by the combination of (1) the benefits that will accrue to the West Slope pursuant to the terms of this Agreement, plus (2) the environmental mitigation requirements and conditions that will be imposed by the federal and state permitting agencies in the  permits and approvals issued for the Moffat Project.  Accordingly, the West Slope Signatories other than Grand County agree not to oppose the issuance of any local, state and federal approvals for the Moffat Project, including those permits listed in Attachment P.  Nothing in this paragraph IV.J shall affect Grand County's continuing actions as a consulting agency in the NEPA process on the Moffat Project.  Nor shall anything in this paragraph IV.J be deemed a waiver of rights a Signatory may have

upon any breach of this Agreement.

K.      Water Rights in Eagle River Basin.  The West Slope Signatories that are parties to the cases
involving Denver Water's Eagle-Colorado water rights agree to implement the settlement of
Denver Water's Eagle-Colorado diligence case and to facilitate the water court case
changing the location of Denver Water's Piney River water right to State Bridge.  All the
West Slope Signatories agree not to oppose a water court application changing the location
of Denver Water's Piney River water right to State Bridge.

L.      Water Rights in Williams Fork Basin.  The West Slope Signatories shall not contest and
West Slope Signatories that are parties to the cases will stipulate to the entry of the proposed
decrees included as Attachment Q in Case No. 2007CW031 (Jones Pass) making 245 cfs
absolute and finding diligence for the remaining conditional amount; and finding diligence
in Case Nos. 2007CW030 (Carr Ditch) and 2007CW029 (Darling Creek, Williams Fork
Power, Moffat Tunnel.

1.      Waiver of Claims.  The West Slope Signatories agree that claim preclusion applies to
all claims and objections to Denver Water's operations under the decrees listed in
this Article IV.L raised or which could have reasonably been raised in the cases
listed above, or which could have reasonably been raised in previous diligence
proceedings for these water rights.  The signatories agree that the resolution of the
current diligence proceeding constitutes an adjudication on the merits of their
statements of opposition.

2.      Claims Not Precluded.  The West Slope Signatories may file statements of
opposition in future proceedings under the water rights listed above limited to: 1)
Denver Water's compliance with this Agreement, and 2) claims that were not and
could not reasonably have been raised in prior proceedings.


**ARTICLE V**
**Green Mountain Reservoir Administration**

A.      Resolution of Disputes.  The Signatories agree that resolution of long-standing
disputes regarding the proper administration of water rights adjudicated in the Blue
River Decree, including the water rights of Green Mountain Reservoir and the Green
Mountain Powerplant, will provide significant benefits for water users on both the
east and west slopes of Colorado, including maximizing beneficial use of the waters
of the state, reducing litigation costs, and providing clarity as to water rights
administration.  Certain Signatories have negotiated with other entities a protocol to
resolve the long-standing disputes, entitled the Green Mountain Reservoir
Administrative Protocol ("Protocol"), a copy of which is attached to this Agreement
as Attachment R-1.

5/15/2012

The primary purpose of the Protocol is to clarify and implement certain provisions of the Blue River Decree by (1) setting forth a protocol for, among other things: (a) the preparation, review, and modification of a fill schedule for Green Mountain Reservoir; (b) definition and administration of the fill season for the 1935 First Fill Storage Right; (c) administration of water rights during the fill season; and (d) operation of the Green Mountain Reservoir Water Rights and the Cities' water rights in response to downstream calls senior to the Cities' water rights; (2) making as much water as possible available for upstream use, including use by the Cities, without impairment of the fill of Green Mountain Reservoir; (3) providing a clear definition of the Cities' replacement obligation operations, including Denver Water's obligations to the City Contract Beneficiaries as defined in Attachment R-1; (4) ensuring that the administration of water rights does not allow the water rights of the Cities to "hide behind" or otherwise benefit from the Green Mountain Reservoir Water Rights; (5) eliminating or reducing as much as possible, the extent to which the Green Mountain Reservoir 60 cfs bypass is accounted against the fill of the Green Mountain Reservoir Storage Rights; and (6) addressing the relative priority of the Green Mountain Water Rights, the Cities' water rights, and the Climax's C.A. 1710 rights in a manner agreed by the Blue River Decree parties and Climax;  all in a manner that is consistent with the Blue River Decree.

B.     Implementation of Green Mountain Administrative Protocol.  The following Signatories are among the parties to an agreement entitled the Green Mountain Reservoir Administrative Protocol Agreement (the "Protocol Agreement", a copy of which is attached to this Agreement as Attachment R-2:  Denver Water, the River District, Middle Park Water Conservancy District, Grand Valley Water Users Association, Orchard Mesa Irrigation District, Ute Water Conservancy District, Palisade Irrigation District, and Grand Valley Irrigation Company.  The Protocol Agreement provides, among other terms and conditions, that these Signatories (and certain other parties to the Protocol Agreement) approve the Protocol and agree to its implementation.  Nothing in this Agreement shall modify the obligations of the parties to the Protocol Agreement in accordance with the terms and conditions contained therein.

C.     Non-opposition to Green Mountain Administrative Protocol.  The following Signatories are not parties to the Protocol Agreement:  the Boards of County Commissioners of Eagle, Grand, and Summit Counties, Clinton Reservoir Company, Eagle Park Reservoir Company, Eagle River Water and Sanitation District, Upper Eagle Regional Water Authority, Mesa County Irrigation District, City of Glenwood Springs, and City of Rifle.  These Signatories agree not to oppose the implementation of the Protocol in any adjudication or other proceeding deemed necessary by the parties to the Protocol Agreement to make the Protocol legally binding and effective, or to confirm the consistency of the Protocol with the Blue River Decree, so long as the Protocol is substantially consistent with Attachment R-1.  These Signatories may support the Protocol in any proceedings in which they have standing to participate.

