EXHIBIT 1
(07-14-2014)
Blue River Decree

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 49-cv-02782-MSK-CBS

Consolidated Civil Case Nos. 2782, 5016 and 5017 and

DISTRICT COURT, WATER DIVISION NO. 5 STATE OF COLORADO
Case No. 2006CW255

───────────────────────────────────────────────────────

**FINDINGS OF FACT, CONCLUSIONS OF LAW, JUDGMENT and DECREE**
───────────────────────────────────────────────────────

CONCERNING THE APPLICATION FOR WATER RIGHTS OF THE CITY AND COUNTY
OF DENVER, ACTING BY AND THROUGH ITS BOARD OF WATER COMMISSIONERS,
IN SUMMIT COUNTY

───────────────────────────────────────────────────────

THIS MATTER comes before the court upon the December 26, 2006 application of the

City and County of Denver, acting by and through its Board of Water Commissioners (the

"Applicant") for finding of reasonable diligence and to make absolute a conditional water right

("Application"). Having reviewed and considered the pleadings, documentary and other

evidence, the stipulation of the Parties, and the Parties' proposed consent decree, the court finds,

determines and declares the following:

## I.    FINDINGS OF FACT

### A.    GENERAL MATTERS

1.    Applicant:

City and County of Denver, acting by and through its Board of Water

Commissioners

1600 W. 12th Avenue

Case Nos. 2782, 5016 and 5017/06CW255 Water Division No. 5
Findings of Fact, Conclusions of Law, Judgment and Decree

Denver, Colorado 80204

303-628-6460

The Applicant is a home rule municipal corporation of the State of Colorado.  The Applicant

derives its authority and power to operate a water supply system under the state constitution, the

Denver City Charter and provisions of state law.  Pursuant to the Denver City Charter, the Applicant

provides all treated and raw water necessary for the full development of land within the City and

County of Denver.  Pursuant to perpetual water service agreements, the Applicant serves as the

water utility for other governmental entities outside the City and County of Denver, but within

Applicant's Service Area depicted in Exhibit A ("Applicant's Service Area" or "Service Area"),

providing all treated and raw water necessary to serve the full development of all land within the

Service Area.  The Applicant also has commitments to provide nearly 68,000 acre-feet of treated

and raw water to customers outside its Service Area under perpetual fixed amount contracts listed in

Exhibit B ("Applicant's Fixed Contractual Commitments").  The entities receiving water under

fixed amount contracts are all located within the Counties of Adams, Arapahoe, Douglas and

Jefferson and the City and County of Broomfield.  From time to time, the Applicant provides treated

and raw water to customers under temporary arrangements.

The Applicant operates an extensive raw water collection system including the South

Platte Collection System, the Roberts Tunnel Collection System[1] and the Moffat Tunnel

Collection System.  On the South Platte, the Applicant typically stores water at Antero, Eleven

---

[1] As decreed in Civil Action Nos. 1805 and 1806, Summit County District Court, the Blue River
Diversion Project includes direct use and storage in Dillon Reservoir.

Mile, Cheesman, and Chatfield reservoirs for delivery or exchange of water to either the Strontia

Springs Diversion Facility or Conduit 20 intakes in Waterton Canyon.  In the future, Applicant

has plans to divert South Platte water and reusable return flows at its downstream storage

facilities currently in place and under development for exchange and use to meet its water supply

obligations; and to provide reusable return flows for use by others outside the Service Area in

accordance with Article I and Article II of an agreement  between Denver and a number of West

Slope entities effective September 26, 2013 (the Colorado River Cooperative Agreement aka

"CRCA").  The Applicant stores and diverts water from the Blue River, Ten Mile Creek and the

Snake River and their tributaries at Dillon Reservoir and delivers this water through the Roberts

Tunnel to the North Fork of the South Platte River above Strontia Springs for immediate use and

storage, including storage by exchange in Antero, Eleven Mile and Cheesman Reservoirs, and

through direct delivery for storage in downstream storage facilities such as Chatfield Reservoir

and the Applicant's downstream storage facilities.  The Applicant also collects water from the

Fraser and Williams Fork Rivers and South Boulder Creek for storage in Gross and Ralston

Reservoirs.  This water is delivered from Ralston Reservoir to the Moffat Treatment Plant for

treatment and distribution or delivered to raw water customers.

Applicant also provides water stored under the Blue River Diversion Project water rights

to users on the West Slope under the agreements described in this paragraph  (collectively, "West

Slope Agreements"), some of which have been incorporated into or are referenced in subsequent

water court decrees.  Under an Agreement between Summit County Board of Commissioners

and the Applicant, dated September 19, 1985, Applicant provides 400 acre feet per year of water

from Dillon Reservoir and allows up to 3,100 acre feet to be exchanged through Dillon

Case Nos. 2782, 5016 and 5017/06CW255 Water Division No. 5
Findings of Fact, Conclusions of Law, Judgment and Decree

Reservoir.  Under the Clinton Reservoir - Fraser River Water Agreement, dated July 21, 1992, as

amended, Applicant provides 351 acre feet per year of Future Dillon water from Dillon

Reservoir; bypasses annually from its Fraser River Diversion Project 920 acre feet of water

converted from 1985 Summit County Agreement water; operates its Blue River Diversion

Project water rights to allow Clinton Reservoir to store up to 3,650 acre feet per year; and

augments by exchange from Williams Fork Reservoir snowmaking diversions up to 6,000 acre

feet.  In the CRCA, Applicant has agreed to provide an additional 1,743 acre feet/year of water

from the Blue River Diversion Project, and its tributaries to users in Summit County; and has

also agreed to operate its Blue River Diversion Project water rights to allow Clinton Reservoir to

store up to 1,301 acre-feet per year of additional water associated with the dead storage pool and

a spillway enlargement.  Under the proposed Green Mountain Reservoir Administration

Protocol, Applicant has also acknowledged that up to 80 acre feet of annual depletions may

occur above Dillon Reservoir by beneficiaries of Senate Document 80 that do not benefit from

the 1985 Summit County agreement or 1992 Clinton Reservoir - Fraser River Water Agreement.

The West Slope Agreements include agreements between the Applicant and individual water

users that implement the foregoing expressly identified agreements.

     2.    Previous Proceedings.  The conditional water rights to the Blue River Diversion

Project and Dillon Reservoir were originally decreed in Civil Action Nos. 1805 and 1806,

Summit County District Court, on March 10, 1952.  After appeal to the Colorado Supreme

Court, Case Nos. 1805 and 1806 were remanded for further proceedings.  In 1955, Case Nos.

1805 and 1806 were removed to the United States District Court for the District of Colorado

where they were consolidated with Case No. 2782, and renumbered Case Nos. 5016 and

5017.  On October 5,1955, the parties to C.A. 2782, 5016 and 5017 entered into a stipulation

which formed the basis for the Final Decree, which was entered by the court on October 12,

1955 (the 1955 Stipulation and Final Decree are referred to jointly herein as the "Blue River

Stipulation and Decree").  Since 1955, the United States District Court has entered various

orders, judgments and decrees including determinations on the Applicant's previous

applications for diligence and to make absolute, which have been adopted and incorporated

into the Blue River Decree.

   3. <u>The Application and Amended Applications</u>.  On December 26, 2006, the

Applicant filed an application for finding of reasonable diligence and to make absolute in Case

No. 2006CW255 and in the Consolidated Cases C.A. Nos. 2782, 5016 and 5017.  On January

26, 2009, the Applicant filed a motion for leave to file an amended application for finding of

reasonable diligence and to make absolute a conditional water right and Applicant's initial

statement of affirmative defenses.  The Applicant's motion to amend was granted on May 5,

2009.  On October 31, 2013, the Applicant filed an unopposed motion for leave to file a second

amended application, with a proposed stipulated decree, and a supplemental resume notice.

That motion was granted on _____, 2013.

   4. <u>Jurisdiction</u>.  The court has subject matter jurisdiction over the Application and

this proceeding, and personal jurisdiction over all persons who would have standing to appear as

parties, regardless of whether they have appeared.  When the Blue River Decree was entered on

October 12, 1955, this court retained jurisdiction to effectuate the objectives of the Blue River

Decree and over matters that could modify or interfere with the terms of the Blue River Decree.