## ARTICLE VI
## Shoshone Call

A.    Shoshone Call.

    1.    The Shoshone Power Plant, which is owned and operated by Public Service Company of Colorado, d/b/a/ Xcel Energy ("Xcel"), is located on the mainstem of the Colorado River in Glenwood Canyon.  The Shoshone Power Plant produces hydroelectric energy by means of two water rights, the 1902 Shoshone Senior Right in the amount of 1250 cfs and the 1929 Shoshone Junior Right in the amount of 158 cfs (together, "Shoshone Water Rights").

    2.    When the Shoshone Power Plant is operating, the Shoshone Water Rights command the flow in the river by exercising the Senior Shoshone Call against upstream junior water rights.  When the Senior Shoshone Call is on, upstream reservoirs cannot store water and junior water rights cannot divert unless they provide an equal volume of replacement water to the stream.  Over the years, many water users have come to rely on the river flow regime created by the Senior Shoshone Call ("Shoshone Call Flows").

    3.    Whenever the Shoshone Power Plant is subject to a shutdown for repair, maintenance, or other reasons ("Shoshone Outage"), the Shoshone Call cannot be exercised, and Shoshone Call Flows may not be present in the river.

    4.    The Signatories agree that a Shoshone Outage could adversely affect water users and recreation interests on the Colorado River.  Accordingly, the Signatories agree to implement the operational procedures described in this section during a Shoshone Outage (the "Shoshone Outage Protocol") to mitigate such potential adverse effects.  The Signatories also agree to cooperate to achieve permanent management of the flows of the Colorado River as described in Article VI.C, whether or not the Shoshone Power Plant remains operational.

B.    Shoshone Outage Protocol.

    1.    Outage During Irrigation Season.  If a Shoshone Outage occurs during the period from March 25 through November 10 (Irrigation Season) and results in a flow of the Colorado River at the Dotsero Gauge below 1,250 cfs (not including any water released for endangered fish species purposes), then the River District, Middle Park and Denver Water agree that they will operate their systems as if the Senior Shoshone Call were on the River, resulting in a flow of  not more than 1250 cfs at the Dotsero Gauge (not including any water released for endangered fish species purposes).  The Shoshone Outage Protocol

5/15/2012

will not apply to Shoshone Outages that occur during certain very dry Irrigation Seasons, as described in the following subparagraphs.

a.      The very dry Irrigation Seasons occur when the two conditions for a water shortage, as defined in paragraph 2 of the 2007 Shoshone Agreement, are met.  Denver Water will make projections in March prior to March 25, and again in early May and late June to determine whether a water shortage is occurring.

b.      If a projection made under subparagraph a above in March or May meets the conditions for a water shortage, then the Shoshone Outage Protocol will not apply during the period from that projection to the next projection.  If a projection made in March or May does not meet the conditions for a water shortage, then the Shoshone Outage Protocol will apply during the period from that projection to the next projection; provided, however, that the Shoshone Outage Protocol will not apply during any period when the Shoshone Call is relaxed under the 2007 Shoshone Agreement.

c.       If the projection made in June under subparagraph a above meets the conditions for a water shortage, then the Shoshone Outage Protocol will not apply during the remainder of the Irrigation Season that year.  If the projection made in June does not meet the conditions for a water shortage, then the Shoshone Outage Protocol will apply during the remainder of the Irrigation Season that year.

2.      Green Mountain Reservoir.  The Signatories will cooperate with one another and use their best efforts to negotiate a separate agreement with the U. S. Bureau of Reclamation ("Reclamation") pursuant to which Reclamation would agree that if a Shoshone Outage occurs, it will continue to operate Green Mountain Reservoir as if the Senior Shoshone Call were on the river. Such agreement with Reclamation shall be subject to terms and conditions as to which the Signatories and Reclamation shall agree, including the following

a.      Any water released from storage in Green Mountain Reservoir would be debited to the appropriate account within the reservoir's 100,000 Acre-Foot Pool to which the releases were attributed, e.g., the historic users pool identified in paragraph 2 of Reclamation's January 23, 1984 Operating Policy for Green Mountain Reservoir,

b.      Water that would have been released from the 52,000 Acre-Foot Replacement Pool had the Senior Shoshone Call been on the river shall be debited as discretionary power releases from the 100,000 Acre-Foot

Pool, unless other arrangements are made with Reclamation and the Northern Colorado Water Conservancy District.

c.     Reclamation will not be obligated to make releases from storage pursuant to this provision if water is not available in the 100,000 Acre-Foot Pool or if the total volume of Green Mountain Reservoir storage accounts is less than an amount to be agreed upon by the West Slope Signatories and Reclamation.

3.    <u>Outage During Winter Season</u>.  If a Shoshone Outage occurs during the period from November 11 to March 24 (Winter Season):  (1) as a result of conditions other than scheduled maintenance on the Shoshone power plant facilities, and (2) if flows at the Dotsero Gauge are at or below 900 cfs, the River District and Denver Water agree that they will operate their systems as if the Senior Shoshone Call were on the river, subject to the following:

The Shoshone Outage Protocol will not apply fully to Shoshone Outages that occur during certain very dry Winter Seasons, when the overall storage in Denver Water's system is less than 79% of capacity on November 1.   For purposes of this paragraph, the reservoirs that will be considered in determining overall storage are those reservoirs listed in Exhibit A to the 2007 Shoshone Agreement, but excluding any reservoirs under storage restrictions due to maintenance, repairs or orders from the Colorado State Engineer.

a.     If the storage is less than  79%, but more than 63%, then the Shoshone Outage Protocol will be applied at half the normal effect during that Winter Season. For example, if Denver Water would be required to bypass or replace 60 c.f.s. under the full operation of the Shoshone Outage Protocol, Denver Water would be required to bypass or replace 30 c.f.s. if the Shoshone Outage Protocol is applied at half the normal effect.

b.     If the storage is equal to or less than  63%, but more than 49%, then the Shoshone Outage Protocol will be applied at one-fourth the normal effect during that Winter Season.

c.     If the storage is equal to or less than 49%, then the Shoshone Outage Protocol will not be applied during that Winter Season.