Final Decree, C.A. Nos. 2782, 5016 and 5017 at 17 (Oct. 12, 1955), as amended by

Supplemental Order Dismissing Reserved Question and Amending Decree dated October 29,

1957; *City of Grand Junction v. Denver*, 960 P.2d 675, 682-685 (Colo. 1998).  On August 4,

1977, the court further ordered that it "will act as the Water Judge provided for by the [Water

Right Determination and Administration Act of 1969] for Water Division No. 5 insofar as

proceedings in connection with cases numbered 5016 and 5017 are concerned."  Order

Regarding Further Proceedings Consonant with the Colorado Water Right Determination and

Administration Act of 1969, C.A. Nos. 2782, 5016 and 5017 at ¶1 (D. Colo. August 4, 1977)

("1977 Order").  In addition, the court has jurisdiction in this matter under the court's December

4, 2000 Findings of Fact, Conclusions of Law, Judgment and Decree, which provides that

"[p]ursuant to § 37-92-301(4), 10 C.R.S. (1999), the Applicant shall file an Application for

Finding of Reasonable Diligence on or before the last day of December, 2006 so long as the

Applicant desires to maintain these conditionally decreed water rights, or until a determination

has been made that these conditionally decreed water rights have become absolute water rights

by reason of the completion of the appropriation."  Decree, Case No. 99CW044 at 18 (Dec. 14,

2000).

    5.    Notice.  Notice of the Application was provided in the January, 2007 water

resume, the Summit County Journal on January 26, 2007, the Glenwood Springs Post

Independent on January 30, 2007, and the Grand Junction Daily Sentinel on January 27, 2007.

The application was adequate to provide the inquiry notice required by law, C.R.S. § 37-92-302

(2006).  Supplemental notice of the second amended application was provided in the _____

water resume, the Summit County Journal on _____, the Glenwood Springs Post

Independent on _____, and the Grand Junction Daily Sentinel on

_____.  Timely and adequate notice of the application, the amended application, and the second amended application was given in the manner required by law.

6.      Summary of Consultation.  The Division Engineer for Water Division No. 5 prepared a summary of consultation dated May 10, 2007 regarding the original Application. Applicant served the Summary of Consultation on all parties on June 11, 2007.  On May 9, 2014, the Division Engineer for Water Division No. 5 prepared a report to the second amended application filed on February 17, 2014.  The Summary of Consultation was served on all parties on May 12, 2014.  Paragraph 28 of the decree was added to address the concerns of the Division Engineer.

7.      Not within a Designated Ground Water Basin. The water rights that are the subject of this Decree are not included within the boundaries of a designated groundwater basin.

8.      Opposers.  The following Opposers filed timely statements of opposition: Colorado River Water Conservation District ("River District"); Town of Frisco ("Frisco"); Grand Valley Water Users Association ("GVWUA"); Palisade Irrigation District ("Palisade"); Ute Water Conservancy District ("Ute Water"); Orchard Mesa Irrigation District ("OMID"); Grand Valley Irrigation Company ("GVIC"); Middle Park Water Conservancy District ("Middle Park") and Climax Molybdenum Company ("Climax").  Northern Colorado Water Conservancy District filed a late statement of opposition pursuant to a motion to intervene which was granted on February 22, 2010.  On ___, the United States Bureau of Reclamation and the Colorado State Engineer filed statements of opposition.  The time for filing statements of opposition to the Applicant's application, as amended, has expired.

Case Nos. 2782, 5016 and 5017/06CW255 Water Division No. 5
Findings of Fact, Conclusions of Law, Judgment and Decree

9.     <u>Withdrawals of Statements of Opposition</u>.  The Town of Frisco withdrew its

Statement of Opposition on February 21, 2008.

10.     <u>Stipulations</u>.  The Colorado River Water Conservation District, Grand Valley

Water Users Association, Orchard Mesa Irrigation District, Grand Valley Irrigation Company,

Palisade Irrigation District, Ute Water Conservancy District, and the Middle Park Water

Conservancy District ("West Slope Objectors") have entered into a stipulation with the

Applicant, dated _____ (the "West Slope Stipulation").   The CRCA is the basis upon

which the West Slope Objectors have entered the West Slope Stipulation and provided their

consent to these Findings of Fact, Conclusions of Law, and Judgment and Decree.

## B.     THE BLUE RIVER DIVERSION PROJECT

11.     <u>Description of Underlying Decrees</u>.  The Blue River Diversion Project was

decreed in Case Nos. 1805 and 1806 in the District Court in the County of Summit on March

10, 1952, with a priority date of June 24, 1946.  After appeal to the Colorado Supreme Court,

Case Nos. 1805 and 1806 were remanded for further proceedings.  Thereafter the cases were

removed to this court and given Civil Action Nos. 5016 and 5017 to correspond to Summit

County District Court Nos. 1805 and 1806.  In this court, the cases were consolidated with

already pending Civil Case No. 2782.  On October 12, 1955, the Summit County District Court

Decrees of March 10, 1952, in Case Nos. 1805 and 1806 were incorporated in and confirmed

by Findings of Fact, Conclusions of Law and the Judgment and Decree entered by this court in

the consolidated cases, Civil Action Nos. 2782, 5016 and 5017, insofar as those decrees

described the rights to the use of water adjudicated to Applicant.

12.    Court.  District Court for the County of Summit and the United States District Court in and for the District of Colorado.

13.    Location.  The Blue River Diversion Project stores water in Dillon Reservoir and diverts water from the Blue River, the Snake River, and Ten Mile Creek and their tributaries through the Harold D. Roberts Tunnel, the west portal of which is located at a point whence the East quarter corner of Section 18, Township 5 South, Range 77 West of the 6th P.M. bears South 81°07' East 941.6 feet.

14.    Source.  The sources of water for the Blue River Diversion Project are the Blue River, the Snake River, and Ten Mile Creek, all of which are tributaries of the Colorado River; and the waters naturally tributary thereto.

15.    Appropriation Date:  June 24, 1946.  The Blue River Diversion Project was decreed conditional priorities 139(c) and 366(c) for 788 cubic feet per second from the Blue River; conditional priorities 140(c) and 367(c) for 788 cubic feet per second from the Ten Mile Creek; and conditional priorities 141(c) and 368(c) for 788 cubic feet per second from the Snake River providing no more than 788 cubic feet per second shall be taken through any combination of the above described sources.   In addition, Dillon Reservoir was decreed conditional reservoir priorities 80(c) and 8(c) for 252,678 acre feet.

16.    Physical Works.  This court has previously determined in 1978 that the physical works necessary for diversion and storage pursuant to the water rights referred to above have been completed by the Applicant.  The as-constructed capacity of Dillon Reservoir is 254,036 acre feet of water and the as-constructed capacity of the Blue River Diversion Project (Roberts

Case Nos. 2782, 5016 and 5017/06CW255 Water Division No. 5
Findings of Fact, Conclusions of Law, Judgment and Decree

Tunnel) is in excess of 1000 cubic feet of water per second of time.  Decree and Determination,
Case No. W-741-77 at 2, ¶ 6 (Sept. 15, 1978).

17.     <u>Amounts Made Absolute in Prior Proceedings and Amounts Remaining
Conditional</u>.  This court has previously made absolute amounts of water stored in Dillon
Reservoir and diverted through the Roberts Tunnel and therefore has as a matter of law
determined that such amounts were placed to lawful beneficial use in accordance with the
requirements of the Blue River Decree.

(a)     <u>Dillon Reservoir</u>.  In 1978, the Dillon Reservoir storage right was made
absolute for all beneficial uses authorized in the decrees entered in Case Nos. 1805 and
1806 in the amount of 252,678 acre feet pursuant to this court's September 15, 1978
Decree and Determination.  Decree and Determination, Consolidated Civil Nos. 2782,
5016 and 5017 and Case No. W-741-77, Water Division No. 5 at ¶ 8 (D. Colo. Sept. 15,
1978).

(b)     <u>Roberts (Montezuma) Tunnel</u>.  In 1993, this court ordered and decreed
that 520 cfs of the Roberts Tunnel direct flow right had been made absolute and placed to
beneficial use in the Denver Municipal Water System in the court's March 11, 1993
Findings of Fact, Conclusions of Law, Decree and Order.  Consolidated Civil Nos. 2782,
5016 and 5017 and Case No. 1990CW112, Water Division No. 5.  As of the court's
March 11, 1993 Decree, 268 cfs of the Roberts Tunnel direct flow water right remained
conditional:

|          |            |
|----------|------------|
| 520 cfs  | absolute   |
| 268 cfs  | conditional |
| 788 cfs  | total      |

18.  Use.  All municipal uses including domestic use, mechanical use, manufacturing use, fire protection, street sprinkling, watering of parks, lawns and grounds.  The water rights which are the subject of this Application are those direct flow water rights appropriated for immediate use through the Roberts Tunnel with an appropriation date of June 24, 1946, for a total rate of flow of 788 cfs.  The Roberts Tunnel has been completed so as to be able to carry water to its decreed capacity of 788 cfs, provided that improvements are made to the tunnel's outlet works as described subsequently in this decree.  The water provided by Applicant under the West Slope Agreements, in the volumes described in paragraph 1, is fully consumable water from the Blue River and its tributaries that may be used by West Slope water users on the West Slope pursuant to those Agreements for municipal, domestic, irrigation, industrial, recreation, piscatorial, snowmaking, wastewater treatment, augmentation, and exchange uses, including reuse and successive use to extinction in Summit County; provided that prior to the reuse or successive use of such water, the plan for such reuse and/or successive use shall be incorporated into an approved water court decree or substitute supply plan.