4.    The Signatories will cooperate with one another and use their best efforts to:

a.    Obtain the agreement of other diverters to participate in the Shoshone Outage Protocol.

b.    Obtain the agreement of the State of Colorado water administration officials to shepherd water released from upstream reservoirs or

otherwise bypassed from upstream water rights under the Shoshone
Outage Protocol to the Grand Valley under a donated instream flow, a
municipal recreation delivery contract or other acceptable
arrangement, and to refrain from accounting for releases from storage
under the Shoshone Outage Protocol as storable inflow.

C.    Permanency of Shoshone Call Flows.

1.    It is the goal of the Signatories to achieve permanent management of the flow
of the Colorado River so that the flow mimics the Shoshone Call Flows,
whether or not the Senior Shoshone Call is on the river and whether or not
the Shoshone Power Plant remains operational.

2.    Denver Water and the River District agree to operate their systems on a
permanent basis under the Shoshone Outage Protocol described in Article
VI.B, even if the Shoshone Power Plant ceases operations altogether, and
regardless of whether the plant is acquired under Article VI.D, subject to the
following conditions:

a.    The relaxation provisions described in Article VI.E below remain in
full force and effect.

b.    The Shoshone Outage Protocol would not apply for 17 cumulative
days during the Winter Season, to duplicate the effect of the current
scheduled outages for maintenance.

3.    The Signatories agree to use their best efforts to work with Xcel Energy,
other diverters, Reclamation and the State of Colorado water administration
officials to devise and implement a mechanism or combination of
mechanisms that will permanently preserve the Shoshone Call Flows.  In
addition to the amounts provided in Article VI.E.1.c., Denver Water agrees to
pay one-third of the costs, not to exceed $100,000, incurred by West Slope
Signatories to begin the process of implementing a mechanism to preserve
the Shoshone Call Flows on a permanent basis.  If total costs exceed
$300,000, the Signatories will confer with regard to further actions.

D.    West Slope Acquisition of Shoshone Assets

1.     West Slope water users believe that one means to ensure the permanent
maintenance of the Shoshone Call is the acquisition and operation of the
Shoshone Power Plant and Shoshone Water Rights (the "Shoshone Assets")
by a West Slope governmental entity that is mutually acceptable to the West
Slope Signatories ("West Slope Governmental Entity").

2.    Within twenty-four (24) months after the effective date of this Agreement
("Investigation Period"), any of the West Slope Signatories may agree among

5/15/2012

38

themselves and at their own cost, to undertake and complete an investigation of the viability of purchasing the Shoshone Assets and operating the Shoshone Power Plant (the "Initial Investigation"). The Initial Investigation may include direct negotiations with Xcel; the hiring of consultants necessary to evaluate the Plant's physical and financial condition and the value of the Shoshone Assets; an evaluation of the legal and regulatory requirements that must be met in order to transfer the Shoshone Assets to a West Slope Governmental Entity; an evaluation of the appropriate West Slope Governmental Entity to acquire and operate the Shoshone Assets and the steps necessary to create such an entity, if a new entity is to be created; and any other matters that the West Slope Signatories believe are necessary or desirable. Denver Water shall assist the West Slope Signatories upon request in undertaking and completing the investigations during the Investigation Period. The West Slope Signatories may agree among themselves to extend the Investigation Period.

3.      If the Initial Investigation determines that it is feasible for a West Slope Governmental Entity to acquire and operate the Shoshone Assets and if Xcel is willing to sell or otherwise transfer the Shoshone Assets to a West Slope Governmental Entity, the West Slope Governmental Entity may pursue the transfer of the Shoshone Assets. Denver Water agrees that it will support such acquisition and will take such reasonable actions as may be necessary to assist the West Slope Governmental Entity in completing the acquisition of the Shoshone Assets. Upon notification by any of the West Slope Governmental Entity of its intent to acquire the Shoshone Assets, Denver Water agrees not to assert its right under paragraph 13 of the 2007 Shoshone Agreement regarding the method of disposition of the Shoshone Water Rights.

4.      Denver Water shall not be obligated to pay any of the purchase price for the Shoshone Assets if other mechanisms are reasonably available to preserve the Shoshone Call Flows. If other mechanisms are not reasonably available, and purchase of the Shoshone Assets is determined to be the best viable option to preserve the Shoshone Call Flows, then Denver Water agrees to contribute to the purchase price in a negotiated amount that is proportionate to its share of the overall benefits created by the purchase, and reasonable as compared to the financial contributions to the purchase price by other parties.

5.      If a West Slope Governmental Entity acquires the Shoshone Assets, the Shoshone Call relaxation provisions described in Section VI.E below, shall remain permanently in effect.

E.      Relaxation of Shoshone Call.

1.      Existing Call Relaxation Agreement. Denver Water and Xcel are parties to the 2007 Shoshone Agreement, a copy of which is attached as Attachment S.