### C.    CLAIM TO MAKE ABSOLUTE

The court finds that on June 23, 2006, the Applicant legally diverted and put to beneficial use 654 cfs of water under the Roberts Tunnel direct flow right, in compliance with the Water Rights Determination and Administration Act of 1969, C.R.S. §§ 37-92-101 – 37-92-602 (the "1969 Act") and the Blue River Stipulation and Decree.

19.  654 cfs Made Absolute.  On June 23, 2006, the Applicant diverted 654 cfs through the Roberts Tunnel and subsequently placed the water to beneficial use to customers within the geographic area depicted in Exhibit A and to fixed amount customers set forth in

Exhibit B.  On June 23, 2006 at approximately 12:30 p.m. a peak discharge of 654 cfs was recorded at the gage located at the East Portal of the Roberts Tunnel.  The water conveyed through the Roberts Tunnel on June 23, less stream carriage losses of 5 percent assessed by the Division Engineer, was delivered to Strontia Springs Reservoir.  From Strontia Springs Reservoir a portion of the water was conveyed to the Foothills Water Treatment Plant where the water underwent treatment for distribution.  The remaining portion of Roberts Tunnel water was delivered to Marston Reservoir where it was temporarily stored and eventually treated at the Applicant's Marston Treatment Plant for distribution to and beneficial use by the Applicant's customers.  The water diverted through the Roberts Tunnel was used in Applicant's Service Area and to supply Applicant's Fixed Contractual Commitments for municipal purposes either directly or by augmentation, exchange and replacement.

20.    Point of Diversion.

(a)    On June 23, 2006, the Applicant diverted the Roberts Tunnel direct flow right through the West Portal of the Roberts Tunnel.  The Applicant accomplished this diversion by means of the West Portal of the Roberts Tunnel.  Although the decree entered by the Summit County District Court in C.A. 1805 and 1806 ("Summit County Decree") lists specific points of direct flow diversion on the Snake, Blue and Ten Mile Rivers, the Summit County Decree also contemplates that Dillon Reservoir would inundate the listed points of diversion and that the West Portal would eventually become the point of diversion for the Dillon Reservoir storage right and the Roberts Tunnel direct flow right.

(b)     The Applicant's original plan and intent in 1927 was to divert the Roberts Tunnel direct flow right by means of the three listed points of diversion on the streams, but only until Dillon Reservoir could be constructed, at which point the Applicant intended to utilize the West Portal as the primary point of diversion for the Blue River Diversion Project.  When the Applicant filed its Statement of Claim for the Blue River Diversion Project in 1942, the Applicant intended to construct the Blue River Diversion Project in two stages.  The first stage involved the construction of a system of feeder ditches and canals that would allow the Applicant to divert its direct flow right into Roberts Tunnel until Dillon Reservoir could be completed.  The second stage involved the construction of Dillon Reservoir, which upon its construction, would inundate the feeder ditches and canals. Statement of Claim, C.A. 1805 and 1806 at ¶4 (County of Summit Nov. 16, 1942). When the Applicant solicited bids for the construction of the Blue River Diversion Project in 1959, the Applicant received a bid that allowed for the construction of Dillon Reservoir in a single stage, eliminating the need to construct the system of feeder ditches and canals.  Thus, when the Applicant built Dillon Reservoir, the West Portal of the Roberts Tunnel became the controlling point of diversion for the Roberts Tunnel direct flow right.

(c).    The three described points of diversion were based upon the Applicant's Exhibit B in C.A. 1805 and 1806 which was offered in support of a 1927 priority.

(d)     The trial court rejected the Applicant's claim for a 1927 priority. Rather the trial court awarded the Applicant a 1946 priority based upon work commenced

in 1946 for Dillon Reservoir and the single point of diversion depicted on a 1942 filing

map offered as Exhibit D and a report dated February 16, 1946 (Denver Exhibit T).

(e)     The 1946 priority confirmed by the Supreme Court contemplated

the Dillon Reservoir configuration and the single point of diversion at the West Portal.

No mandate was issued to conform the decree to the configuration based upon the 1946

priority.

(f)     The Applicant has engaged in a course of conduct whereby it has

diverted its direct right through the West Portal of the Roberts Tunnel under a 1946

priority since the tunnel went into operation on July 17, 1964.

(g)     This court has previously decreed the West Portal of the Roberts

Tunnel as the primary point of diversion for the Roberts Tunnel direct flow right in the

Blue River Decree itself and in the subsequent decrees entering amounts made absolute.

Findings of Fact and Conclusions of Law and Final Decree, Civil Action Nos. 2782,

5016, and 5017 at 43, ¶ 19 (D. Colo. Oct. 12, 1955);  Finding and Order Concerning Due

Diligence of the City and County of Denver, Civil Action Nos. 2782, 5016 and 5017 at 2

(D. Colo. Apr. 6, 1964); Supplemental Finding and Decree of 1966 for the City and

County of Denver, Civil Action Nos. 2782, 5016 and 5017 at 2 (D. Colo. Feb. 6, 1966);

Decree and Determination, Civil Action Nos. 2782, 5016 and 5017 (W-741-77) at 2, ¶4

(D. Colo. Sept. 15, 1978); Findings of Fact, Conclusions of Law, Decree and Order, Civil

Action Nos. 2782, 5016 and 5017 (82CW129 WD5) at ¶ 6(b) (D. Colo. Oct. 3, 1985);

Findings of Fact, Conclusions of Law, Decree and Order, Civil Action Nos. 2782, 5016

and 5017 (86CW132 WD5) at ¶ 6(b) (D. Colo. June 2, 1987); Findings of Fact,

Conclusions of Law, Decree and Order, Civil Action Nos. 2782, 5016 and 5017 (90CW112 WD5) at ¶ 5(b) (D. Colo. Mar. 11, 1993).

(h)    For the above stated reasons, the court finds that the West Portal of the Roberts Tunnel is the primary point of diversion for the Roberts Tunnel direct flow right under the 1946 priority.

21.    <u>Green Mountain Reservoir Not Impaired</u>.    The Applicant complied with Paragraphs 4(a) of the Blue River Stipulation and Decree, Paragraph 4 of the April 16, 1964 Stipulation, and Paragraphs 2, 3 and 4 of the Supplemental Judgment and Decree of February 9, 1978, when the Applicant diverted 654 cfs under the Roberts Tunnel direct flow right on June 23, 2006. Green Mountain Reservoir had already achieved its annual fill prior to the Applicant's diversions under its Roberts Tunnel direct flow right on June 23, 2006. The Applicant's diversions on June 23, 2006 therefore did not impair the ability of Green Mountain Reservoir to fulfill its function as set forth in the Manner of Operation of Project Facilities and Auxiliary Features, contained in Senate Document No. 80, 75th Congress, 1st Session.

22.    <u>Payment for Power Interference</u>.

(a)    Paragraph 4(b) of the Blue River Stipulation and Decree requires that the Applicant deliver electric energy to the United States in substantially the same amounts, at approximately the same hours and at substantially the same rates of delivery that would have been generated by the Green Mountain Power Plant had it not been for the diversions of the waters by the Applicant and under the West Slope Agreements.

(b)    The power loss to Green Mountain Reservoir caused when the Applicant and users under the West Slope Agreements divert water from the Blue River is termed

power interference.  The Applicant currently repays this power interference through two agreements with the Western Area Power Administration ("WAPA"), an agency of the United States Department of Energy.

(c)    Under a September 30, 1987 contract with WAPA, the Applicant purchases firm electric service generated by WAPA (Contract No. 87-LAO-110) in order to offset power interference caused to Green Mountain Reservoir by storage at Dillon Reservoir.  Under this agreement, the Applicant purchases approximately 7 gigawatt hours of energy per year.

(d)    The Applicant also entered into a September 21, 1990 Interchange Agreement with WAPA to bank surplus power with WAPA until the power is required by the Applicant to pay off its interference obligations (89-LAO-512).  The Interchange Agreement allows the Applicant to deposit and withdraw power in order to pay back its power interference.  Excess power can be banked for later use and any deficit in the account can be paid off by the Applicant in cash at WAPA's "average value of seasonal purchases."