5/15/2012

The 2007 Shoshone Agreement currently is set to expire on December 31, 2032. The Signatories agree that the Shoshone Call relaxation provisions of the 2007 Shoshone Agreement shall remain in effect during its term and any renewal thereof.

    a.    Denver Water agrees that, except as provided in Articles V and VI.E.2, it will not seek any relaxation of the Shoshone Call, other than a renewal of the specific provisions of the 2007 Shoshone Agreement beyond the year 2032.

    b.    The West Slope Signatories will not oppose a renewal of the 2007 Shoshone Agreement, provided that the Shoshone Outage Protocol remains in effect.

    c.    If the relaxation of the Shoshone Call is made permanent and Denver Water's yield is increased as a result, Denver Water agrees that 500 acre-feet of the increased yield (Relaxation Water) will be made available as potable water for use as blending water in a project using reusable return flows as described in Article I.B.2.e. The water supply created by the Relaxation Water will be added to the list of permissible fixed-amount contracts listed in Article I.B.1. In return for the availability of the Relaxation Water, the recipients must agree to pay the 2010 System Development Charge (SDC) applicable to potable water served outside the Combined Service Area. Denver Water will transmit the SDCs attributable to the Relaxation Water into a Relaxation Water Fund to be used (a) to contribute to the acquisition of the Shoshone Assets under Article VI.D; or (b) to implement a mechanism or combination of mechanisms that will permanently preserve the Shoshone Call Flows. It is anticipated that advance financing may be needed to accomplish the purposes described in this paragraph. The Signatories agree to consult with each other on an appropriate financing mechanism, should one be needed. It is also anticipated that the SDCs for the Relaxation Water may be paid pursuant to a payment schedule. If the Relaxation Water Fund is not fully expended for the purposes described in this paragraph, the money shall be used to contribute to the costs of a future cooperative project, determined by the River District and Denver Water to be beneficial to both the West Slope and the East Slope.

    2.    <u>Expansion of Call Relaxation Period for Severe Drought Conditions</u>. The 2007 Shoshone Agreement provides that the Shoshone Call may be relaxed during the period from March 14 until May 20, inclusive ("Call Relaxation Period"), under the conditions specified in the 2007 Shoshone Agreement. Denver Water desires to extend the Call Relaxation Period back into the winter months during extreme drought periods. The West Slope Signatories agree to support the amendment of the 2007 Shoshone Agreement to provide

for the relaxation of the Senior Shoshone Call down to 704 cfs (a "one-turbine call") for an expanded period during the winter months ("Expanded Call Relaxation Period"), subject to the following terms and conditions:

a.      An Expanded Call Relaxation Period may occur under either of the following circumstances:

      i.      The Senior Shoshone Call may be relaxed to a one-turbine call beginning on November 11 if Denver Water has banned outdoor residential lawn watering beginning no later than August 1, and the ban has remained in effect continuously from its inception through November 11.

      ii.      The Senior Shoshone Call may also be relaxed to a one-turbine call beginning three (3) days after the date that the Denver Water Board formally adopts a drought declaration requiring that outdoor residential lawn watering be prohibited during the following irrigation season. The call relaxation under this section only applies to the period from November 11 until March 14 of the following year.

b.      Denver Water will pay for power replacement costs as provided for in the 2007 Shoshone Agreement.

c.      Denver Water will provide ten percent (10%) of the net water savings as defined in the 2007 Shoshone Agreement for use by West Slope Signatories. The West Slope Signatories will allocate the 10% as they may determine pursuant to any future agreement among them.

d.      The Expanded Call Relaxation Period will end the earlier of:

      i.      The date Denver Water rescinds its ban on outdoor residential lawn watering; or

      ii.      The date a Cameo Call is placed on the river; or

      iii.      March 14 of the year following implementation of the Extended Call Relaxation Period if implementation occurs on or prior to December 31; or March 14 of the year in which the Expanded Call Relaxation Period was implemented if implementation occurs on or after January 1.

e.      Any relaxation of the Shoshone Call after March 14 of any given year shall occur only as provided in the 2007 Shoshone Agreement.

5/15/2012

3.    Call Relaxation Mitigation.  The $500,000 to be placed in a special fund by Denver Water pursuant to Article III.G of this Agreement shall be managed and utilized as follows:

a.    The proceeds of this fund will be used to help offset the impacts of, or prepare for, a call relaxation pursuant to the 2007 Shoshone Agreement or during the Expanded Call Relaxation Period, or a Shoshone Outage during the Winter Season pursuant to Section VI.B.3, above.

b.    In order for a municipal water provider to access the funds described in this subsection, the provider must either be a signatory to this Agreement or must be located in Garfield County and agree to be bound by the terms and conditions of this Agreement.

c.    The West Slope Signatories at their discretion may utilize funds available to any of them pursuant to Article III of this Agreement or the West Slope Fund to either replace or increase the funding for this special fund as may be necessary or desirable from time to time.

F.    Environmental and Recreational Pilot Project.   The Signatories agree to evaluate a pilot project to determine the feasibility of implementing a partial Shoshone Call relaxation in non-critical winter months and dedicating the saved water to environmental and recreation purposes.

G.    Support for Glenwood Springs RICD.  The City of Glenwood Springs currently has whitewater features located below the confluence of the Colorado River and the Roaring Fork River near Glenwood Springs, Colorado.  Glenwood Springs currently does not have an adjudicated water right for these white water features but anticipates filing for one at some point in the future.  In addition, Glenwood Springs anticipates creating additional white water features on the reach of the Colorado River between the Shoshone Power Plant and South Canyon on the main stem of the Colorado River.  Denver Water will not oppose the filing of a water rights application for a Recreational In-Channel Diversion ("RICD") for the existing and proposed structures by Glenwood Springs; provided that any such application filed for any proposed structure above the confluence of the Roaring Fork and Colorado Rivers does not:  (1)  Claim a flow rate  that exceeds the amount of water needed to satisfy the senior Shoshone Call for 1,250 cfs at the Dotsero gage; (2)  Seek an amount of water in excess of that needed to replicate historic operations  under the Senior Shoshone Call; or (3) Impair Denver's ability to divert under Article VI.

As to structures located below the confluence of the Roaring Fork and Colorado Rivers, Denver and Glenwood Springs recognize that the contributing flows of the two rivers make it difficult to predict the exact effect of a RICD on flows above the confluence.  Glenwood Springs agrees to consult with Denver regarding such application prior to filing.