(e)    The United States Bureau of Reclamation and the Applicant account for the power interference on a monthly basis.  In order to determine the amount of potential power interference, the Applicant accounts for depletions to the Blue River caused by the Applicant and by deliveries to water users under the West Slope Agreements.  Such depletions to the Blue River are accounted for by calculating the change in storage at Dillon Reservoir, plus amounts of water diverted through the Roberts Tunnel, plus net evaporation, plus depletions made in accordance with the West Slope Agreements that

are not reflected in Dillon Reservoir change in storage. The Applicant and the Bureau currently assume that the power interference amount is the equivalent of 210 kilowatt hours per acre-foot diverted. Thus, for example, assuming Dillon Reservoir diverts 100 acre feet, the Applicant owes interference of 21,000 kilowatt hours (100 acre-feet x 210 kilowatt hours per acre-foot). The computed interference is also distributed into on-peak and off-peak hours. Current interference accounting allocates about 56% of the power interference to on-peak demand hours, and 44% to off-peak hours.

(f)  Since the Blue River Decree was entered, the Applicant has acquired numerous electrical credits through its Agreements with WAPA and other entities, including Public Service Company of Colorado. The Applicant has also supplied electrical power generated by its own hydroelectric facilities. During the most recent diligence period, the Applicant paid for its power interference through the energy credits purchased from WAPA that were banked through the Interchange Agreement.

(g)  The court therefore finds, the Applicant has accounted and paid for all power interference owed to the Bureau of Reclamation under paragraph 4(b) of the Blue River Stipulation and Decree for power interference that occurred during the month of June 2006, when the Applicant diverted 654 cfs.

23.  Place of Use.

All water provided by Applicant on the East Slope from the Blue River Diversion Project is used within the six counties of Denver, Arapahoe, Jefferson, Adams, Broomfield and Douglas. In the CRCA, the Applicant agreed to limit the volumes of water it provides and the geographic area in which recipients of the water are located. Under the West Slope Agreements,

Applicant has also agreed to provide water under the Blue River Diversion Project to water users located in Summit County.

      (a)      Article I of the CRCA defines the areas in which the Applicant may provide water on the East Slope as the Service Area depicted in Exhibit A and the areas served by the entities listed in Exhibit B under fixed amount contracts. Article I.B of the CRCA also provides for the use of water outside of the Service Area under specified contracts or other defined limitations. Water provided by Applicant to customers on the East Slope in accordance with the limitations of Article I and Article II.A of the CRCA is used in the City and County of Denver and areas adjacent to and reasonably integrated with the development of the City and County of Denver, which is defined in the Blue River Decree as the Denver Metropolitan Area. The Blue River Decree does not require that the Applicant own all the pipes or facilities that convey water to individual customers.

      (b)      In order to address some of the impacts of its diversions on the West Slope, the Applicant has also agreed to provide water either directly or from storage under the Blue River Diversion Project to water users in Summit County as described in paragraph 1 pursuant to the West Slope Agreements and any decrees that may incorporate or rely on one or more of the West Slope Agreements.

For these reasons, the court finds that the Applicant placed the water diverted under the Roberts Tunnel direct flow right in June 2006, to beneficial use within the Denver Metropolitan Area as required by Paragraph 4(g) of the Blue River Stipulation. Based on the unique circumstances described above, the Applicant's use of water derived from the Blue River Diversion Project

Case Nos. 2782, 5016 and 5017/06CW255 Water Division No. 5
Findings of Fact, Conclusions of Law, Judgment and Decree

pursuant to the West Slope Agreements to address impacts of its diversion on the West Slope is a lawful beneficial use that is not contrary to the terms of the Blue River Stipulation and Decree.

24.    <u>Type of Use</u>.  The court finds that the Applicant complied with Paragraph 4(g) of the Blue River Stipulation and Decree by placing the water diverted on June 23, 2006 under the Roberts Tunnel direct flow right only to municipal uses.  The 654 cfs diverted by the Applicant through the Roberts Tunnel was put to beneficial use and all uses for which the water was beneficially used constituted municipal uses, including augmentation, exchange and replacement. The water was treated at the Foothills and Marston Water Treatment Plants, and distributed through its system for potable water use by the Applicant's customers within the Service Area and under potable contracts listed in Exhibit B.  The Applicant also supplies nonpotable water for municipal use to customers located within the Service Area pursuant to the nonpotable water contracts listed in Exhibit B.  In addition, water is delivered to the Applicant's customers by augmentation, exchange and replacement and used by them for municipal purposes.  None of the water was delivered for agricultural purposes.  The court finds that uses of the water rights decreed for the Blue River Diversion Project under the West Slope Agreements for fully consumable municipal, domestic, irrigation, industrial, recreation, piscatorial, snowmaking, wastewater treatment, augmentation, and exchange uses, including  reuse and successive use to extinction in Summit County do not violate paragraph 4(g) of the Blue River Stipulation and Decree.

25.    <u>Reuse</u>. The court finds that in diverting the 654 cfs, which the Applicant seeks to make absolute, the Applicant complied with the Paragraph 4(e) and (f) of the Blue River Stipulation and Decree:

Case Nos. 2782, 5016 and 5017/06CW255 Water Division No. 5
Findings of Fact, Conclusions of Law, Judgment and Decree

(a)    The Applicant does not need to show that specific molecules of Colorado River water were reused to meet its obligations to utilize return flows from the Colorado River System by exchange or otherwise under ¶¶ 4(e) and (f) of the Blue River Stipulation and Decree.  The Applicant has shown that it has complied with the terms and conditions in ¶¶ 4 (e) and (f) of the Blue River Stipulation and Decree.

(b)    The Applicant has constructed, and is in the process of constructing, a number of facilities to increase its ability to reuse water from the Colorado River System.  The Applicant is constructing an estimated total of 30,000 acre feet of gravel pit storage to capture additional return flows from the Colorado River System which it is currently unable to utilize.  The Applicant has constructed a water recycling plant which, at build out, will be able to treat 45 million gallons per day of water diverted directly from the effluent returning to the South Platte, for non-potable industrial and landscape irrigation uses within the Denver Metropolitan Area.  In addition, Applicant is in the process of adjudicating an application in Water Division 1 to reuse and exchange lawn irrigation return flows resulting from reusable water applied to lawns and landscaping.  Certain obligations regarding Denver's reuse of water are specified in Articles II(A) and II(C) of the CRCA in furtherance of the implementation of the Blue River Decree.

(c)    During the diligence period and pursuant to paragraph 4(f) of the Blue River Stipulation and Decree, the Applicant submitted to the Secretary of the Interior annual reports showing by month for the respective water years, the quantities of water diverted from the Colorado River System, the extent such water was used directly or placed in storage, the quantities of return flow from municipal uses of such Colorado

20

River water accruing to the South Platte River, and the steps, by legal action or otherwise, taken during the period covered by the report to utilize such return flow by exchange or otherwise.  The Secretary accepted the Applicant's annual reports without any expression of disapproval.

(d)      During the diligence period, the United States did not apply to the court for injunctive or other remedial orders pursuant to paragraph 4(f) of the Blue River Stipulation and Decree, and the court finds the Applicant made reasonable efforts, in view of legal limitations and economic feasibility, in establishing, enforcing, utilizing or operating a plan designed to accomplish reduction of its Blue River water use.

(e)      Further, the Applicant's plan to provide water derived from Colorado River return flows to entities outside the Service Area in accordance with the limitations of Article I and Article II of the CRCA comports with paragraphs 4(e) and (f), and paragraph 4(g) of the Blue River Stipulation and Decree.

26.      <u>Reasonable Number of Gauging Stations</u>.  The Applicant has developed a procedure by which it measures and accounts for its return flows attributable to Colorado River sources.  These measurements are reported annually to the Secretary of the Interior.  The Applicant utilizes a reasonable number of gauging stations for the purposes of measuring (1) the quantities of water actually diverted from the Blue River; and (2) the increased return flow water into the South Platte River and other streams by reason of the diversion of its Colorado River System.  For these reasons, the court finds that the Applicant has complied with paragraph 4(h) of the Blue River Stipulation and Decree.

27.    <u>Roberts Tunnel Seepage</u>.  When diverting water on June 23, 2006 through the Roberts Tunnel, the Applicant accounted for ground water seepage in the Roberts Tunnel. Ground water seepage in the Roberts Tunnel is administered by the State Engineer as 100 percent tributary to the Colorado River.  Accordingly, when the Applicant diverts water under the 1946 priority for the Roberts Tunnel direct flow right, and the right is in priority, the Applicant is diverting the ground water in accordance with the prior appropriation system, as was the case on June 23, 2006.  When the Applicant's Dillon Reservoir storage right or Roberts Tunnel direct flow water right is not in priority, the Applicant accounts for the Roberts Tunnel seepage as water depleting the Colorado River.  Whether in or out of priority, the Applicant pays power interference for all seepage into the Roberts Tunnel pursuant to Paragraph 4(b) of the Blue River Stipulation and Decree and provides that water to Green Mountain Reservoir in substitution years.