5/15/2012

**ARTICLE VII**
**Bilateral Commitments**

A.    <u>Water Rights Peace Pact</u>.  With regard to all conditional water rights presently owned by the Signatories to this Agreement, and listed in Attachment T, the Signatories agree to withdraw any statements of opposition in each others' pending diligence filings and not to oppose each other's pending or future diligence applications, including applications to make the listed conditional rights absolute, provided, however, that the parties may file statements of opposition to such applications for the limited purpose of ensuring compliance with the obligations of this agreement.

B.    <u>Water Conservation</u>.  The Signatories to this Agreement will cooperate to develop and promote best management practices for water conservation appropriate for the various types of water use and regional geographic locations within the state.  The Signatories agree to adopt any best management practices developed under this paragraph for their own water uses.

C.    <u>Compact Curtailment Plan</u>.  The Signatories agree to cooperate in good faith toward the development of a plan to avoid a potential curtailment of existing Colorado water rights under the provisions of the 1922 Colorado River Compact and the 1948 Upper Colorado River Compact, and to mitigate the impacts of any unavoidable curtailment.  If joint efforts do not result in agreement on such a plan, each Signatory will take such actions as it may deem necessary to protect its water rights from curtailment.

D.    <u>Freedom to Operate</u>. So long as the Signatories meet all of their obligations under this Agreement, their independent legal obligations and any contemporaneous implementing agreements, the Signatories agree that they do not have an obligation to operate their system or to conduct their decision-making in any particular way.

E.    <u>No Third Party Beneficiaries</u>.  It is expressly understood and agreed that enforcement of the terms and conditions of this Agreement, and all rights of action relating to such enforcement, shall be strictly reserved to the Signatories, and nothing contained in this Agreement shall give or allow any such claim to a right of action by any third person.  It is the expressed intention of the Signatories that any person other than a signatory receiving services or benefits under this Agreement shall be deemed to be an incidental beneficiary only.

F.    <u>No Precedent</u>.  The various commitments and agreements of the Signatories to this agreement are premised on circumstances and considerations unique to this Agreement.  Nothing in this Agreement shall be construed as establishing any legal precedent regarding any matters not expressly addressed in this Agreement.  The Signatories agree that they do not intend this Agreement to have the effect of precedent or preclusion on any factual or legal issues in any matter not expressly addressed in this Agreement.

G.    <u>Risk Sharing</u>.  A fundamental premise of this Agreement is that the Signatories will not actively seek to undermine, or encourage others to undermine, the Signatories' respective interests and resources that have been committed, compromised, dedicated, or otherwise addressed in this Agreement. For purposes of this paragraph, "Adverse Action" means an action of a legislature, court, administrative agency, regulatory body or other governmental

5/15/2012

entity that would cause a material adverse impact to a Signatory's interests or resources that have been committed, compromised or otherwise addressed in this Agreement. In the event that an Adverse Action is proposed or is likely to occur, the Signatory whose interests or resources would suffer a material adverse impact will notify the other Signatories. The Signatories will meet and discuss in good faith the potential detrimental effect of such Adverse Action, with the goal of determining whether any action by one or more Signatories could avoid the Adverse Action or mitigate its impact on the affected Signatory. Each party agrees to evaluate in good faith whether it can implement changes in its operations or undertake other efforts that would achieve this goal, and to implement any such efforts as may be agreed to by the Signatories.

H.  Preservation of Governmental Powers. Except as specifically provided herein, nothing in this Agreement shall be construed as a limitation on or waiver of any review, approval, or permit authority, or a predetermination of any action taken thereunder, by any governmental or quasi-municipal entity including, without limitation, the legislative or quasi-judicial power or authority of Eagle, Grand and Summit Counties and the City and County of Denver, acting by and through its Board of Water Commissioners.

I.  No Property Interest Created. Any rights created by this Agreement are contractual rights. This Agreement does not create and shall not be construed to create or convey any property interest, including any covenant, easement or servitude, in the real property of any Signatory.

J.  Implementation of this Agreement.

1.  In Article IV.A.1, the West Slope Signatories agree not to contest or to stipulate to the entry of the two proposed decrees included in Attachment N, in Case No. 2006CW255 (Roberts Tunnel – N1) and Case No. 2003 CW039 (Dillon Refill – N2), and to support and cooperate in any proceedings necessary to implement the provisions of this Agreement related to the Blue River Decree. The Signatories agree that, upon execution of this Agreement, Denver Water will file an amended application in 2006CW255 (Roberts Tunnel) for approval of the proposed Roberts Tunnel decree in Attachment N1 and publish supplemental notice thereof in the Division 5 Water Court. The Signatories agree that the amended application in Case No. 2006CW255 and the proposed Roberts Tunnel decree in Attachment N1 are among the mechanisms that will be used to implement Article III.A.3. If statements of opposition are filed as a result of the supplemental notice, the Signatories agree to cooperate to resolve any issues raised by such statements and to finalize the proposed Robert Tunnel decree in 2006 CW255.

2.  The Signatories agree that the proposed Roberts Tunnel decree in Attachment N1 will not be presented to the federal court for entry of final judgment until the earlier of the following:

a.  The U. S. Bureau of Reclamation has executed the "separate agreement" described in Article VI.B.2, pursuant to which it agrees "that if a Shoshone

Outage occurs, it will continue to operate Green Mountain Reservoir as if the Senior Shoshone Call were on the river."

b.  The Signatories agree that the goal of Article VI.C.3 has been achieved, such that the Signatories, other water users, and the State of Colorado water administration officials have devised and implemented "a mechanism or combination of mechanisms that will permanently preserve the Shoshone Call Flows." If the agreed-upon mechanism requires a water court application, achievement of the goal for purposes of this paragraph 2.b is defined as the entry of a final decree approving the mechanism by the water court, which is no longer subject to appeals.