**D.**    28.    <u>Summary of amounts claimed and made absolute</u>.  The application and amendments thereto seek to make 654 cfs absolute, which is the total amount diverted on June 23, 2006.  The court has already made 520 cfs absolute (Case No. 90CW112).  Therefore, an additional 134 cfs is being made absolute (654 cfs – 520 cfs = 134 cfs) leaving 134 cfs conditional of the total 788 cfs decreed (788 cfs – 654 cfs = 134 cfs).**CLAIM FOR FINDING OF**

**REASONABLE DILIGENCE**

The court finds that the Applicant has been reasonably diligent in developing the conditional portion of the Roberts Tunnel direct flow right.

29.    <u>Physical Works</u>.  As the court has previously determined, the physical works necessary for diversion of the Roberts Tunnel direct flow rights have been completed and the

facilities necessary to bring about the application of the water appropriated to beneficial use are in a continuous pattern of development and construction. Decree and Determination, Case No. W-741-77 at ¶9 (September 15, 1978). Since 1978, the physical works of the Roberts Tunnel direct flow right have been continuously maintained and the Applicant is currently capable of diverting up to 684 cfs.

30.    Diligence Activities. The Blue River Diversion Project is an integral part of the entire water collection, distribution, treatment and delivery system, designed and constructed to provide water for municipal use within the Denver Metropolitan Area. The activities listed in the amended application are incorporated herein by this reference. The court finds that the activities listed in the amended application are evidence of the Applicant's continued reasonable diligence in developing the conditional portion of the Roberts Tunnel direct flow right. These activities evidence the continuous efforts of development and construction of the facilities necessary to divert, store and use waters from the Blue River, Snake River and Ten Mile Creek including the diversion, storage and use of these waters by water users in Summit County to help mitigate the impacts of its diversions on the West Slope.

31.    Capability. The Applicant is capable of developing the conditional portion of the Roberts Tunnel direct flow right.

(a)    Existing Structure. The Blue River Diversion Project is an existing facility consisting of Dillon Reservoir and the Roberts Tunnel.

(b)    Water Availability. The Applicant presented a water availability analysis showing that water is available in sufficient amounts and frequency so as to allow it to divert the remaining conditional portion of its Roberts Tunnel direct flow right. In most

years during the Applicant's 1988-2007 study period, water is available for diversion in the amount of 788 cfs by the Roberts Tunnel direct flow right. On average there were approximately 13 days per year that an amount equal to or greater than 788 cfs was available to the Roberts Tunnel direct flow water right, with 788 cfs of water available a maximum of 34 days in 2006. Water was available for diversion at the 788 cfs threshold in 17 out of the 20 years during the Applicant's 1988-2007 study period.

(c)    <u>Roberts Tunnel Capacity</u>. The tunnel is concrete lined with a diameter of 10' 3" with a capacity of 1,000 cfs when the water level in Dillon Reservoir is 9017 feet. The outlet works consists of a 90" wye branch off the tunnel. The 90" outlet pipe continues approximately 243 feet to a 66" x 42" x 66" trifurcation. The center of the trifurcation consists of a 42" butterfly valve with a 36" hollow-jet valve to release the water. In 1975, the Applicant installed a 20" cone valve, a 12" Howell-Bunger discharge valve and a 20" Howell-Bunger discharge valve. The calculated discharge through the current outlet works is approximately 684 cfs. On June 23, 2006, 654 cfs was measured discharging from the outlet works. The outlet works are physically capable of accommodating a 78" butterfly valve, 66" piping and a 66" hollow-jet valve in addition to the 42" butterfly valve for a potential calculated discharge capacity of approximately 944 cfs.

(d)    <u>Power Interference</u>. The Applicant currently holds agreements with the Western Area Power Administration ("WAPA"), an agency of the United States Department of Energy, to purchase electrical energy from WAPA to pay power interference to the Bureau of Reclamation. The Applicant's agreement to purchase

electrical energy does not expire until September 30, 2024. The Applicant also has an Interchange Agreement with WAPA to "bank" electrical power to use to repay the Bureau for power interference. This agreement also is set to expire on September 30, 2024. Based on these contractual arrangements, the court finds that the Applicant is capable of meeting its power interference obligations under the Blue River Decree.

(e)    North Fork Capacity. The North Fork of the South Platte River below the outlet works of the Roberts Tunnel is currently capable of carrying 680 cubic feet per second on a sustained basis and 1020 cubic feet per second for short periods of time. The Applicant has established design flows, design criteria for channel improvement, completed construction of improvements, and continued maintenance of the channel which has increased the carrying capacity of the North Fork of the South Platte River to an amount in excess of 788 cubic feet per second, in addition to the natural flow, from the Roberts Tunnel at Grant downstream to its South Platte River intake.

(f)    Capacity of South Platte Facilities. The Applicant's evidence shows that it will have the capacity to directly divert and put to beneficial use up to 967 cfs through the Foothills Tunnel and Conduit 26 for use at the Foothills Water Treatment Plant and through Conduit 20, which diverts water from the South Platte to Marston Reservoir. The Applicant is also able to store Blue River water by exchange in Cheesman Reservoir under its decree entered into C.A. 3635. Roberts Tunnel water can also be stored directly in Strontia Springs Reservoir, Chatfield Reservoir, and the Applicant's South Platte gravel pit reservoirs. In addition, Roberts Tunnel Water can be delivered directly via the South Platte River to holders of temporary and long-term contract users.

(g)　　<u>Financial ability</u>.  The Applicant is the largest municipal water supplier in the state, serving nearly one quarter of the state's population.   The Applicant is authorized to issue municipal bonds and generally issues approximately $50 million in bonds each year.  As of end of the year 2006, its capital assets were valued at $1.6 billion and its total operating revenues were over $200 million.   The Applicant annually maintains a cash reserve of $150-200 million.  Unless some catastrophe occurs in the future, the Applicant has and will continue to have the financial ability to store, divert and use the water under the Blue River Stipulation and Decree.

(h)　　<u>Two Forks</u>.

i.　　　To date, Two Forks Reservoir has not been constructed.  The Applicant can fully utilize its importations from the Blue River with or without Two Forks Reservoir by storing the same water in other east slope facilities or by direct delivery to Conduit 26 Intake, Conduit 20 Intake, Last Chance Ditch Intake and Chatfield Reservoir manifold or pump.

ii.　　　Further, the Applicant currently holds a right of way for Two Forks Reservoir.  The 1989 veto of Two Forks by EPA did not foreclose the Applicant from applying for permits of different size or location.   In June 2003, the Applicant entered into the South Platte Protection Plan as an alternative to the proposed Wild and Scenic designation.  Pursuant to Attachment F of this plan, the Applicant agreed to a 20 year moratorium on permit applications to construct Two Forks to allow it to pursue alternative projects to develop Two Forks water.  The Applicant further agreed to relinquish its right of way when development of the

Right of Way becomes impractical because alternative development of the Two
Forks waters has reduced the economic value of the Right of Way below
meaningful value. To date, alternative projects have not been developed that have
reduced the economic value of the right of way below meaningful value. Further,
the Applicant secured a finding of reasonable diligence on September 2, 2005 in
Case No. 2003CW357 Water Division 1 for the Two Forks Reservoir South Platte
storage right. The court finds, for purposes of this diligence proceeding, that the
Applicant has not abandoned the development of Two Forks Reservoir.

(i)       East Slope Place of Storage.   The Applicant is currently physically able to
store water in Antero, Eleven Mile, Cheesman, Strontia Springs, Chatfield, Platte
Canyon, Marston, Gross, and Ralston Reservoirs and will in the future be able to store
water in the downstream gravel lake complexes, which are under construction or will be
constructed. All of these facilities are part of the Denver Municipal Water System. The
Applicant is or will be capable of placing Blue River water into all of these structures
either directly or by exchange. In accordance with Article IV(B) of the CRCA and the
Blue River Decree and Stipulation, the Applicant may store any imported Blue River
water, whether released from Dillon Reservoir or diverted directly through the Roberts
Tunnel at any existing or future storage facility on the East Slope; provided that the
amount of imported Blue River Water in storage on the East Slope does not exceed
400,000 acre feet at any point in time. This provision and limitation on the amount of
imported Blue River water does not apply to the storage of return flows from the use or

reuse of imported Blue River water either directly or by exchange to any existing or future storage facility.

32.    <u>Need</u>.    Based on the evidence considered by the court in connection with the following factors, the court finds that the Applicant continues to have a non-speculative need for the conditional portion of the Roberts Tunnel direct flow right that is the subject of this Decree.