3.  Several provisions of this Agreement are contingent upon the Resolution of Blue River Decree Issues, which is defined in Article III.A.2 and the Definitions as the entry of final judgments and decrees no longer subject to appeals in 06CW255 and 03CW039. The Signatories acknowledge that any delay required by Article VII.J.2 above in the entry of a final judgment will cause an equivalent delay in implementing the various provisions of this Agreement that are contingent upon Resolution of Blue River Decree Issues.

4.  The Signatories acknowledge that they are contractually bound upon the Effective Date of this Agreement, regardless of any delay in the entry of a final judgment in Case No. 06CW255 required by Article VII.J.2 above.

5.  The Signatories agree to coordinate and provide reasonable assistance to each other in obtaining any necessary license, permit or approval to carry out this Agreement, including those described in this Article VII.J. The Signatories agree that not every issue and problem can be foreseen and dealt with in advance, and that cooperation will be needed to handle future events that might impair implementation of particular provisions of this Agreement. If such an impairment of a particular provision occurs, the Signatories agree to cooperate in good faith in a reasonable manner to develop alternative means to accomplish as nearly as possible the desired outcome of the provision in question.

K.  <u>Severability or Reform of Invalid Provisions</u>. Wherever possible each provision of this Agreement shall be interpreted and implemented in such manner as to be effective and valid under applicable law. If any provision or portion of this Agreement is determined to be invalid or unenforceable, the remaining provisions shall remain in full force and effect unless the remaining provision's effectiveness is explicitly dependent upon the invalid or unenforceable provision. The Signatories agree to reform this Agreement to replace any such invalid or unenforceable provision with a valid and enforceable provision that comes as close as possible to the intention of the stricken provision. The provisions of this Agreement shall be reasonably and liberally construed to achieve the intent of the Signatories.

L.  <u>Venue</u>. Venue for resolution of any dispute of water matters under this Agreement resulting in litigation shall be the District Court, Colorado, for the appropriate Water Division or federal district court, as appropriate under the Blue River Decree. Venue for all other matters under this Agreement resulting in litigation shall be the Colorado District Court for the county in which any defendant resides.

M.  Conflict Resolution.  The Signatories agree that if a dispute arises between Denver Water and a West Slope Signatory, the affected Signatories will confer in good faith and endeavor to resolve the concern.  If the affected Signatories reach an impasse, they will select a neutral third party mediator who would seek an acceptable voluntary solution to the conflict.  For conflicts that involve a technical or scientific matter, the neutral third party mediator may select an independent technical or scientific expert, acceptable to the Signatories involved in the mediation, to review and make a recommendation on the matter.  If the conflict cannot be resolved through the efforts of the mediator, then the affected Signatories may pursue any available legal or administrative recourse.

N.  Information Sharing.  The Signatories shall maintain records in accordance with their normal procedures with regard to their respective obligations under this Agreement, and shall make such records available to each other upon reasonable request.

5/15/2012

**Article VIII**
**Definitions**

| TERM | DEFINITION |
|---|---|
| 1985 Summit Agreement | Agreement between Summit County Board of Commissioners and Denver Water, dated September 19, 1985 |
| 1992 Clinton Agreement | Clinton Reservoir - Fraser River Water Agreement, dated July 21, 1992 |
| 2007 Shoshone Agreement | Agreement between Denver Water and Public Service Company of Colorado d/b/a Xcel Energy, effective January 1, 2007, concerning reduction of the Shoshone Call |
| Abstention Provisions | a.      Abstain permanently from pursuing or participating in any project that would result in any new depletion from the Colorado River and its tributaries above the confluence with the Gunnison River, including without limitation the Eagle River (with the exception of the Eagle River MOU for Aurora and the Upper Colorado Cooperative Project). Pursuing or participating in a project means seeking formal approval of any aspect of a project in a regulatory or judicial forum, but does not include conducting various planning activities such as feasibility studies.<br><br>b.      Abstain from pursuing or participating in any project that would result in diversions from the Colorado River Basin within Water Divisions Nos. 4 and 6, or downstream from the confluence of the Gunnison and Colorado Rivers in Water Division No. 5 for a period of 25 years.  Pursuing or participating in a project means seeking formal approval of any aspect of a project in a regulatory or judicial forum, but does not include conducting various planning activities such as feasibility studies.  This abstention period would be reduced to 15 years if, within the first 10 years following execution of this agreement, the NEPA permitting process for the Upper Colorado Cooperative Project has not been initiated.  If construction of a cooperative project commences within 20 years from the date of this agreement, then the abstention period under this paragraph would be extended for an additional 10 years (a total of 35 years). |
| Blue River Decree | The stipulations, judgments, decrees and orders entered in Consolidated Civil Nos. 2782, 5016 and 5017, United States District Court, District of Colorado including determinations of diligence and to make absolute. |
| Cameo Call | A request to the state water officials to curtail diversions of junior water rights to satisfy any or all of the water rights legally divertible for irrigation and power purposes at the headgates of the Grand Valley Project's Government Highline Canal near Cameo and the Grand Valley |