(a)    <u>The Applicant performs regular water supply planning</u>.    The Applicant's Integrated Resources Plan prepared in 2002 identifies that the Applicant has not developed enough water to serve the projected future growth of Applicant's Service Area, depicted in Exhibit A.  Further in 2006, the Applicant identified various events and developments that make the Applicant's ability to meet projected future water demands and supply even more difficult.  The Applicant reasonably anticipates that it will rely more and more upon this water right to fulfill the future needs of its customers.

(b)    <u>The Applicant has a Reasonable Water Supply Planning Period</u>.    The Applicant's current water supply planning period extends to 2050.  The court finds that this is a reasonable water supply planning period, particularly considering the size of the Applicant's Service Area, both in population and geography, and the extent of the Applicant's contractual commitments outside of its Service Area.

(c)    <u>The Applicant's Substantiated Population/Rate of Growth Projections</u>. The Applicant bases its demand projections on an econometric model that relies on numerous factors, including population growth within the Denver Metropolitan Area as predicted by the Denver Regional Council of Governments ("DRCOG") in 2030, and the U.S. Census Bureau as projected in 2050.  The court finds that Applicant reasonably

Case Nos. 2782, 5016 and 5017/06CW255 Water Division No. 5
Findings of Fact, Conclusions of Law, Judgment and Decree

relied on the rate of population growth used by DRCOG and the U.S. Census Bureau. Population growth factor is one of several factors considered by the Applicant's model. The Applicant relies on a model that interrelates water usage with demographics and various other socio-economic factors. This includes the rate of usage for single-family households in the future, so that total single-family usage can be determined by multiplying that usage rate by the future number of single-family households. The model uses a projected growth rate of 1.0 percent per year for the years 2005 through 2050, and a population of 1.74 million residents in 2050. In addition, the model projects employment in the service area to increase to a total of 1.25 million jobs by 2050, reflecting an average annual job growth rate of just under 0.9 percent from 2005 through 2050. The court finds that the model assumes a water demand projection based on a reasonable rate of population and employment growth.

(d)     Water Required to Meet the Applicant's Reasonably Anticipated Needs. The Applicant demonstrated that the remaining amounts conditionally decreed for the direct flow right in the Roberts Tunnel are reasonably necessary to serve the reasonably anticipated needs of the Applicant for the planning period, above its current water supply.

i.     Implementation of Reasonable Water Conservation Measures During Planning Period. The Applicant has adopted an accelerated conservation plan intended to achieve by 2016 the 29,000 acre-feet of savings targeted in the 1996 IRP for 2045. To achieve these goals, the Applicant has instituted a new customer information system that provides customers with access to monthly consumption information rather than the bi-monthly consumption data historically

provided by the Applicant to its customers. The Applicant offers rebates and incentives to encourage customers to convert to low water use appliances, plumbing fixtures, irrigation systems and more efficient landscapes. The Applicant has developed an increasing block rate structure that encourages conservation through price signals, and allows for more effective demand management during peak summer irrigation use and severe droughts. In addition, the Applicant is engaged in educational outreach to provide customers with information to reduce their consumption through best-practices for irrigation and other water use. During the period 2002-2006, the Applicant spent approximately $16,600,000 on conservation programs. Since 2007, the Applicant has spent over $31,000,000 on these conservation activities. Article II(B) and II(C) of the CRCA describe additional obligations regarding Denver's water conservation efforts. The court finds that these conservation measures are reasonable.

     ii.    <u>Reasonably Expected Land Use Mixes during the Planning Period</u>. The Applicant's demand model considers three types of customers, which could be characterized as land use mixes. These uses include (1) single-family residences; (2) commercial, multi-family and industrial users; (3) and government and institutional users. The court finds that these are reasonable land use mixes to consider for the planning period.

     iii.    <u>Reasonably Attainable Per Capita Usage Projections for Indoor and Outdoor Use Based on the Land Use Mixes During the Planning Period</u>. In year 2000, the Applicant's system-wide metered water use was 220 gallons per

Case Nos. 2782, 5016 and 5017/06CW255 Water Division No. 5
Findings of Fact, Conclusions of Law, Judgment and Decree

capita per day. The Applicant's forecast projects that system-wide metered use will decline to 181 gallons per capita per day by 2050. Along with other economic and demographic factors, this decline reflects the impact of natural replacement of older, less efficient fixtures. Traditionally, 60 percent of the Applicant's use is for indoor purposes and 40 percent is for outdoor purposes. The Applicant's projections represent the exercise of informed judgment.

      iv.    <u>Amount of Consumptive Use Reasonably Necessary to Serve the Increased Population</u>.  The court finds that the Applicant's past and planned future demands account for a reasonable amount of consumptive use to serve its customers.

      (e)    <u>The Applicant's Current Water Supply</u>.  The Applicant's projected future demands are in excess of the water supply currently available from its Municipal Water System. The Applicant generally uses its direct flow water rights first before using its reservoir storage to meet its water supply needs.  During the period of 1998-2003, the Applicant's storage declined to a point where the Applicant's storage reserves were drawn down to less than its annual demand.  The Blue River Diversion Project water rights are a key part in meeting future demand and as the population increases in the future or as hydrologic conditions change, Applicant will increase its draw on Dillon Reservoir storage right and Roberts Tunnel direct flow right to meet its future demands, subject to various regulatory requirements, the CRCA, and other contractual commitments.

(f)    <u>The Applicant's Future Demand Projections</u>.  The Applicant presented an econometric demand model and projections of future water demands for the Applicant's Service Area and Fixed Contractual Commitments.   The model, which projects unconstrained water demand, meaning water demand without emergency water restrictions, forecasts the Applicant's water demands through 2050 by utilizing socioeconomic forecasts, historical data, and U.S. Census data.  Specifically, the model relies on socioeconomic projections made by DRCOG, which projects future population as far as 2030, and then extends the socioeconomic forecasts through 2050 based on national projections from the U.S. Census Bureau and other sources, such as historic relationships between service area growth and national trends.   To determine, the Applicant's 2050 demand, the DRCOG data is extended forward to 2050 using U.S. Census Bureau data and projections.   In order to accurately forecast the Applicant's demand, the model uses separate equations to measure (1) single family water use per household customers; (2) multi-family, commercial and industrial customers; and (3) institutional (governmental) customers.   The data for these three types of customers is based on annual water use data collected by the Applicant and its distributors from 1973 to 1999.   The Applicant's model projects that its 2050 treated water demand at the customers' meters would be 370,000 acre feet, including a five percent calibration adjustment.  To estimate the Applicant's total system-wide demand water requirements a number of adjustments must be made.  First, system losses and unaccounted for water use, which is estimated to average six percent, must be added (22,000 acre feet).  Second, 39,000 acre feet must be subtracted to account for improved efficiency of water using

fixtures. Third, 67,000 acre feet for Applicant's Fixed Contractual Commitments must be added. Fourth, pursuant to the Applicant's policy of maintaining a 30,000 acre foot safety factor, 30,000 acre feet was added. With these adjustments the Applicant's total system-wide demand in 2050 is 450,000 acre feet. Applicant has analyzed these demand forecast results. Such analysis included evaluation of overall usage and demographic metrics of the forecast in comparison to historical statistics. The court concludes that the Applicant has engaged in a thoughtful planning process and has properly taken into account both its own experience and expertise, and analysis by outside experts.

(g)    <u>Safety Factor.</u>  The court finds that the Applicant's current 30,000 acre foot safety factor (30,000 acre feet/year of a four year drought) is a reasonable and prudent amount of water to store in reserve in light of the large number of customers who rely on the Applicant's system and the importance of the Applicant to the economic development of the State.

## II.    CONCLUSIONS OF LAW

Based upon and fully incorporating the Findings of Fact set forth above, this court concludes as a matter of law that:

33.    <u>Application was Timely.</u>  The Application for a Finding of Diligence and to Make Absolute was timely filed with the Water Clerk pursuant to C.R.S. §37-92-301(4) (2006).

34.    <u>Notice.</u>  The Applicant satisfied all requirements for notice under C.R.S. §37-92-302(3) (2006).

35.    <u>Perfection of Water Rights</u>.    The court concludes and determines that the Applicant perfected 654 c.f.s. of the Roberts Tunnel direct flow right by lawfully:  (1) capturing, possessing, and controlling water; and (2) applying the water to a beneficial use.  *City of Lafayette v. New Anderson Ditch Co*., 962 P.2d 955, 961-962 (Colo.1998) (citing *City & County of Denver v. Northern Colo. Water Conservancy Dist.,* 276 P.2d 992, 998-99 (Colo. 1954)).  The Applicant has petitioned the court to declare the right absolute in the amount of 654 c.f.s. for purposes of fixing the appropriator's place in the priority system in relation to all other appropriators in a manner consistent with the 1969 Act.  *New Anderson Ditch Co*., 962 P.2d 962; C.R.S. § 37-92-306.