5/15/2012

| | |
|---|---|
| | Irrigation Company's Grand Valley Canal near Palisade. The water rights divertible at these headgates are owned and/or operated by Grand Valley Irrigation Company, Grand Valley Water Users Association, Mesa County Irrigation District, Palisade Irrigation District and Orchard Mesa Irrigation District and are listed on Exhibits A and B to the Stipulation and Agreement dated as of September 4, 1996, in the "Orchard Mesa Check Case," Case No. 91CW247. |
| Eagle River MOU | The agreement effective December 1, 1997 among the Cities of Aurora and Colorado Springs, Colorado River Water Conservation District, Cyprus Climax Metals Company, and the Vail Consortium consisting of the Eagle River Water and Sanitation District, Upper Eagle Regional Water Authority and Vail Associates, Inc. |
| Effective Date | The first business day at least seven days after the last Signatory has signed this Agreement. |
| Environmental Enhancement Project | A project that involves aquatic and riparian species habitat protection or enhancement; wetland creation or enhancement for (1) mined land reclamation or (2) other water quality protection; or watershed protection, including, without limitation, fuel reduction, erosion control or revegetation. |
| Fraser Collection System | Denver's Water system of diversions, canals, tunnels and other infrastructure located in the headwaters of the Fraser River Basin in Grand County |
| Grand County Operating Plan | Exhibit B to the 1992 Clinton Agreement |
| Grand County Water Users | Those entities listed in paragraph 4(c) of the Clinton Agreement |
| IRP | Denver Water's Integrated Resource Plan, prepared pursuant to the Denver Water Board's October 15, 1996 water resource statement, published in 1997 and updated in 2002 |
| Issuance and Acceptance by Denver Water of Permits Necessary for the Moffat Project | The permits necessary for the Moffat Project are defined to be the 404 permit by the Corps of Engineers; the license amendment by FERC; the section 4(e) conditions and special use permit by the U. S. Forest Service; the 401 certification from the Colorado Water Quality Control Division; and the Boulder County 1041 permit, if one is required. The Denver Water Board must decide, in its sole discretion, whether to accept the permits within 6 months after the last final agency action regarding the permits on this list. If a permit is appealed during the six-month approval period, the deadline for Denver Water to decide whether to accept the permits will be extended until 30 days after the final resolution of the appeal. |
| Joint Use Project | A water supply project located on the East Slope agreed to by Denver Water and one or more East Slope water suppliers |

| Moffat Project | Denver Water's Moffat Collection System Project, which is the subject of permit application NWO-2002-80762-DEN, filed with the U. S. Army Corps of Engineers |
|---|---|
| Moffat Project becomes operational | The capacity of Gross Reservoir has been enlarged, and water has been diverted and stored in the enlarged portion of Gross Reservoir |
| Resolution of Blue River Decree Issues | The entry of final judgments and decrees in 06CW255, Water Division 5, and in 49-cv-2782, U.S. District Court, and in 03CW039, Water Division 5, that are no longer subject to appeals, in the form of the proposed decrees set forth as Attachment N to this Agreement. |
| Reusable Return Flows | Flows that return to the river system after the initial beneficial use of water, including reusable effluent, which may be reused or successively used, either directly or by exchange. |
| Reuse | Use of return flows or effluent directly or by exchange for the same or a different purpose as the initial use. |
| Senior Shoshone Call | A request to the state water officials to curtail diversions of junior water rights to produce a flow at the Dotsero Gauge of 1250 cfs for power purposes at the Shoshone Power Plant |
| Service Area | Denver Water's 2010 Service Area as depicted in the map in Attachment B. |
| Shoshone Call | A request to the state water officials to curtail diversions of junior water rights to produce a flow at the Dotsero Gauge of 1408 cfs for power purposes at the Shoshone Power Plant. |
| Shoshone Junior Rights | The water rights decreed for and associated with the Shoshone Power Plant (aka the Glenwood Power Canal), adjudicated for 158 cfs on February 7, 1956, with an appropriation date of May 15, 1929. |
| Shoshone Senior Right | The water right decreed for and associated with the Shoshone Power Plant (aka the Glenwood Power canal), adjudicated for 1,250 cfs on December 9, 1907 with and appropriation date of January 7, 1902. |
| Signatories | Denver Water, Colorado River Water Conservation District, Middle Park Water Conservancy District, Boards of County Commissioners of Eagle, Grand, and Summit Counties, Clinton Reservoir Company, Eagle Park Reservoir Company, Eagle River Water and Sanitation District, Upper Eagle Regional Water Authority, Grand Valley Water Users Association, Orchard Mesa Irrigation District, Ute Water Conservancy District, Palisade Irrigation District, Mesa County Irrigation District, Grand Valley Irrigation Company, City of Glenwood Springs, and City of Rifle. |
| Upper Colorado Cooperative Project | A water supply project located on the West Slope, agreed to by Denver Water and the West Slope Signatories to this Agreement, and designed to |

5/15/2012

| | |
|---|---|
| | produce water for use on the East and West Slopes, including at least 20,000 acre-feet of average annual diversions for use on the East Slope. |
| West Slope Charge | A per-acre-foot charge that East Slope recipients of water under Articles I.B.1, I.B.2.e, I.B.3, and I.B.4 agree to pay into the West Slope Fund, to be collected by Denver Water pursuant to a West Slope Charge Agreement, in substantially the form of Attachment D. The payment will be equivalent to the stated percentage of the then-current standard rate for nonpotable or potable water, as applicable, charged by Denver Water to customers outside its Service Area. |
| West Slope Fund | A fund to be established within six months of the Effective Date of this Agreement to serve as the depository of payments of the West Slope Charge.  The West Slope Fund will be managed by the Colorado River Water Conservation District, or other manager acceptable to the parties, and will be used solely for water supply, watershed and water quality projects that benefit the West Slope.  No money from the West Slope Fund may be used for litigation costs. <br><br> a.     One-fifth of the West Slope Charge imposed under Articles I.B.1, I.B.2.e, and I.B.4, or 2.5% of the 12.5% (Forest Restoration Funds) will be dedicated to accomplishing the following activities in the watersheds in which Denver Water's facilities in Grand and Summit counties are located: <br> Forest thinning, prescribed fire, tree planting, riparian vegetation improvements, road decommissioning, road improvements, mine reclamation, and other forest and watershed health treatments that benefit water flows or water quality within and below the watershed; and <br> Aquatic restoration or improvement activities that address sediment loading or other water flow or water quality issues caused directly or indirectly by the pine beetle infestation or other forest health issues. <br><br> b.     The Forest Restoration Funds shall be split equally into two interest-bearing accounts, one for Summit County and one for Grand County, to be managed by the River District.  The River District shall distribute Forest Restoration Funds from the accounts as directed by the counties. <br><br> c.     During the term of the Memorandum of Understanding between Denver Water and the USDA, Forest Service Rocky Mountain Region (USFS) dated July 29, 2010 (MOU), the Forest Restoration Funds shall be used for projects consistent with USFS activities in the Sulphur and Dillon Ranger Districts that are included in the August 19, 2010 5-Year Operating Plan that supports the MOU, as determined by agreement between Denver Water and the Board of |