36.    <u>Points of Diversion</u>.

(a)    Only those diversions at the decreed point of diversion or at decreed alternate points of diversion may be utilized to make absolute a decreed conditional water right.  *Broyles v. Fort Lyon Canal Co*., 638 P.2d 244, 251 (Colo. 1981).

(b)    As it has continuously since inundation in 1964, the Applicant diverted the Roberts Tunnel direct flow right by means of the West Portal, which the court determines is an acceptable point of diversion under the decrees entered in C.A. 1805 and 1806, and in Consolidated Case Nos. 2782, 5016 and 5017.

(c)    The Decrees entered in C.A. 1805 and 1806 found and decreed that the Blue River Diversion Project would divert through a system of intakes, feeder ditches and canals located at three distinct points of diversion on the Snake, Blue, and Ten Mile Rivers.  Judgment and Decree, C.A. 1805/1806 at p.2 ¶6(a)-(c); p. 5 ¶1(a)-(c) (Summit County Mar. 10, 1952).  The Summit County District Court decrees also decreed that the

Applicant would construct Dillon Reservoir, in an area defined under the decrees, which would inundate the three points of diversion.  Judgment and Decree, C.A. 1805/1806 at p. 4 ¶7(a); p. 6 ¶1(d) (Summit County Mar. 10, 1952).   Further, the Summit County District Court decree in C.A. 1806 includes a finding that "[i]n its final form, the [Blue River Diversion] Project will provide the means of diverting water at the points of diversion hereinabove mentioned at the maximum rate of 788 cubic feet per second of time, transmitting the same to the North Fork of the South Platte River through a tunnel approximately twenty-three miles in length known as the Montezuma Tunnel, which has a maximum carrying capacity of 788 cubic feet of water per second of time and the West Portal of which is located at a point whence the East quarter corner of Section 18, Township 5 South, Range 77 West of the 6th Principal Meridian bears South 81° 07' East, 941.6 feet."   Judgment and Decree, CA 1806 at p. 2, ¶4 (Mar. 10, 1952).   As determined in *City and County of Denver v. Northern Colorado Water Conservancy Dist.*, 276 P.2d 992, 1003 (Colo. 1955), the June 24, 1946 priority date for the Blue River Diversion Project was fixed based on the selection of a project involving "a large reservoir at Dillon near the confluence of the Blue with the Ten Mile and the Snake, and with a new single point of diversion in the reservoir which captured waters more than a mile below the former proposed points of diversion."   In addition, this court has historically recognized the West Portal of the Roberts Tunnel as the primary point of diversion for the Roberts Tunnel direct flow right in the Final Decree entered by this court on October 12, 1955 and in subsequent diligence proceedings.  Final Decree and Stipulation, CA 2782, 5016 and 5017 at ¶19 (D. Colo. Oct. 12, 1955); Finding and Order

Concerning Due Diligence of the City and County of Denver at 2 (D. Colo. Apr. 6, 1964); Decree and Determination, CA 2782, 5016 and 5017 (Case No. W-741-77) at 2 ¶ 4 (D. Colo. Sept. 15, 1978).

(d)      Because the Summit County District Court decrees award the Applicant a June 24, 1946 priority date based on the use of a single point of diversion at the Roberts Tunnel, and because this court's decree entered in 1955 and in later diligence matters referred to the Roberts (Montezuma) Tunnel as the point of diversion for the direct flow right, the court concludes that Applicant's diversion under a 1946 priority can legally be made at the point of diversion described as the West Portal of the Roberts Tunnel.  Based on the court's findings in this regard, the court concludes that the West Portal of the Roberts Tunnel was intended to become the primary point of diversion for the Blue River Diversion Project upon the construction of Dillon Reservoir and is therefore the appropriate point of diversion for the Blue River Diversion Project.

(e)      All previous findings of amounts made absolute also affirm the West Portal of the Roberts Tunnel as the point of diversion for the direct flow right.  Under *Taussig v. Moffat Tunnel Water & Development Company*, 106 P.2d 363 (Colo. 1940), the precise location of the point of diversion of a conditional water right is not essential until the water is placed to beneficial use.  When the conditional water right is made absolute then the decree must take on the elements of definiteness and certainty.

(f)      Based on the foregoing, the court concludes and determines that the Applicant diverted the 654 cfs at the decreed point of diversion for the Roberts Tunnel direct flow right.

37.    Place of Use.

(a)    Municipal appropriations are made to serve a growing population.  *City and County of Denver v. Sheriff*, 96 P.2d 836, 841 (Colo.1939) (stating that a specified tract of land does not increase in size, but populations do, and in short periods of time).

(b)    Unlike agricultural water rights, which are appropriated for a fixed area of land, *In re Water Rights of Central Colorado Water Conservancy Dist.*, 147 P.3d 9, 14 (Colo. 2006), municipal water rights must serve a growing population, which can expand and increase in size.  *Sheriff*, 96 P.2d at 841.

(c)    The geographic area where the Applicant serves and provides water, including water diverted on June 23, 2006, is the area within and adjacent to the City and County of Denver, and is within Denver Metropolitan Area, that being the area reasonably integrated with the development of the City and County of Denver (as defined by the Blue River Decree), subject to the limitations of Article I and Article II of the CRCA.

(d)    Because Applicant diverts water from the West Slope to the East Slope it has voluntarily agreed through the West Slope Agreements to supply water for beneficial use by water users in Summit County to help address the impacts of its diversions on the West Slope.  The court therefore finds that the amounts and uses of water deliveries from the Blue River Diversion Project made available voluntarily by the Applicant under the West Slope Agreements effectuate the objectives of the Blue River Decree and Stipulation and, under these unique circumstances, are lawful municipal uses of such water under the Blue River Decree and Stipulation.  The water provided by Applicant

37

under the West Slope Agreements is fully consumable water from the Blue River and its tributaries that may be used by West Slope water users on the West Slope pursuant to those Agreements for municipal, domestic, irrigation, industrial, recreation, piscatorial, snowmaking, wastewater treatment, augmentation, and exchange uses, including reuse and successive use to extinction in Summit County; provided that prior to the reuse or successive use of such water, the plan for such reuse and/or successive use shall be incorporated into an approved water court decree or substitute supply plan.  No additional amount of water from the Blue River Diversion Project under the decrees entered in CA 1805 and 1806 and Consolidated Case Nos. 2782, 5016 and 5017 shall be used for these West Slope purposes.  This decree shall not be considered precedent or persuasive authority with regard to any other water right or any other matter unrelated either to the operation of the Blue River Diversion Project water rights as contemplated under this decree or enforcement of this decree.

(e)    The Applicant's plans to provide water derived from Colorado River return flows to entities located outside the Applicant's Service Area, but within the six counties listed in paragraph 23 of this decree in accordance with Article I and Article II of  the CRCA are lawful and effectuate the objectives of the Blue River Stipulation and Decree.

38.    Diligence.  The measure of reasonable diligence is the steady application of effort to complete the appropriation in a reasonably expedient and efficient manner under all the facts and circumstances.  When a project or integrated system is comprised of several features, work on one feature of the project or system shall be considered in finding that

reasonable diligence has been shown in the development of water rights for all features of the entire project or system. C.R.S. § 37-92-301(4)(b) (2010).

(a)    A water court makes a case-by-case consideration of several factors to determine whether the applicant has made the required effort. *See City of Lafayette v. New Anderson Ditch Co.*, 962 P.2d 955, 961 (Colo.1998) (citing *Dallas Creek v. Huey*, 933 P.2d 27, 36 (Colo.1997)).

(b)    These factors include but are not limited to: (1) economic feasibility; (2) the status of requisite permit applications and other required governmental approvals; (3) expenditures made to develop the appropriation; (4) the ongoing conduct of engineering and environmental studies; (5) the design and construction of facilities; and (6) the nature and extent of land holdings and contracts demonstrating the water demand and beneficial uses which the conditional right is to serve when perfected. *Dallas Creek*, 933 P.2d at 36.

(c)    All acts necessary to complete the appropriation need not be accomplished in the same diligence period. What must be demonstrated is continued intent and progress toward finalizing the conditionally decreed appropriation. The existence of a plan, capability, and need for the water is examined periodically by the water court, at the close of each diligence period, to determine whether the applicant is entitled to retain the antedated priority. Monitoring of use and need for the conditional appropriation is a proper role of the water court in a diligence proceeding. *Dallas Creek*, 933 P.2d at 36.

(d)    Based on the foregoing diligence activities, the court determines that the Applicant has demonstrated reasonable diligence in the development of the conditional portion of the Roberts Tunnel direct flow right.