County Commissioners of each county for projects located in that county. This use of Forest Restoration Funds will be in addition to, and will not reduce the total amount of planned contributions of Denver Water and USFS under the MOU and the Operating Plan. The Forest Restoration Funds may be used on non-USFS lands.

d.    Following termination of the MOU, Forest Restoration Funds from Grand County's account will be added to the resources available for use in the Learning by Doing Cooperative Effort established in Article III.E.6. Decisions on how best to use the funds will follow the decision process outlined in the Learning by Doing IGA. The use of Forest Restoration Funds from Summit County's account will be determined by agreement between Summit County and Denver Water.

01/07/13

Colorado River Cooperative Agreement
Counterpart Signature Page

**CITY AND COUNTY OF DENVER**,
acting by and through its
**BOARD OF WATER COMMISSIONERS**

ATTEST:

Secretary

President

REGISTERED AND COUNTERSIGNED:
Dennis J. Gallagher, Auditor
CITY AND COUNTY OF DENVER

APPROVED AS TO FORM:

By:

General Counsel

**BOARD OF COUNTY COMMISSIONERS,
COUNTY OF SUMMIT**

**BOARD OF COUNTY COMMISSIONERS,
COUNTY OF GRAND**

By:

Chairman

By:

Chairman

ATTEST:

By:

Gary Martinez, Summit County Manager

ATTEST:

By:

Grand County Clerk and Recorder

**CLINTON DITCH & RESERVOIR
COMPANY**

**MIDDLE PARK WATER CONSERVANCY
DISTRICT**

By:

Chairman

By:

President

AND ITS ATTORNEYS

By:

General Counsel

AND ITS ATTORNEYS

By:

Cazier, McGowan & Walker

5/15/2012

Colorado River Cooperative Agreement
Counterpart Signature Page

**BOARD OF COMMISSIONERS OF
EAGLE COUNTY**

By: _____
Chairman Pro Tem

AND ITS ATTORNEYS

By: _____


**EAGLE RIVER WATER AND
SANITATION DISTRICT**

By: _____
Chairman of the Board of Directors

AND ITS ATTORNEYS

By: _____
Glenn E. Porzak
Porzak Browning & Bushong LLP


**UPPER EAGLE REGIONAL WATER
AUTHORITY**

By: _____
Chairman of the Board of Directors

AND ITS ATTORNEYS

By: _____
Glenn E. Porzak
Porzak Browning & Bushong LLP


**EAGLE PARK RESERVOIR
COMPANY**

By: _____
President

AND ITS ATTORNEYS

By: _____
Glenn E. Porzak
General Counsel

Colorado River Cooperative Agreement
Counterpart Signature Page

**COLORADO RIVER WATER
CONSERVATION DISTRICT**

By: _____
President

AND ITS ATTORNEYS

By: _____
General Counsel

**CITY OF GLENWOOD SPRINGS**

By: _____
Mayor

ATTEST:

By: _____
City Clerk

APPROVED AS TO FORM:

By: _____
Karp Neu Hanlon PC

**CITY OF RIFLE**

By: _____
Mayor

ATTEST:

By: _____
City Clerk

APPROVED AS TO FORM:

By: _____
Karp Neu Hanlon PC

Colorado River Cooperative Agreement
Counterpart Signature Page

**GRAND VALLEY IRRIGATION COMPANY**

By: _Robert Maynard 9-19-13_
   President                    Date

AND ITS ATTORNEYS

By: _____
   Frederick G. Aldrich
   Aldrich Law Firm, LLC

**GRAND VALLEY WATER USERS
ASSOCIATION**

By: _D. Kim Albertson 8/28/2013_
   President                    Date

AND ITS ATTORNEYS

By: _Mark A. Hermundstad 9/6/2013_
   Mark A. Hermundstad
   Williams, Turner & Holmes, P.C.

**MESA COUNTY IRRIGATION DISTRICT**

By: _Dave Voorhees 9/9/13_
   President                    Date

AND ITS ATTORNEYS

By: _Nathan A. Keever 9/5/13_
   Nathan A. Keever
   Dufford, Waldeck, Milburn & Krohn, LLP

**PALISADE IRRIGATION DISTRICT**

By: _John Krysman 9/9/13_
   President                    Date

AND ITS ATTORNEYS

By: _Nathan A. Keever 9/5/13_
   Nathan A. Keever
   Dufford, Waldeck, Milburn & Krohn, LLP

**ORCHARD MESA IRRIGATION DISTRICT**

By: _Larry Cutler 8-29-13_
   President                    Date

AND ITS ATTORNEYS

By: _Mark A. Hermundstad 9/6/2013_
   Mark A. Hermundstad
   Williams, Turner & Holmes, P.C.

**UTE WATER CONSERVANCY DISTRICT**

By: _____ 8/30/13_
   President                    Date

AND ITS ATTORNEYS

By: _Mark A. Hermundstad 9/6/2013_
   Mark A. Hermundstad
   Williams, Turner & Holmes, P.C.