39.    Economic Conditions and Governmental Permits.    Applicant has obtained all necessary governmental permits to construct facilities necessary to date to divert the Roberts Tunnel direct flow right and put water diverted under the right to beneficial use. Neither current economic conditions beyond the control of the applicant which adversely affect the feasibility of perfecting a conditional water right or the proposed use of water from a conditional water right nor the fact that one or more governmental permits or approvals have not been obtained shall be considered sufficient to deny a diligence application, so long as other facts and circumstances which show diligence are present. C.R.S. § 37-92-301(4)(c).

40.    Can and Will.

(a)    To show reasonable diligence in the development of a conditional right, an applicant must demonstrate that the waters "can and will" be stored and beneficially used and that the project "can and will" be completed with diligence and within a reasonable time.  See C.R.S. § 37-92-305(9)(b).  *Municipal Subdistrict, Northern Colorado Water Conservancy District v. OXY, Inc.* 990 P.2d 701 (Colo. 1999).

(b)    C.R.S.  §37-92-305(9)(b) (2010) provides:  "No claim for a conditional water right may be recognized or a decree therefore granted except to the extent that it is established that the water can be and will be diverted, stored, or otherwise captured,

possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time."

(c)      The Can and Will doctrine requires that a conditional water right applicant show a "substantial probability that within a reasonable time the facilities necessary to affect the appropriation can and will be completed with diligence, and that as a result water will be applied to a beneficial use." *Board of County Comm'rs of County of Arapahoe v. United States*, 891 P.2d 952, 961 (Colo.1995). Proof of such a substantial probability necessarily involves imperfect predictions of future events and conditions. *City of Black Hawk v. City of Central,* 97 P.3d 951 (Colo. 2004).

(d)      The can and will requirement should not be applied rigidly to prevent beneficial uses where an applicant otherwise satisfies the legal standard of establishing a non-speculative intent to appropriate for a beneficial use. *City of Black Hawk v. City of Central,* 97 P.3d 951, 957 (Colo. 2004). Further, the existence of contingencies does not prevent the can and will test from being satisfied. *Id.*; *City of Thornton v. Bijou Irr. Co*., 926 P.2d 1, 43-45 (Colo. 1996).

(e)      The Applicant has demonstrated satisfaction of C.R.S. §37-92-305(9) (2010) based on its showing that water remains available to be developed, physically and legally, under the conditional portion of the Roberts Tunnel direct flow right. The court further determines that the North Fork of the South Platte River is currently capable of conveying the full amount of the Roberts Tunnel direct flow right, and that the Applicant is capable of enlarging facilities necessary to divert the full amount of the Roberts Tunnel direct flow right, including the Roberts Tunnel valves and the Foothills Treatment Plant.

41

In addition, there is no evidence that the Applicant is not capable of continuing to meet its obligations under the Blue River Decree, including payment of power interference.

41.    Anti-Speculation.

(a)    An appropriator must have a legally vested interest in the lands or facilities to be served *"unless such appropriator is a governmental agency* or an agent in fact for the persons proposed to be benefited by such appropriation."  C.R.S. § 37-92-103(3)(a)(I) (2010).

(b)    Because a conditional right may become speculative over time, the anti-speculation doctrine continues to apply in later diligence proceedings.  *Municipal Subdistrict, Northern Colorado Water Conservancy District v. OXY, Inc.* 990 P.2d 701 (Colo. 1999).

(c)    The test for determining need with regard to a municipality was stated in *Pagosa Area Water & Sanitation District v. Trout Unlimited*, 170 P.3d 307, 309-310, 312 (Colo. 2007):  A governmental agency must demonstrate that its intent to make a non-speculative conditional appropriation of unappropriated water is based on (1) a reasonable water supply planning period; (2) that its substantiated population projections are based on a normal rate of growth for that period; and (3) the amount of available unappropriated water is reasonably necessary to serve the reasonably anticipated needs of the governmental agency for the planning period, above its current water supply.

(d)    The Applicant is a governmental entity and has satisfied the anti-speculation test.  The Applicant is a municipal corporation and a political subdivision of the state, under the control of a Board appointed by the Mayor of Denver.  Charter of the

City and County of Denver, Article X.  *Bennett Bear Creek Farm Water and Sanitation District v. Denver Board of Water Commissioners*, 928 P.2d 1254, 1265, 1273 (Colo. 1996).  As such, it is governed by the Denver Charter and other laws applicable to governmental entities.  As dictated by the Denver Charter, all revenues received by the Board are placed in the Water Works Fund.  The Board must "deposit all receipts into a bank account. . . . Monies shall be paid out of the account only upon the authority of the Board."  Denver Charter, § 10.1.7.  Article XX of the Colorado Constitution grants the City and County of Denver home rule power to legislate on local and municipal matters and to operate water works "within or without its territorial limits." *Colo. Const. Art. XX, §§ 1 and 6.*  The Denver Charter grants the Board "all the powers of the City and County of Denver including those granted by the Constitution and by the law of the State of Colorado and by the Charter[.]" *Exhibit 3, Denver Charter, § 10.1.5.*  Specifically, the Charter gives the Applicant "complete charge and control of a water works system and plant for supplying the City and County of Denver and its inhabitants with water for all uses and purposes." *.Id., § 10.1.1.*  The Applicant, when providing contractually based water service, has been determined by the Supreme Court to be "a governmental entity acting pursuant to a legislative grant of authority." *Bennett Bear Creek*, 928 P.2d at 1274 n. 17, citing *Board of County Comm'rs of Arapahoe County v. Denver Board of Water Comm'rs*, 718 P.2d 235, 245 (Colo. 1986).  The court determines that because of the Applicant's status as a governmental entity, it is entitled to the anti-speculation exception afforded to governmental entities.  C.R.S. § 37-92-103(3)(a)(I) (2010).

(e)     The Applicant does not have speculative intent with regard to the Roberts Tunnel direct flow right. Applicant is a governmental agency which will serve persons proposed to be benefited by the Roberts Tunnel direct flow right, and therefore does not need to demonstrate a legally vested interest in the lands or facilities to be served.  C.R.S. § 37-92-103(3)(a)(I) (2010).   Applicant also demonstrated its intent to make a non-speculative conditional appropriation of unappropriated water based on (1) a reasonable water supply planning period; (2) that its substantiated population projections are based on a normal rate of growth for that period; and (3) the amount of available unappropriated water is reasonably necessary to serve the reasonably anticipated needs of the governmental agency for the planning period, above its current water supply.   C.R.S. § 37-92-103(3)(a) (2010). *Pagosa Area Water and Sanitation Dist. v. Trout Unlimited*, 219 P.3d 774, 780 (Colo. 2009); *Pagosa Area Water & Sanitation District v. Trout Unlimited*, 170 P.3d 307, 309-310, 312 (Colo. 2007).   The court determines that the Applicant has a specific plan and intent to divert, store, or otherwise capture, possesses, and control the full amount of 788 cfs under the Roberts Tunnel direct flow right for specific decreed beneficial uses.

### III.   JUDGMENT AND DECREE

42.     The foregoing Findings of Fact and Conclusions of Law are incorporated herein.

43.     The Applicant has been reasonably diligent in the development of the conditional water rights for the Blue River Diversion Project described above for the diligence period December 14, 2000 to December 26, 2006 and the conditionally decreed water right and

priorities are hereby continued in full force and effect and no order or decree is direct or entered for the cancellation of them in whole or in part.

44.    The Applicant lawfully diverted 654 cfs of the Roberts Tunnel direct flow right in compliance with the Judgments and Decrees entered in CA 1805 and 1806 and Consolidated Case Nos. 2782, 5016 and 5017, and under the Water Right and Administration Act of 1969, and put the water to beneficial use by customers in areas in and adjacent to the City and County of Denver and reasonably integrated with the development of the City and County of Denver.  Further, Applicant's voluntary provision of water from the Blue River Diversion Project for use in Summit County under the West Slope Agreements is lawful and effectuates the objectives of the Final Decree and Stipulation in Civil Case Nos. 2782, 5016 and 5017.  The amount remaining conditional under the Roberts Tunnel direct flow right is 134 cfs.

45.    Pursuant to C.R.S. § 37-92-301(4), the Applicant shall file an Application for Finding of Reasonable Diligence on or before the last day of _____ 201_, so long as the Applicant desires to maintain these conditionally decreed water rights, or until a determination has been made that these conditionally decreed water rights have become absolute water rights by reason of the completion of the appropriation.

DATED this ___ day of _____.


**BY THE COURT:**



_____
Marcia S. Krieger
United States District Judge

Case Nos. 2782, 5016 and 5017/06CW255 Water Division No. 5
Findings of Fact, Conclusions of Law, Judgment and Decree